**IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KREF CAPITAL LLC,** | : | |
| | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.** |
| | : | |
| **LAK BOURSE OWNER, LLC, and** | : | |
| **LAK BOURSE MASTER HTC** | : | |
| **LANDLORD, LLC,** | : | |
| | : | |
| **Defendants.** | : | |

**COMPLAINT**

Plaintiff, KREF Capital LLC ("Lender"), for its complaint in mortgage foreclosure against Defendants, LAK Bourse Owner, LLC ("Bourse Fee Borrower"), and LAK Bourse Master HTC Landlord, LLC ("Bourse Leasehold Borrower," and together with Bourse Fee Borrower, "Borrower" or "Bourse Borrower"), avers as follows:

**I.     PARTIES, JURISDICTION AND VENUE**

1.     Lender is a Delaware limited liability company with an address of 30 Hudson Yards, Suite 7500, New York, New York 10001. Lender's membership interests are directly or indirectly wholly owned through intervening limited partnership(s) and/or limited liability company(ies) by KKR Real Estate Finance Trust Inc., a Maryland corporation with its principal place of business in New York, New York.

2.     Bourse Fee Borrower is a Delaware limited liability company with an address c/o Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428. Upon information and belief, Bourse Fee Borrower's membership interests are owned through one or more intervening limited liability companies and/or limited partnerships by Dean Adler, William Glazer, Richard Gottlieb and Marc Rash, who

#4925-2294-4701 v2

are citizens of Pennsylvania, and Carl Kuehner, who is a citizen of Florida, and none of Bourse Fee Borrower's members is a citizen of Maryland or New York.

3.     Bourse Leasehold Borrower is a Delaware limited liability company with an address c/o Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428.  Upon information and belief, Bourse Leasehold Borrower's membership interests are owned through one or more intervening limited liability companies and/or limited partnerships by Dean Adler, William Glazer, Richard Gottlieb and Marc Rash, who are citizens of Pennsylvania, and Carl Kuehner, who is a citizen of Florida, and none of Bourse Leasehold Borrower's members is a citizen of Maryland or New York.

4.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and the action is between citizens of different states.

5.     Venue exists in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because the real property that is the subject of this action is situated in this district.

## II.     FACTS

### A.     The Property

6.     Bourse Fee Borrower and Bourse Leasehold Borrower are the owners of the fee and leasehold interests, respectively, in certain real property located at 111 South Independence Mall East A and 111 South Independence Mall East B, Philadelphia, Pennsylvania 19106, as more fully described as Tract 2 in Exhibit A (Legal Description) to the Mortgage (defined below), together with the Additional Land, Improvements, Appurtenances, Equipment, Fixtures, Personal Property and other property as enumerated and defined in the Mortgage (defined below) (collectively, the "Property" or the "Bourse Property"), which is commonly known as the Bourse Building.

**B.     The Original Loan Transaction**

7.     On or about June 28, 2024, KREF Lending III LLC ("Original Lender") issued a commercial mortgage loan in the principal amount of up to $83,700,000,000.00 (the "Loan") to Bourse Borrower and two co-borrowers, LAK 400 Owner, LLC, and LAK Market Master HTC Landlord, LLC (together, "400 Market Borrower," and collectively with Bourse Borrower, "Original Borrower").

8.     The Loan is evidenced by a Promissory Note from Original Borrower to Original Lender dated June 28, 2024, in the principal amount of up to $83,700,000.00 (the "Note"), a copy of which is attached hereto as *Exhibit A*.

9.     To secure payment of the Debt (as defined) and the performance of its obligations, Original Borrower executed in favor of Original Lender an Open-End Fee and Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated June 26, 2024, but effective as of June 28, 2024 (the "Mortgage"), a copy of which is attached hereto as *Exhibit B*, with respect to the Property and certain other property owned by 400 Market Borrower and located at 400 Market Street in the City of Philadelphia (the "400 Market Street Property").  The Mortgage was electronically recorded with the Philadelphia Commissioner of Records (the "Recorder") on July 9, 2024, as Document No. 54317813.

10.     The Loan is also evidenced by a Loan Agreement between Original Borrower and Original Lender dated as of June 28, 2024 (the "Loan Agreement"), a copy of which is attached hereto as *Exhibit C*.  The Note, the Mortgage and the Loan Agreement, as modified, and various other documents executed by Borrower and/or its guarantors with respect to the Loan are collectively referred to herein as the "Loan Documents."

#4925-2294-4701 v2

**C.      The Release of the 400 Market Street Property and 400 Market Borrower**

11.      Section 2.9 of the Loan Agreement, entitled "Release of 400 Market Street Property," provides for the release of the 400 Market Street Property and 400 Market Borrower from the Loan Documents and the lien of the Mortgage upon the satisfaction of enumerated conditions.  *See* Ex. C (Loan Agreement) § 2.9.

12.      Original Lender acknowledged the satisfaction of the contractually enumerated conditions and released the 400 Market Street Property, 400 Market Borrower and its guarantors from the Loan Documents and the lien of the Mortgage via a Release (400 Market) dated as of March 5, 2025, a copy of which is attached hereto as ***Exhibit D***.

13.      Pursuant to the Release, Original Lender executed a Partial Release of Mortgage made as of March 3, 2025, to be effective as of March 5, 2025 (the "Partial Release"), a copy of which is attached hereto as ***Exhibit E***, which was electronically recorded with the Recorder on March 6, 2025, as Document No. 54399206.

14.      Pursuant to Section 2.9 of the Loan Agreement, it was expressly "understood and agreed that no Release of the 400 Market Street Property shall impair or otherwise adversely affect the Liens, security interests and other rights of Lender under the Loan Documents with respect to the Bourse Property or the Bourse Borrower."  *See* Ex. C (Loan Agreement) § 2.9.

**D.      The Assignment of the Loan to Lender**

15.      Original Lender subsequently assigned the Loan to Lender effective December 19, 2025.

16.      In connection with the assignment, Original Lender delivered the original Note to Lender with an affixed Allonge dated as of December 19, 2025, a copy of which is attached hereto as ***Exhibit F***.

4

17. Also in connection with the assignment, Original Lender executed in favor of Lender an Assignment and Assumption of Interest under Open-End Fee and Leasehold Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing dated as of December 18, 2025, but effective as of December 19, 2025, a copy of which is attached hereto as ***Exhibit G***, which was electronically recorded with the Recorder on December 24, 2025, as Document No. 54503787.

Additionally, Original Lender executed in favor of Lender an Omnibus Assignment dated December 19, 2025, a copy of which is attached hereto as ***Exhibit H***, by which Original Lender, as Assignor, assigned to Lender, *inter alia*, "all of Assignor's right, title and interest in, to and under the Loan Documents, and all of Assignor's right, title and interest, if any, in, to and under all other documents executed and/or delivered in connection with the loan evidenced and/or secured by the Loan Documents."

### E.   Borrower's Defaults

#### i.   The Milestone Non-Compliance and Cessation of Construction Defaults

18. Section 2.8 of the Loan Agreement, entitled "Hotel Conversion," provides in part that "Borrower intends to redevelop a portion of the Bourse Property into a hotel, as provided in the Hotel Conversion Scope of Work." *See* Ex. C (Loan Agreement) § 2.8.

19. The Loan Agreement provides for certain "Hotel Conversion Major Milestones," including but not limited to:

> (iii) receipt of a temporary certificate of occupancy with respect to the portion of the Improvements subject to the Hotel Conversion by April 30, 2026, subject to extension by up to 60 days in the aggregate so long as Bourse Borrower is diligently pursuing completion of such milestone; and (iv) Hotel Conversion Substantial Completion by May 31, 2026, subject to extension by up to 60 days in the aggregate so long as Bourse Borrower is diligently pursuing completion of such milestone.

*See* Ex. C (Loan Agreement) at p. 20 (defining "Hotel Conversion Major Milestones").

#4925-2294-4701 v2

20. The Loan Agreement defines "Milestone Non-Compliance" to "mean that any Hotel Conversion Major Milestone has not been timely satisfied as provided in the definition of 'Hotel Conversion Major Milestones.'" *See* Ex. C (Loan Agreement) at p. 30 (defining "Milestone Non-Compliance").

21. The Loan Agreement provides that "the occurrence of Milestone Non-Compliance" constitutes an Event of Default. *See* Ex. C (Loan Agreement) § 10.1(a)(xxiv).

22. The Loan Agreement further provides that it shall constitute an Event of Default "if, following Hotel Conversion Commencement, there is any cessation at any time in construction of the Hotel Conversion for more than fifteen (15) consecutive Business Days after notice thereof and a failure to resume construction after such period, other than as a result of Force Majeure." *See* Ex. C (Loan Agreement) § 10.1(a)(xxvii).

23. Upon information and belief, by no later than the first quarter of 2026, Borrower abandoned its plans to redevelop a portion of the Bourse Property into a hotel and ceased work on the Hotel Conversion.

24. By correspondence dated April 12, 2026 (the "Reservation of Rights Letter"), a copy of which is attached hereto as ***Exhibit I***, Lender notified Borrower that:

> Lender is informed that the hotel conversion construction work at the Property has ceased and that the hotel conversion portion of the project may no longer be moving forward as originally planned (see the article attached hereto as Schedule 2). Lender hereby reserves all of its rights under the Loan Documents with respect to Borrower's . . . apparent failure and/or expected failure to satisfy the Hotel Conversion Major Milestones and with respect to any cessation of construction work.

*See* Ex. I (Reservation of Rights Letter) at p. 2.

25. Borrower failed to receive a temporary certificate of occupancy with respect to the portion of the Improvements subject to the Hotel Conversion by April 30, 2026, and was not diligently pursuing completion of such milestone by that time, which constitutes Milestone Non-

#4925-2294-4701 v2

Compliance and an Event of Default under the Loan Documents (the "<u>Milestone Non-Compliance Default</u>").  *See* Ex. C (Loan Agreement) § 10.1(a)(xxiv).

26.     Borrower also ceased construction of the Hotel Conversion, which persisted for more than 15 consecutive Business Days after notice via the Reservation of Rights Letter and constitutes an Event of Default under the Loan Documents (the "<u>Cessation of Construction Default</u>").  *See* Ex. C (Loan Agreement) § 10.1(a)(xxvii).

### ii.     The Unsecured Trade Payables Covenant Default

27.     Section 4.2 of the Loan Agreement comprises an itemized list of "Borrower Negative Covenants," including the covenant in Section 4.2.6 (Indebtedness) that:

> Borrower shall not directly or indirectly create, incur or assume any Indebtedness other than . . . (f) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, and (g) Permitted Equipment Financing, which in the case of such unsecured trade payables set forth in the preceding clause (f) (i) are not evidenced by a note, (ii) do not, together with Permitted Equipment Financing, evidence underlying obligations that exceed, at any time, a maximum aggregate amount of three percent (3.0%) of the Outstanding Principal Balance and (iii) are paid within ninety (90) days of the date invoiced (collectively, "**Permitted Indebtedness**").

*See* Ex. C (Loan Agreement) § 4.2.6.

28.     Section 10.1 of the Loan Agreement provides that it shall constitute an Event of Default "if Borrower breaches any . . . covenant in," among other sections, Section 4.2.6. *See* Ex. C (Loan Agreement) § 10.01(a)(xi).

29.     Contrary to its covenant in Section 4.2.6(f), Borrower incurred and allowed substantial unsecured trade payables relating to the Property to remain unpaid for more than 90 days after the date invoiced.

30.     Lender notified Borrower via the Reservation of Rights Letter that:

> It has come to Lender's attention that significant accounts payable relating to the Property are accruing and not being paid current as required by Section 4.2.6(f)(iii) of the Loan Agreement. Lender hereby reserves all of its rights under the Loan

7

Documents with respect to Borrower's failure to pay trade payables within the timeline required by the Loan Agreement.

*See* Ex. I (Reservation of Rights Letter) at p. 3.

31.     Borrower's breach of its covenant in Section 4.2.6(f) of the Loan Agreement constitutes an Event of Default (the "Unsecured Trade Payables Covenant Default"). *See* Ex. C (Loan Agreement) § 10.01(a)(xi).

### iii.    The Lien Default

32.     Section 4.2.2 (Liens) of the Loan Agreement provides that "Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or the Collateral or permit any such action to be taken, except for Permitted Encumbrances and Permitted Transfers." *See* Ex. C (Loan Agreement) § 4.2.2. The definition of "Lien" includes "mechanic's, materialmen's and other similar liens and encumbrances." *See id*. at p. 26 (defining "Lien").

33.     Section 10.1 of the Loan Agreement provides that it shall constitute an Event of Default "subject to Borrower's right to contest as set forth in this Agreement, if the Property becomes subject to any mechanic's, materialman's or other Lien (other than a Lien for local real estate taxes and assessments not then due and payable)." *See* Ex. C (Loan Agreement) § 10.1(a)(viii).

34.     Borrower has permitted and continues to permit at least five Liens to exist on the Property:

(a)     A mechanic's lien claim filed by Tantillo Architecture on February 9, 2026, at Case No. 2602M0005 in the amount of $484,508.77;

(b)     A mechanic's lien claim filed by PD Construction Group on December 3, 2025, at Case No. 2512M0004 in the amount of $324,493.60;

8

(c)      A mechanic's lien claim filed by K Guller LLC on January 22, 2026, at Case No. 2601M0023 in the amount of $93,397.50;

(d)      An assessment lien claim filed by the Old City Special Services District on March 2, 2026, at Case No. 260300308 in the amount of $26,029.06; and

(e)      A mechanic's lien claim filed by Fastrack Builders, Inc., on March 23, 2026, at Case No. 2603M0018 in the amount of $1,166,875.00.

35.      Borrower's sufferance of the Liens to exist on the Property constitutes an Event of Default under the Loan Documents (the "Lien Default").  *See* Ex. D (Loan Agreement) § 10.1(a)(viii).

36.      Lender notified Borrower via the Reservation of Rights Letter that "Lender hereby reserves all of its rights under the Loan Documents with respect to Borrower's . . . failure to discharge such liens." *See* Ex. I (Reservation of Rights Letter) at p. 3.

### iv.      The Monthly Payment Default

37.      Section 2.3.1 of the Loan Agreement requires that Borrower make a payment to Lender in the defined Monthly Debt Service Payment Amount on each Monthly Payment Date, which is defined as "the seventh (7th) calendar day of each calendar month during the term of the Loan, and if such day is not a Business Day, then the Business Day immediately succeeding such day." *See* Ex. C (Loan Agreement) § 2.3.1 and at p. 30 (defining "Monthly Debt Service Payment Amount" and "Monthly Payment Date").

38.      Section 2.3.3 (Late Payment Charge) of the Loan Agreement provides that:

If any principal, interest or any other sum due under the Loan Documents, other than the payment of Outstanding Principal Balance and any other amounts due on the Maturity Date, is not paid by Borrower on or before the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by applicable Legal Requirements in order to defray the expense incurred by Lender in handling

9

and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment.

*See* Ex. C (Loan Agreement) § 2.3.3.

39.    The Loan Agreement provides that it shall constitute an Event of Default if, among other things, "any regularly scheduled monthly payment of interest is not paid in full on the applicable Monthly Payment Date."  *See* Ex. C (Loan Agreement) § 10.1(a)(i)(B).

40.    Beginning with the Monthly Payment Date for June 2026, Borrower failed to pay the Monthly Debt Service Payment Amount due to Lender under the Loan Documents.

41.    Borrower's failure to pay the Monthly Debt Service Payment Amounts constitutes an Event of Default under the Loan Documents (the "Monthly Payment Default").  *See* Ex. C (Loan Agreement) § 10.1(a)(i)(B).

**F.    Lender's Notice of Default and Acceleration of the Debt**

42.    Lender provided a Notice of Event of Default, Imposition of Default Rate Interest, Notice of Recourse Events and Reservation of Rights to Borrower by letter dated May 7, 2026 (the "Notice of Default"), a copy of which is attached hereto as ***Exhibit J***.

43.    The Notice of Default advised Borrower, among other things, that "one or more Events of Default have occurred and are continuing under the Loan Agreement and the other Loan Documents" by virtue of the Milestone Non-Compliance Default, the Cessation of Construction Default, the Unsecured Trade Payables Covenant Default and the Lien Default.  *See* Ex. J (Notice of Default) at pp. 2-4.

44.    Notwithstanding the Notice of Default, Borrower not only failed and/or refused to cure the identified Events of Default but subsequently committed the Monthly Payment Default.

#4925-2294-4701 v2

45.     The Mortgage provides that, "[u]pon the occurrence and during the continuance of any Event of Default," Lender may, among other things, "declare the entire unpaid Debt to be immediately due and payable" and "institute proceedings . . . for the complete foreclosure of this Security Instrument under any applicable provision of law."   *See* Ex. B (Mortgage) §§ 7.1(a)-(b).

46.     Lender, through its counsel, provided a Notice of Acceleration to Borrower by letter dated July 16, 2026, a copy of which is attached hereto as ***Exhibit K***, which advised Borrower that "the Debt secured by the Mortgage is hereby accelerated and declared to be immediately due and payable" and that "demand is hereby made of Borrower for the immediate and full payment of the entire unpaid Debt."  *See* Ex. K (Notice of Acceleration) at p. 2.

47.     To date, Borrower has failed to pay the Debt in full or otherwise cure the ongoing Events of Default.

48.     Accordingly, Lender brings this action to foreclose the Mortgage.

## G.     Lender's Damages

49.     Section 2.2.3(a) of the Loan Agreement provides that, "[i]n the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent not prohibited by applicable Legal Requirements, all other portions of the Debt, shall accrue interest at the Default Rate," which is defined to mean "a rate per annum equal to the lesser of (x) the Maximum Legal Rate and (y) four percent (4%) above the non-default Interest Rate."  *See* Ex. C (Loan Agreement) § 2.2.3(a) and at p. 14 (defining "Default Rate").

50.     Section 4.1.14 of the Loan Agreement provides that, if "the Mortgage is put into the hands of an attorney for collection, suit, action or foreclosure," Borrower "shall be chargeable with and agrees to pay all reasonable, out-of-pocket and documented costs of collection

11

. . ., including reasonable attorneys' fees and costs, incurred by Lender in connection therewith."

*See* Ex. C (Loan Agreement) § 4.1.14.

51.    Section 9.3 of the Loan Agreement provides that:

Borrower shall be responsible for the customary costs relating to or arising under the Servicing Agreement, including the standard monthly servicing fee due to the Servicer under the Servicing Agreement which shall not be an amount in excess of $25,000 per annum, any customary fees or costs payable to Servicer in connection with each Advance or disbursement of Reserve Funds, and any customary special servicing and similar fees as more particularly set forth in Section 11.13 hereof incurred an Event of Default (collectively, the "**Servicing Fees**").

*See* Ex. C (Loan Agreement) § 9.3.

52.    Section 11.13 of the Loan Agreement provides that Borrower shall pay or reimburse Lender for "for all reasonable and documented actual, third-party out-of-pocket costs and expenses (including any such third party attorneys' fees and disbursements) incurred by Lender in connection with," among other things, "enforcing any obligations of or collecting any payments due from Borrower and Guarantor under this Agreement, the other Loan Documents or with respect to the Property."  *See* Ex. C (Loan Agreement) § 11.13.

53.    As of July 16, 2026, except as otherwise indicated. there was due and owing on the Loan without defense, deduction, offset, recoupment, or counterclaim the total amount of $24,174,380.61, itemized as follows:

| | |
|---|---|
| Principal Balance | $24,443,294.00 |
| Interest (5/7/26-8/6/26) | 476,364.89 |
| Default Interest (5/7/26-7/16/26) | 192,830.43 |
| May 2026 Service Fee | 708.75 |
| May 2026 Cash Management Fee | 350.00 |
| June 2026 Service Fee | 708.75 |
| June 2026 Cash Management Fee | 350.00 |

| | |
|---|---|
| July 2026 Service Fee | 708.75 |
| July 2026 Cash Management Fee | 350.00 |
| Trimont Servicing Fee | 6,249.99 |
| Late Charges | 17,465.43 |
| Final Bank Fee | 250.00 |
| Payoff Quote Preparation Fee | 250.00 |
| Legal Fees (through 7/24/26) | 20,565.50 |
| *Less Credit – Replacement Reserve* | (223,732.80) |
| *Less Credit – Rollover Reserve* | (404,594.76) |
| *Less Credit – Cash Collateral Reserve* | (34,513.97) |
| *Less Credit – Tax Escrow* | (323,224.35) |
| TOTAL AMOUNT DUE a/o 7/16/26 | $24,174,380.61 |

54. Additional interest and default interest, together with other fees, charges and costs recoverable under the Loan Documents, have continued and continue to accrue on the Loan since July 16, 2026.

## COUNT ONE – MORTGAGE FORECLOSURE

55. Paragraphs 1 through 54 of this Complaint are incorporated herein by reference.

56. Borrower executed the Note, which is secured by the Mortgage, in favor of Lender.

57. Borrower has defaulted on its obligations under the Note, the Mortgage, the Loan Agreement and the other Loan Documents.

58. Lender is authorized by the Mortgage and by Pennsylvania law to foreclose the Mortgage in the event of a default by Borrower.

#4925-2294-4701 v2

59.     There is due and owing on the Loan the sum of $24,174,380.61 as of July 16, 2026, together with accruing default interest, fees, charges and costs recoverable under the Loan Documents.

WHEREFORE, Lender asks that a judgment in mortgage foreclosure be entered in its favor and against Borrower and the Property in the amount of $24,174,380.61, together with additional accrued and accruing interest (at the Default Rate), fees, charges and costs recoverable under the Loan Documents, and that Lender be awarded such other and further relief as the Court in its discretion may deem equitable and just.

## COUNT TWO – SALE OF PERSONAL PROPERTY

60.     Paragraphs 1 through 59 of this Complaint are incorporated herein by reference.

61.     Borrower granted to Original Lender in the Mortgage a security interest in, among other things, the Personal Property defined in Section 1.1(h) of the Mortgage, which is incorporated herein by reference.

62.     Original Lender perfected its lien and security interest in the Personal Property of Bourse Fee Borrower by filing a UCC-1 Financing Statement with the Delaware Department of State (the "Department") on July 1, 2024, as Filing No. 2024 4436299, a copy of which is attached hereto as *Exhibit L*.

63.     Original Lender assigned its lien and security interest in the Personal Property to Lender via a UCC-3 Amendment-Assignment, which was filed with the Department on July 23, 2026, as Amendment No. 2026 5992934.   A copy of the referenced UCC-3 Amendment-Assignment is attached hereto as *Exhibit M*.

64.     Borrower has defaulted on its obligations under the Note, the Mortgage, the Loan Agreement and the Other Loan Documents.

#4925-2294-4701 v2

65.     Lender is authorized by the Mortgage and by Pennsylvania law to foreclose its security interest in the Personal Property in the event of a default by Borrower.

66.     Pursuant to Pennsylvania Rule 1147(b), Lender hereby elects to have the Personal Property sold at public sale together with the real property under the Mortgage.

WHEREFORE, Lender respectfully requests that the Court order the Personal Property to be sold together with the real property under the Mortgage according to law to satisfy the amounts due to Lender and for such other and further relief as the Court in its discretion may deem equitable and just.

Dated:  July 28, 2026

/s/ Raymond A. Quaglia
Raymond A. Quaglia, PA ID No. 63146
Brian N. Kearney, PA ID No. 326227
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA  19103
(215) 665-8500
quaglia@ballardspahr.com
kearneyb@ballardspahr.com

Counsel for Plaintiff

#4925-2294-4701 v2