# Exhibit D

Case 2:26-cv-05284-CFK    eRecorded in Philadelphia PA/Doc Id: 54312813 Filed 07/28/06  Doc Id: 54312813 Page 2 of 41

eRecorded in Philadelphia PA
07/09/2024 08:01 AM    Page 1 of 40    Rec Fee: $244.75
Receipt#: 24-53046
Records Department    Doc Code: M

PREPARED BY AND UPON
RECORDATION RETURN TO:

Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193
Attention: Eric Meer, Esq.

Tax Parcel ID No(s): 883012000, 883101010 and 883101510

---

**LAK BOURSE OWNER, LLC,**
**LAK BOURSE MASTER HTC LANDLORD, LLC**
**LAK 400 OWNER LLC,**
**and**
**LAK MARKET MASTER HTC LANDLORD, LLC**
collectively, as mortgagor
(Borrower)

to

**KREF LENDING III LLC**, as mortgagee
(Lender)

---

**OPEN-END FEE AND LEASEHOLD MORTGAGE, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

---

| | |
|---|---|
| Dated: | June 26, 2024 |
| Effective as of: | June 28, 2024 |
| Location: | 111 S. Independence Mall East & 400 Market Street |
| County: | Philadelphia |

107207352.15

54317815    07/09/2024 08:01 AM

THIS SECURITY INSTRUMENT IS AN OPEN-END MORTGAGE WHICH SECURES EXISTING AND FUTURE ADVANCES UP TO A MAXIMUM PRINCIPAL SUM OF UP TO $83,700,000.00 PLUS ACCRUED AND UNPAID INTEREST AND OTHER INDEBTEDNESS AS DESCRIBED IN TITLE 42 PENNSYLVANIA CONSOLIDATED STATUTES ANNOTATED §§ 8143 AND 8144.

THIS SECURITY INSTRUMENT IS A "CONSTRUCTION MORTGAGE" WITHIN THE MEANING OF 13 PA. C.S.A. § 9334.

THIS SECURITY INSTRUMENT IS A FINANCING STATEMENT FILED AS A FIXTURE FILING PURSUANT TO §§ 9334 AND 9502 OF THE PENNSYLVANIA UNIFORM COMMERCIAL CODE. THIS SECURITY INSTRUMENT IS TO BE FILED AND INDEXED A FIXTURE FILING PURSUANT TO THE PENNSYLVANIA UNIFORM COMMERCIAL CODE UNDER THE NAMES OF BORROWER, AS "DEBTOR", AND LENDER, AS "SECURED PARTY", THE MAILING ADDRESSES OF THE DEBTOR AND SECURED PARTY ARE AS SET FORTH IN THIS SECURITY INSTRUMENT.

THIS **OPEN-END FEE AND LEASEHOLD MORTGAGE, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "**Security Instrument**") is made as of this 26th day of June, 2024, but effective as of the 28th day of June, 2024, by **LAK BOURSE OWNER, LLC**, a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**Bourse Fee Borrower**"), **LAK BOURSE MASTER HTC LANDLORD, LLC**, a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**Bourse Leasehold Borrower**", and together with Bourse Fee Borrower, collectively, "**Bourse Borrower**"), **LAK 400 OWNER, LLC,** a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**400 Market Fee Borrower**"), and **LAK MARKET MASTER HTC LANDLORD, LLC,** a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**400 Market Leasehold Borrower**", and together with 400 Market Fee Borrower, collectively, "**400 Market Borrower**"; Bourse Fee Borrower, Bourse Leasehold Borrower, 400 Market Fee Borrower and 400 Market Leasehold Borrower, jointly and severally, each, a "**Borrower**" and collectively, "**Borrower**"), as mortgagor, for the benefit of **KREF LENDING III LLC**, a Delaware limited liability company, having an address at 30 Hudson Yards, Suite 7500, New York, New York 10001, as mortgagee (together with its successors and assigns, "**Lender**").

W I T N E S S E T H:

WHEREAS, this Security Instrument is given to secure a loan (the "**Loan**") in the maximum principal sum of up to EIGHTY-THREE MILLION SEVEN HUNDRED THOUSAND AND NO/100 DOLLARS ($83,700,000.00) or so much thereof as may be advanced pursuant to that certain Loan Agreement dated as of the date hereof between Borrower and Lender (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Loan Agreement**") and evidenced by the Note (as defined in the Loan Agreement);

WHEREAS, Borrower desires to secure the payment of the Debt (as defined in the Loan Agreement), all Additional Interest and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents (as defined herein). "**Additional Interest**" shall mean all interest, fees (including the Extension Fees), costs and expenses (including reasonable attorneys' fees and expenses), all Transfer Taxes (as defined herein), and other charges and fees for which Borrower is obligated to Lender pursuant to this Security Instrument, the Loan Agreement, the other Loan Documents;

WHEREAS, 400 Market Fee Borrower desires to mortgage its fee interest in the 400 Market Street Property (as defined in the Loan Agreement) under this Security Instrument to secure the payment of the Debt (as defined in the Loan Agreement), all Additional Interest and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents;

WHEREAS, Bourse Fee Borrower desires to mortgage its fee interest in the Bourse Property (as defined in the Loan Agreement) under this Security Instrument to secure the payment of the Debt (as defined in the Loan Agreement), all Additional Interest and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents;

WHEREAS, 400 Market Leasehold Borrower desires to mortgage its leasehold estate interest in the 400 Market Street Property (as defined in the Loan Agreement) under this Security Instrument to secure the payment of the Debt (as defined in the Loan Agreement), all Additional Interest and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents;

WHEREAS, Bourse Leasehold Borrower desires to mortgage its leasehold estate interest in the Bourse Property (as defined in the Loan Agreement) under this Security Instrument to secure the payment of the Debt (as defined in the Loan Agreement), all Additional Interest and the performance of all of its obligations under the Note, the Loan Agreement and the other Loan Documents;

WHEREAS, this Security Instrument is given pursuant to the Loan Agreement, and payment, fulfillment, and performance by Borrower of its obligations thereunder and under the other Loan Documents are secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties of the parties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Security Instrument (the Loan Agreement, the Note, this Security Instrument, and all other documents evidencing or securing the Debt are hereinafter referred to collectively as the "**Loan Documents**").

NOW THEREFORE, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Security Instrument:

## Article 1 - GRANTS OF SECURITY

Section 1.1    PROPERTY MORTGAGED.    Borrower does hereby irrevocably mortgage, grant, bargain, pledge, assign, warrant, transfer and convey to Lender, and grant a security interest to Lender in, all of Borrower's right, title, interest and privileges in and to the following property, rights, interests and estates now owned, or hereafter acquired by Borrower (collectively, the "**Property**"):

(a)    Land.    The real property described in Exhibit A attached hereto and made a part hereof (the "**Land**");

(b)    Additional Land.    All additional lands, estates and development rights hereafter acquired by Borrower for use in connection with the Land and the development of the Land and all additional lands and estates therein which may, from time to time, by supplemental mortgage or otherwise be expressly made subject to the lien of this Security Instrument (the "**Additional Land**");

(c)    <u>Improvements</u>.    The buildings, foundations, structures, fixtures, additions, enlargements, extensions, modifications, repairs, replacements and improvements now or hereafter erected or located on the Land or the Additional Land (collectively, the "**Improvements**");

(d)    <u>Appurtenances</u>.  All of Borrower's right and interest in and to (i) all air, light lateral support and development rights (including, without limitation, any inclusionary housing floor area ratio bonus) now or hereafter pertaining to or used in connection with the Land; (ii) all and singular, the tenements, hereditaments, rights of way, easements, appendages and appurtenances and property now or hereafter belonging or in any way appertaining to the Land; and (iii) all estate, right, title, claim or demand whatsoever, either at law or in equity, in possession or expectancy, of, in and to the Land (collectively, the "**Appurtenances**");

(e)    <u>Easements</u>.  All easements, rights-of-way or use, rights, strips and gores of land, streets, ways, alleys, passages, sewer rights, water, water courses, water rights and powers, air rights and development rights (including, without limitation, any inclusionary housing floor area ratio bonus), excess or unused zoning floor area development rights (including, without limitation, any inclusionary housing floor area ratio bonus), abatements, zoning floor area bonuses, zoning incentives or awards, and all estates, rights, titles, interests, privileges, liberties, servitudes, tenements, hereditaments and appurtenances of any nature whatsoever, in any way now or hereafter belonging, appurtenant to, relating or pertaining to the Land, the Additional Land and the Improvements or otherwise owned by or available to Borrower and the reversion and reversions, remainder and remainders, and all land lying in the bed of any street, road or avenue, opened or proposed, in front of or adjoining the Land, to the center line thereof and all the estates, rights, titles, interests, dower and rights of dower, curtesy and rights of curtesy, property, possession, claim and demand whatsoever, both at law and in equity, of Borrower of, in and to the Land or the Additional Land and the Improvements and every part and parcel thereof, with the appurtenances thereto;

(f)    <u>Equipment</u>.  All "equipment," as such term is defined in Article 9 of the Uniform Commercial Code (as hereinafter defined), now owned or hereafter acquired by Borrower, which is used at or in connection with the Improvements or the Land or is located thereon or therein (including, but not limited to, all machinery, equipment, furnishings, and electronic data-processing and other office equipment now owned or hereafter acquired by Borrower and any and all additions, substitutions and replacements of any of the foregoing), together with all attachments, components, parts, equipment and accessories installed thereon or affixed thereto (collectively, the "**Equipment**").  Notwithstanding the foregoing, Equipment shall not include any property belonging to Tenants under Leases except to the extent that Borrower shall have any right or interest therein;

(g)    <u>Fixtures</u>.  All Equipment now owned, or the ownership of which is hereafter acquired, by Borrower which is so related to the Land or the Additional Land and Improvements forming part of the Property that it is deemed fixtures or real property under the law of the particular state or commonwealth in which the Equipment is located, including, without limitation, all building or construction materials intended for construction, reconstruction, alteration or repair of or installation on the Property, construction equipment, appliances, machinery, plant equipment, fittings, apparatuses, fixtures and other items now or hereafter attached to, installed in or used in

connection with (temporarily or permanently) any of the Improvements or the Land or the Additional Land, including, but not limited to, engines, devices for the operation of pumps, pipes, plumbing, cleaning, call and sprinkler systems, fire extinguishing apparatuses and equipment, heating, ventilating, plumbing, laundry, incinerating, electrical, air conditioning and air cooling equipment and systems, gas and electric machinery, appurtenances and equipment, pollution control equipment, security systems, disposals, dishwashers, refrigerators and ranges, recreational equipment and facilities of all kinds, and water, gas, electrical, storm and sanitary sewer facilities, utility lines and equipment (whether owned individually or jointly with others, and, if owned jointly, to the extent of Borrower's interest therein) and all other utilities whether or not situated in easements, all water tanks, water supply, water power sites, fuel stations, fuel tanks, fuel supply, and all other structures, together with all accessions, appurtenances, additions, replacements, betterments and substitutions for any of the foregoing and the proceeds thereof (collectively, the "**Fixtures**"). Notwithstanding the foregoing, "Fixtures" shall not include any property which Tenants are entitled to remove pursuant to Leases except to the extent that Borrower shall have any right or interest (reversionary or otherwise) therein;

(h)     Personal Property. All furniture, furnishings, objects of art, machinery, goods, tools, supplies, appliances, general intangibles, contract rights (including without limitation all material contracts related to the Personal Property, Construction Contracts, Material Construction Contracts, the Development Agreement, the General Contractor's Agreement, the Leasing Agreement, the Hotel Conversion Architect's Contract and the Management Agreement), the Office CapEx Project Plans and Specifications, if any, the Governmental Approvals (to the extent permitted by applicable law), accounts, accounts receivable, franchises, licenses, certificates and permits, and all other personal property of any kind or character whatsoever (as defined in and subject to the provisions of the Uniform Commercial Code as hereinafter defined), other than Fixtures, which are now or hereafter owned by Borrower and which are located within or about the Land and the Improvements, together with all accessories, replacements and substitutions thereto or therefor and the proceeds thereof (collectively, the "**Personal Property**"), and the right, title and interest of Borrower in and to any of the Personal Property which may be subject to any security interests, as defined in the Uniform Commercial Code, as adopted and enacted by the state, states, commonwealth or commonwealths where any of the Property is located (the "**Uniform Commercial Code**"), superior in lien to the lien of this Security Instrument and all proceeds and products of the above;

(i)     Ground Lease. All of Bourse Fee Borrower's and 400 Market Fee Borrower's right, title and interest in and to the Ground Lease (as defined in the Loan Agreement) and all of Bourse Leasehold Borrower's and 400 Market Leasehold Borrower's right, title and interest in and to the Ground Lease, and all right, title and interest of Bourse Fee Borrower's and 400 Market Fee Borrower's and Bourse Leasehold Borrower's and 400 Market Leasehold Borrower's successors and assigns therein and thereunder, and all Rents and all proceeds from the sale or other disposition of the Ground Lease and the right to receive and apply the Rents to the payment of the Debt;

(j)     Leases and Rents.   All leases, subleases, subsubleases, lettings, licenses, concessions or other agreements (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of the Land and the Improvements, and every modification, amendment or other agreement relating to such leases, subleases, subsubleases, or other agreements entered into in

connection with such leases, subleases, subsubleases, or other agreements and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto, heretofore or hereafter entered into, whether before or after the filing by or against Borrower of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "**Bankruptcy Code**") (collectively, the "**Leases**") and all right, title and interest of Borrower, its successors and assigns therein and thereunder, including, without limitation, cash, letters of credit or securities deposited thereunder to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, rent equivalents, moneys payable as damages or in lieu of rent or rent equivalents, early termination fees and payments and other termination fees and payments, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or its agents or employees from any and all sources arising from or attributable to the Land and the Improvements, including, all receivables, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of property or rendering of services by Borrower or Manager and proceeds, if any, from business interruption or other loss of income insurance whether paid or accruing before or after the filing by or against Borrower of any petition for relief under the Bankruptcy Code, and all of Borrower's claims and rights to the payment of damages arising from the rejection by a Tenant of any Lease (collectively, the "**Rents**") and all proceeds from the sale or other disposition of the Leases and the right to receive and apply the Rents to the payment of the Debt;

(k)     Condemnation Awards.  Subject to the terms of the Loan Agreement, all awards or payments, including interest thereon, which may heretofore and hereafter be made with respect to the Property, whether from the exercise of the right of eminent domain (including but not limited to any transfer made in lieu of or in anticipation of the exercise of such right), or for a change of grade, or for any other injury to or decrease in the value of the Property;

(l)     Insurance Proceeds.  Subject to the terms of the Loan Agreement, all proceeds in respect of the Property under any insurance policies covering the Property, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments, or settlements made in lieu thereof, for damage to the Property;

(m)     Tax Certiorari.  All refunds, rebates or credits in connection with reduction in real estate taxes and assessments charged against the Property as a result of tax certiorari or any applications or proceedings for reduction;

(n)     Rights.  The right, in the name and on behalf of Borrower, to appear in and defend any action or proceeding brought with respect to the Property and to commence any action or proceeding to protect the interest of Lender in the Property;

(o)     Agreements.  All agreements, contracts, certificates, instruments, franchises, permits, licenses, plans, specifications and other documents, now or hereafter entered into, and all extensions, amendments and modifications thereto, and all rights therein and thereto, respecting

or pertaining to the use, occupation, construction, management or operation of the Land and any part thereof and any Improvements or respecting any business or activity conducted on the Land and any part thereof and all right, title and interest of Borrower therein and thereunder, including, without limitation, the right, upon the occurrence and during the continuance of an Event of Default, to receive and collect any sums payable to Borrower thereunder;

(p)    Trademarks.    All tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property;

(q)    Accounts.  All reserves, escrows and deposit accounts maintained by Borrower with respect to the Property, including, without limitation, all accounts established or maintained pursuant to the Clearing Account Agreement, Cash Management Agreement and Loan Agreement; together with all deposits or wire transfers made to such accounts and all cash, checks, drafts, certificates, securities, investment property, financial assets, instruments and other property held therein from time to time and all proceeds, products, distributions or dividends or substitutions thereon and thereof;

(r)    Interest Rate Protection Agreement.  The Interest Rate Protection Agreement, including, but not limited to, all "accounts", "chattel paper", "general intangibles" and "investment property" (as such terms are defined in the Uniform Commercial Code as from time to time in effect) constituting or relating to the foregoing; and all products and proceeds of any of the foregoing;

(s)    Uniform Commercial Code Property.  All documents, instruments, chattel paper and intangibles, as the foregoing terms are defined in the Uniform Commercial Code, and general intangibles relating to the Property;

(t)    Minerals; Vegetation.  All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above the Land;

(u)    Proceeds.  All proceeds of any of the foregoing, including, without limitation, proceeds of insurance and condemnation awards, whether cash, liquidation or other claims or otherwise; and

(v)    Other Rights.  Any and all other rights of Borrower in and to the items set forth in Subsections (a) through (t) above.

AND without limiting any of the other provisions of this Security Instrument, to the extent permitted by applicable law, Borrower expressly grants to Lender, as secured party, a security interest in the portion of the Property which is or may be subject to the provisions of the Uniform Commercial Code which are applicable to secured transactions; it being understood and agreed that the Improvements and Fixtures are part and parcel of the Land (the Land, the Additional Land, the Improvements and the Fixtures collectively referred to as the "**Real Property**") appropriated to the use thereof and, whether affixed or annexed to the Real Property or not, shall for the purposes of this Security Instrument be deemed conclusively to be real estate and mortgaged hereby.

Section 1.2    ASSIGNMENT OF RENTS.  Borrower hereby absolutely and unconditionally assigns to Lender all of Borrower's right, title and interest in and to all current and future Leases and Rents; it being intended by Borrower that this assignment constitutes a present, absolute assignment and not an assignment for additional security only.  Nevertheless, subject to the terms of Section 7.1(h) of this Security Instrument, Lender grants to Borrower a revocable license (provided that Lender shall not revoke this license unless and until an Event of Default occurs and is continuing) to collect, receive, use and enjoy the Rents.  Borrower shall hold the Rents, or a portion thereof sufficient to discharge all current sums due on the Debt, for use in the payment of such sums.

Section 1.3    SECURITY AGREEMENT.  This Security Instrument is both a real property mortgage and a "security agreement" within the meaning of the Uniform Commercial Code.  The Property includes both real and personal property and all other rights and interests, whether tangible or intangible in nature, of Borrower in the Property.  By executing and delivering this Security Instrument, Borrower hereby grants to Lender, as security for the Obligations (hereinafter defined), a security interest in the Fixtures, the Equipment, the Personal Property and the other property constituting the Property to the full extent that the Fixtures, the Equipment, the Personal Property and such other property may be subject to the Uniform Commercial Code (said portion of the Property so subject to the Uniform Commercial Code being called the "**Collateral**").  If an Event of Default shall occur and be continuing, Lender, in addition to any other rights and remedies which it may have, shall have and may exercise immediately and without demand, any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing, the right to take possession of the Collateral or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Collateral.  Upon request or demand of Lender after the occurrence and during the continuance of an Event of Default, Borrower shall, at its expense, assemble the Collateral and make it available to Lender at a convenient place (at the Land if tangible property) reasonably acceptable to Lender.  Borrower shall pay to Lender on demand any and all reasonable expenses, including reasonable legal expenses and attorneys' fees, incurred or paid by Lender in protecting its interest in the Collateral and in enforcing its rights hereunder with respect to the Collateral after the occurrence and during the continuance of an Event of Default. Any notice of sale, disposition or other intended action by Lender with respect to the Collateral sent to Borrower in accordance with the provisions hereof at least ten (10) Business Days prior to such action, shall, except as otherwise provided by applicable law, constitute reasonable notice to Borrower.  The proceeds of any disposition of the Collateral, or any part thereof, may, except as otherwise required by applicable law, be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper.  The principal place of business of Borrower (Debtor) is as set forth on page one hereof and the address of Lender (Secured Party) is as set forth on page one hereof.

Section 1.4    FIXTURE FILING.  Certain of the Property is or will become "fixtures" (as that term is defined in the Uniform Commercial Code) on the Land, described or referred to in this Security Instrument, and this Security Instrument, upon being filed of record in the real estate records of the city or county wherein such fixtures are situated, shall operate also as a financing statement naming Borrower as Debtor and Lender as Secured Party filed as a fixture filing in accordance with the applicable provisions of said Uniform Commercial Code upon such of the Property that is or may become fixtures.  As to all of the above described Property which is or

which hereafter becomes a "fixture" under applicable law, this Security Instrument constitutes a fixture filing under the Uniform Commercial Code. This Security Instrument creates a security interest in the Collateral, and, to the extent the Collateral is not real property, this Security Instrument constitutes a security agreement from Borrower to Lender under the Uniform Commercial Code. Borrower is the record owner of the Collateral.

> Name of Debtor: LAK BOURSE OWNER, LLC
> Debtor's Address: c/o Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428
> Debtor's Jurisdiction of Organization: Delaware

> Name of Debtor: LAK BOURSE MASTER HTC LANDLORD, LLC
> Debtor's Address: c/o Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428
> Debtor's Jurisdiction of Organization: Delaware

> Name of Debtor: LAK 400 OWNER, LLC
> Debtor's Address: c/o Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428
> Debtor's Jurisdiction of Organization: Delaware

> Name of Debtor: LAK MARKET MASTER HTC LANDLORD, LLC
> Debtor's Address: c/o Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428
> Debtor's Jurisdiction of Organization: Delaware

> Name of Secured Party:  KREF LENDING III LLC
> Secured Party's Address:  30 Hudson Yards, Suite 7500, New York, New York 10001
> Collateral Covered by Financing Statement:  As described in Section 1.3
> Place of Filing:  To be filed in the Real Property Records of Philadelphia, Pennsylvania
> Description of Real Property to which Collateral is Related:  See attached Exhibit A
> Owner of Record of the Real Property is:  Debtor

Borrower hereby authorizes Lender at any time and from time to time to file any initial financing statements, amendments thereto and continuation statements to the extent permitted by applicable law, as applicable with respect to all or part of the Personal Property as Lender deems necessary to perfect the security interests granted herein. Such financing statements may indicate or describe the collateral in any manner Lender chooses, including, without limitation, describing such collateral as "all assets of debtor, whether now owned or hereafter acquired," "all personal property of debtor, whether now owned or hereafter acquired," or using words of similar import.

Section 1.5    PLEDGES OF MONIES HELD.  Borrower hereby pledges to Lender any and all monies now or hereafter held by Lender or on behalf of Lender in connection with the Loan, including, without limitation, any sums deposited in the Accounts (as defined in the Cash Management Agreement) and Net Proceeds, as additional security for the Obligations until expended or applied as provided in this Security Instrument, the Cash Management Agreement or the Loan Agreement.

## CONDITIONS TO GRANT

TO HAVE AND TO HOLD the above granted and described Property unto and to the use and benefit of Lender and its successors and assigns, forever;

PROVIDED, HOWEVER, these presents are upon the express condition that, if Borrower shall well and truly pay to Lender the Debt at the time and in the manner provided in the Note, the Loan Agreement and this Security Instrument, shall well and truly perform the Other Obligations as set forth in this Security Instrument and shall well and truly abide by and comply with each and every covenant and condition set forth herein and in the Note, the Loan Agreement and the other Loan Documents, these presents and the estate hereby granted shall cease, terminate and be void; provided, however, that Borrower's obligation to indemnify and hold harmless Lender pursuant to the provisions hereof shall survive any such payment or release.

## Article 2 - DEBT AND OBLIGATIONS SECURED

Section 2.1    DEBT.  This Security Instrument and the grants, assignments and transfers made in Article 1 are given for the purpose of securing the Debt which by its definition (as set forth in the Loan Agreement) includes, but is not limited to, the obligations of Borrower to pay to Lender the principal and interest owing pursuant to the terms and conditions of the Note.

Section 2.2    OTHER OBLIGATIONS.  This Security Instrument and the grants, assignments and transfers made in Article 1 are also given for the purpose of securing the following (the "**Other Obligations**"):

(a)    the performance of all other obligations of Borrower contained herein;

(b)    the performance of each obligation of Borrower contained in the Loan Agreement and any other Loan Document; and

(c)    the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of the Note, the Loan Agreement or any other Loan Document.

Section 2.3    DEBT AND OTHER OBLIGATIONS.  Borrower's obligations for the payment of the Debt and the performance of the Other Obligations shall be referred to collectively herein as the "**Obligations**."

Section 2.4    VARIABLE.  The Loan secured by this Security Instrument is a variable interest rate loan, as more particularly set forth in the Loan Agreement.

## Article 3 - BORROWER COVENANTS

Borrower covenants and agrees that:

Section 3.1    PAYMENT OF DEBT.  Borrower will pay the Debt at the time and in the manner provided in the Loan Agreement, the Note and this Security Instrument.

Section 3.2    INCORPORATION BY REFERENCE.    All the covenants, conditions and agreements contained in (a) the Loan Agreement, (b) the Note and (c) all and any of the other Loan Documents, are hereby made a part of this Security Instrument to the same extent and with the same force as if fully set forth herein.

Section 3.3    INSURANCE.  Borrower shall obtain and maintain, or cause to be maintained, in full force and effect at all times insurance with respect to Borrower and the Property as required pursuant to the Loan Agreement.

Section 3.4    MAINTENANCE OF PROPERTY.    Borrower shall cause the Property to be maintained in a good and safe condition and repair.   The Improvements, the Fixtures, the Equipment and the Personal Property shall not be removed, demolished or materially altered (except for normal replacement of the Fixtures, the Equipment or the Personal Property, tenant finish and refurbishment of the Improvements) without the consent of Lender (such consent not to be unreasonably withheld, conditioned or delayed) except as otherwise permitted pursuant to the Loan Agreement.  Borrower shall promptly repair, replace or rebuild any part of the Property which may be destroyed by any Casualty or become damaged, worn or dilapidated or which may be affected by any Condemnation, and shall complete and pay for any structure at any time in the process of construction or repair on the Land, in each case, as and to the extent required by the Loan Agreement.

Section 3.5    WASTE.  Borrower shall not commit or suffer any waste of the Property or make any change in the use of the Property which will in any way materially increase the risk of fire or other hazard arising out of the operation of the Property, or take any action that could be reasonably expected to invalidate or allow the cancellation of any Policy, or do or permit to be done thereon anything that could be reasonably expected to in any way materially impair the value of the Property or the security of this Security Instrument.  Borrower will not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Land, regardless of the depth thereof or the method of mining or extraction thereof.

Section 3.6    PAYMENT FOR LABOR AND MATERIALS.

(a)    Subject to Section 3.6(b) below, Borrower will promptly pay when due all bills and costs for labor, materials, and specifically fabricated materials ("**Labor and Material Costs**") incurred in connection with the Property and not permit to exist beyond the due date thereof in respect of the Property or any part thereof any lien or security interest, even though inferior to the liens and the security interests created hereby and by the other Loan Documents, and in any event not permit to be created or exist in respect of the Property or any part thereof any other or additional lien or security interest other than the liens or security interests created hereby and by the other Loan Documents except for the Permitted Encumbrances.

(b)    After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any of the Labor and Material Costs, in accordance with the terms and provisions of Section 4.2.2 of the Loan Agreement.

Section 3.7    INTENTIONALLY OMITTED.

Section 3.8    PERFORMANCE OF OTHER AGREEMENTS.    Borrower shall observe and perform each and every term, covenant and provision to be observed or performed by Borrower pursuant to the Loan Agreement, any other Loan Document and any other agreement or recorded instrument affecting or pertaining to the Property and any amendments, modifications or changes thereto.

Section 3.9    CHANGE OF NAME, IDENTITY OR STRUCTURE.    Borrower shall not change Borrower's name, identity (including its trade name or names) or, if not an individual, Borrower's corporate, partnership, limited liability company or other structure (e.g., convert from a limited liability company to a limited partnership) without first (a) notifying Lender of such change in writing at least thirty (30) days prior to the effective date of such change, (b) taking all action required by Lender for the purpose of perfecting or protecting the lien and security interest of Lender and (c) in the case of a change in Borrower's structure, without first obtaining the prior written consent of Lender, not to be unreasonably withheld.    Borrower shall promptly notify Lender in writing of any change in its organizational identification number.    If Borrower does not now have an organizational identification number and later obtains one, Borrower shall promptly notify Lender in writing of such organizational identification number.    Borrower shall execute and deliver to Lender, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement change required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein.    At the request of Lender, Borrower shall execute a certificate in form reasonably satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

## Article 4 - OBLIGATIONS AND RELIANCES

Section 4.1    RELATIONSHIP OF BORROWER AND LENDER.    The relationship between Borrower and Lender is solely that of debtor and creditor, and Lender has no fiduciary or other special relationship with Borrower, and no term or condition of any of the Loan Agreement, the Note, this Security Instrument and the other Loan Documents shall be construed so as to deem the relationship between Borrower and Lender to be other than that of debtor and creditor.

Section 4.2    NO RELIANCE ON LENDER.    The general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Property, and Borrower and Lender are relying solely upon such expertise and business plan in connection with the ownership and operation of the Property. Borrower is not relying on Lender's expertise, business acumen or advice in connection with the Property.

Section 4.3    NO LENDER OBLIGATIONS.

(a)    Notwithstanding the provisions of Subsection 1.1(m) or Section 1.2, Lender is not undertaking the performance of (i) any obligations under the Leases; or (ii) any obligations with respect to such agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents.

(b)      By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lender pursuant to this Security Instrument, the Loan Agreement, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lender.

Section 4.4      RELIANCE.  Borrower recognizes and acknowledges that in accepting the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, Lender is expressly and primarily relying on the truth and accuracy of the warranties and representations set forth in Article III of the Loan Agreement without any obligation to investigate the Property and notwithstanding any investigation of the Property by Lender; that such reliance existed on the part of Lender prior to the date hereof, that the warranties and representations are a material inducement to Lender in making the Loan; and that Lender would not be willing to make the Loan and accept this Security Instrument in the absence of the warranties and representations as set forth in Article III of the Loan Agreement.

## Article 5 - FURTHER ASSURANCES

Section 5.1      RECORDING OF SECURITY INSTRUMENT, ETC.  Borrower forthwith upon the execution and delivery of this Security Instrument and thereafter, from time to time, will cause this Security Instrument and any of the other Loan Documents creating a lien or security interest or evidencing the lien hereof upon the Property and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect and perfect the lien or security interest hereof upon, and the interest of Lender in, the Property.  Borrower will pay all taxes, filing, registration or recording fees, and all expenses incident to the preparation, execution, acknowledgment and/or recording of the Note, this Security Instrument, the other Loan Documents, any note, deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property and any instrument of further assurance, and any modification or amendment of the foregoing documents, and all federal, state, county and municipal taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of this Security Instrument, any deed of trust or mortgage supplemental hereto, any security instrument with respect to the Property or any instrument of further assurance, and any modification or amendment of the foregoing documents, except where prohibited by law so to do, and Borrower shall hold harmless and indemnify Lender against any liability incurred by reason of the imposition of any tax on the issuance, making, filing, registration or recording of this Agreement.

Section 5.2      FURTHER ACTS, ETC.  Borrower will, at the cost of Borrower, and without expense to Lender, do, execute, acknowledge and deliver all and every such further acts, deeds, conveyances, deeds of trust, mortgages, assignments, notices of assignments, transfers and assurances as Lender shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lender the property and rights hereby mortgaged, deeded, granted, bargained, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower may be or may hereafter

become bound to convey or assign to Lender, or for carrying out the intention or facilitating the performance of the terms of this Security Instrument or for filing, registering or recording this Security Instrument, or for complying with all Legal Requirements.  Borrower, on demand, will execute and deliver, and in the event it shall fail to so execute and deliver, hereby authorizes Lender to execute in the name of Borrower or without the signature of Borrower to the extent Lender may lawfully do so, one or more financing statements (including, without limitation, initial financing statements and amendments thereto and continuation statements) with or without the signature of Borrower as authorized by applicable law, to evidence more effectively the security interest of Lender in the Property.  Borrower also ratifies its authorization for Lender to have filed any like initial financing statements, amendments thereto and continuation statements, if filed prior to the date of this Security Instrument.  Borrower grants to Lender an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lender at law and in equity, including, without limitation, such rights and remedies available to Lender pursuant to this Section 5.2, which power of attorney may be exercised by Lender solely upon the occurrence and during the continuance of an Event of Default.

Section 5.3    CHANGES IN TAX, DEBT, CREDIT AND DOCUMENTARY STAMP LAWS.

(a)    If any law is enacted or adopted or amended after the date of this Security Instrument which deducts the Debt from the value of the Property for the purpose of taxation or which imposes a tax, either directly or indirectly, on the Debt or Lender's interest in the Property, Borrower will pay the tax, with interest and penalties thereon, if any.  If Lender is advised by counsel chosen by it that the payment of tax by Borrower would be unlawful or taxable to Lender or unenforceable or provide the basis for a defense of usury then Lender shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable; provided, however, Borrower shall not be liable for any prepayment premium, penalty or fee of any kind in connection with such prepayment of the Debt pursuant to this Section 5.3(a).

(b)    Borrower will not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Property, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Property, or any part thereof, for real estate tax purposes by reason of this Security Instrument or the Debt.  If such claim, credit or deduction shall be required by law, Lender shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable; provided, however, Borrower shall not be liable for any prepayment premium, penalty or fee of any kind in connection with such prepayment of the Debt pursuant to this Section 5.3(b).

(c)    If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, this Security Instrument, or any of the other Loan Documents or impose any other tax or charge on the same, Borrower will pay for the same, with interest and penalties thereon, if any.

Section 5.4    SPLITTING OF SECURITY INSTRUMENT.    Subject in all events to the limitations set forth in Section 9.5 of the Loan Agreement and applicable law, this Security Instrument and the Note shall, at any time until the same shall be fully paid and satisfied, at the

sole election of Lender, be split or divided into two or more notes and two or more security instruments, each of which shall cover all or a portion of the Property to be more particularly described therein. To that end, Borrower, upon written request of Lender, shall execute, acknowledge and deliver, or cause to be executed, acknowledged and delivered by the then owner of the Property, to Lender and/or its designee or designees substitute notes and security instruments in such principal amounts, aggregating not more than the then unpaid principal amount of the Note, and containing terms, provisions and clauses similar to those contained herein and in the Note, and such other documents and instruments as may be required by Lender.

Section 5.5    REPLACEMENT DOCUMENTS. Upon receipt of an affidavit of an officer of Lender as to the loss, theft, destruction or mutilation of the Note or any other Loan Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, and, with respect to the Note, receipt of a lost note affidavit, in form and substance acceptable to Lender and Borrower, at no cost or expense to Borrower, will (i) issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor, and (ii) with respect to the Note, if requested by Lender, a reaffirmation of the Debt as evidenced by such Note acknowledging that Lender has informed Borrower that the Note was lost, stolen, destroyed or mutilated and that such Debt continues to be an obligation and liability of the Borrower as set forth in the Note, a copy of which shall be attached to such reaffirmation.

Section 5.6    NO OFFSETS OR COUNTERCLAIMS. Borrower represents and warrants as of the date hereof that there are no offsets, counterclaims or defenses against the Debt, this Security Instrument or the Note, that Borrower has full power, authority and legal right to execute this Security Instrument and to keep and observe all of the terms and provisions of this Security Instrument on Borrower's part to be observed or performed and that the Note and this Security Instrument constitute valid and binding obligations of Borrower.

## Article 6 - DUE ON SALE/ENCUMBRANCE

Section 6.1    LENDER RELIANCE. Borrower acknowledges that Lender has examined and relied on the experience of Borrower and its general partners, members, principals and (if Borrower is a trust) beneficial owners in owning and operating properties such as the Property in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Debt and the performance of the Other Obligations. Borrower acknowledges that Lender has a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Debt or the performance of the Other Obligations, Lender can recover the Debt by a sale of the Property.

Section 6.2    NO TRANSFER. Borrower shall not permit to occur or suffer any Transfer (as defined in the Loan Agreement), unless specifically permitted by Article 8 of the Loan Agreement or unless Lender shall consent thereto in writing in accordance with Section 4.2.1 of the Loan Agreement.

## Article 7 - RIGHTS AND REMEDIES UPON DEFAULT

Section 7.1    REMEDIES.  Upon the occurrence and during the continuance of any Event of Default, Borrower agrees that Lender may take such action, without notice or demand, as it deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, but not limited to, the following actions, each of which may be pursued concurrently or otherwise, at such time and in such order as Lender may determine, in its sole discretion, without impairing or otherwise affecting the other rights and remedies of Lender:

(a)      declare the entire unpaid Debt to be immediately due and payable;

(b)      institute proceedings, judicial or otherwise, for the complete foreclosure of this Security Instrument under any applicable provision of law, in which case the Property or any interest therein may be sold for cash or upon credit in one or more parcels or in several interests or portions and in any order or manner;

(c)      with or without entry, to the extent permitted and pursuant to the procedures provided by applicable law, institute proceedings for the partial foreclosure of this Security Instrument for the portion of the Debt then due and payable, subject to the continuing lien and security interest of this Security Instrument for the balance of the Debt not then due, unimpaired and without loss of priority;

(d)      sell for cash or upon credit the Property or any part thereof and all estate, claim, demand, right, title and interest of Borrower therein and rights of redemption thereof, pursuant to judicial sale or otherwise, at one or more sales, as an entirety or in parcels, at such time and place, upon such terms and after such notice thereof as may be required or permitted by law; and, without limiting the foregoing:

(i)      In connection with any sale or sales hereunder, to the extent permitted by applicable law, Lender shall be entitled to elect to treat any of the Property which consists of (x) a right in action, or (y) property that can be severed from the Real Property covered hereby, or (z) any improvements (without causing structural damage thereto), as if the same were personal property, and dispose of the same in accordance with applicable law, separate and apart from the sale of the Real Property.  Where the Property consists of the Real Property, the Personal Property, the Equipment or the Fixtures, whether or not such Personal Property or Equipment is located on or within the Real Property, Lender shall be entitled to elect to exercise its rights and remedies against any or all of the Real Property, the Personal Property, the Equipment and the Fixtures in such order and manner as is now or hereafter permitted by applicable law;

(ii)      Lender shall be entitled to elect to proceed against any or all of the Real Property, Personal Property, Equipment and Fixtures in any manner permitted under applicable law;

(iii)      Should Lender elect to sell any portion of the Property which is Real Property or which is Personal Property, Equipment or Fixtures that the Lender has elected under applicable law to sell together with Real Property in accordance with the laws governing a sale of the Real Property, Lender shall give such notice of the occurrence of

an Event of Default, if any, and its election to sell such Property, each as may then be required by law. Thereafter, upon the expiration of such time and the giving of such notice of sale as may then be required by law, subject to the terms hereof and of the other Loan Documents, and without the necessity of any demand on Borrower, Lender at the time and place specified in the notice of sale, shall sell such Real Property or part thereof at public auction to the highest bidder for cash in lawful money of the United States. Lender may from time to time postpone any sale hereunder by public announcement thereof at the time and place noticed for any such sale; and

(iv)    If the Property consists of several lots, parcels or items of property, Lender shall, subject to applicable law, (A) designate the order in which such lots, parcels or items shall be offered for sale or sold, or (B) elect to sell such lots, parcels or items through a single sale, or through two or more successive sales, or in any other manner Lender designates in Lender's sole discretion. Any Person, including Borrower or Lender, may purchase at any sale hereunder. Should Lender desire that more than one sale or other disposition of the Property be conducted, Lender shall, subject to applicable law, cause such sales or dispositions to be conducted simultaneously, or successively, on the same day, or at such different days or times and in such order as Lender may designate, and no such sale shall terminate or otherwise affect the Lien of this Security Instrument on any part of the Property not sold until all the Obligations have been satisfied in full. In the event Lender elects to dispose of the Property through more than one sale, except as otherwise provided by applicable law, Borrower agrees to pay the costs and expenses actually incurred by Lender in connection with each such sale and of any judicial proceedings wherein such sale may be made;

(e)    institute an action, suit or proceeding in equity for the specific performance of any covenant, condition or agreement contained herein, in the Note, the Loan Agreement or in the other Loan Documents;

(f)    recover judgment on the Note either before, during or after any proceedings for the enforcement of this Security Instrument or the other Loan Documents;

(g)    apply for the appointment of a receiver, trustee, liquidator or conservator of the Property, without notice and without regard for the adequacy of the security for the Debt and without regard for the solvency of Borrower, any guarantor, indemnitor with respect to the Loan or of any Person liable for the payment of the Debt;

(h)    the license granted to Borrower under Section 1.2 hereof shall automatically be revoked and Lender may enter into or upon the Property, either personally or by its agents, nominees or attorneys and dispossess Borrower and its agents and servants therefrom, without liability for trespass, damages or otherwise and exclude Borrower and its agents or servants wholly therefrom, and take possession of all books, records and accounts relating thereto and Borrower agrees to surrender possession of the Property and of such books, records and accounts to Lender upon demand, and thereupon Lender may (i) use, operate, manage, control, insure, maintain, repair, restore and otherwise deal with all and every part of the Property and conduct the business thereat; (ii) complete any construction on the Property in such manner and form as Lender deems advisable; (iii) make alterations, additions, renewals, replacements and improvements to or on the

Property; (iv) exercise all rights and powers of Borrower with respect to the Property, whether in the name of Borrower or otherwise, including, without limitation, the right to make, cancel, enforce or modify Leases, obtain and evict tenants, and demand, sue for, collect and receive all Rents of the Property and every part thereof; (v) require Borrower to pay monthly in advance to Lender, or any receiver appointed to collect the Rents, the fair and reasonable rental value for the use and occupation of such part of the Property as may be occupied by Borrower; (vi) require Borrower to vacate and surrender possession of the Property to Lender or to such receiver and, in default thereof, Borrower may be evicted by summary proceedings or otherwise; and (vii) apply the receipts from the Property to the payment of the Debt, in such order, priority and proportions as Lender shall deem appropriate in its sole discretion after deducting therefrom all expenses (including reasonable attorneys' fees) incurred in connection with the aforesaid operations and all amounts necessary to pay the Taxes, Other Charges, insurance and other expenses in connection with the Property, as well as just and reasonable compensation for the services of Lender, its counsel, agents and employees;

(i)     exercise any and all rights and remedies granted to a secured party upon default under the Uniform Commercial Code, including, without limiting the generality of the foregoing: (i) the right to take possession of the Fixtures, the Equipment and the Personal Property, or any part thereof, and to take such other measures as Lender may deem necessary for the care, protection and preservation of the Fixtures, the Equipment and the Personal Property, and (ii) request Borrower at its expense to assemble the Fixtures, the Equipment and the Personal Property and make it available to Lender at a convenient place acceptable to Lender.  Any notice of sale, disposition or other intended action by Lender with respect to the Fixtures, the Equipment and/or the Personal Property sent to Borrower in accordance with the provisions hereof at least ten (10) Business Days prior to such action, shall constitute commercially reasonable notice to Borrower;

(j)     apply any sums then deposited or held in escrow or otherwise by or on behalf of Lender in accordance with the terms of the Loan Agreement, this Security Instrument or any other Loan Document to the payment of the following items in any order in its uncontrolled discretion:

(i)     Taxes and Other Charges;

(ii)     Insurance Premiums;

(iii)     Interest on the unpaid principal balance of the Note;

(iv)     Amortization of the unpaid principal balance of the Note;

(v)     All other sums payable pursuant to the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, including without limitation the Spread Maintenance Premium and advances made by Lender pursuant to the terms of this Security Instrument;

(k)     pursue such other remedies as Lender may have under applicable law; or

(l)     apply the undisbursed balance of any Net Proceeds Deficiency deposit, together with interest thereon, to the payment of the Debt in such order, priority and proportions as Lender shall deem to be appropriate in its discretion.

In the event of a sale, by foreclosure, judicial sale or otherwise, of less than all of Property, this Security Instrument shall continue as a lien and security interest on the remaining portion of the Property unimpaired and without loss of priority.

Section 7.2    APPLICATION OF PROCEEDS.    Upon the occurrence and during the continuance of an Event of Default, the purchase money, proceeds and avails of any disposition of the Property, and or any part thereof, or any other sums collected by Lender pursuant to the Note, this Security Instrument or the other Loan Documents, may be applied by Lender to the payment of the Debt in such priority and proportions as Lender in its discretion shall deem proper, to the extent consistent with Legal Requirements.

Section 7.3    RIGHT TO CURE DEFAULTS.    Upon the occurrence and during the continuance of any Event of Default or if Borrower fails to make any payment or to do any act as herein provided, Lender may, but without any obligation to do so and without notice to or demand on Borrower and without releasing Borrower from any obligation hereunder, make or do the same in such manner and to such extent as Lender may deem necessary to protect the security hereof. Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property or to foreclose this Security Instrument or collect the Debt, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 7.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand. All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any such action or proceeding shall bear interest at the Default Rate, for the period after notice from Lender that such cost or expense was incurred to the date of payment to Lender. All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by this Security Instrument and the other Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 7.4    ACTIONS AND PROCEEDINGS.    Lender has the right to appear in and defend any action or proceeding brought with respect to the Property and to bring any action or proceeding, in the name and on behalf of Borrower, which Lender, in its discretion, decides should be brought to protect its interest in the Property.

Section 7.5    RECOVERY OF SUMS REQUIRED TO BE PAID.    Lender shall have the right from time to time to take action to recover any sum or sums which constitute a part of the Debt as the same become due, without regard to whether or not the balance of the Debt shall be due, and without prejudice to the right of Lender thereafter to bring an action of foreclosure, or any other action, for any Event of Default by Borrower existing at the time such earlier action was commenced.

Section 7.6    EXAMINATION OF BOOKS AND RECORDS.    At reasonable times and upon reasonable notice, Lender, its agents, accountants and attorneys shall have the right to examine the records, books, management and other papers of Borrower which reflect upon its financial condition, at the Property or at any office regularly maintained by Borrower where the books and records are located. Lender and its agents shall have the right to make copies and extracts from the foregoing records and other papers. In addition, at reasonable times and upon reasonable

notice, Lender, its agents, accountants and attorneys shall have the right to examine the books and records of Borrower pertaining to the income, expenses and operation of the Property during reasonable business hours at any office of Borrower where the books and records are located.  This Section 7.6 shall apply throughout the term of the Note and without regard to whether an Event of Default has occurred or is continuing.

Section 7.7    OTHER RIGHTS, ETC.

(a)    The failure of Lender to insist upon strict performance of any term hereof shall not be deemed to be a waiver of any term of this Security Instrument.  Borrower shall not be relieved of Borrower's obligations hereunder by reason of (i) the failure of Lender to comply with any request of Borrower or any guarantor or indemnitor with respect to the Loan to take any action to foreclose this Security Instrument or otherwise enforce any of the provisions hereof or of the Note or the other Loan Documents, (ii) the release, regardless of consideration, of the whole or any part of the Property, or of any Person liable for the Debt or any portion thereof, or (iii) any agreement or stipulation by Lender extending the time of payment or otherwise modifying or supplementing the terms of the Note, this Security Instrument or the other Loan Documents.

(b)    It is agreed that the risk of loss or damage to the Property is on Borrower, and Lender shall have no liability whatsoever for decline in value of the Property, for failure to maintain the Policies, or for failure to determine whether insurance in force is adequate as to the amount of risks insured.  Possession by Lender shall not be deemed an election of judicial relief if any such possession is requested or obtained with respect to any Property or collateral not in Lender's possession.

(c)    Upon the occurrence and during the continuance of an Event of Default, Lender may resort for the payment of the Debt to any other security held by Lender in such order and manner as Lender, in its discretion, may elect.  Upon the occurrence and during the continuance of an Event of Default, Lender may take action to recover the Debt, or any portion thereof, or to enforce any covenant hereof without prejudice to the right of Lender thereafter to foreclose this Security Instrument.  The rights of Lender under this Security Instrument shall be separate, distinct and cumulative and none shall be given effect to the exclusion of the others.  No act of Lender shall be construed as an election to proceed under any one provision herein to the exclusion of any other provision.  Lender shall not be limited exclusively to the rights and remedies herein stated but shall be entitled to every right and remedy now or hereafter afforded at law or in equity.

Section 7.8    RIGHT TO RELEASE ANY PORTION OF THE PROPERTY.  Lender may release any portion of the Property for such consideration as Lender may require without, as to the remainder of the Property, in any way impairing or affecting the lien or priority of this Security Instrument, or improving the position of any subordinate lienholder with respect thereto, except to the extent that the obligations hereunder shall have been reduced by the actual monetary consideration, if any, received by Lender for such release, and may accept by assignment, pledge or otherwise any other property in place thereof as Lender may require without being accountable for so doing to any other lienholder.  This Security Instrument shall continue as a lien and security interest in the remaining portion of the Property.

Section 7.9    INTENTIONALLY OMITTED.

Section 7.10    RECOURSE AND CHOICE OF REMEDIES.  Notwithstanding any other provision of this Security Instrument or the Loan Agreement, including, without limitation, Section 11.22 of the Loan Agreement, Lender and other Indemnified Parties (as hereinafter defined) are entitled to enforce the obligations of Borrower, any guarantor and indemnitor contained in Section 11.22 of the Loan Agreement without first resorting to or exhausting any security or collateral and without first having recourse to the Note or any of the Property, through foreclosure or acceptance of a deed in lieu of foreclosure or otherwise, and in the event Lender commences a foreclosure action against the Property, Lender is entitled to pursue a deficiency judgment with respect to such obligations against Borrower with respect to the Loan. The provisions of Section 11.22 of the Loan Agreement are exceptions to any non-recourse or exculpation provisions in the Loan Agreement, the Note, this Security Instrument or the other Loan Documents, and Borrower and any guarantor or indemnitor with respect to the Loan are fully and personally liable for the obligations pursuant to Section 11.22 of the Loan Agreement.  The liability of Borrower and any guarantor or indemnitor with respect to the Loan pursuant to Section 11.22 of the Loan Agreement is not limited to the original principal amount of the Note.  Notwithstanding the foregoing, nothing herein shall inhibit or prevent Lender from foreclosing or exercising any other rights and remedies pursuant to the Loan Agreement, the Note, this Security Instrument and the other Loan Documents, whether simultaneously with foreclosure proceedings or in any other sequence.  A separate action or actions may be brought and prosecuted against Borrower pursuant to Section 11.22 of the Loan Agreement, whether or not action is brought against any other Person or whether or not any other Person is joined in the action or actions.  In addition, Lender shall have the right but not the obligation to join and participate in, as a party if it so elects, any administrative or judicial proceedings or actions initiated in connection with any matter addressed in the Environmental Indemnity.

Section 7.11    RIGHT OF ENTRY.  Upon reasonable notice to Borrower, Lender and its agents shall have the right to enter and inspect the Property at all reasonable times, subject to the rights of Tenants under Leases.

Section 7.12    BANKRUPTCY.

(a)    Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, and Borrower hereby assigns to Lender its right and irrevocably constitutes and appoints Lender its attorney-in-fact, coupled with an interest, to proceed in its own name or in the name of Borrower in respect of any claim, suit, action or proceeding relating to the rejection of any Lease, including, without limitation, the right to file and prosecute, to the exclusion of Borrower, any proofs of claim, complaints, motions, applications, notices and other documents, in any case in respect of the Tenant under such Lease under the Bankruptcy Code.

(b)    If there shall be filed by or against Borrower a petition under the Bankruptcy Code and Borrower, as lessor under any Lease, shall determine to reject such Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Lease.  Lender shall have the right, but not the obligation, to serve upon Borrower within such ten (10) day period a notice stating that (i) Lender demands that Borrower assume and assign the Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender covenants to cure or provide adequate assurance of future performance under the Lease.  If Lender serves upon

Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the covenant provided for in clause (ii) of the preceding sentence.

### Article 8 - ENVIRONMENTAL HAZARDS

Section 8.1  ENVIRONMENTAL COVENANTS.  Borrower has provided representations, warranties and covenants regarding environmental matters set forth in the Environmental Indemnity and Borrower shall comply with the aforesaid covenants regarding environmental matters.

### Article 9 - INDEMNIFICATION

The provisions of Section 11.13 of the Loan Agreement are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

### Article 10 - WAIVERS

Section 10.1  WAIVER OF COUNTERCLAIM.  To the extent permitted by applicable law, Borrower hereby waives the right to assert a counterclaim, other than a mandatory or compulsory counterclaim, in any action or proceeding brought against it by Lender arising out of or in any way connected with this Security Instrument, the Loan Agreement, the Note, any of the other Loan Documents, or the Obligations.

Section 10.2  MARSHALLING AND OTHER MATTERS.  To the extent permitted by applicable law, Borrower hereby waives the benefit of all appraisement, valuation, stay, extension, reinstatement and redemption laws now or hereafter in force and all rights of marshalling in the event of any sale hereunder of the Property or any part thereof or any interest therein.  Further, Borrower hereby expressly waives any and all rights of redemption from sale under any order or decree of foreclosure of this Security Instrument on behalf of Borrower, and on behalf of each and every person acquiring any interest in or title to the Property subsequent to the date of this Security Instrument and on behalf of all persons to the extent permitted by applicable law.

Section 10.3  WAIVER OF NOTICE.  To the extent permitted by applicable law, Borrower shall not be entitled to any notices of any nature whatsoever from Lender under this Security Instrument except with respect to matters for which this Security Instrument specifically and expressly provides for the giving of notice by Lender to Borrower and except with respect to matters for which Lender is required by applicable law to give notice, and Borrower hereby expressly waives the right to receive any notice from Lender under this Security Instrument with respect to any matter for which this Security Instrument does not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 10.4  WAIVER OF STATUTE OF LIMITATIONS.  To the extent permitted by applicable law, Borrower hereby expressly waives and releases to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its Other Obligations.

Section 10.5    W̲A̲I̲V̲E̲R̲ ̲O̲F̲ ̲T̲R̲I̲A̲L̲ ̲B̲Y̲ ̲J̲U̲R̲Y̲.  EACH OF BORROWER AND LENDER, BY ITS ACCEPTANCE OF THIS SECURITY INSTRUMENT, HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND FOREVER WAIVES, TO THE EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST, WITH REGARD TO THE LOAN AGREEMENT, THE NOTE, THIS SECURITY INSTRUMENT OR THE OTHER LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE WITH REGARD TO THE LOAN DOCUMENTS. BORROWER AND LENDER ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY EACH PARTY.

## Article 11 - EXCULPATION

The provisions of Section 11.22 of the Loan Agreement are hereby incorporated by reference into this Security Instrument to the same extent and with the same force as if fully set forth herein.

## Article 12 - NOTICES

All notices or other written communications hereunder shall be delivered in accordance with Section 11.6 of the Loan Agreement.

## Article 13 - APPLICABLE LAW

Section 13.1    **GOVERNING LAW.**  **(A) THIS SECURITY INSTRUMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY BORROWER AND ACCEPTED BY LENDER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS SECURITY INSTRUMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES (I) THE PROVISIONS FOR THE CREATION, PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS WITH RESPECT TO THE PROPERTY (OTHER THAN THAT DESCRIBED IN**

SUBPARAGRAPH II BELOW) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE COMMONWEALTH IN WHICH THE PROPERTY AND FIXTURES ARE LOCATED AND (II) WITH RESPECT TO THE PERFECTION, PRIORITY AND ENFORCEMENT OF THE LIENS AND SECURITY INTERESTS CREATED BY THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS), THE LAW OF THE JURISDICTION APPLICABLE IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK SHALL GOVERN.  TO THE FULLEST EXTENT PERMITTED BY LAW, EACH OF BORROWER AND, BY ITS ACCEPTANCE OF THIS SECURITY INSTRUMENT, LENDER, HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS SECURITY INSTRUMENT AND/OR THE OTHER LOAN DOCUMENTS, AND THIS SECURITY INSTRUMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

(B)  ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS SECURITY INSTRUMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND EACH OF BORROWER AND, BY ITS ACCEPTANCE OF THIS SECURITY INSTRUMENT, LENDER, WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.

Section 13.2   USURY LAWS.  Notwithstanding anything to the contrary, (a) all agreements and communications between Borrower and Lender are hereby and shall automatically be limited so that, after taking into account all amounts deemed interest, the interest contracted for, charged or received by Lender shall never exceed the Maximum Legal Rate or amount, (b) in calculating whether any interest exceeds the Maximum Legal Rate, all such interest shall be amortized, prorated, allocated and spread over the full amount and term of all principal indebtedness of Borrower to Lender, and (c) if through any contingency or event, Lender receives or is deemed to receive interest in excess of the Maximum Legal Rate, any such excess shall be deemed to have been applied toward payment of the principal of any and all then outstanding indebtedness of Borrower to Lender (in which case such payment shall not be subject to any prepayment, premium, penalty or fee of any kind), or if there is no such indebtedness, shall immediately be returned to Borrower.

Section 13.3   P<small>ROVISIONS</small> S<small>UBJECT TO</small> A<small>PPLICABLE</small> L<small>AW</small>.  All rights, powers and remedies provided in this Security Instrument may be exercised only to the extent that the exercise thereof does not violate any applicable provisions of law and are intended to be limited to the extent necessary so that they will not render this Security Instrument invalid, unenforceable or not entitled to be recorded, registered or filed under the provisions of any applicable law.  If any term of this Security Instrument or any application thereof shall be invalid or unenforceable, the remainder of this Security Instrument and any other application of the term shall not be affected thereby.

## Article 14 - DEFINITIONS

All capitalized terms not defined herein shall have the respective meanings set forth in the Loan Agreement.  Unless the context clearly indicates a contrary intent or unless otherwise specifically provided herein, words used in this Security Instrument may be used interchangeably in singular or plural form and the word "**Borrower**" shall mean "Borrower and any subsequent owner or owners of the Property or any part thereof" the word "**Lender**" shall mean "Lender and any subsequent holder of the Note," the word "**Note**" shall mean "the Note and any other evidence of indebtedness secured by this Security Instrument," the word "**Property**" shall include any portion of the Property and any interest therein, and the phrases "**attorneys' fees**", "**legal fees**" and "**counsel fees**" shall mean any and all reasonable and documented attorneys', paralegal and law clerk fees and disbursements with respect to retained firms, including, but not limited to, fees and disbursements at the pre-trial, trial and appellate levels incurred or paid by Lender in protecting its interest in the Property, the Leases and the Rents and enforcing its rights hereunder.  In the event of any conflict or inconsistency between the provisions of the Loan Agreement and the provisions of this Security Instrument, the provisions of the Loan Agreement shall control and be binding.

## Article 15 - MISCELLANEOUS PROVISIONS

Section 15.1   N<small>O</small> O<small>RAL</small> C<small>HANGE</small>.  This Security Instrument, and any provisions hereof, may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrower or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

Section 15.2   S<small>UCCESSORS AND</small> A<small>SSIGNS</small>.  This Security Instrument shall be binding upon and inure to the benefit of Borrower and Lender and their respective successors and assigns, as set forth in the Loan Agreement.  Lender shall have the right to assign or transfer its rights under this Security Instrument in connection with any assignment of the Loan and the Loan Documents effectuated in accordance with the terms of the Loan Agreement.  Any such assignee or transferee of Lender shall be entitled to all the benefits afforded to Lender under this Security Instrument.  Borrower shall not have the right to assign or transfer its rights or obligations under this Security Instrument without the prior written consent of Lender, as provided in the Loan Agreement, and any attempted assignment without such consent shall be null and void.

Section 15.3   I<small>NAPPLICABLE</small> P<small>ROVISIONS</small>.  If any term, covenant or condition of the Loan Agreement, the Note or this Security Instrument is held to be invalid, illegal or unenforceable in

any respect, the Loan Agreement, the Note and this Security Instrument shall be construed without such provision.

Section 15.4   HEADINGS, ETC.   The headings and captions of various Sections of this Security Instrument are for convenience of reference only and are not to be construed as defining or limiting, in any way, the scope or intent of the provisions hereof.

Section 15.5   NUMBER AND GENDER.   Whenever the context may require, any pronouns used herein shall include the corresponding masculine, feminine or neuter forms, and the singular form of nouns and pronouns shall include the plural and vice versa.

Section 15.6   SUBROGATION.   If any or all of the proceeds of the Note have been used to extinguish, extend or renew any indebtedness heretofore existing against the Property, then, to the extent of the funds so used, Lender shall be subrogated to all of the rights, claims, liens, titles, and interests existing against the Property heretofore held by, or in favor of, the holder of such indebtedness and such former rights, claims, liens, titles, and interests, if any, are not waived but rather are continued in full force and effect in favor of Lender and are merged with the lien and security interest created herein as cumulative security for the repayment of the Debt, the performance and discharge of Borrower's obligations hereunder, under the Loan Agreement, the Note and the other Loan Documents and the performance and discharge of the Other Obligations.

Section 15.7   ENTIRE AGREEMENT.   The Note, the Loan Agreement, this Security Instrument and the other Loan Documents constitute the entire understanding and agreement between Borrower and Lender with respect to the transactions arising in connection with the Debt and supersede all prior written or oral understandings and agreements between Borrower and Lender with respect thereto.   Borrower hereby acknowledges that, except as incorporated in writing in the Note, the Loan Agreement, this Security Instrument and the other Loan Documents, there are not, and were not, and no Persons are or were authorized by Lender to make, any representations, understandings, stipulations, agreements or promises, oral or written, with respect to the transaction which is the subject of the Note, the Loan Agreement, this Security Instrument and the other Loan Documents.

Section 15.8   LIMITATION ON LENDER'S RESPONSIBILITY.   No provision of this Security Instrument shall operate to place any obligation or liability for the control, care, management or repair of the Property upon Lender, nor shall it operate to make Lender responsible or liable for any waste committed on the Property by the Tenants or any other Person, or for any dangerous or defective condition of the Property, or for any negligence in the management, upkeep, repair or control of the Property resulting in loss or injury or death to any Tenant, licensee, employee or stranger.   Nothing herein contained shall be construed as constituting Lender a "mortgagee in possession."

Section 15.9   JOINT AND SEVERAL.   If more than one Person has executed this Security Instrument as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

Section 15.10  COUNTERPARTS.   This Security Instrument may be executed in any number of duplicate originals and each duplicate original shall be deemed to be an original.   This Security

Instrument may be executed in several counterparts, each of which counterparts shall be deemed an original instrument and all of which shall constitute a single agreement. The failure of any party hereto to execute this Security Instrument, or any counterpart thereof, shall not relieve the other signatories from their obligations hereunder.

## Article 16 - STATE-SPECIFIC PROVISIONS

Section 16.1 PRINCIPLES OF CONSTRUCTION. In the event of any inconsistencies between the terms and conditions of this Article 16 and the other terms and conditions of this Security Instrument, the terms and conditions of this Article 16 shall control and be binding.

Section 16.2 PROTECTIVE ADVANCES. This Security Instrument is executed and delivered to secure, among other things, future advances and re-advances. It is understood and agreed that this Security Instrument secures present and future advances and re-advances of principal up to a maximum principal amount of such advances and readvances of $83,700,000.00 (which limitation shall not apply to protective advances, any and all of which would be in addition thereto) made for the benefit of Lender and that the lien of such future advances and re-advances shall relate back to the date of this Security Instrument, and Borrower and Lender intend that this Security Instrument be an "Open-End Mortgage" as described in 42 Pa. C.S.A. § 8143 and as such be entitled to all benefits under 42 Pa. C.S.A. § 8141, as amended. This Security Instrument also secures any and all amounts advanced by Lender which may be secured by a Security Instrument under 42 Pa. C.S.A. § 8144 and this Security Instrument shall have all of the benefits thereof. Without limitation, to the extent permitted by applicable law, this Security Instrument secures, and the Note evidences the obligation of Borrower to repay, any advances made after the date hereof for the payment of taxes, assessments, maintenance charges, insurance premiums, or costs incurred for the protection of the Property or the lien of this Security Instrument, expenses incurred by Lender by reason of default by Borrower under this Security Instrument or advances made under a construction loan to enable completion of the improvements for which the construction loan was originally made. Borrower agrees that, if at any time during the term of this Security Instrument or following a foreclosure hereof, Borrower fails to perform or observe any covenant or obligation under this Security Instrument including, without limitation, payment of any of the foregoing, Lender may (but shall not be obligated to) take such steps as are reasonably necessary to remedy any such nonperformance or nonobservance and provide payment thereof subject to, and in accordance with, the terms of this Security Instrument.

Section 16.3 EVENT OF DEFAULT. At Lender's election, it shall be an Event of Default if Borrower delivers to Lender a notice under 42 Pa. C.S.A. §8143(c).

Section 16.4 SURVIVAL LANGUAGE. (a) All covenants of Borrower contained herein and in the Loan Agreement providing for the indemnification, defense or release of Lender, or for the payment of costs or expenses by Borrower, including without limitation the payment or reimbursement of reasonable attorneys' fees or costs, or for the payment of any expenses for the protection, upkeep or maintenance of the Property, including without limitation the payment of taxes or any other expenses, are intended to be severable from the other provisions of this Security Instrument, shall survive the entry of any judgment hereunder, and shall not be deemed merged into the judgment. In particular and without limiting the foregoing, any reasonable attorneys' fees incurred in the enforcement of any judgment obtained hereunder shall be recoverable as a separate

item and shall not be merged into the judgment. (b) If any payment due hereunder or under the Note is not paid when due, after the passage of any applicable notice and/or cure period, either at stated or accelerated maturity or pursuant to any of the terms hereof, then and in such event, Borrower shall pay interest thereon in accordance with the provisions of the Loan Documents. Nothing in this Section 16.4 or in any other provision of this Security Instrument shall constitute an extension of the time of payment of the Debt. After entry of a judgment on any of the Loan Documents or a judgment in mortgage foreclosure hereunder, interest shall continue to accrue under the Note and this Security Instrument at the rates set forth in the Loan Documents. This Security Instrument shall not, for purposes of determining interest payable under the Note, merge with any judgment on any Loan Document or a judgment in mortgage foreclosure under this Security Instrument

Section 16.5    RELEASE OF MORTGAGE. This Security Instrument is granted upon express condition that if Borrower pays the Obligations (excluding any indemnification or other Obligation that is expressly stated in any of the Loan Documents to survive the repayment of the Debt in full) in accordance with the terms of the Loan Documents, then this Security Instrument and the estates and liens granted hereby shall automatically cease and become void, except for those provisions hereof which by their terms survive, and the Property shall become wholly clear of the liens, security interests, conveyances and assignments evidenced hereby, which shall be released by Lender of record in due form at Borrower's reasonable cost. No release of this Security Instrument or the lien hereof shall be valid unless executed by Lender.

Section 16.6    CONFESSION OF JUDGEMENT. FOR THE PURPOSE OF OBTAINING POSSESSION OF THE PROPERTY UPON THE OCCURRENCE AND DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, BORROWER HEREBY AUTHORIZES AND EMPOWERS ANY ATTORNEY OF RECORD OR THE PROTHONOTARY, CLERK OR SIMILAR OFFICER, OF ANY COURT IN THE COMMONWEALTH OF PENNSYLVANIA OR ELSEWHERE, AS ATTORNEY FOR BORROWER, AS ATTORNEY FOR BORROWER AND ALL PERSONS CLAIMING UNDER OR THROUGH BORROWER TO SIGN AN AGREEMENT FOR ENTERING IN ANY COMPETENT COURT AN ACTION IN EJECTMENT FOR POSSESSION OF THE PROPERTY AND TO APPEAR FOR AND CONFESS JUDGMENT AGAINST BORROWER AND AGAINST ALL PERSONS CLAIMING UNDER OR THROUGH BORROWER (SUBJECT TO THE RIGHTS OF TENANTS UNDER THE LEASES), IN FAVOR OF LENDER, FOR RECOVERY BY LENDER OF POSSESSION THEREOF, FOR WHICH THIS SECURITY INSTRUMENT, OR A COPY THEREOF VERIFIED BY AFFIDAVIT, SHALL BE A SUFFICIENT WARRANT; AND THEREUPON A WRIT OF POSSESSION MAY IMMEDIATELY ISSUE FOR POSSESSION OF THE PROPERTY, WITHOUT ANY PRIOR WRIT OR PROCEEDING WHATSOEVER AND WITHOUT ANY STAY OF EXECUTION, IF FOR ANY REASON AFTER SUCH ACTION HAS BEEN COMMENCED IT SHOULD BE DISCONTINUED, OR POSSESSION OF THE PROPERTY SHALL REMAIN IN OR BE RESTORED TO BORROWER, LENDER SHALL HAVE THE RIGHT FOR THE SAME EVENT OF DEFAULT OR ANY SUBSEQUENT EVENT OF DEFAULT THAT IS CONTINUING TO BRING ONE OR MORE FURTHER ACTIONS AS ABOVE PROVIDED TO RECOVER POSSESSION OF THE PROPERTY. LENDER MAY BRING AN ACTION IN EJECTMENT AND CONFESS JUDGMENT FOR POSSESSION THEREIN BEFORE OR AFTER THE INSTITUTION OF PROCEEDINGS TO FORECLOSE THIS SECURITY INSTRUMENT OR TO ENFORCE THE

NOTE, OR AFTER ENTRY OF JUDGMENT THEREIN OR ON THE NOTE, OR AFTER A SHERIFF'S SALE OF THE PROPERTY IN WHICH LENDER IS THE SUCCESSFUL BIDDER; THE AUTHORIZATION TO PURSUE SUCH PROCEEDINGS FOR OBTAINING POSSESSION AND CONFESS JUDGMENT THEREIN IS AN ESSENTIAL PART OF THE REMEDIES FOR ENFORCEMENT OF THIS SECURITY INSTRUMENT AND THE NOTE, AND SHALL SURVIVE ANY EXECUTION SALE TO LENDER.

BORROWER CONFIRMS TO LENDER THAT (I) BORROWER IS A BUSINESS ENTITY AND THAT ITS PRINCIPALS ARE KNOWLEDGEABLE IN BUSINESS MATTERS; (II) THE TERMS OF THIS SECURITY INSTRUMENT, INCLUDING THE FOREGOING WARRANT OF ATTORNEY TO CONFESS JUDGMENT FOR POSSESSION, HAVE BEEN NEGOTIATED AND AGREED UPON IN A COMMERCIAL CONTEXT; AND (III) IT HAS FULLY REVIEWED THE AFORESAID WARRANT OF ATTORNEY TO CONFESS JUDGMENT WITH ITS OWN COUNSEL AND IS KNOWINGLY AND VOLUNTARILY WAIVING CERTAIN RIGHTS IT WOULD OTHERWISE POSSESS, INCLUDING BUT NOT LIMITED TO, THE RIGHT TO ANY NOTICE OR A HEARING PRIOR TO THE ENTRY OF JUDGMENT BY LENDER PURSUANT TO THE AFORESAID WARRANT OF ATTORNEY.

Borrower Initials: _____

Section 16.7    NOTICES. ALL NOTICES TO BE GIVEN TO LENDER PURSUANT TO 42 PA. C.S.A. §8143 ARE TO BE GIVEN AS SET FORTH IN ARTICLE 12 OF THIS SECURITY INSTRUMENT.

Section 16.8    PENNSYLVANIA DEFICIENCY JUDGMENT ACT. Upon the occurrence and during the continuation of an Event of Default, Lender may institute any one or more actions of mortgage foreclosure against all or any part of the Property, or take such other action at law or in equity for the enforcement of this Security Instrument and realization on the security herein or elsewhere provided for, as law may allow, and may proceed therein to final judgment and execution for the entire amount of the outstanding Indebtedness, subject however, to the effect and application of the Pennsylvania Deficiency Judgment Act, 42 Pa. C.S.A. §8103.

Section 16.9    PURCHASE MONEY MORTGAGE. If the proceeds of the Loan are used by Borrower to pay all or part of the purchase price of any of the Property, this Security Instrument is intended to be a purchase money mortgage and shall be entitled to all the benefits as such under and subject to the lien priority provisions of the Pennsylvania Judicial Code, 42 Pa. C.S.A. § 8141, as amended.

## Article 17 - GROUND LEASE PROVISIONS

Section 17.1    NO MERGER OF FEE AND LEASEHOLD ESTATES; RELEASES. So long as any portion of the Debt shall remain unpaid (excluding any indemnification or other Obligation that is expressly stated in any of the Loan Documents to survive the repayment of the Debt in full), unless Lender shall otherwise consent, the fee title to the Land and the leasehold estate under each Ground Lease shall not merge but shall always be kept separate and distinct, notwithstanding the union of

such estates in Borrower or in any other Person by purchase, operation of law or otherwise. Subject to the terms and conditions of each Ground Lease, Lender reserves the right, at any time, to release portions of the Property, including, but not limited to, the leasehold estate under any Ground Lease, with or without consideration, at Lender's election, without waiving or affecting any of its rights hereunder or under the Note or the other Loan Documents and any such release shall not affect Lender's rights in connection with the portion of the Property not so released.

Section 17.2    REJECTION OF THE GROUND LEASE.

(a)    If a Ground Lease is terminated by Bourse Fee Borrower or 400 Market Fee Borrower (as applicable) for any reason in the event of the rejection or disaffirmance of the applicable Ground Lease by Bourse Fee Borrower or 400 Market Fee Borrower pursuant to the Bankruptcy Code or any other law affecting creditor's rights, (i) Borrower, immediately after obtaining notice thereof, shall give notice thereof to Lender, (ii) Bourse Leasehold Borrower or 400 Market Leasehold Borrower, as applicable, without the prior written consent of Lender, shall not elect to treat the applicable Ground Lease as terminated pursuant to Section 365(h) of the Bankruptcy Code or any comparable federal or state statute or law, and any election by Bourse Leasehold Borrower or 400 Market Leasehold Borrower, as applicable, made without such consent shall be void and (iii) this Security Instrument and all the liens, terms, covenants and conditions of this Security Instrument shall extend to and cover Bourse Leasehold Borrower's and 400 Market Leasehold Borrower's possessory rights under Section 365(h) of the Bankruptcy Code and to any claim for damages due to the rejection of any Ground Lease or other termination of any Ground Lease. In addition, Bourse Leasehold Borrower and 400 Market Leasehold Borrower each hereby assign irrevocably to Lender their respective rights to treat the applicable Ground Lease as terminated pursuant to Section 365(h) of the Bankruptcy Code and to offset rents under the Ground Lease in the event any case, proceeding or other action is commenced by or against Bourse Fee Borrower or 400 Market Fee Borrower, as applicable, under the Bankruptcy Code or any comparable federal or state statute or law, provided that Lender shall not exercise such rights and shall permit Bourse Leasehold Borrower or 400 Market Leasehold Borrower to exercise such rights with the prior written consent of Lender, in its sole discretion.

(b)    Each Borrower hereby assigns to Lender such Borrower's right to reject the Ground Lease under Section 365 of the Bankruptcy Code or any comparable federal or state statute or law with respect to any case, proceeding or other action commenced by or against Borrower under the Bankruptcy Code or comparable federal or state statute or law, provided Lender shall not exercise such right, and shall permit Borrower to exercise such right with the prior written consent of Lender in its sole discretion. Further, if either Borrower shall desire to so reject its applicable Ground Lease, at Lender's request, to the extent not prohibited by the terms of such Ground Lease and applicable law, such Borrower shall assign its interest in such Ground Lease to Lender in lieu of rejecting such Ground Lease as described above, upon receipt by such Borrower of written notice from Lender of such request together with Lender's agreement to cure any existing defaults of such Borrower under such Ground Lease and to provide adequate assurance of future performance of the applicable Borrower's obligations thereunder.

(c)    Each Borrower hereby assigns to Lender such Borrower's right to seek an extension of the 60-day period within which such Borrower must accept or reject its Ground Lease under Section 365 of the Bankruptcy Code or any comparable federal or state statute or law with respect

to any case, proceeding or other action commenced by or against such Borrower under the Bankruptcy Code or comparable federal or state statute or law, provided Lender shall not exercise such right, and shall permit such Borrower to exercise such right with the prior written consent of Lender in its sole discretion.  Further, if a Borrower shall desire to so reject its Ground Lease, at Lender's request, to the extent not prohibited by applicable law, such Borrower shall assign its interest in such Ground Lease to Lender in lieu of rejecting such Ground Lease as described above, upon receipt by such Borrower of written notice from Lender of such request together with Lender's agreement to cure any existing defaults of such Borrower under the Ground Lease and to provide adequate assurance of future performance of such Borrower's obligations thereunder.

(d)      Each Borrower hereby agrees that if its Ground Lease is terminated for any reason in the event of the rejection or disaffirmance of such Ground Lease pursuant to the Bankruptcy Code or any other law affecting creditor's rights, any Personal Property of such Borrower not removed from the Property by such Borrower as permitted or required by the Ground Lease, shall at the option of Lender be deemed abandoned by Borrower, provided that Lender may remove any such Personal Property required to be removed by such Borrower pursuant to such Ground Lease and all reasonable out-of-pocket costs and expenses associated with such removal shall be paid by such Borrower within five (5) days of receipt by such Borrower of an invoice for such removal costs and expenses.

[NO FURTHER TEXT ON THIS PAGE]

IN WITNESS WHEREOF, THIS SECURITY INSTRUMENT has been executed by Borrower, intending to be legally bound, as of the day and year first above written.

**BOURSE FEE BORROWER:**

**LAK BOURSE OWNER, LLC,**
a Delaware limited liability company

By: _____

Name: Marc Rash

Title: Authorized Signatory

## ACKNOWLEDGMENT

STATE OF PA )
            ) SS:
COUNTY OF Montgomery

On the __26__ day of __June__, 2024, before me, the undersigned, personally appeared __Marc Rash__, personally known to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/ their capacity(ies) as __authorized signatory__ of __LAK Bourse Owner, LLC__, a Delaware limited liability company, and that by his/her/their signature(s) on the instrument, the individual(s), or their person upon behalf of which the individual(s) acted, executed the instrument on behalf of said company.

_____
Notary Public

My Commission Expires: July 3, 2027

Commonwealth of Pennsylvania - Notary Seal
SARA JANICE LOPEZ · Notary Public
Philadelphia County
My Commission Expires July 3, 2027
Commission Number 1263691



[Signature Page to Mortgage]

**BOURSE LEASEHOLD BORROWER:**

**LAK BOURSE MASTER HTC LANDLORD,**
**LLC**, a Delaware limited liability company

By: _____

Name: Marc Rash

Title: Authorized Signatory

## ACKNOWLEDGMENT

STATE OF PA    )
              ) SS:
COUNTY OF Montgomery )

On the _26_ day of _June_, 2024, before me, the undersigned, personally appeared _Marc Rash_, personally known to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/ their capacity(ies) as _authorized signatory_ of _LaK Bourse Master HTC Landlord LLC_, a Delaware limited liability company, and that by his/her/their signature(s) on the instrument, the individual(s), or their person upon behalf of which the individual(s) acted, executed the instrument on behalf of said company.

_____
Notary Public

My Commission Expires: July 3, 2027

> Commonwealth of Pennsylvania - Notary Seal
> SARA JANICE LOPEZ - Notary Public
> Philadelphia County
> My Commission Expires July 3, 2027
> Commission Number 1263691

[Signature Page to Mortgage]

**400 MARKET FEE BORROWER:**

**LAK 400 OWNER, LLC,**
a Delaware limited liability company

By: _____

Name: Marc Rash

Title: Authorized Signatory

## ACKNOWLEDGMENT

STATE OF PA      )
                 ) SS:
COUNTY OF Montgomery

On the ____26____ day of ____June____, 2024, before me, the undersigned, personally appeared ____Marc Rash____, personally known to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/ their capacity(ies) as ____authorized signatory____ of ____Lak 400 Owner, LLC____, a Delaware limited liability company, and that by his/her/their signature(s) on the instrument, the individual(s), or their person upon behalf of which the individual(s) acted, executed the instrument on behalf of said company.

_____
Notary Public

My Commission Expires: July 3, 2027

Commonwealth of Pennsylvania - Notary Seal
SARA JANICE LOPEZ - Notary Public
Philadelphia County
My Commission Expires July 3, 2027
Commission Number 1263691

[Signature Page to Mortgage]

**400 MARKET LEASEHOLD BORROWER:**

**LAK MARKET MASTER HTC LANDLORD,**
**LLC,** a Delaware limited liability company

By: _____

Name: Marc Rash

Title: Authorized Signatory

## ACKNOWLEDGMENT

STATE OF PA )
                ) SS:
COUNTY OF Montgomery )

On the 26 day of June, 2024, before me, the undersigned, personally appeared Marc Rash, personally known to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/ their capacity(ies) as authorized signatory of Lak Market Master HTC Landlord LLC, a Delaware limited liability company, and that by his/her/their signature(s) on the instrument, the individual(s), or their person upon behalf of which the individual(s) acted, executed the instrument on behalf of said company.

_____
Notary Public

My Commission Expires: July 3, 2027

Commonwealth of Pennsylvania - Notary Seal
SARA JANICE LOPEZ - Notary Public
Philadelphia County
My Commission Expires July 3, 2027
Commission Number 1263691

[Signature Page to Mortgage]

## CERTIFICATE OF RESIDENCE

The undersigned does hereby certify that the precise address of the Lender is:

30 Hudson Yards, Suite 7500, New York, New York 10001

**KREF LENDING III LLC,**
a Delaware limited liability company

By: _____

Name: Paul Fine

Title:   Authorized Signatory

.

[Signature Page to Certificate of Residence]

## Exhibit A

## Legal Description

Tract 1

ALL THAT CERTAIN lot or piece of ground with the buildings and improvements thereon erected.

SITUATE in the 5th Ward of the City of Philadelphia, Commonwealth of Pennsylvania described in accordance with a Survey and Plan of Property made for the Ludlow Fourth Company by Barton and Martin Engineers dated 02/23/1998, last revised 01/11/2001, as follows:

BEGINNING at a point marking the intersection of the South side of Market Street (100 feet wide) and the West side of 4th Street (68.21 feet wide); thence extending along the said side of 4th Street in a Southerly direction 113 feet 3 inches to a point on the intersection of the West side of 4th Street and the North side of Ludlow Street (28.75 feet wide); thence extending along the said side of Ludlow Street in a Westerly direction 163 feet 11-1/4 inches to a point; thence extending in a Northerly direction at right angles to Ludlow Street and Market Street and along the West face of a wall 113 feet 3 inches to a point on the South side of Market Street; thence extending along the said side of Market Street in an Easterly direction 165 feet 4-1/4 inches to the first mentioned point and place of BEGINNING.

BEING 400 Market Street, Philadelphia, Pennsylvania 19106 BEING OPA No. 883012000
BEING the same premises which 400 Market L.P., a Pennsylvania limited partnership, by Deed in Lieu of Foreclosure dated 05/03/2023, effective as of 12/22/2023 and recorded 01/09/2024 in Philadelphia County at Document No. 54259567, granted and conveyed unto KREF Lending III, LLC, a Delaware limited liability company {as successor in interest to KREF Capital LLC, a Delaware limited liability company}, in fee.

Tract 2

PREMISES A

ALL THAT CERTAIN land, property and space with the improvements thereon, SITUATE in the 5th Ward of the City of Philadelphia, Commonwealth of Pennsylvania, located at and beneath the plane formed by the top of a slab forming the floor of the former 3rd floor now the existing 5th floor, the top of which slab has an elevation of 69.39 feet above City Datum, being within and bounded by surfaces formed by projecting vertically between the aforesaid planes, the boundaries of a parcel of land bounded and described with dimensions on the surface of earth, in accordance with a Survey and Plan of Property made by Surveyor and Regulator of the 3rd Survey District, as follows, to wit:

BEGINNING at a point of intersection formed by the Easterly side of 5th Street (variable width) and the Southerly side of Ludlow Street (28.75 feet wide), thence extending Eastwardly along the said Southerly side of Ludlow Street the distance of 362.57 feet to a point on the Westerly side of 4th Street (variable width), thence extending Southwardly along the said Westerly side of 4th Street 131.82 feet to a point on the Northerly side of Ranstead Street (Variable Width), thence Westwardly along the said Northerly side of Ranstead Street 362.37 feet to a point on the said Easterly side of 5th Street, thence Northwardly along the said Easterly side of 5th Street 131.82 feet to a point on the Southerly side of Ludlow Street being the first mentioned point and place of BEGINNING.

TOGETHER with a permanent and perpetual right and easement for support and access in favor of the parcel described as follows:

ALL THAT CERTAIN LAND, property and space with the improvements thereon, SITUATE in the 5th Ward of the City of Philadelphia, Commonwealth of Pennsylvania, located at and above the plane formed by the top of a slab forming the floor of the former 3rd floor now the existing 5th floor, the top of which slab has an elevation of 69.39 feet above City Datum, being within and bounded by surfaces formed by projecting vertically between the aforesaid planes, the boundaries of a parcel of land bounded and described with dimensions on the surface of earth in

accordance with a Survey and Plan of property prepared by Barton and Martin, Engineers, dated May 26, 1998, and revised June 22, 1998 as follows, to wit:

BEGINNING at a point of intersection formed by the Easterly side of 5th Street (variable width) and the Southerly side of Ludlow Street (28.75 feet wide), thence extending Eastwardly along the said Southerly side of Ludlow Street the distance of 362.37 feet to a point on the Westerly side of 4th Street (variable width), thence Southwardly along the said Westerly side of 4th Street 131.82 feet to a point on the Northerly side of Ranstead Street (variable width), thence Westwardly along said Northerly side of Ranstead Street 362.37 feet to a point on the said Easterly side of 5th Street, thence Northwardly along the said Easterly side of 5th Street 131.82 feet to a point on the Southerly side of Ludlow Street being the first mentioned point and place of BEGINNING.

BEING 111 South Independence Mall East A, Philadelphia, Pennsylvania 19106

PREMISES B
ALL THAT CERTAIN land, property and space with the improvements thereon, SITUATE in the 5th Ward of the City of Philadelphia, Commonwealth of Pennsylvania, located at and above the plane formed by the top of a slab forming the floor of the former 3rd floor now the existing 5th floor, the top of which slab has an elevation of 69.39 feet above City Datum, being within and bounded by surfaces formed by projecting vertically between the aforesaid planes, the boundaries of a parcel of land bounded and described with dimensions on the surface of earth, in accordance with a Survey and Plan of Property made by Surveyor and Regulator of the 3rd Survey District, as follows, to wit:
BEGINNING at a point of intersection formed by the Easterly side of 5th Street (variable width) and the Southerly side of Ludlow Street (28.75 feet wide), thence extending Eastwardly along the said Southerly side of Ludlow Street the distance of 362.57 feet to a point on the Westerly side of 4th Street (variable width), thence extending Southwardly along the said westerly side of 4th Street 131.82 feet to a point on the Northerly side of Ranstead Street (variable width), thence Westwardly along the said Northerly side of Ranstead Street 362.37 feet to a point on the said Easterly side of 5th Street, thence Northwardly along the said Easterly side of 5th Street 131.82 feet to a point on the Southerly side of Ludlow Street being the first mentioned point and place of BEGINNING.

TOGETHER with a permanent and perpetual right and easement for support and access in favor of the parcel described as follows:

ALL THAT CERTAIN LAND, property and space with the improvements thereon.

SITUATE in the 5th Ward of the City of Philadelphia, Commonwealth of Pennsylvania, located at and below the plane formed by the top of a slab forming the floor of the former 3rd floor now the existing 5th floor, the top of which slab has an elevation of 69.39 feet above City Datum, being within and bounded by surfaces formed by projecting vertically between the aforesaid planes, the boundaries of a parcel of land bounded and described with dimensions on the surface of earth in accordance with a Survey and Plan of property prepared by Barton and Martin, Engineers, dated May 26, 1998, and revised June 22, 1998 as follows, to wit:
BEGINNING at a point of intersection formed by the Easterly side of 5th Street (variable width) and the Southerly side of Ludlow Street (28.75 feet wide), thence extending Eastwardly along the said Southerly side of Ludlow Street the distance of 362.37 feet to a point on the Westerly side of 4th Street (variable width), thence Southwardly along the said Westerly side of 4th Street 131.82 feet to a point on the Northerly side of Ranstead Street (variable width), thence Westwardly along said Northerly side of Ranstead Street 362.37 feet to a point on the said Easterly side of 5th Street, thence Northwardly along the said Easterly side of 5th Street 131.82 feet to a point on the Southerly side of Ludlow Street being the first mentioned point and place of BEGINNING.

BEING 111 South Independence Mall East B, Philadelphia, Pennsylvania 19106
Together with those certain beneficial easements set forth in that certain Trash Compactor Easement Agreement to be duly recorded. (For the benefit of Mall East B only)

BEING OPA Nos. 883101010 (A) and 883101510 (B)
BEING AS TO PREMISES A the same premises which Bourse Mall Associates, l.P., a Pennsylvania limited partnership, by Deed in Lieu of Foreclosure dated 05/03/2023 and recorded 01/09/2024 in Philadelphia County at Document No. 54259569, granted and conveyed unto KREF Lending III LLC, a Delaware limited liability

company, in fee.

BEING AS TO PREMISES B the same premises which Bourse Tower Associates, L.P., a Pennsylvania limited partnership, by Deed in Lieu of Foreclosure dated 05/03/2023 and recorded 01/09/2024 in Philadelphia County at Document No. 54259570, granted and conveyed unto KREF Lending III LLC, a Delaware limited liability company, in fee.

.