# Exhibit E

**EXECUTION VERSION**
KKR Loan No. 2666001

**LOAN AGREEMENT**

Dated as of June 28, 2024

Among

**LAK BOURSE OWNER, LLC,**
**LAK BOURSE MASTER HTC LANDLORD, LLC**
**LAK 400 OWNER LLC,**
**and**
**LAK MARKET MASTER HTC LANDLORD, LLC**
collectively, as Borrower

and

**KREF LENDING III LLC**
as Lender

# TABLE OF CONTENTS

Page

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION ...........................................1

    Section 1.1    Definitions.........................................................................................1
    Section 1.2    Principles of Construction.................................................................45

ARTICLE II THE LOAN .......................................................................................................46

    Section 2.1    The Loan ...........................................................................................46
    Section 2.2    The Interest Rate. .............................................................................47
    Section 2.3    Loan Payments.................................................................................50
    Section 2.4    Prepayments.....................................................................................52
    Section 2.5    Change in Law; Taxes. .....................................................................53
    Section 2.6    Additional Advances........................................................................57
    Section 2.7    Force Funding. .................................................................................69
    Section 2.8    Hotel Conversion .............................................................................71
    Section 2.9    Release of 400 Market Street Property. ............................................72
    Section 2.10   Historic Tax Credit Documents. .......................................................73

ARTICLE III REPRESENTATIONS AND WARRANTIES.....................................................74

    Section 3.1    Borrower Representations..................................................................74
    Section 3.2    Survival of Representations ..............................................................95

ARTICLE IV BORROWER COVENANTS.............................................................................95

    Section 4.1    Borrower Affirmative Covenants ......................................................95
    Section 4.2    Borrower Negative Covenants........................................................120

ARTICLE V INSURANCE, CASUALTY AND CONDEMNATION .....................................125

    Section 5.1    Insurance .......................................................................................125
    Section 5.2    Casualty and Condemnation ...........................................................130
    Section 5.3    Delivery of Net Proceeds. ..............................................................131

ARTICLE VI RESERVE FUNDS .......................................................................................136

    Section 6.1    Cash Management Arrangements....................................................136
    Section 6.2    Property Tax Funds..........................................................................136
    Section 6.3    Insurance Funds .............................................................................137
    Section 6.4    Replacement Funds.........................................................................138
    Section 6.5    Rollover Funds...............................................................................140
    Section 6.6    Hotel Conversion Rebalancing Reserve Account.............................141
    Section 6.7    Carry Cost Account.........................................................................142
    Section 6.8    Excess Cash Funds.........................................................................143
    Section 6.9    Outstanding Hotel Conversion Shortfall..........................................143
    Section 6.10   Leasing Cost Account .....................................................................143
    Section 6.11   Office CapEx Project Account.........................................................144
    Section 6.12   Free Rent Account ..........................................................................145
    Section 6.13   Casualty and Condemnation Account...............................................145
    Section 6.14   Intentionally Omitted......................................................................145
    Section 6.15   Intentionally Omitted......................................................................145

## TABLE OF CONTENTS
(continued)

Page

Section 6.16    Property Cash Flow Allocation.................................................145
Section 6.17    Security Interest in Reserve Funds and Interest on Reserve Funds.........147
Section 6.18    Provisions Regarding Letters of Credit....................................148
Section 6.19    Intentionally Omitted......................................................149
Section 6.20    Eligible Accounts..........................................................149

ARTICLE VII CONSTRUCTION COVENANTS, REPRESENTATIONS AND
          WARRANTIES ......................................................................149

Section 7.1    Hotel Conversion ...........................................................149
Section 7.2    Hotel Conversion Budget.....................................................153
Section 7.3    Intentionally Omitted.......................................................154
Section 7.4    Change Orders ..............................................................154
Section 7.5    Cost Savings and Contingency ...............................................154
Section 7.6    Stored Materials and Deposits. .............................................156
Section 7.7    "As-built" Drawings ........................................................157

ARTICLE VIII PERMITTED TRANSFERS............................................................157

Section 8.1    Due on Sale.................................................................157
Section 8.2    Permitted Transfers.........................................................157

ARTICLE IX SECONDARY MARKET TRANSACTION.....................................................160

Section 9.1    Sale of Loan................................................................160
Section 9.2    Intentionally Omitted.......................................................161
Section 9.3    Servicing and Trust Expenses................................................161
Section 9.4    Register ...................................................................161
Section 9.5    Severance Documentation ....................................................163
Section 9.6    Secondary Market Transaction Expenses ......................................164

ARTICLE X DEFAULTS .........................................................................164

Section 10.1    Event of Default...........................................................164
Section 10.2    Remedies...................................................................169
Section 10.3    Right to Cure Defaults ....................................................172
Section 10.4    Remedies Cumulative .......................................................172
Section 10.5    Supplemental Guarantees....................................................173
Section 10.6    Replacement Guarantees. ...................................................174

ARTICLE XI MISCELLANEOUS ...................................................................175

Section 11.1    Successors and Assigns.....................................................175
Section 11.2    Lender's Discretion........................................................176
Section 11.3    Governing Law .............................................................176
Section 11.4    Modification, Waiver in Writing ...........................................177
Section 11.5    Delay Not a Waiver ........................................................178
Section 11.6    Notices ...................................................................178
Section 11.7    Trial by Jury..............................................................179
Section 11.8    Headings ..................................................................180
Section 11.9    Severability ..............................................................180

## TABLE OF CONTENTS
(continued)

| | | Page |
|---|---|---|
| Section 11.10 | Preferences | 180 |
| Section 11.11 | Waiver of Notice | 180 |
| Section 11.12 | Remedies of Borrower | 180 |
| Section 11.13 | Expenses; General Indemnity; Mortgage Tax Indemnity; ERISA Indemnity | 180 |
| Section 11.14 | Schedules Incorporated | 182 |
| Section 11.15 | Offsets, Counterclaims and Defenses | 183 |
| Section 11.16 | No Joint Venture or Partnership; No Third-Party Beneficiaries | 183 |
| Section 11.17 | Publicity. | 183 |
| Section 11.18 | Waiver of Marshalling of Assets | 184 |
| Section 11.19 | Waiver of Offsets/Defenses/Counterclaims | 184 |
| Section 11.20 | Conflict; Construction of Documents; Reliance | 184 |
| Section 11.21 | Brokers and Financial Advisors | 184 |
| Section 11.22 | Exculpation and Recourse | 185 |
| Section 11.23 | Prior Agreements | 191 |
| Section 11.24 | Acknowledgment and Consent to Bail-In of Affected Financial Institutions | 191 |
| Section 11.25 | Joint and Several Liability | 194 |
| Section 11.26 | Creation of Security Interest | 194 |
| Section 11.27 | Set-Off | 194 |
| Section 11.28 | Lead Lender | 195 |
| Section 11.29 | Negation of Implied Right to Cure Events of Default | 195 |

**SCHEDULES AND EXHIBITS**:

**SCHEDULES**:

| | |
|---|---|
| Schedule I | Hotel Conversion Scope of Work |
| Schedule II | Leasing Guidelines |
| Schedule III | Intentionally Omitted |
| Schedule IV | Exceptions to Representations and Warranties |
| Schedule V | Rent Roll |
| Schedule VI | Leasing Costs |
| Schedule VII | Organizational Chart |
| Schedule VIII | Intellectual Property |
| Schedule IX | Initial Approved Annual Budget |
| Schedule X | Intentionally Omitted |
| Schedule XI | Office CapEx Projects and Project Budget |
| Schedule XII | Intentionally Omitted |
| Schedule XIII | Preliminary Hotel Conversion Budget |
| Schedule XIV | Preliminary Hotel Conversion Construction Schedule |
| Schedule XIV | Approved Hotel Managers and Franchisors |
| Schedule XV | Approved Terminations and Relocations |
| Schedule XVI | Schedule of Stored Materials and Deposits |

**EXHIBITS**:

| | |
|---|---|
| Exhibit A | Form of AIA Form G706 |
| Exhibit B | Form of Lien Waivers |
| Exhibit C | Form of Tenant Direction Letter |

# TABLE OF CONTENTS
(continued)

Page

Exhibit D — Form of Architect's Certificate

Exhibit E — Form of Application and Certificate for Payment (AIA Document No. G702 and No. G703)

Exhibit F — Intentionally Omitted

Exhibit G — Form of Anticipated Cost Report (Borrower)

Exhibit H — Form of Architect's Certificate (Completion)

Exhibit I — Form of Draw Request

Exhibit J — Form of Draw Endorsement

Exhibit K — Form of Release Endorsement

**LOAN AGREEMENT**

THIS LOAN AGREEMENT, dated as of June 28, 2024 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**"), by and among **KREF LENDING III LLC**, a Delaware limited liability company, having an address at 30 Hudson Yards, Suite 7500, New York, New York 10001 (together with its successors and assigns, "**Lender**"), **LAK BOURSE OWNER, LLC**, a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**Bourse Fee Borrower**"), **LAK BOURSE MASTER HTC LANDLORD, LLC**, a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**Bourse Leasehold Borrower**", and together with Bourse Fee Borrower, collectively, "**Bourse Borrower**"), **LAK 400 OWNER, LLC,** a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**400 Market Fee Borrower**"), and **LAK MARKET MASTER HTC LANDLORD, LLC,** a Delaware limited liability company, having an address at c/o of Keystone Development + Investment, 1001 Conshohocken State Road, Suite 2-201, West Conshohocken, Pennsylvania 19428 (together with its permitted successors and permitted assigns, "**400 Market Leasehold Borrower**", and together with 400 Market Fee Borrower, collectively, "**400 Market Borrower**"; Bourse Fee Borrower, Bourse Leasehold Borrower, 400 Market Fee Borrower and 400 Market Leasehold Borrower, jointly and severally, each, a "**Borrower**" and collectively, "**Borrower**").

All capitalized terms used herein shall have the respective meanings set forth in Article I hereof.

**W I T N E S S E T H**:

WHEREAS, Borrower desires to obtain the Loan from Lender; and

WHEREAS, Lender is willing to make the Loan to Borrower, subject to and in accordance with the conditions and terms of this Agreement and the other Loan Documents.

NOW, THEREFORE, in consideration of the covenants set forth in this Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree, represent and warrant as follows:

**ARTICLE I**
**DEFINITIONS; PRINCIPLES OF CONSTRUCTION**

Section 1.1    Definitions.    For all purposes of this Agreement, except as otherwise expressly provided:

"**400 Market Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**400 Market Fee Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**400 Market Leasehold Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**400 Market Street Property**" shall mean the parcel of real property located at 400 Market Street, Philadelphia, Pennsylvania, including the Improvements thereon and all personal property owned by 400 Market Borrower, and encumbered by the Mortgage (including, without limitation, all right, title and interest of 400 Market Master Tenant assigned and/or pledged to 400 Market Leasehold Borrower pursuant to the applicable Historic Tax Credit Documents), together with all rights pertaining to such property and Improvements, all as more particularly described in the granting clauses of the Mortgage.

"**400 Market Master Tenant**" shall mean LAK Market Master Tenant, LLC, a Delaware limited liability company.

"**Acceptable Accounting Method**" shall mean (a) GAAP, (b) cash basis accounting, (c) accrual or tax basis of accounting, or (d) another generally acceptable accounting method, consistently applied, and reasonably acceptable to Lender.

"**Acceptable Blanket Policy**" shall have the meaning set forth in Section 5.1.1(c).

"**Accounts**" shall have the meaning set forth in Section 6.1.

"**Act**" shall have the meaning set forth in Section 3.1.24(cc)(v).

"**ADA**" shall mean the Americans with Disabilities Act, of July 26, 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101 et seq., as amended from time to time.

"**Advance Expiration Date**" shall have the meaning set forth in Section 2.7.1.

"**Advance Maximum Amount**" shall mean $53,600,000.00.

"**Advances**" shall mean, collectively, the Initial Advance, and any additional advance of proceeds of the Loan after the Closing Date made by Lender pursuant to Section 2.6 hereof, which shall include each of the Hotel Conversion Advances, the Leasing Cost Advances, the Carry Cost Advances and the Office CapEx Project Advances, and "**Advance**" shall mean any one of the Initial Advance or any Hotel Conversion Advance, Leasing Cost Advance, Carry Cost Advance or Office CapEx Project Advances.

"**Affiliate**" shall mean, as to any Person, any other Person that is in direct and/or indirect Control of, is directly and/or indirectly Controlled by or is under common direct and/or indirect ownership or Control with such Person.

"**Affirmation of Payment**" shall mean Construction Manager's affirmation of payment (AIA Form G706) in the form attached hereto as **Exhibit A**.

2

"**Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**ALTA**" shall mean American Land Title Association, or any successor thereto.

"**Alteration Threshold**" shall mean two percent (2.0%) of the Loan Amount.

"**AML Laws**" shall have the meaning set forth in Section 3.1.40(c).

"**Annual Budget**" shall mean the operating and capital budget for the Property setting forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's estimate of anticipated operating income, operating expenses and capital expenditures for the applicable Fiscal Year.

"**Anti-Corruption Laws**" shall have the meaning set forth in Section 3.1.40(a).

"**Applicable Similar Law**" shall have the meaning set forth in Section 3.1.8.

"**Appraisal**" shall mean an "as is" appraisal prepared in accordance with the requirements of FIRREA and USPAP, prepared by an independent third-party appraiser selected by Lender, who is State licensed or State certified if required under the laws of the State where the Property is located, who meets the requirements of FIRREA and USPAP.

"**Appraised Value**" shall mean the "as is" appraised value of the Property, as determined by an Appraisal, and in connection with any calculation of the Loan to Value Ratio pursuant to the terms of this Agreement, that is dated not more than thirty (30) days prior to the date of the calculation thereof.

"**Approved Affiliate Leasing Expenses**" shall mean (i) any leasing commission payable to Leasing Agent pursuant to the terms of the Leasing Agreement, and (ii) any construction management fee payable to an Affiliate of Borrower in accordance with the terms of the Management Agreement.

"**Approved Annual Budget**" shall have the meaning set forth in Section 4.1.6(f).

"**Approved Hotel Conversion Expenses**" shall mean the Hotel Conversion Expenses that are set forth in the Hotel Conversion Budget, as may be modified from time to time in accordance with this Agreement.

"**Approved Independent Director Provider**" shall mean (a) each of CT Corporation, Corporation Service Company, National Registered Agents, Inc., Wilmington Trust Company, Stewart Management Company and Lord Securities Corporation and (b) additional national providers of Independent Directors approved in writing by Lender, such approval not to be unreasonably withheld, conditioned or delayed.

"**Approved Leasing Expenses**" shall mean actual out-of-pocket expenses to unaffiliated third parties (except with respect to Approved Affiliate Leasing Expenses) incurred by Bourse Borrower in connection with leasing space at the Property pursuant to Leases existing as of the date hereof and Leases entered into in accordance with this Agreement, including Leasing

Commissions, Tenant Improvements (which may include costs for architects', engineers' and attorneys' fees, and space plan and design costs with respect to the applicable demised premises), Tenant Improvement Allowances and Approved Termination and Relocation Fees, in each case, which expenses (a) are (i) specifically approved by Lender in connection with approving the applicable Lease, if Lender's approval of such Lease is required pursuant to the terms of this Agreement (it being agreed that Approved Affiliate Leasing Expenses are hereby deemed approved), (ii) incurred in the ordinary course of business in accordance with the Leasing Guidelines in connection with Leases which do not require Lender's approval under this Agreement, and Lender shall have received a budget for such Tenant Improvement costs and a schedule of Leasing Commission payments payable in connection therewith, or (iii) otherwise approved by Lender in writing, which approval shall not be unreasonably withheld or delayed, and (b) are substantiated by executed Lease documents and brokerage agreements entered into in accordance with this Agreement as well as bills and invoices or other evidence reasonably satisfactory to Lender. Approved Leasing Expenses shall include the leasing costs set forth on **Schedule VI** attached hereto that will become due and payable with respect to Digitas's expansion of up to 6,500 square feet on the 6th floor of the Property pursuant to its Lease.

"**Approved Office CapEx Project Expenses**" shall mean the Office CapEx Project Expenses that are set forth in the Office CapEx Project Budget, as may be modified from time to time in accordance with this Agreement.

"**Approved Termination and Relocation Fees**" shall mean those fees and expenses set forth in the Hotel Conversion Budget to be paid or that are payable by Borrower in connection with the termination and/or modification (as applicable) of those Leases in effect as of the Effective Date that are set forth on Schedule XV attached hereto.

"**Architect's Certificate**" shall have the meaning set forth in Section 7.1(b)(iv).

"**Assignment of Construction Manager's Agreement**" shall mean that certain Assignment of Construction Manager's Agreement and Subordination of Construction Management Fees, to be executed in accordance with the terms of this Agreement, among Bourse Borrower, Lender and Construction Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Development Agreement**" shall mean that certain Assignment of Development Agreement and Subordination of Developer's Fees, to be executed in accordance with the terms of this Agreement, among Bourse Borrower, Lender and Developer, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Interest Rate Protection Agreement**" shall mean that certain Assignment of Interest Rate Protection Agreement, dated as of the Closing Date, between Borrower and Lender and acknowledged by the Counterparty (as defined in clause (a) of the definition thereof) and any other Assignment of Interest Rate Protection Agreement hereafter delivered, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

4

"**Assignment of Leases**" shall mean that certain first priority Assignment of Leases and Rents, dated as of the Closing Date, from Borrower, as assignor, to Lender, as assignee, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Leasing Agreement**" shall mean (i) that certain Assignment of Leasing Agreement and Subordination of Leasing Fees, dated as of the Closing Date, among Bourse Leasehold Borrower, Leasing Agent and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, and (ii) that certain Assignment of Leasing Agreement and Subordination of Leasing Fees, dated as of the Closing Date, among 400 Market Leasehold Borrower, Leasing Agent and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Assignment of Management Agreement**" shall mean (i) that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the Closing Date, among Bourse Leasehold Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, and (ii) that certain Assignment of Management Agreement and Subordination of Management Fees, dated as of the Closing Date, among 400 Market Leasehold Borrower, Manager and Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. §101 et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other federal or state bankruptcy or insolvency law.

"**Bankruptcy Event**" shall mean with respect to any Person:  (a) such Person filing a voluntary petition under the Bankruptcy Code; (b) the filing of an involuntary petition against such Person under the Bankruptcy Code (upon the same not being dismissed within ninety (90) days of commencement of same); (c) such Person filing an answer consenting to or otherwise acquiescing in or joining in any involuntary petition filed against it, by any other Person under the Bankruptcy Code, or soliciting or causing to be solicited petitioning creditors for any involuntary petition from any Person; (d) such Person consenting to or acquiescing in or joining in an application for the appointment of a custodian, receiver, trustee, assignee, sequestrator (or similar official), liquidator, or examiner for such Person or any portion of the Property; (e) the filing of a petition against a Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Bankruptcy Code or any other applicable Legal Requirements; (f) under the provisions of any other law for the relief or aid of debtors, an action taken by any court of competent jurisdiction that allows such court to assume custody or Control of a Person or of the whole or any substantial part of its property or assets; or (g) such Person making an assignment for the benefit of creditors.

"**Benchmark**" shall mean, initially, Term SOFR; provided, that if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to Term SOFR or

5

the then current Benchmark, then "Benchmark" shall mean the applicable Benchmark Replacement to the extent that such Benchmark Replacement has replaced the then-current Benchmark pursuant to <u>Section 2.2.3(b)</u>. In no event shall the applicable Benchmark be less than zero (0).

"**Benchmark Replacement**" shall mean in connection with any Benchmark Transition Event, for the applicable Benchmark Replacement Date, the sum of (i) the alternate benchmark rate that has been selected by Lender as the replacement for the then-current Benchmark, giving due consideration to (A) any selection or recommendation of a replacement benchmark rate or the mechanism for determining such a rate by the Relevant Governmental Body, or (B) any evolving or then-prevailing market convention for determining a rate of interest as a replacement for the then-current Benchmark for U.S. dollar denominated floating rate loans primarily secured by mortgages on commercial real estate assets at such time and (ii) the related Benchmark Replacement Adjustment.

"**Benchmark Replacement Adjustment**" shall mean, with respect to any replacement of the then-current Benchmark with an Unadjusted Benchmark Replacement, the spread adjustment, or method for calculating or determining such spread adjustment (which may be a positive or negative value or zero) that has been selected by Lender giving due consideration to (a) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of such Benchmark with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (b) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the then-current Benchmark with the applicable Unadjusted Benchmark Replacement for U.S. dollar denominated floating rate loans primarily secured by mortgages on commercial real estate assets at such time.

"**Benchmark Replacement Date**" shall mean the earliest to occur of the following events with respect to the then-current Benchmark:

(a)     in the case of <u>clause (a)</u> or <u>(b)</u> of the definition of "Benchmark Transition Event", the later of (i) the date of the public statement or publication of information referenced therein and (ii) the date on which the administrator of such Benchmark (or the published component used in the calculation thereof) permanently or indefinitely ceases to provide such Benchmark (or such component thereof); or

(b)     in the case of <u>clause (c)</u> of the definition of "Benchmark Transition Event", the first date on which such Benchmark (or the published component used in the calculation thereof) has been determined and announced by or on behalf of the administrator of such Benchmark (or such component thereof) or the regulatory supervisor for the administrator of such Benchmark (or such component thereof) to be non-representative; <u>provided</u> that such non-representativeness will be determined by reference to the most recent statement or publication referenced in such <u>clause (c)</u> and even if the one month tenor of such Benchmark (or such component thereof) continues to be provided on such date.

For the avoidance of doubt, the "Benchmark Replacement Date" will be deemed to have occurred with respect to any Benchmark upon the occurrence of the applicable event or events set forth

6

therein with respect to such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Transition Event**" shall mean the occurrence of one or more of the following events with respect to the then-current Benchmark:

(a)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such administrator has ceased or will cease to provide such Benchmark (or such component thereof), permanently or indefinitely, provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof);

(b)    a public statement or publication of information by the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof), the Board of Governors of the Federal Reserve System, the Federal Reserve Bank of New York, an insolvency official with jurisdiction over the administrator for such Benchmark (or such component thereof), a resolution authority with jurisdiction over the administrator for such Benchmark (or such component thereof ) or a court or an entity with similar insolvency or resolution authority over the administrator for such Benchmark (or such component thereof), which states that the administrator of such Benchmark (or such component thereof) has ceased or will cease to provide such Benchmark (or such component thereof) permanently or indefinitely, provided, that at the time of such statement or publication, there is no successor administrator that will continue to provide such Benchmark (or such component thereof); or

(c)    a public statement or publication of information by or on behalf of the administrator of such Benchmark (or the published component used in the calculation thereof) or the regulatory supervisor for the administrator of such Benchmark (or the published component used in the calculation thereof) announcing that such Benchmark (or such component thereof) is not, or as of a specified future date will not be, representative.

For the avoidance of doubt, a "Benchmark Transition Event" will be deemed to have occurred with respect to any Benchmark solely to the extent that a public statement or publication of information set forth above has occurred with respect to such Benchmark (or the published component used in the calculation thereof).

"**Benchmark Unavailability Period**" shall mean either (i) the period (if any) (a) beginning at the time that a Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.2.5 and (b) ending at the time that a Benchmark Replacement has replaced the then-current Benchmark for all purposes hereunder and under any Loan Document in accordance with Section 2.2.5, or (ii) the period (if any) (a) beginning at the time that Lender determines that either (I) any Change in Law makes it unlawful or impossible, or any Governmental Authority has asserted that it is unlawful, for Lender to make, maintain or fund loans based on the then-applicable Benchmark or determine or charge interest rates based upon the then-applicable Benchmark (II) other than as a result of a Benchmark Transition Event, reasonable and adequate means do not existing for ascertaining Term SOFR for an applicable

7

Interest Period, or (III) Term SOFR for an applicable Interest Period does not adequately and fairly reflect the cost to Lender of making or maintaining the Loan, provided, that Lender makes such determination in good faith and on a non-discriminatory basis, and (b) ending at the time that Lender notifies Borrower that the circumstances giving rise to such suspension no longer exist.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto; provided, that in connection with a Release of the 400 Market Street Property (or, if applicable of the 400 Market Borrower) effectuated in accordance with Section 2.9 hereof, effective upon such Release, 400 Market Borrower shall no longer be considered a "Borrower".

"**Borrower Party**" shall mean, collectively and individually, each of Borrower, Sole Member, Guarantor and Master Tenant.

"**Borrower Related Party**" shall mean, collectively and individually, any Borrower Party and any Affiliate of any Borrower Party, any officer or director of the foregoing, and in the case of Guarantor, any immediate family member thereof. Notwithstanding the foregoing or anything herein to the contrary, Borrower Related Party shall include any Keystone Independence Portfolio Member, LLC, Lubert-Adler Independence Portfolio Investors, LP, any HTC Investor and any Affiliates of the foregoing.

"**Borrower's Knowledge**" shall mean the actual present and conscious awareness or knowledge of Dean Adler, without any duty of inquiry or investigation.

"**Borrower's Operating Account**" shall mean Borrower's account located at TriState Bank account number (i) with respect to the Bourse Property, 320050859, and (ii) with respect to the 400 Market Property, 320050883.

"**Borrower's Share**" shall mean thirty percent (30%) of any dollar amount qualified by the term "Borrower's Share" in this Agreement.

"**Bourse Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Bourse Fee Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Bourse Leasehold Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Bourse Master Tenant**" shall mean LAK Bourse Master Tenant, LLC, a Delaware limited liability company.

"**Bourse Property**" shall mean the parcels of real property located at 111 South Independence Mall East, Philadelphia, Pennsylvania, including the Improvements thereon and all personal property owned by Bourse Borrower encumbered by the Mortgage (including, without limitation, all right, title and interest of Bourse Master Tenant assigned and/or pledged to Bourse Leasehold Borrower pursuant to the applicable Historic Tax Credit Documents), together with all rights pertaining to such property and Improvements, all as more particularly described in the granting clauses of the Mortgage.

8

"**Breakage Costs**" shall have the meaning set forth in Section 2.2.3(d).

"**BSA/PATRIOT Act**" shall have the meaning set forth in Section 3.1.40(c).

"**Business Day**" shall mean any day other than (a) a Saturday, a Sunday or a legal holiday on which national banks are not open for general business in (i) the State of New York or (ii) the state where the servicing offices of the Servicer are located, or (b) a day on which the Securities Industry and Financial Markets Association recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**Calculation Date**" shall mean the last day of each calendar quarter during the term of the Loan.

"**Capital Expenditures**" shall mean any amount expended for labor performed or materials installed in connection with any Capital Improvements.

"**Capital Improvements**" for any period shall mean replacements and alterations to the Property, excluding any Tenant Improvements, which are required to be capitalized according to GAAP.

"**Capped Benchmark Rate**" shall mean (i) prior to the Initial Maturity Date, five percent (5.0%), and (ii) during the Extension Period, the lesser of (x) five percent (5.0%) and (y) a strike rate that results in a Debt Service Coverage Ratio equal to 1.15:1.00. For the purposes of this definition only, "**Debt Service Coverage Ratio**" shall mean a ratio equal to Net Operating Income divided by the aggregate annual Debt Service on the Loan assuming the then-current Benchmark is equal to the strike rate under the Interest Rate Protection Agreement for the applicable extension term.

"**Carry Cost Account**" shall have the meaning set forth in Section 2.7.3.

"**Carry Cost Advance**" shall have the meaning set forth in Section 2.6.4.

"**Carry Cost Advance Maximum Amount**" shall mean $2,200,000.00.

"**Carry Cost Funds**" shall have the meaning set forth in Section 2.7.1.

"**Carry Costs**" shall mean Debt Service, Property Taxes (and the funding of the Property Tax Account), Insurance Premiums (and the funding of the Insurance Account), Ground Rent, Operating Expenses, Other Charges, the funding of the Replacement Account and any other costs necessary to own and operate the Property. For the avoidance of doubt, Carry Costs shall not include Capital Expenditures.

"**Cash Collateral Account**" shall have the meaning set forth in Section 6.8.1.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement dated as of the Closing Date, by and among Lender, Borrower and Cash Management Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

9

"**Cash Management Bank**" shall mean PNC Bank, National Association, or any successor bank selected by Lender in its sole discretion.

"**Cash Management Sweep Period**" shall mean each of the following periods:

(i)       from and after the Closing Date until each of the following has occurred (such period the "**Initial Cash Management Sweep Period**"): (x) Hotel Conversion Substantial Completion has occurred, (y) the Debt Yield shall be at least 10% for two consecutive calendar quarters, and (z) the Debt Service Coverage Ratio shall be at least 1.15:1.0x for two consecutive calendar quarters (provided that no Cash Management Sweep Period remains in effect pursuant to clause (ii) below).

(ii)      from and after the occurrence of any Event of Default, until such time as Lender has accepted in writing a cure of such Event of Default (it being understood that Lender shall have no obligation to accept a cure by Borrower of an Event of Default) (provided that no Cash Management Sweep Period remains in effect pursuant to clause (i) above or clauses (iii) or (iv) below);

(iii)     from and after the Initial Cash Management Sweep Period, the occurrence of a Debt Yield Event, until such time as the Debt Yield shall be at least 10.5% for two consecutive calendar quarters (provided that no Cash Management Sweep Period remains in effect pursuant to clauses (ii) or (iv) below);

(iv)      from and after the Initial Cash Management Sweep Period, the occurrence of a Debt Service Coverage Ratio Event, until such time as the Debt Service Coverage Ratio shall be at least 1.20:1.0x for two consecutive calendar quarters (provided that no Cash Management Sweep Period remains in effect pursuant to clauses (ii) or (iii) above).

"**Casualty**" shall mean the occurrence of any casualty, damage or injury, by fire or otherwise, to the Property or any part thereof.

"**Casualty and Condemnation Account**" shall have the meaning set forth in Section 6.13.

"**Casualty and Condemnation Funds**" shall have the meaning set forth in Section 6.13.

"**Casualty Consultant**" shall have the meaning set forth in Section 5.3.2(c).

"**Casualty Retainage**" shall have the meaning set forth in Section 5.3.2(d).

"**Cause**" shall mean, with respect to an Independent Director, (i) acts or omissions by such Independent Director that constitute willful disregard of, or gross negligence with respect to, such Independent Director's duties, (ii) such Independent Director has engaged in or has been charged with or has been indicted or convicted for any crime or crimes of fraud or other acts constituting a crime under any law applicable to such Independent Director, (iii) such Independent Director has breached its duties as and to the extent of such duties in accordance with the terms of this Agreement, (iv) there is a material increase in the fees charged by such Independent Director or a material change to such Independent Director's terms of service, (v) such Independent Director is

10

unable to perform his or her duties as Independent Director due to death, disability or incapacity, or (vi) such Person no longer meets the definition of Independent Director.

"**Central Bank Pledge**" shall have the meaning set forth in Section 11.26.

"**Change in Law**" shall mean the occurrence, after the Closing Date, of any of the following:  (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (in each case having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "**Change in Law**," regardless of the date enacted, adopted or issued.

"**Change Order**" shall mean any change in, modification to or deviation from the Hotel Conversion Plans and Specifications, the Hotel Conversion Scope of Work, or any Construction Contract, in each such case, with respect to the Hotel Conversion, whether designated a change order or construction change directive, and whether or not there is a change in the contract sum or contract time under any Construction Contract.

"**Clearing Account**" shall have the meaning set forth in Section 6.1.

"**Clearing Account Agreement**" shall mean, collectively, (i) that certain Deposit Account Control Agreement dated as of the Closing Date, by and among Bourse Leasehold Borrower, Lender and Clearing Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, and (ii) that certain Deposit Account Control Agreement dated as of the Closing Date, by and among 400 Market Leasehold Borrower, Lender and Clearing Bank, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**400 Market DACA**").

"**Clearing Bank**" shall have the meaning set forth in Section 6.1.

"**Closing Date**" shall mean the date of this Agreement.

"**Co-Lender Agreement**" shall have the meaning set forth in Section 11.28.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended from time to time, any successor statutes thereto, and applicable U.S.  Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall have the meaning ascribed thereto in the Pledge Agreement.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or

11

eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condemnation Proceeds**" shall have the meaning ascribed thereto in clause (b) of the definition of the term "Net Proceeds".

"**Conforming Changes**" shall mean, with respect to the use or administration of Term SOFR or the use, administration, adoption or implementation of any Benchmark Replacement, any technical, administrative or operational changes (including, without limitation, changes to the definition of "Business Day," the definition of "Interest Period," the definition of "Monthly Payment Date," the definition of "U.S. Government Securities Business Day", or any similar or analogous definition, timing and frequency of determining rates and making payments of interest, timing of borrowing requests or prepayment, conversion or continuation notices, the applicability and length of lookback periods, the applicability of breakage provisions, and other technical, administrative or operational matters) that Lender determines is reasonably necessary to reflect the adoption and implementation of any such rate or to permit the use and administration thereof by Lender in a manner substantially consistent with market practice for bilateral and syndicated business loans (or, if Lender reasonably and in good faith determines that adoption of any portion of such market practice is not administratively feasible or if Lender reasonably and in good faith determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as Lender reasonably and in good faith decides is reasonably necessary in connection with the administration of this Agreement and the other Loan Documents).

"**Connection Income Taxes**" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"**Constituent Member**" shall have the meaning set forth in Section 3.1.24(ee)(i).

"**Construction Consultant**" shall mean such Person (which may be an Affiliate of Lender and/or Servicer) as Lender may designate and engage from time to time to inspect the Hotel Conversion and any Office CapEx Project as construction of the applicable work progresses and consult with and to provide advice to and to render reports to Lender.

"**Construction Contract**" shall mean any agreement, contract, subcontract or purchase order entered into by Bourse Borrower or any general contractor or construction manager engaged by or on behalf of Bourse Borrower (prior to or after the Closing Date), in which the Contractor thereunder agrees to provide labor, equipment, services and/or materials in connection with the Hotel Conversion, including, without limitation, any architect or engineer engaged by or on behalf of Bourse Borrower.

"**Construction Manager**" shall mean the construction manager for the Hotel Conversion to be selected by Bourse Borrower, subject to Lender's approval, such approval not to be unreasonably withheld, conditioned or delayed; Lender acknowledges and agrees that Fastrack Construction, Inc. is an approved Construction Manager.

12

"**Construction Manager's Agreement**" shall mean any agreement to be entered into by and between Bourse Borrower and Construction Manager, approved by Lender in accordance with the terms of this Agreement, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, in accordance with the terms hereof.

"**Contractor**" shall mean a Person performing work under a Construction Contract.

"**Control**" shall mean, with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, through the ownership of voting securities, by contract or otherwise, and the terms Controlled, Controlling and Common Control shall have correlative meanings; provided, that (x) a Person shall not be deemed to lack Control even though certain decisions may be subject to customary "major decision" consent or approval rights in favor of another Person, and (y) a Person shall not be deemed to have Control even though such Person retains certain customary "major decision" consent or approval rights over another Person.

"**Cost Savings**" shall mean, with respect to the Hotel Conversion, (a) if Bourse Borrower has bought out a trade with respect to any work for the same scope of work as covered by the related Line Item at a lower price than is set forth in the Hotel Conversion Budget and Bourse Borrower has completed 75% of the work relating to such Line Item, and/or (b) the amount, if any, remaining in any Line Item in the Hotel Conversion Budget after (i) completion of 100% of the work relating to such Line Item, (ii) all Contractors, materialmen and other Persons have been paid in full for work performed and materials provided with respect to the component of the Hotel Conversion to be funded from such Line Item, and (iii) delivery to Lender of lien waivers from Construction Manager and such first tier subcontractors who have performed work in accordance with the terms hereof, and with respect to materialman and other Persons who have provided materials or supplies, evidence reasonably acceptable to Lender, demonstrating, in each such case, that such Contractors, materialmen and other Persons have been paid in full with respect to the component of the Hotel Conversion to be funded from such Line Item.

"**Counterparty**" shall mean (a) the counterparty under the Interest Rate Protection Agreement, or (b) a Person that guarantees such counterparty's obligations under the Interest Rate Protection Agreement or otherwise provides to such counterparty credit support reasonably acceptable to Lender; provided, however, that such guarantor shall be deemed the "**Counterparty**" for so long as the long-term credit rating issued by the Rating Agencies to such guarantor is better than the long-term credit rating of the actual counterparty under the Interest Rate Protection Agreement.

"**Debt**" shall mean the Outstanding Principal Balance, together with all interest accrued and unpaid thereon and all other sums due to Lender in respect of the Loan under the Note, this Agreement and any other Loan Document.

"**Debt Service**" shall mean, with respect to any particular period, the sum of the amount of interest and principal (if any) due pursuant to and in accordance with this Agreement with respect to such particular period.

13

"**Debt Service Coverage Ratio**" shall mean, as of any Calculation Date, a ratio, calculated by Lender in which (a) the numerator is the Net Operating Income, and (b) the denominator is the Debt Service as of such Calculation Date, annualized.

"**Debt Service Coverage Ratio Event**" shall mean, as of any Calculation Date, the Debt Service Coverage Ratio is less than 1.15:1.0x.

"**Debt Yield**" shall mean, as of any Calculation Date, the quotient (expressed as a percentage) obtained by dividing (x) Net Operating Income as of such Calculation Date, by (y) the Loan Amount as of such Calculation Date.

"**Debt Yield Event**" shall mean, as of any Calculation Date, the Debt Yield is less than 10.0%.

"**Deemed Approval Mechanics**" shall mean, with respect to any approval right vested in Lender pursuant to the terms hereof that is expressly subject to the Deemed Approval Mechanics, Borrower's compliance with the following:  (I) Borrower delivers to Lender a written request for Lender's approval of any applicable matter pursuant to the applicable Section of this Agreement, (II) Lender fails to respond to such request within ten (10) Business Days after Lender's receipt of such request, and (III) Borrower delivers to Lender a second copy of such request after the expiration of the ten (10)-Business Day period described in the immediately preceding clause (II), and Lender fails to respond to such second request within ten (10) Business Days after Lender's receipt of such second request.  If Borrower properly complies with the foregoing Deemed Approval Mechanics, then the applicable request shall be deemed approved by Lender, provided that each such request was contained in the subject line of an envelope, as applicable, marked "PRIORITY" and included a legend prominently displayed at the top of the first page thereof in solid capital letters in bold face type of a font size not less than twelve (12) point as follows: "WARNING:  PURSUANT TO [INSERT APPLICABLE SECTION] OF THE LOAN AGREEMENT, YOU WILL BE DEEMED TO HAVE APPROVED THIS REQUEST IF YOU DO NOT RESPOND WITHIN TEN (10) BUSINESS DAYS AFTER RECEIPT", and each such request is accompanied by a concurrent notice by e-mail as well as the information and documents required pursuant to the applicable Section of this Agreement, and any other information reasonably requested by Lender in writing prior to the expiration of such ten (10)-Business Day period in order to adequately review the same has been delivered.  As used in this definition, the term "respond" means an approval, disapproval or request for additional information with respect to the subject request for approval.

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (x) the Maximum Legal Rate and (y) four percent (4%) above the non-default Interest Rate.

"**Deposit Account**" shall mean an Eligible Account under the sole dominion and control of Lender at the Cash Management Bank.

"**Deposits**" shall have the meaning set forth in Section 7.6(b).

14

"**Developer**" shall mean the developer of the Hotel Conversion approved by Lender in its sole discretion.

"**Development Agreement**" shall mean any agreement to be entered into by and between Bourse Borrower and Developer, approved by Lender in accordance with the terms of this Agreement, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, in accordance with the terms hereof.

"**Digitas**" shall mean Lion Re:Sources, Inc.

"**Disregarded Entity**" shall mean any entity treated as disregarded as an entity separate from its owner under Treasury Regulations Section 301.7701-3.

"**Dominion**" shall mean Dominion Bond Rating Service Limited.

"**Draw Request**" shall have the meaning set forth in Section 2.6.6(a).

"**Easements**" shall have the meaning set forth in Section 3.1.12(a).

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account or accounts (or subaccounts thereof) maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account or accounts (or subaccounts thereof) maintained with the corporate trust department of a federal depository institution or state chartered depository institution subject to regulations regarding fiduciary funds on deposit similar to Title 12 of the Code of Federal Regulations § 9.10(b), having in either case corporate trust powers, acting in its fiduciary capacity, and a combined capital and surplus of at least $50,000,000, subject to supervision or examination by federal and state authorities and having a long-term unsecured debt rating of "BBB-" or higher by S&P and "A2" or higher by Moody's and a short-term unsecured debt rating of "A-1" or higher by S&P and "P-1" or higher by Moody's. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, any account held by TriState Bank shall be an Eligible Account regardless of whether such account satisfies the definition of "Eligible Account"; provided, that, if at least two Rating Agencies providing credit ratings for TriState Bank reduce their respective credit ratings of TriState Bank by at least two-notch downgrades from the closing date credit ratings, then any account held by TriState Bank shall not be an Eligible Account.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation so long as the short-term unsecured debt obligations or commercial paper of such depository institution or trust company are rated at least "A-1" by S&P, "P-1" by Moody's and "F-1" by Fitch (and the long-term unsecured debt obligations of such depository institution are rated at least "A" by Fitch) in the case of accounts in which funds are held for thirty (30) days or less or, in the case of accounts in which funds are held for more than thirty (30) days, the long-term unsecured debt obligations of which are rated at least (a) "A" by S&P, (b) "A" by Fitch (and the short-term deposits or short-term unsecured debt obligations or commercial paper of such depository institution are rated no less than "F1" by Fitch), and (c) "A2" by Moody's, or in the case of Letters of Credit, the long-term unsecured debt obligations of which

15

are rated at least (i) "A+" by S&P, (ii) "A+" by Fitch (and the short-term deposits or short-term unsecured debt obligations or commercial paper of such depository institution are rated no less than "F1" by Fitch) and (iii) "A1" by Moody's. Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, TriState Bank shall be an Eligible Institution regardless of whether TriState Bank satisfies the definition of "Eligible Institution"; provided, that, if at least two Rating Agencies providing credit ratings for TriState Bank reduce their respective credit ratings of TriState Bank by at least two-notch downgrades from the closing date credit ratings, then TriState Bank shall not be an Eligible Institution.

"**Entity Guarantor**" shall mean DSA Guarantor, a Delaware limited liability company.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement dated as of the Closing Date executed by Borrower and Entity Guarantor in connection with the Loan for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Equipment**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Equity Collateral Enforcement Action**" shall have the meaning set forth in Section 11.22(k)(A).

"**Equity Collateral Transfer Date**" shall have the meaning set forth in Section 11.22(k)(A).

"**ERISA**" shall have the meaning set forth in Section 4.2.10(a).

"**Event of Default**" shall have the meaning set forth in Section 10.1(a).

"**Excess Cash Flow**" shall have the meaning set forth in Section 6.16.1(viii).

"**Excess Cash Funds**" shall have the meaning set forth in Section 6.8.1.

"**Excluded Taxes**" shall mean any of the following Taxes imposed on or with respect to Lender or required to be withheld or deducted from a payment to Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of Lender being organized under the laws of, or having its principal office or, in the case of Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of Lender with respect to its interest in the Loan or commitment pursuant to a law in effect on the date on which (i) Lender acquires such interest in the Loan or commitment or (ii) Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.5, amounts with respect to such Taxes were payable either to Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to Lender's failure to comply with Section 2.5.6 and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Exculpated Parties**" shall have the meaning set forth in Section 11.22.

16

"**Extension Fee**" shall mean an amount equal to 0.25% of the Outstanding Principal Balance of the Loan as of the Initial Maturity Date.

"**Extension Maturity Date**" shall mean July 7, 2029.

"**Extension Option**" shall have the meaning set forth in Section 2.3.2(b).

"**Extension Period**" shall mean the period commencing on the day immediately following the Initial Maturity Date and ending on the Extension Maturity Date.

"**Extraordinary Expense**" shall have the meaning set forth in Section 4.1.6(g).

"**FATCA**" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable) and not materially more onerous to comply with, any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities and implementing such Sections of the Code.

"**Fiscal Year**" shall mean each twelve-month period commencing on January 1 and ending on December 31 of such calendar year during each year of the term of the Loan, except that the first Fiscal Year with respect to the Loan shall commence on the Closing Date and end on December 31, 2024.  Borrower may change its Fiscal Year with the prior written consent of Lender, such consent not to be unreasonably withheld, conditioned or delayed.

"**Fitch**" shall mean Fitch, Inc.

"**Fixtures**" shall have the meaning specified in the Mortgage.

"**Force Majeure**" shall mean acts of God (such as tornado, earthquake, flood, hurricane, etc.), fires and other casualties; any rule, order or regulation of Governmental Authorities; pandemics or epidemics, embargos, disruption to transportation or supply lines; an enemy action; a civil commotion; a war; hostilities; an invasion; an insurrection; a riot; mob violence; malicious mischief; sabotage; terrorism; or any similar types of events; failure of a Governmental Authority to issue any permits or to timely take action when required (provided that Bourse Borrower has made timely application and has diligently pursued issuance of such permits or approvals); delays in construction caused by weather events which result in work stoppages that last in excess of two (2) days; or the inability to obtain equipment, supplies, materials or labor, or strike or lockout beyond the reasonable control of Bourse Borrower, provided that, with respect to any of the circumstances described in this definition:

(i)    for the purposes of this Agreement, any period of Force Majeure shall apply only to such Person's performance of the obligations necessarily affected by such circumstance and shall continue only so long as such Person is continuously and diligently using all reasonable efforts to minimize the effect and duration thereof, and in no event, for longer than one hundred twenty (120) days from the commencement of the Force Majeure period (in the aggregate for all Force Majeure events;

17

(ii)     Force Majeure shall not include the unavailability or insufficiency of funds; and

(iii)     Bourse Borrower shall have notified Lender of any Force Majeure promptly following the occurrence thereof (and in no event more than ten (10) Business Days following the occurrence thereof).

"**Foreign Lender**" shall have the meaning set forth in Section 2.5.6(b)(ii).

"**Free Rent Account**" shall have the meaning set forth in Section 6.12.

"**Free Rent Funds**" shall have the meaning set forth in Section 6.12.

"**GAAP**" shall mean generally accepted accounting principles set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board (or agencies with similar functions of comparable stature and authority within the accounting profession), or in such other statements by such entity as may be in general use by significant segments of the U.S. accounting profession.

"**Government Official**" shall mean (a) an officer, employee or any person acting in an official capacity for or on behalf of a government, including its departments, agencies, instrumentalities, quasi- or partially-government owned or controlled entities; (b) an officer or employee of an international organization (e.g., World Bank, United Nations); (c) an officer or employee of a political party or any party official, or a candidate for political office; (d) a member of the royal or ruling family of a country; or (e) any individual who is a principal or senior manager of, or who has an immediate family or close personal relationship or business ties with, any of the foregoing individuals or entities.

"**Governmental Approvals**" shall mean all approvals, consents, waivers, orders, acknowledgments, authorizations, inspections, signoffs, permits and licenses required under applicable Legal Requirements to be obtained from any Governmental Authority for the use, occupancy and operation of the Improvements, including, without limitation, all land use, building, subdivision, zoning, environmental and similar ordinances and regulations promulgated by any Governmental Authority.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit or any other governmental or quasi-governmental entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions pertaining to government (federal, state, county, district, municipal, city, foreign, supra-national or otherwise) whether now or hereafter in existence.

"**Gross Revenue**" shall mean all revenue or other proceeds derived from the ownership, operation, financing or sale of the Property (or any portion thereof) from whatever source, (including, without limitation, Rents and Lease Termination Fees), any revenue received in connection with any tax certiorari proceeding and any amounts received by any Borrower Related Party with respect to the Property as a result of any litigation or other legal, administrative or other proceeding (net of reasonable costs and expenses incurred by such Borrower Related Party in

18

accordance herewith in recovering such amounts); provided, however, Gross Revenue shall not include any Awards or Insurance Proceeds (other than business interruption and/or rental loss insurance proceeds) or disbursements of any Reserve Funds from the Accounts.

"**Ground Lease**" shall mean, collectively, (i) that certain Ground Lease, dated as of the date hereof, by and between Bourse Fee Borrower, as lessor, and Bourse Leasehold Borrower, as lessee, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement (the "**Bourse Ground Lease**"), and (ii) that certain Ground Lease, dated as of the date hereof, by and between 400 Market Fee Borrower, as lessor, and 400 Market Leasehold Borrower, as lessee, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement (the "**400 Market Ground Lease**").

"**Ground Rent**" shall mean any rent, additional rent or other charge payable by the tenant under a Ground Lease.

"**Guarantor**" shall mean, collectively, Individual Guarantor and Entity Guarantor.

"**Guarantor Financial Covenants**" shall mean those covenants specified in Section 5.2 of the Guaranty.

"**Guaranty**" shall mean that certain Guaranty of Recourse Obligations, dated as of the Closing Date, from Individual Guarantor for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Guaranty of Completion**" shall mean that certain Guaranty of Completion, dated as of the Closing Date, from Entity Guarantor for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Guaranty of Payment**" shall mean that certain Guaranty of Payment, dated as of the Closing Date, from Individual Guarantor for the benefit of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hard Costs**" shall mean those Hotel Conversion Expenses which are for labor, materials, tools, equipment, and fixtures.

"**Historic Tax Credit Documents**" shall mean, collectively, (i) the Master Lease, (ii) the Master Lease SNDA, (iii) the Master Tenant Governing Documents and (iv) any other documents or agreements to be entered into by and/or among (as the case may be) Borrower, Master Tenant and/or HTC Investor, in each case, in accordance with the terms hereof relating to the historic tax credits that are available to the Property and the investment by any HTC Investor or its Affiliates in the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Hotel Conversion**" shall mean the work described in the Hotel Conversion Scope of Work, to be performed in accordance with the Hotel Conversion Budget and the Hotel Conversion Plans and Specifications in all material respects.

19

"**Hotel Conversion Advance**" shall mean an Advance for the payment of Approved Hotel Conversion Expenses made by Lender pursuant to the terms and provisions of Section 2.6 hereof.

"**Hotel Conversion Advance Maximum Amount**" shall mean $38,500,000.00.

"**Hotel Conversion Architect**" shall mean, with respect to the Hotel Conversion, the architect to be selected by Bourse Borrower, subject to Lender's approval, such approval not to be unreasonably withheld, conditioned or delayed; Lender acknowledges and agrees that Tantillo Architecture is an approved Hotel Conversion Architect.

"**Hotel Conversion Architect's Contract**" shall mean an agreement to be entered into by and between Bourse Borrower and Hotel Conversion Architect in accordance herewith, as the same may be amended from time to time in compliance with the terms hereof.

"**Hotel Conversion Budget**" shall mean the Preliminary Hotel Conversion Budget**,** as the same may be amended from time to time in compliance with the terms hereof.

"**Hotel Conversion Commencement**" shall mean the physical commencement of construction of all or any portion of the Property, but excluding Hotel Conversion Demolition.

"**Hotel Conversion Conditions**" shall have the meaning set forth in Section 7.1(b).

"**Hotel Conversion Construction Schedule**" shall mean the Preliminary Hotel Conversion Construction Schedule, as the same may be amended from time to time in compliance with the terms hereof.

"**Hotel Conversion Demolition**" shall mean the demolition of all or any portion of the existing Improvements that will be subject to the Hotel Conversion.

"**Hotel Conversion Expenses**" shall mean all costs and expenses to be incurred to achieve Hotel Conversion Final Completion.

"**Hotel Conversion Expenses Available Amount**" shall mean Lender's determination in its sole but good faith discretion of the sum of the following amounts as of the applicable date of determination:  (i) the amount of unadvanced Hotel Conversion Advances (if any); (ii) the amount to be funded by Bourse Borrower pursuant to the Hotel Conversion Budget to pay Borrower's Share of Approved Hotel Conversion Expenses; and (iii) the amount of funds in the Hotel Conversion Rebalancing Reserve Account (if any) which are held by Lender as of such date of determination to pay Approved Hotel Conversion Expenses in accordance with Section 6.6.1 hereof.

"**Hotel Conversion Final Completion**" shall mean, with respect to the Hotel Conversion (a) Hotel Conversion Substantial Completion has occurred, and (b) all Punch List Items have been completed.

"**Hotel Conversion Major Milestones**" shall mean the fulfillment of the following milestones: (i) receipt of a demolition permit with respect to the portion of the Improvements subject to the Hotel Conversion by November 30, 2024, subject to extension by up to 60 days in

20

the aggregate so long as Bourse Borrower is diligently pursuing completion of such milestone; (ii) receipt of a building permit with respect to the portion of the Improvements subject to the Hotel Conversion by March 30, 2025, subject to extension by up to 60 days in the aggregate so long as Bourse Borrower is diligently pursuing completion of such milestone; (iii) receipt of a temporary certificate of occupancy with respect to the portion of the Improvements subject to the Hotel Conversion by April 30, 2026, subject to extension by up to 60 days in the aggregate so long as Bourse Borrower is diligently pursuing completion of such milestone; and (iv) Hotel Conversion Substantial Completion by May 31, 2026, subject to extension by up to 60 days in the aggregate so long as Bourse Borrower is diligently pursuing completion of such milestone.

"**Hotel Conversion Plans and Specifications**" shall mean, with respect to the Hotel Conversion, the plans and specifications to be prepared by Hotel Conversion Architect and to be approved by Lender in accordance with the terms of this Agreement (and as the same may be further amended from time to time in compliance with the terms hereof), including all architectural, structural, mechanical, electrical, plumbing, fire protection and elevator plans and specifications, as applicable.

"**Hotel Conversion Rebalancing Reserve Account**" shall have the meaning specified in Section 6.6.1.

"**Hotel Conversion Report**" shall mean, with respect to the Hotel Conversion, periodic reports to be prepared by the Construction Consultant, based on its review of the Hotel Conversion Budget with respect to the Hotel Conversion and the Hotel Conversion Plans and Specifications, inspections of the Property and a review of the Hotel Conversion then ongoing and such documents and information reasonably required by the Construction Consultant.

"**Hotel Conversion Scope of Work**" shall mean the narrative of the scope of the Hotel Conversion approved by Lender on or prior to the Closing Date and attached as **Schedule I** hereto, as the same may be modified from time to time with Lender's prior written approval.

"**Hotel Conversion Shortfall**" shall have the meaning specified in Section 6.6.1.

"**Hotel Conversion Shortfall Notice**" shall have the meaning specified in Section 6.6.1.

"**Hotel Conversion Substantial Completion**" shall mean, with respect to the Hotel Conversion (a) the occurrence of substantial completion of the Hotel Conversion free and clear of all Liens (subject to Bourse Borrower's right to contest in accordance with Section 4.2.2 hereof), in accordance with the Hotel Conversion Plans and Specifications in all material respects and in compliance in all material respects with all applicable material Legal Requirements (subject to Bourse Borrower's right to contest in accordance with Section 4.1.1 hereof), and this Agreement, (b) except with respect to Punch List Items, all Hotel Conversion Expenses with respect to the Hotel Conversion have been paid in full and duly executed final and unconditional Lien waivers (other than the condition on payment only) in substantially the form set forth in **Exhibit B** from Construction Manager and all first tier subcontractors who performed any work with regard to all work performed (in each case, in connection with the Hotel Conversion) have been delivered to Lender (or the disputed amount of any such Hotel Conversion Expenses has been fully bonded to the reasonable satisfaction of Lender) (but in no event shall Bourse Borrower be required to deliver

21

lien waivers from materialmen and suppliers so long as Bourse Borrower has provided evidence to Lender that all such Persons have been (or will be) paid in full), together with an Affirmation of Payment from Construction Manager, (c) Bourse Borrower has delivered to Lender an AIA Form G704 (Certificate of Substantial Completion) executed by Hotel Conversion Architect and Bourse Borrower in connection with the Hotel Conversion, (d) the hotel shall contain all fixtures, furniture and equipment required for the use and operation of the Improvements for their intended use or which may be required by any Governmental Authority or under any Legal Requirement, (e) all utilities necessary to serve the Property have been connected to the Property and are in operation, and (f) Bourse Borrower shall have delivered to Lender a copy of a temporary or permanent certificate of occupancy for the portion of the Property subject to the Hotel Conversion; with completion and/or satisfaction, as applicable, of such requirements set forth in (a) through (e) above to be evidenced to the reasonable satisfaction of Lender.

"**Hotel Management Conversion Conditions**" shall have the meaning set forth in Section 2.8.

"**HTC Investor**" shall mean any investor in the historic tax credits evidenced by the Historic Tax Credit Documents.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" shall mean, for any Person, without duplication:  (a) all indebtedness of such Person for borrowed money, for amounts drawn under a letter of credit, or for the deferred purchase price of property for which such Person or its assets is liable; (b) all unfunded amounts under a loan agreement, letter of credit, or other credit facility for which such Person would be liable if such amounts were advanced thereunder; (c) all amounts required to be paid by such Person as a guaranteed payment to partners or a preferred or special dividend, including any mandatory redemption of shares or interests; (d) all indebtedness guaranteed by such Person, directly or indirectly; (e) all obligations under leases that constitute capital leases for which such Person is liable; (f) obligations under a PACE Loan, and (g) all obligations of such Person under interest rate swaps, caps, floors, collars and other interest hedge agreements, in each case whether such Person is liable contingently or otherwise, as obligor, guarantor or otherwise, or in respect of which obligations such Person otherwise assures a creditor against loss.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 11.13(b).

"**Indemnified Taxes**" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any Obligation of Borrower, and (b) to the extent not otherwise described in clause (a), Other Taxes.

"**Independent Director**" shall have the meaning set forth in Section 3.1.24(dd).

"**Individual Guarantor**" shall mean Dean Adler, an individual.

"**Individual Lease Completion**" shall mean, with respect to any Lease, that all work required to be performed by Bourse Borrower under such Lease (whether within the demised premises or otherwise) has been completed in accordance with the terms of such Lease, in all material respects, the Tenant under such Lease has accepted possession of the demised premises

under such Lease and Bourse Borrower has delivered an estoppel from such Tenant or other evidence reasonably acceptable to Lender that all such work has been so completed and such Tenant has accepted possession of the demised premises.

"**Initial Advance**" shall have the meaning specified in Section 2.1.2(a).

"**Initial Maturity Date**" shall mean July 7, 2028.

"**Insurance Account**" shall have the meaning set forth in Section 6.3.1.

"**Insurance Funds**" shall have the meaning set forth in Section 6.3.1.

"**Insurance Premiums**" shall mean the premiums due under the Policies.

"**Insurance Proceeds**" shall have the meaning ascribed thereto in clause (a) of the definition of the term "Net Proceeds".

"**Intellectual Property**" shall have the meaning set forth in Section 3.1.44.

"**Interest Determination Date**" shall mean, with respect to each Interest Period (a) during which the Benchmark is Term SOFR, the date that is two (2) U.S. Government Securities Business Days prior to the fifteenth (15th) day of the calendar month in which such Interest Period commences, and (b) during which the Benchmark is not Term SOFR, the date and time determined by Lender in accordance with the Conforming Changes; provided, however, that with respect to both of the foregoing clauses (a) and (b), Lender shall have the right to change the Interest Determination Date to any other day upon written notice to Borrower (in which event such change shall then be deemed effective) and, if requested by Lender, Borrower shall promptly execute an amendment to this Agreement in form reasonably acceptable to Borrower to evidence such change.

"**Interest Period**" shall mean (a) for the first interest period hereunder, (i) if the Closing Date occurs on or before the sixth (6th) day of a calendar month, the period commencing on the Closing Date and ending on (and including) the sixth (6th) day of the calendar month in which the Closing Date occurs, and (ii) if the Closing Date occurs on or after the seventh (7th) day of a calendar month, the period commencing on the Closing Date and ending on (and including) the sixth (6th) day of the following calendar month and (b) for each interest period thereafter commencing July 7, 2024, the period commencing on the seventh (7th) day of each calendar month and ending on (and including) the sixth (6th) day of the following calendar month.  Each Interest Period as set forth in clause (b) above shall be a full month and shall not be shortened by reason of any payment of the Loan prior to the expiration of such Interest Period.

"**Interest Rate**" shall mean with respect to each Interest Period, an interest rate per annum determined in accordance with Section 2.2.3 hereof.

"**Interest Rate Protection Agreement**" shall mean one or more interest rate caps (together with the schedules relating thereto) in form and substance reasonably satisfactory to Lender, with a confirmation from the Counterparty in a form reasonably satisfactory to Lender, between Borrower and, subject to Section 4.1.11, a Counterparty with a Minimum Counterparty Rating, and all amendments, restatements, replacements, supplements and modifications thereto, and after

23

delivery of a Substitute Interest Rate Protection Agreement to Lender, the term "Interest Rate Protection Agreement" shall be deemed to mean such Substitute Interest Rate Protection Agreement.

"**IRS**" shall mean the United States Internal Revenue Service.

"**KKR**" shall mean KKR Real Estate Finance Manager LLC and/or any of its Affiliates.

"**KYC Procedures**" shall have the meaning set forth in Section 8.2(b)(vi).

"**Lead Lender**" shall have the meaning set forth in Section 11.28.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, or other agreement entered into in connection with such lease, sublease, subsublease, or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto. Notwithstanding the foregoing, (i) if Borrower enters into a management agreement in lieu of a Lease with respect to the approximately 25,000 RSF ground floor events space at the Bourse Property, then the same shall be deemed to constitute a Lease for purposes of this Agreement and the other Loan Documents, and (ii) in no event shall the Ground Lease or the Master Lease be considered a "Lease" for any purpose under this Agreement or other Loan Documents (but the Rents payable thereunder shall constitute Rent for all purposes hereunder and the other Loan Documents).

"**Lease Termination Fee**" shall have the meaning set forth in Section 6.5.1(ii).

"**Leasing Agent**" shall mean (a) Keystone Properties Group, Inc., a Pennsylvania corporation, or (b) such other leasing agent as may be approved by Lender in its reasonable good faith discretion.

"**Leasing Agreement**" shall mean, collectively (i) that certain Exclusive Listing Agreement, dated as of the date hereof, by and between Bourse Leasehold Borrower and Leasing Agent, or any replacement leasing agreement entered into by and between Bourse Leasehold Borrower and a Leasing Agent in accordance with the terms of the Loan Documents, in each case, pursuant to which the Leasing Agent is to provide leasing services with respect to the Bourse Property, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, and (ii) that certain Exclusive Listing Agreement, dated as of the date hereof, by and between 400 Market Leasehold Borrower and Leasing Agent, or any replacement leasing agreement entered into by and between 400 Market Leasehold Borrower and a Leasing Agent in accordance with the terms of the Loan Documents, in each case, pursuant to which the Leasing Agent is to provide leasing services with respect to the 400 Market Property, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Leasing Commissions**" shall mean the leasing commissions required to be paid by Bourse Borrower to Leasing Agent pursuant to the terms and provisions of the Leasing Agreement, or to any leasing agent pursuant to a brokerage agreement entered into in accordance with the terms and provisions hereof, for procuring Leases with respect to the Property.

"**Leasing Cost Advance**" shall mean an Advance for the payment of Approved Leasing Expenses made by Lender pursuant to the terms and provisions of Section 2.6 hereof.

"**Leasing Cost Advance Maximum Amount**" shall mean $9,700,000.00.

"**Leasing Cost Available Amount**" shall mean, with respect to any Lease, Lender's determination in its sole but good faith discretion of the sum of the following amounts as of the applicable date of determination:  (i) the amount of unadvanced Leasing Cost Advances (if any) to pay Approved Leasing Expenses with respect to such Lease (i.e., the funding of Lender's Share of such Approved Leasing Expenses); (ii) the amount to be funded by Bourse Borrower to pay Borrower's Share of Approved Leasing Expenses with respect to such Lease; (iii) the amount of funds in the Leasing Cost Rebalancing Reserve Account (if any) which are held by Lender as of such date of determination to pay Approved Leasing Expenses in accordance with Section 6.10.1 hereof with respect to such Lease and (iv) the amount of funds in the Rollover Account (if any) which are held by Lender as of such date of determination to pay Approved Leasing Expenses in accordance with Section 6.10.1 hereof and not previously earmarked for another purpose. With respect to a Lease, the Leasing Cost Available Amount under clauses (i) and (ii) of this definition shall not, in the aggregate, exceed the Leasing Cost Threshold for such Lease).

"**Leasing Cost Rebalancing Reserve Account**" shall have the meaning set forth in Section 6.10.1.

"**Leasing Cost Shortfall**" shall have the meaning set forth in Section 6.10.1.

"**Leasing Cost Shortfall Notice**" shall have the meaning set forth in Section 6.10.1.

"**Leasing Cost Threshold**" shall mean, with respect to any Approved Leasing Expense incurred by Bourse Borrower in connection with a new Lease entered into by Bourse Borrower after the Closing Date in accordance with the terms hereof, an amount equal to the following: (A) with respect to the retail portion of the Improvements, the product of (x) the amount set forth on **Schedule II** attached hereto under the applicable row labeled "UW Minimum Net Effective Starting Rent" with respect to the retail portions of the Bourse Property, multiplied by (y) the rentable square feet demised under such Lease, and (B) with respect to the office portion of the Improvements, the product of (x) the amount set forth on **Schedule II** attached hereto under the applicable row labeled "UW Minimum Net Effective Starting Rent" with respect to the office portions of the Bourse Property, multiplied by (y) the rentable square feet demised under such Lease.

"**Leasing Guidelines**" shall mean any Lease that satisfies the following requirements:  (a) complies with the leasing guidelines set forth on **Schedule II** attached hereto, (b) is for an initial term of not less than five (5) years and not more than twenty (20) years (inclusive of all extension rights thereunder), (c) is otherwise on market terms, (d) does not contain any option or other preferential right or option to purchase all or any portion of the Property, (e) is not with a Borrower

Related Party, (f) complies in all material respects with all applicable material Legal Requirements, and (g) is on the applicable standard form of lease that has been approved in writing by Lender (such approval not to be unreasonably withheld, conditioned or delayed), together with any commercially reasonable changes thereto approved by Borrower that do not cause clauses (a)-(f) above to be untrue.

"**Legal Requirements**" shall mean all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting or having jurisdiction over the Loan, any Borrower Party, the Property, the Collateral or any part thereof or the construction, use, alteration, operation or sale thereof (including, without limitation, in connection with commencing, performing and completing the Hotel Conversion, the Office CapEx Projects and any Tenant Improvements performed by or on behalf of Borrower), or any part thereof, whether now or hereafter enacted and in force, including, without limitation, the rules and regulations promulgated pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, zoning and land use laws, the Americans with Disabilities Act of 1990, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof, including, without limitation, any which may require repairs, modifications or alterations in or to the Property or any part thereof or in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**Lender Indemnitee**" shall have the meaning set forth in Section 11.13(b).

"**Lender's Share**" shall mean seventy percent (70.0%) of any dollar amount qualified by the term "Lender's Share" in this Agreement.

"**Letter of Credit**" shall mean an irrevocable, unconditional, transferable (without payment of any fee), clean sight draft letter of credit reasonably acceptable to Lender (either an evergreen letter of credit or one which does not expire until at least thirty (30) Business Days after the Maturity Date) in favor of Lender and entitling Lender to draw thereon in New York, New York, issued by a domestic Eligible Institution or the U.S. agency or branch of a foreign Eligible Institution.

"**Lien**" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, PACE Loan, or any other encumbrance, charge or transfer of, or any agreement to enter into or create any of the foregoing, on or affecting the Property, the Collateral or any portion thereof or any direct or indirect interest in Master Tenant, Borrower or Sole Member, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

"**Line Item**" shall mean each category of direct and indirect cost set forth in the Hotel Conversion Budget or an Office CapEx Project Budget, as applicable.

"**LLC Agreement**" shall have the meaning set forth in Section 3.1.24(cc).

26

"**Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement in the maximum principal amount of the Loan Amount.

"**Loan Amount**" shall mean an amount equal to $83,700,000.00.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Mortgage, the Assignment of Leases, the Cash Management Agreement, the Clearing Account Agreement, the Environmental Indemnity, the Guaranty, the Assignment of Management Agreement, the Assignment of Leasing Agreement, the Assignment of Interest Rate Protection Agreement, the Pledge Agreement, the Pledge Agreement Guaranty, the Assignment of Construction Manager's Agreement, the Assignment of Development Agreement, the Guaranty of Completion, the Guaranty of Payment, the Master Lease SNDA and any other document pertaining to the Property as well as all other documents now or hereafter executed and/or delivered in connection with the Loan, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Loan to Value Ratio**" shall mean, as of any date, the ratio, of (a) the Loan Amount, to (b) the Appraised Value of the Property.

"**Losses**" shall mean losses, liabilities (including, without limitation, strict liability), obligations, damages (but excluding consequential, special, exemplary, indirect, incidental and/or punitive damages), penalties, settlement payments, fees, assessments, citations, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable out-of-pocket and documented fees and disbursements of counsel engaged by Lender (excluding in-house counsel) related thereto).

"**Major Contractor**" shall mean any Contractor hired by or on behalf of Bourse Borrower, supplying labor or materials, or both, in connection with the Hotel Conversion under a Material Construction Contract.

"**Major Lease**" shall mean any Lease (and expansions, renewals or modifications of Leases, and any cancellation or termination of any such Leases) of all or any part of the Property and Improvements which:  (a) demises any space at the Property, which, either individually, or when taken together with any other Lease with the same Tenant or its Affiliates, and assuming the exercise of all expansion rights and all preferential rights to lease additional space contained in such Lease, in excess of 20,000 rentable square feet, (b) contains any option, offer, right of first refusal or other similar entitlement to acquire all or any portion of the Property, (c) is with an Affiliate of Borrower or Guarantor as Tenant, (d) is for a Restricted Use, (e) does not comply with the Leasing Guidelines, or with respect to a modification of a Lease that results in the non-compliance with the Leasing Guidelines, or (f) is entered into upon the occurrence and during the continuance of an Event of Default.

"**Management Agreement**" shall mean, collectively, (i) that certain Management Agreement, dated as of the Closing Date, by and between Bourse Leasehold Borrower and Manager, or any replacement property management agreement entered into by and between Bourse Leasehold Borrower and a Manager in accordance with the terms of the Loan Documents, in each case, pursuant to which the Manager is to provide property management and other services with

27

respect to the Bourse Property, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, and (ii) that certain Management Agreement, dated as of the Closing Date, by and between 400 Market Leasehold Borrower and Manager, or any replacement property management agreement entered into by and between 400 Market Leasehold Borrower and a Manager in accordance with the terms of the Loan Documents, in each case, pursuant to which the Manager is to provide property management and other services with respect to the 400 Market Street Property, as each of the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Manager**" shall mean Keystone Property Group, L.P., a Pennsylvania limited partnership, or any other property manager engaged by Borrower in accordance with the terms and conditions of the Loan Documents.

"**Master Lease**" shall mean, collectively, (i) that certain lease agreement to be entered into in accordance with the terms hereof, by and between Bourse Leasehold Borrower, as lessor, and Bourse Master Tenant, as lessee, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement (the "**Bourse Master Lease**"), and (ii) that certain lease agreement to be entered into in accordance with the terms hereof, by and between 400 Market Leasehold Borrower, as lessor, and 400 Market Master Tenant, as lessee, as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement (the "**400 Market Master Lease**").

"**Master Lease SNDA**" shall mean, collectively (i) that certain Subordination, Non-Disturbance and Attornment Agreement, to be entered into in accordance with the terms hereof, by and among Bourse Leasehold Borrower, Lender, and the HTC Investor, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof, and (ii) that certain Subordination, Non-Disturbance and Attornment Agreement, to be entered into in accordance with the terms hereof, by and among 400 Market Leasehold Borrower, Lender, and the HTC Investor, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Master Tenant**" shall mean, collectively, the Bourse Master Tenant and the 400 Market Master Tenant.

"**Master Tenant Capital Contributions**" shall mean all capital contributions made by HTC Investor to Master Tenant pursuant to the terms of the Master Tenant Governing Documents or otherwise contributed or made by HTC Investor or its Affiliates in respect of the Property.

"**Master Tenant Governing Documents**" shall mean each organizational document that governs the ownership of each Master Tenant that is entered into in accordance with the terms hereof, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"**Material Action**" shall mean to file any insolvency or reorganization case or proceeding, to institute proceedings to have a Required SPE be adjudicated bankrupt or insolvent, to institute

28

proceedings under any applicable insolvency law, to seek any relief under any law relating to relief from debts or the protection of debtors, to consent to the filing or institution of bankruptcy or insolvency proceedings against a Required SPE to file a petition seeking, or consent to, reorganization or relief with respect to Borrower under any applicable federal or state law relating to bankruptcy or insolvency, to seek or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator, custodian, or any similar official of or for a Required SPE or a substantial part of its property, to make any assignment for the benefit of creditors of a Required SPE or to take action in furtherance of any of the foregoing.

"**Material Adverse Effect**" shall mean a material adverse effect on (a) the Property or the Collateral, (b) the business, management, operations or financial condition of Borrower or the Property, (c) the enforceability, validity, perfection or priority of the Lien of the Mortgage, the Pledge Agreement or the other Loan Documents, (d) the ability of Borrower to perform its Obligations, or (e) the ability of Guarantor to perform its obligations under the Loan Documents to which Guarantor is a party.

"**Material Agreements**" shall mean (a) any contract which extends beyond one year (unless cancelable on thirty (30) days or less notice without requiring the payment of termination fees or payments of any kind), (b) any contract with a Borrower Related Party, in any case, whether written or oral, or (c) any contract with respect to the Property which is, when aggregated with all other contracts and agreements with such Person and their Affiliates, for an aggregate per annum contract price equal to or greater than $500,000; in no event shall Material Agreements include any utility contracts, Construction Contracts, Development Agreement, Leases, Leasing Agreement, Management Agreement, Major Leases, or Material Construction Contracts.

"**Material Change Order**" shall mean, with respect to the Hotel Conversion, any Change Order that (a) involves the use of materials, fixtures or equipment that is not at least of equal quality to that set forth in the final Hotel Conversion Plans and Specifications, (b) constitutes a material change in the architectural or structural design of any of the Improvements relating to the Hotel Conversion, (c) would result in an increase of construction costs in excess of $250,000 for any single Change Order, (d) would, inclusive of such Change Order, increase the additional cost of all Change Orders permitted and effectuated without Lender's consent, to an amount in excess of $500,000, (e) affects or is reasonably likely to affect in any material respect a structural element, building system or the exterior of the Improvements, (f) would change the floor area or rentable square footage of the Improvements, or (g) could reasonably be expected to adversely affect the Lien or priority of the Lien of the Mortgage.

"**Material Construction Contract**" shall mean (a) any general contractor's agreement, construction manager's agreement, architect's contract or agreement, material engineering contract and other material design professional contract or agreement entered into by Bourse Borrower with respect to the Hotel Conversion or an Office CapEx Project, (b) any Construction Contract between Bourse Borrower or Construction Manager, on the one hand, and an Affiliate of Bourse Borrower, on the other hand, (c) any Construction Contract which is, when aggregated with all other contracts and agreements entered into by Bourse Borrower or Construction Manager on behalf of Bourse Borrower, with such Person and their Affiliates, for an aggregate remaining contract price equal to or greater than $1,000,000, and (d) the Hotel Conversion Architect's Contract.

29

"**Maturity Date**" shall mean the Initial Maturity Date or if the term of the Loan is extended in accordance with the terms of this Agreement, the Extension Maturity Date or such earlier date on which the final payment of principal of the Note becomes due and payable as therein or herein provided, whether at such stated maturity date, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum non-usurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the Indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Member**" shall have the meaning set forth in Section 3.1.24(cc)(i).

"**Milestone Non-Compliance**" shall mean that any Hotel Conversion Major Milestone has not been timely satisfied as provided in the definition of "Hotel Conversion Major Milestones."

"**Minimum Counterparty Rating**" shall mean a long-term credit rating from S&P of at least "A-" and a long term-credit rating from Moody's of at least "A3".

"**Minor Field Change**" means a *de minimis* change to the Hotel Conversion Plans and Specifications solely necessitated by field conditions.

"**Monthly Carry Cost Shortfall**" shall have the meaning set forth in Section 2.6.4.

"**Monthly Debt Service Payment Amount**" shall mean on each Monthly Payment Date through and including the Maturity Date, an amount equal to the interest accruing on the Outstanding Principal Balance at the Interest Rate for the immediately preceding Interest Period, which interest shall be calculated in accordance with Section 2.2.

"**Monthly Operating Expense Budgeted Amount**" shall mean the monthly amount set forth in the Approved Annual Budget for operating expenses (excluding Taxes and Insurance Premiums, and for the avoidance of doubt, excluding Debt Service) for the calendar month in which the applicable Monthly Payment Date occurs.

"**Monthly Payment Date**" shall mean the seventh (7th) calendar day of each calendar month during the term of the Loan, and if such day is not a Business Day, then the Business Day immediately succeeding such day.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean that certain first priority Open-End Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, dated as of the Closing Date, executed and delivered by Borrower as security for the Loan and encumbering the Property, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Net Operating Income**" shall mean as of the Calculation Date (a) annualized Operating Income based on in place Rents (including projected disbursements from the Free Rent Account into the Deposit Account during such period and contractual increases (e.g., rent step ups) over the

30

following twelve (12) months, provided, such increases shall only be credited for the time periods when they are actually effective and not annualized for the entire twelve (12)-month period) in connection with Leases with Tenants who have taken possession of their respective premises and paying Rent (except as set forth herein), but subject to a maximum market occupancy cap of ninety-five percent (95%), but excluding (i) Rents relating to Tenants under Leases (pursuant to the most recent rent roll) which are more than sixty (60) days delinquent in the payment of base rent or percentage rent, (ii) Rents relating to Tenants who are month-to-month, (iii) Rents relating to Tenants who are Borrower Related Parties unless Lender has approved the same in writing, (iv) Rents from Tenants who are in a free rent period, unless Borrower deposits the full amount of such free rent into the Free Rent Account, (v) Rents relating to Tenants who have gone "dark" or ceased to occupy their demised premises for business purpose (which is not meant to include Tenants that are "dark" or not in occupancy due to a public health situation or due to safety or health concerns or due to government regulations or recommendations), (vi) Rents relating to Tenants subject to a Bankruptcy Event unless the applicable Lease has been affirmed in connection with such Bankruptcy Event, (vii) Rents under any Leases with less than ninety (90) days remaining on the then current term unless the applicable Lease shall have been renewed or extended, (viii) Rents from Tenants that have given notice to vacate or of non-renewal or have failed to renew their lease by the required notice date, less (b) actual Operating Expenses incurred in connection with the Property for the trailing twelve (12) month period preceding the date of calculation, with adjustments for any known or anticipated increases in such Operating Expenses (including those projected to occur as a result of higher occupancy), and assuming (i) a base property management fees equal to the greater of (A) the actual amount paid by Borrower during such prior twelve (12)-month period, and (B) three percent (3.0%) of Gross Revenues, and (ii) a normalized adjustment for Capital Expenditures equal to $0.25 per square foot.  Lender's calculation of Net Operating Income shall be conclusive and binding absent manifest error.

"**Net Proceeds**" shall mean (a) the net amount of all insurance proceeds received by Lender pursuant to Section 5.1.1 as a result of such damage or destruction, after deduction of its reasonable, out-of-pocket and documented costs and expenses (including, but not limited to, reasonable counsel fees of retained firms (but excluding in-house counsel)), if any, in collecting same ("**Insurance Proceeds**"); or (b) the net amount of the Award, after deduction of Lender's reasonable, out-of-pocket and documented costs and expenses (including, but not limited to, reasonable counsel fees of retained firms (but excluding in-house counsel)), if any, in collecting same ("**Condemnation Proceeds**"), whichever the case may be.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 5.3.2(f).

"**Note**" shall mean that certain Promissory Note, dated as of the Closing Date, in the stated principal amount of the Loan Amount, executed by Borrower and payable to the order of Lender, as the same may hereafter be amended, supplemented, restated, increased, extended, split, severed or consolidated from time to time.

"**Notice**" shall have the meaning set forth in Section 11.6.

"**O&M Program**" shall mean the asbestos operations and maintenance program developed by Borrower with respect to the Property and approved by Lender, as the same may be amended, replaced, supplemented or otherwise modified from time to time.

31

"**Obligations**" shall mean, collectively, Borrower's obligations for the payment of the Debt and the performance of the Other Obligations.

"**OFAC**" shall have the meaning ascribed thereto in the definition of the term "Sanctions".

"**Office CapEx Project**" shall mean, subject to Section 4.1.40 hereof, each project described on Schedule XI attached hereto, and "**Office CapEx Projects**" shall mean each of the projects described on Schedule XI attached hereto, in each case, to be performed in accordance with the Office CapEx Project Budget, the Office CapEx Project Plans and Specifications (if applicable) and all applicable material Legal Requirements, in each case, in all material respects.

"**Office CapEx Project Advance**" shall mean an Advance for the payment of Approved Office CapEx Project Expenses made by Lender pursuant to the terms and provisions of Section 2.6 hereof.

"**Office CapEx Project Advance Maximum Amount**" shall mean $3,200,000.00.

"**Office CapEx Project Budget**" shall mean the budget for the Office CapEx Projects prepared by Bourse Borrower and approved by Lender from time to time in accordance with the terms of this Agreement. The Office CapEx Project Budget approved by Lender as of the Closing Date is attached hereto as Schedule XI.

"**Office CapEx Project Expenses**" shall mean all costs and expenses of performing the Office CapEx Projects through completion thereof.

"**Office CapEx Project Plans and Specifications**" shall mean, to the extent prepared by Bourse Borrower for an Office CapEx Project, the plans and specifications for such Office CapEx Project, including all architectural, structural, mechanical, electrical, plumbing, fire protection and elevator plans and specifications, as applicable.

"**Officer's Certificate**" shall mean a certificate delivered to Lender by Borrower which is signed by an authorized senior officer of Borrower (or its general partner or managing member).

"**Operating Expenses**" shall mean, for any period, without duplication, all expenses actually paid or payable by Borrower during such period in connection with the operation, management, maintenance, repair and use of the Property in accordance with an Acceptable Accounting Method. Operating Expenses specifically shall include (a) all expenses incurred in the immediately preceding twelve (12)-month period based on quarterly financial statements delivered to Lender in accordance with Section 4.1.6(c) (or during any shorter period of determination), (b) all payments required to be made pursuant to any service contracts and Permitted Encumbrances, (c) property management fees in an amount equal to the management fees actually paid under the Management Agreement, (d) administrative, payroll, security and general expenses for the Property, (e) the cost of utilities, inventories and fixed asset supplies consumed in operation of the Property, (f) a reasonable reserve for uncollectible accounts, (g) costs and fees of independent professionals (including, without limitation, legal, accounting, consultants and other professional expenses), technical consultants, operational experts (including quality assurance inspectors) or other third parties retained to perform services required or permitted hereunder, (h) advertising expenses, (i) Ground Rent, (j) operational equipment and other lease

32

payments, (k) Taxes and Other Charges (other than income taxes or Other Charges in the nature of income taxes) and Insurance Premiums, and (l) all underwritten reserves required by Lender hereunder(without duplication of the items set forth above and excluding reserves for the items set forth below).   Notwithstanding the foregoing, Operating Expenses shall not include (1) depreciation or amortization, (2) income taxes or Other Charges in the nature of income taxes, (3) any expenses (including legal, accounting and other professional fees, expenses and disbursements) incurred in connection with the making of the Loan or the sale, exchange, transfer, financing or refinancing of all or any portion of the Property or in connection with the recovery of Insurance Proceeds or Awards, (4) Capital Expenditures, (5) Debt Service, (6) any item of expense which would otherwise be considered within Operating Expenses pursuant to the provisions above but is paid directly by any Tenant and (7) non-recurring expenses.  To the extent the period of determination of Operating Expenses is less than one year and an Operating Expense relates to an entire calendar year (e.g., real estate taxes), then, for purposes of determining the calculation of such Operating Expense, the same shall be prorated for the relevant period of determination based on the total annual amount paid with respect thereto.  Lender shall calculate Operating Expenses based upon information provided to Lender by Borrower pursuant to Section 4.1.6 and such determination shall be final absent manifest error.

"**Operating Income**" shall mean, for any period, all income of Borrower during such period from the use, ownership or operation of the Property, including:

(a)    all amounts actually paid to Borrower by any Person as Rent and other amounts under Leases or other agreements relating to the Property;

(b)    business interruption insurance proceeds allocable to the applicable reporting period; and

(c)    all other amounts which in accordance with an Acceptable Accounting Method, are included in Borrower's financial statements as operating income attributable to the Property.

Notwithstanding the foregoing, Operating Income shall not include (a) any Insurance Proceeds, (b) any proceeds resulting from the Transfer of all or any portion of the Property, (c) intentionally omitted, (d) any item of income otherwise included in Operating Income but paid directly by any Tenant to a Person other than Borrower as an offset or deduction against Rent payable by such Tenant; provided such item of income is for payment of an item of expense (such as payments for utilities paid directly to a utility company) and such expense is otherwise excluded from the definition of Operating Expenses pursuant to clause (6) of the definition thereof, (e) security deposits received from Tenants until forfeited or applied pursuant to the applicable Lease, (f) any Lease Termination Fees, (g) any amount recovered in a litigation proceeding, (h) intentionally omitted, or (i) revenue received pursuant to an Interest Rate Protection Agreement. Operating Income shall be calculated on a cash basis of accounting and, except to the extent otherwise provided in this definition, in accordance with an Acceptable Accounting Method.

"**Other Charges**" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the

use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or imposed against the Property or any part thereof.

"**Other Connection Taxes**" shall mean, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Obligations**" shall mean (a) the performance of all obligations of Borrower contained herein; (b) the performance of each obligation of Borrower contained in any other Loan Document; and (c) the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of this Agreement, the Note or any other Loan Document.

"**Other Taxes**" shall mean all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Outstanding Principal Balance**" shall mean, as of any date, the then outstanding principal balance of the Loan.

"**Ownership and Control Condition**" shall mean that (a) Dean Adler and Carl Kuehner (or upon the death, disability or incapacity of the last of the foregoing Persons, such other Person or Persons proposed by Borrower within thirty (30) days of such event and acceptable to Lender in its sole but good faith discretion) collectively, directly or indirectly, maintain the same level of Control over Borrower and Master Tenant as in effect as of the Closing Date, (b) William Glazer (or upon the death, disability or incapacity of the foregoing Person, such other Person or Persons proposed by Borrower within thirty (30) days of such event and acceptable to Lender in its sole but good faith discretion) directly or indirectly maintains the same level of Control over Borrower and Master Tenant as in effect as of the Closing Date, and (c) Dean Adler and Carl Kuehner (or upon the death, disability or incapacity of the last of the foregoing Persons, such other Person or Persons proposed by Borrower within thirty (30) days of such event and acceptable to Lender in its sole but good faith discretion) collectively, directly or indirectly, Controls Lubert-Adler Independence Portfolio Investors, LP, a Delaware limited partnership ("**LAIPI**"), and LAIPI owns, directly or indirectly, not less than fifty percent (50.0%) of the direct or indirect ownership interests in Borrower.

"**PACE Loan**" shall mean (a) any "Property-Assessed Clean Energy loan" or (b) any other Indebtedness, without regard to the name given to such Indebtedness, which is (i) incurred for improvements to the Property for the purpose of increasing energy efficiency, increasing use of renewable energy sources, resource conservation, or a combination of the foregoing, and (ii) repaid through multi-year assessments against the Property.

34

"**Participant**" shall have the meaning set forth in Section 9.4(b)(i).

"**Participant Register**" shall have the meaning set forth in Section 9.4(b)(i).

"**Permitted Encumbrances**" shall mean, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters accepted by Lender as of closing under the Title Insurance Policy, and such other title and survey exceptions as Lender has approved or may approve in writing in Lender's reasonable discretion, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, subject to Borrower's right to contest in accordance with the requirements of this Agreement, (d) any workers', mechanics' or other similar Liens on the Property so long as any such Lien is being contested in accordance with Section 4.2.2 hereof, (e) such governmental, public utility and private easements, covenants, conditions and restrictions which are customary and reasonably necessary for the provisions of utilities or access to the Property, (f) each Lease existing as of the date hereof or entered into in accordance with the terms of this Agreement, (g) Liens created pursuant to Permitted Equipment Financing, (h) the execution of the Historic Tax Credit Documentation by Borrower and Master Tenant in accordance with the terms hereof, and (i) such other Liens as Lender may hereafter approve in writing in Lender's reasonable discretion.

"**Permitted Equipment Financing**" shall mean equipment financing with respect to the Personal Property; provided, that, in each case, such financing (a) is entered into on commercially reasonable terms and conditions in the ordinary course of Borrower's business and (b) relates to Personal Property which is (i) used in connection with the operation and maintenance of the Property in the ordinary course of Borrower's business and (ii) readily replaceable without material interference or interruption to the operation of the Property.

"**Permitted Indebtedness**" shall have the meaning set forth in Section 4.2.6.

"**Permitted Investments**" shall mean any one or more of the following obligations or securities acquired at a purchase price of not greater than par, including those issued by the Servicer, if any has occurred, or any of their respective Affiliates, payable on demand or having a maturity date not later than the Business Day immediately prior to the first Monthly Payment Date following the date of acquiring such investment and meeting one of the appropriate standards set forth below:

(a)    obligations of, or obligations directly and unconditionally guaranteed as to principal and interest by, the U.S. government or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the United States of America and have maturities not in excess of one year;

(b)    federal funds, unsecured certificates of deposit, time deposits, banker's acceptances, and repurchase agreements having maturities of not more than 90 days of any commercial bank organized under the laws of the United States of America or any state thereof or the District of Columbia, the short-term debt obligations of which are rated (i) "A-1+" (or the equivalent) by S&P and, if it has a term in excess of three months, the long-term debt obligations of which are rated "AAA" (or the equivalent) by S&P, and that (1) is at least "adequately capitalized" (as defined in the regulations of its primary federal banking regulator) and (2) has Tier

1 capital (as defined in such regulations) of not less than One Billion and No/100 Dollars ($1,000,000,000.00), (ii) in one of the following Moody's rating categories:  (1) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (2) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (3) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (4) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1", or such other ratings as confirmed by Lender in its sole discretion;

(c)     deposits that are fully insured by the Federal Deposit Insurance Corporation;

(d)     commercial paper rated (i) "A–1+" (or the equivalent) by S&P and having a maturity of not more than 90 days and (ii) in one of the following Moody's rating categories:  (1) for maturities less than one month, a long-term rating of "A2" or a short-term rating of "P-1", (2) for maturities between one and three months, a long-term rating of "A1" and a short-term rating of "P-1", (3) for maturities between three months to six months, a long-term rating of "Aa3" and a short-term rating of "P-1" and (4) for maturities over six months, a long-term rating of "Aaa" and a short-term rating of "P-1";

(e)     any money market funds that (i) has substantially all of its assets invested continuously in the types of investments referred to in subparagraph (a) above, (ii) has net assets of not less than Five Billion and No/100 Dollars ($5,000,000,000.00), and (iii) has the highest rating obtainable from S&P and Moody's; and

(f)     such other investments as to which Lender shall have approved in its sole discretion.

Notwithstanding the foregoing, "Permitted Investments" (i) shall exclude any security with the S&P's "r" symbol (or any other Approved Rating Agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because of market risk), as well as any mortgage-backed securities and any security of the type commonly known as "strips"; (ii) shall be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; and (iii) shall exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of one hundred and twenty percent (120%) of the yield to maturity at par of such underlying investment.  Interest may either be fixed or variable, and any variable interest must be tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with that index.  No investment shall be made which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity.  All investments shall mature or be redeemable upon the option of the holder thereof on or prior to the earlier of (x) three months from the date of their purchase and (y) the Business Day preceding the day before the date such amounts are required to be applied hereunder.

"**Permitted Transfers**" shall have the meaning set forth in Section 8.2(a).

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other entity, any federal, state, county

36

or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning specified in the Mortgage.

"**Pfandbrief Pledge**" shall have the meaning set forth in Section 11.26.

"**Pledge Agreement**" shall mean, collectively, (i) that certain Pledge and Security Agreement dated as of the Closing Date by Bourse Fee Sole Member and Bourse Leasehold Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**Bourse Pledge Agreement**"), (ii) that certain Pledge and Security Agreement dated as of the Closing Date by 400 Market Fee Sole Member and 400 Market Leasehold Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**400 Market Pledge Agreement**"), (iii) that certain Pledge and Security Agreement dated as of the Closing Date by Bourse Master Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**Bourse Master Tenant Pledge Agreement**"), and (iv) that certain Pledge and Security Agreement dated as of the Closing Date by 400 Market Master Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**400 Market Master Tenant Pledge Agreement**").

"**Pledge Agreement Guaranty**" shall mean, collectively, (i) that certain Sole Member Guaranty dated as of the Closing Date by Bourse Fee Sole Member and Bourse Leasehold Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**Bourse Pledge Agreement Guaranty**"), (ii) that certain Sole Member Guaranty dated as of the Closing Date by 400 Market Fee Sole Member and 400 Market Leasehold Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**400 Market Pledge Agreement Guaranty**"), (iii) that certain Sole Member Guaranty dated as of the Closing Date by Bourse Master Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**Bourse Master Pledge Agreement Guaranty**"), and (iv) that certain Sole Member Guaranty dated as of the Closing Date by 400 Market Master Sole Member in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time (the "**400 Market Master Pledge Agreement Guaranty**").

"**Policies**" shall have the meaning set forth in Section 5.1.1(b).

"**Politically Exposed Person**" shall mean any U.S. and non-U.S. individuals who are, or have been entrusted with prominent public functions (*e.g.*, Heads of State or of government, senior politicians, senior government, judicial or military officials, senior executives of state owned corporations, or important political party officials).

"**Preliminary Hotel Conversion Budget**" shall mean the preliminary budget for the Hotel Conversion attached hereto as Schedule XIII, as the same may be amended from time to time in compliance with the terms hereof.

"**Preliminary Hotel Conversion Construction Schedule**" shall mean the preliminary construction schedule for the Hotel Conversion attached hereto as Schedule XIV, as the same may be amended from time to time in compliance with the terms hereof.

"**Projected Carry Cost Available Amount**" shall mean Lender's determination in its sole but good faith discretion of the sum of the following amounts as of the applicable date of determination with respect to the succeeding 3-month period: (i) Lender's determination in its sole but good faith discretion of Rents and other Gross Revenue expected to be collected during such 3-month period to the extent Lender determines in its sole but good faith discretion such Rents and Gross Revenue would be applied to pay Carry Costs for such 3-month period in accordance with the payment priority waterfall in Section 6.16.1 hereof; (ii) the amount of Carry Cost Advances (if any) available to be Advanced by Lender in accordance with Section 2.6 hereof to pay Carry Costs during such 3-month period; (iii) Lender's determination in its sole but good faith discretion of the Carry Cost Funds (if any) which would be available to be disbursed to Borrower to pay Carry Costs in accordance with Section 6.7 for such 3-month period; and (iv) the amount to be funded pursuant to the Approved Annual Budget during the applicable period to pay Borrower's Share of Carry Costs. The Projected Carry Cost Available Amount for any date of determination shall be determined by Lender in its sole but good faith discretion and shall be final, conclusive and binding on Borrower absent manifest error.

"**Projected Carry Cost Shortfall**" shall mean as of any applicable date of determination, the amount by which Lender determines that Lender's estimate of the Carry Costs payable by Borrower for the succeeding 3-month period shall exceed Lender's estimate of the Projected Carry Cost Available Amount for such succeeding 3-month period. The Projected Carry Cost Shortfall for any date of determination shall be determined by Lender in its sole and absolute discretion and shall be final, conclusive and binding on Borrower absent manifest error.

"**Projected Carry Cost Shortfall Notice**" shall have the meaning set forth in Section 6.7.1.

"**Property**" shall mean, individually and collectively, the 400 Market Street Property and the Bourse Property; provided, that effective upon the Release of the 400 Market Street Property in accordance with the terms hereof, the 400 Market Street Property shall no longer be considered a part of the "Property" for purposes of this Agreement or the other Loan Documents.

"**Property Tax Account**" shall have the meaning set forth in Section 6.2.1.

"**Property Tax Funds**" shall have the meaning set forth in Section 6.2.1.

"**Property Taxes**" shall mean all real estate and personal property taxes, payments in lieu of taxes, assessments, water rates or sewer rents, now or hereafter levied or assessed or imposed against the Property or part thereof, together with all interest and penalties thereon.

"**Punch List Items**" shall mean, collectively, minor or insubstantial details of construction, decoration, mechanical adjustment or installation, the non-completion of which does not prevent the use and occupancy of the hotel or the ability to obtain a temporary certificate of occupancy with respect thereto.

38

"**Purchase Agreement**" shall mean that certain Purchase and Sale Agreement, dated as of February 27, 2024, by and between Lender, as seller, and Borrower, as purchaser, as amended by that certain First Amendment to Purchase and Sale Agreement, dated as of May 17, 2024, as amended by that certain Second Amendment to Purchase and Sale Agreement, dated as of June 14, 20124, as the same may be further amended, restated or supplemented from time to time after the Closing Date.

"**Radius**" shall have the meaning set forth in Section 5.1.1(c).

"**Rating Agency**" shall mean each of Dominion, Fitch, S&P, Moody's and any other nationally recognized statistical rating agency designated by Lender (and any successor to any of the foregoing).

"**Recipient**" shall mean (a) Lender and (b) the Lead Lender pursuant to Section 11.28, as applicable.

"**Reference Rate**" shall mean an adjustable rate of interest equal to the rate quoted in the Wall Street Journal as the "prime rate" (which prime rate may not be the lowest rate offered by Lenders to their most creditworthy borrowers).

"**Register**" shall have the meaning set forth in Section 9.4(a).

"**Regulation D**" shall mean Regulation D of the Board of Governors of the Federal Reserve System from time to time in effect, including any successor or other Regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

"**Release**" shall have the meaning set forth in Section 2.9.

"**Release Amount**" shall mean an amount equal to $6,000,000.00.

"**Relevant Governmental Body**" shall mean the Federal Reserve Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Federal Reserve Board and/or the Federal Reserve Bank of New York or any successor thereto.

"**Rent Roll**" shall have the meaning set forth in Section 3.1.22.

"**Rents**" shall mean all rents, rent equivalents, "additional rent" (i.e. pass-throughs for operating expenses, real estate tax escalations and/or real estate tax pass-throughs, payments by Tenants on account of electrical consumption, porters' wage escalations, condenser water charges and tap-in fees, freight elevator and HVAC overtime charges, charges for excessive rubbish removal and other sundry charges), moneys payable as damages (including payments by reason of the rejection of a Lease in a bankruptcy proceeding) or in lieu of rent or rent equivalents, royalties (including all oil and gas or other mineral royalties and bonuses), income, fees, receivables, receipts, revenues, deposits (including security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other payment and consideration of whatever form or nature received by or paid to or for the account of or benefit of any Borrower Related Party from any and all sources arising from or attributable to the Property and the Improvements, including

39

all receivables, signage income, customer obligations, installment payment obligations and other obligations now existing or hereafter arising or created out of the sale, lease, sublease, license, concession or other grant of the right of the use and occupancy of the Property or rendering of services by any Borrower Related Party with respect to the Property, and Insurance Proceeds, if any, from business interruption or other loss of income insurance, but only to the extent such Insurance Proceeds are treated as business or rental interruption Insurance Proceeds pursuant to Section 5.2.3.  Notwithstanding the foregoing, "Rents" shall not include any security deposits received from Tenants until forfeited or applied in accordance with the applicable Lease.

"**Replacement Account**" shall have the meaning set forth in Section 6.4.1.

"**Replacement Completion Guaranty**" shall have the meaning set forth in Section 10.6(a).

"**Replacement Deadline**" shall have the meaning set forth in Section 10.6(a).

"**Replacement Environmental Indemnity**" shall have the meaning set forth in Section 10.6(a).

"**Replacement Funds**" shall have the meaning set forth in Section 6.4.1.

"**Replacement Guarantees**" shall have the meaning set forth in Section 10.6(a).

"**Replacement Guarantor**" shall have the meaning set forth in Section 10.6(a).

"**Replacement Guarantor Event of Default/Recourse Event**" shall have the meaning set forth in Section 10.6.

"**Replacement Payment Guaranty**" shall have the meaning set forth in Section 10.6(a).

"**Replacement Recourse Guaranty**" shall have the meaning set forth in Section 10.6(a).

"**Requested Advance Date**" shall have the meaning set forth in Section 2.6.7(a)(i).

"**Required Records**" shall have the meaning set forth in Section 4.1.6(l).

"**Required SPE**" shall mean each of Borrower, Sole Member, Master Tenant and any SPC Party.

"**Reserve Funds**" shall mean amounts in the Accounts, and any other escrow fund or reserve established under or pursuant to the Loan Documents.

"**Restoration**" shall have the meaning set forth in Section 5.2.1.

"**Restoration Threshold**" shall mean two percent (2.0%) of the Loan Amount.

"**Restricted Person**" shall have the meaning set forth in Section 3.1.40(b).

"**Restricted Use**" shall mean any of the following uses:  (i) any pornographic or obscene purposes, any commercial sex establishment, any pornographic, obscene, nude or semi-nude performances, modeling, materials, activities or sexual conduct; (ii) any office or other use related to the cannabis industry, including, but not limited to, investment in, trade, or retail sale; and/or (iii) the operation of a business the purpose of which is to provide to unrelated third parties for sublease or license a flexible workplace center consisting primarily of executive and/or general office suites and/or shared office workplaces or other co-working businesses.

"**Retainage**" shall mean, for each Construction Contract with respect to the Hotel Conversion, the greater of (a) (i) prior to completion of fifty percent (50%) of the work to be performed pursuant to such Construction Contract, ten percent (10%) of all costs funded to the Contractor under such Construction Contract, and (ii) from and after completion of fifty percent (50%) of the work to be performed pursuant to such Construction Contract, five percent (5%) of all costs funded to the Contractor under such Construction Contract, and (b) the actual retainage required under such Construction Contract; provided, that, if Bourse Borrower requests Lender's consent to a Construction Contract with retainage that is less than the above-referenced amounts (and Bourse Borrower specifically identifies the retainage amount in such Construction Contract to Lender in Bourse Borrower's request), and Lender approves such Construction Contract, then the retainage amount in such approved Construction Contract shall be the "Retainage" amount hereunder with respect to such Construction Contract.

"**Rollover Account**" shall have the meaning set forth in Section 6.5.1.

"**Rollover Funds**" shall have the meaning set forth in Section 6.5.1.

"**S&P**" shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, pledge, assignment, grant of any options with respect to, or any other transfer or disposition (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) of a legal or beneficial interest, including, without limitation, any division, merger, consolidation, recapitalization or reorganization.

"**Sanctions**" shall mean all applicable sanctions laws and regulations administered or enforced by the United States, including without limitation the U.S. Department of the Treasury's Office of Foreign Assets Control ("**OFAC**") and the U.S. Department of State, the United Nations Security Council, the European Union, the United Kingdom, including without limitation His Majesty's Treasury, or any other relevant sanctions authority.

"**Secondary Market Transactions**" shall have the meaning set forth in Section 9.1.1.

"**Senior Foreign Political Figure**" shall mean (a) a current or former senior official in the executive, legislative, administrative, military or judicial branches of a non-U.S. government (whether elected or not), a current or former senior official of a major non-U.S. political party, or a current or former senior executive of a non-U.S. government-owned commercial enterprise; (b) a corporation, business, or other entity that has been formed by, or for the benefit of, any such

41

individual; (c) an immediate family member of any such individual; and (d) a person who is widely and publicly known (or is actually known) to be a close associate of such individual. For purposes of this definition, a "senior official" or "senior executive" means an individual with substantial authority over policy, operations, or the use of government-owned resources; and "immediate family member" means a spouse, parents, siblings, children and spouse's parents or siblings.

"**Servicer**" shall have the meaning set forth in Section 9.3.

"**Servicing Agreement**" shall have the meaning set forth in Section 9.3.

"**Servicing Fees**" shall have the meaning set forth in Section 9.3.

"**Severed Loan Documents**" shall have the meaning set forth in Section 10.2(e).

"**SFPF/PEP**" shall have the meaning set forth in Section 3.1.40(g).

"**Single Member Delaware LLC**" shall mean a single member limited liability company formed under Delaware law which (a) has at least one springing member, which, upon the dissolution of the single member or the withdrawal or the disassociation of the single member from such limited liability company, shall immediately become the sole member of such limited liability company, and (b) complies with the terms and provisions of Section 3.1.24(cc).

"**SOFR**" shall mean a rate equal to the secured overnight financing rate as administered by the SOFR Administrator.

"**SOFR Administrator**" shall mean the Federal Reserve Bank of New York (or a successor administrator of the secured overnight financing rate).

"**Soft Costs**" shall mean those Hotel Conversion Expenses which are not Hard Costs, including but not limited to, architect's, engineer's and contractor's fees, recording taxes and title charges in respect of the Mortgage, Taxes and Other Charges, Insurance Premiums.

"**Sole Member**" shall mean, collectively, (i) LAK Bourse Mezz, LLC, a Delaware limited liability company (the "**Bourse Fee Sole Member**"), (ii) LAK Bourse HTC Master Landlord Mezz, LLC, a Delaware limited liability company (the "**Bourse Leasehold Sole Member**"), (iii) LAK Market Mezz, LLC, a Delaware limited liability company (the "**400 Market Fee Sole Member**"), (iv) LAK Market HTC Master Landlord Mezz, LLC, a Delaware limited liability company (the "**400 Market Leasehold Sole Member**"), (v) LAK Bourse ML MM, LLC, a Delaware limited liability company ("**Bourse Master Sole Member**"), and (vi) LAK Market ML MM, LLC, a Delaware limited liability company ("**400 Market Master Sole Member**").

"**SPC Party**" shall mean, if Borrower is a limited partnership or a limited liability company (other than a Single Member Delaware LLC), each general partner or managing member of Borrower (as of the Closing Date, Borrower is a Single Member Delaware LLC and there are no SPC Parties).

"**Special Member**" shall have the meaning set forth in Section 3.1.24(cc)(i).

42

"**Special Purpose Bankruptcy Remote Entity**" shall mean a corporation, limited liability company or limited partnership which, at all times, complies with the requirements set out in Section 3.1.24.

"**Spread**" shall mean 4.11% per annum; provided, that effective from and after a Release that is effectuated by Borrower in accordance with the terms of this Agreement, the Spread shall equal 4.0% per annum.

"**Springing Recourse Event**" shall have the meaning set forth in Section 11.22.

"**State**" shall mean the State or Commonwealth in which the Property or any part thereof is located.

"**Stored Materials**" shall have the meaning set forth in Section 7.6(a).

"**Supplemental Completion Guaranty**" shall have the meaning set forth in Section 10.5(a).

"**Supplemental Deadline**" shall have the meaning set forth in Section 10.5(a).

"**Supplemental Environmental Indemnity**" shall have the meaning set forth in Section 10.5(a).

"**Supplemental Guarantees**" shall have the meaning set forth in Section 10.5(a).

"**Supplemental Guarantor**" shall have the meaning set forth in Section 10.5(a).

"**Supplemental Guarantor Event of Default/Recourse Event**" shall have the meaning set forth in Section 10.5.

"**Supplemental Payment Guaranty**" shall have the meaning set forth in Section 10.5(a).

"**Supplemental Recourse Guaranty**" shall have the meaning set forth in Section 10.5(a).

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and reasonably satisfactory to Lender and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor reasonably satisfactory to Lender.

"**Taxes**" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties thereto.

"**Tenant**" shall mean any Person obligated by contract or otherwise to pay monies (including a percentage of gross income, revenue or profits) under any Lease now or hereafter affecting all or any part of the Property.

"**Tenant Direction Letter**" shall mean a letter in the form attached hereto as **Exhibit C** or otherwise in a form and substance reasonably satisfactory to Lender, addressed to each Tenant of the Property (and any new Tenants with whom Borrower enters into Leases after the Closing Date

43

in accordance with this Agreement) executed by Borrower, which letter shall require each Tenant to deliver its respective Rent in accordance with the instructions contained in such letter to the Clearing Account established with the Clearing Bank.

"**Tenant Improvement Allowance**" shall mean the amount required to be paid by Borrower to a Tenant under a Lease on account of or in lieu of work performed by such Tenant in the applicable space demised under such Lease.

"**Tenant Improvements**" shall mean the improvements and/or other work affecting any space at the Property required to be constructed and paid for by Borrower on behalf of a Tenant pursuant to applicable Leases for such space.

"**Term SOFR**" shall mean, with respect to any Interest Period, the forward-looking term rate based on SOFR for a one month tenor as of the applicable Interest Determination Date that has been selected or recommended by the Term SOFR Administrator; provided, however, that if as of 5:00 p.m. (New York City time) on the applicable Interest Determination Date the Term SOFR rate for a one month tenor has not been published by the Term SOFR Administrator and a Benchmark Replacement Date with respect to Term SOFR has not occurred, then Term SOFR will be the Term SOFR rate for the one month tenor by the Term SOFR Administrator on the U.S. Government Securities Business Day first preceding such Interest Determination Date so long as such U.S. Government Securities Business Day is not more than three (3) U.S. Government Securities Business Days prior to such Interest Determination Date.

"**Term SOFR Administrator**" shall mean CME Group Benchmark Administration Limited (CBA) (or a successor administrator of the "Term SOFR Reference Rate" selected by Lender in its reasonable discretion).

"**Terrorism Cap**" shall have the meaning set forth in Section 5.1.1(a)(xiii).

"**Terrorism Insurance**" shall have the meaning set forth in Section 5.1.1(a)(xiii).

"**Title Company**" shall mean First American Title Insurance Company.

"**Title Insurance Policy**" shall mean an ALTA mortgagee title insurance policy in the form reasonably acceptable to Lender issued by the Title Company with respect to the Property and insuring the Lien of the Mortgage.

"**Traded Security**" shall have the meaning set forth in Section 8.2(a)(iii).

"**Transfer**" shall have the meaning set forth in Section 4.2.1(a).

"**Transferee**" shall have the meaning set forth in Section 9.4(b)(ii).

"**TRIPRA**" shall have the meaning set forth in Section 5.1.1(a)(xiii).

"**U.S. Government Securities Business Day**" means any day except for (a) a Saturday, (b) a Sunday or (c) a day on which the Securities Industry and Financial Markets Association

recommends that the fixed income departments of its members be closed for the entire day for purposes of trading in United States government securities.

"**U.S. Person**" shall mean any Person that is a "United States person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" shall have the meaning set forth in Section 2.5.6(b)(ii)(C).

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State (with respect to fixtures), the State of New York or the state in which any of the Accounts are located, as the case may be.

"**Unadjusted Benchmark Replacement**" shall mean the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

"**Unadvanced Carry Cost Amounts**" shall have the meaning set forth in Section 2.7.3.

"**Unadvanced Carry Cost Termination Notice**" shall have the meaning set forth in Section 2.7.3.

"**Unadvanced Hotel Conversion Amounts**" shall have the meaning set forth in Section 2.7.1.

"**Unadvanced Hotel Conversion Termination Notice**" shall have the meaning set forth in Section 2.7.1.

"**Unadvanced Leasing Cost Amounts**" shall have the meaning set forth in Section 2.7.2.

"**Unadvanced Leasing Cost Termination Notice**" shall have the meaning set forth in Section 2.7.2.

"**Unadvanced Office CapEx Project Amounts**" shall have the meaning set forth in Section 2.7.4.

"**Unadvanced Office CapEx Project Termination Notice**" shall have the meaning set forth in Section 2.7.4.

"**Updated Information**" shall have the meaning set forth in Section 9.1.2(a).

"**Waterfall Calculation Date**" shall have the meaning set forth in Section 6.16.4.

"**Waterfall Shortfall**" shall have the meaning set forth in Section 6.16.4.

"**Withholding Agent**" shall mean Borrower and Lead Lender.

Section 1.2    Principles of Construction.    All references to sections, schedules and exhibits are to sections, schedules and exhibits in or to this Agreement unless otherwise specified. Any reference in this Agreement or in any other Loan Document to any Loan Document shall be

45

deemed to include references to such documents as the same may hereafter be amended, modified, supplemented, extended, replaced and/or restated from time to time (and, in the case of any note or other instrument, to any instrument issued in substitution therefor). Unless otherwise specified, the words "hereof," "herein," and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined.

## ARTICLE II
## THE LOAN

Section 2.1    The Loan.

2.1.1    Agreement to Lend and Borrow.    Subject to and upon the terms and conditions set forth herein, (i) Lender shall make the Initial Advance to Borrower and Borrower shall accept the Initial Advance from Lender on the Closing Date, and (ii) Lender hereby agrees to make and Borrower hereby agrees to accept the additional Advances as more particularly set forth in this Agreement.

2.1.2    Advances.

(a)    Initial Advance.  Lender agrees, on the terms and conditions set forth in this Agreement, to make an advance of the Loan in the amount of $30,100,000.00 to Borrower on the Closing Date (the "**Initial Advance**").

(b)    Hotel Conversion Advances.  In the event that Borrower shall have satisfied the applicable terms and conditions set forth in Section 2.6 hereof, Lender shall make Hotel Conversion Advances to Borrower for Approved Hotel Conversion Expenses incurred by Borrower, up to an aggregate amount not to exceed the Hotel Conversion Advance Maximum Amount.  Borrower agrees that Hotel Conversion Advances from Lender shall be made upon and subject to the applicable terms and conditions of this Agreement.

(c)    Leasing Cost Advances.  In the event that Borrower shall have satisfied the applicable terms and conditions set forth in Section 2.6 hereof, Lender shall make Leasing Cost Advances to Borrower for Lender's Share of Approved Leasing Expenses incurred by Borrower up to an aggregate amount not to exceed the Leasing Cost Advance Maximum Amount.  Borrower agrees that Leasing Cost Advances from Lender shall be made upon and subject to the applicable terms and conditions of this Agreement.

(d)    Carry Cost Advances.  In the event that Borrower shall have satisfied the terms and conditions set forth in Section 2.6 hereof, Lender shall make Carry Cost Advances to Borrower for Lender's Share of Monthly Carry Cost Shortfalls on each Monthly Payment Date, up to an aggregate amount not to exceed the Carry Cost Advance Maximum Amount.  Borrower agrees that Carry Cost Advances from Lender shall be made upon and subject to the applicable terms and conditions of this Agreement.

(e)    Office CapEx Project Advances.  In the event that Borrower shall have satisfied the applicable terms and conditions set forth in Section 2.6 hereof, Lender shall make Office CapEx Project Advances to Borrower for Approved Office CapEx Project Expenses incurred by Borrower, up to an aggregate amount not to exceed the Office CapEx Project Advance Maximum Amount.  Borrower agrees that Office CapEx Project Advances from Lender shall be made upon and subject to the applicable terms and conditions of this Agreement.

(f)    Limitation on Advances.  Other than the Initial Advance, Hotel Conversion Advances, Leasing Cost Advances, Carry Cost Advances and Office CapEx Project Advances made pursuant to this Agreement, Lender shall have no obligation to loan any funds in respect of the Loan.  The Initial Advance, Hotel Conversion Advances, Leasing Cost Advances, Carry Cost Advances and Office CapEx Project Advances shall constitute a part of the Debt secured by the Mortgage and the other Loan Documents.  Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3    The Note.  The Loan shall be evidenced by the Note and shall be repaid in accordance with the terms of this Agreement and the Note.

2.1.4    Use of Proceeds.  Borrower shall use proceeds of (a) the Initial Advance to (i) acquire the Property, (ii) fund the applicable Accounts and (iii) pay costs and expenses incurred in connection with the closing of the Loan, (b) Hotel Conversion Advances for Approved Hotel Conversion Expenses in accordance with the terms and conditions of this Agreement, (c) Leasing Cost Advances for Approved Leasing Expenses in accordance with the terms and conditions of this Agreement, (d) Carry Cost Advances for Monthly Carry Cost Shortfalls in accordance with the terms and conditions of this Agreement, and (e) Office CapEx Project Advances for Approved Office CapEx Project Expenses in accordance with the terms and conditions of this Agreement.

2.1.5    Required Equity Funds.  As of the Closing Date, Lender shall have received evidence acceptable to Lender that direct and/or indirect members of Borrower have, on the Closing Date, collectively contributed at least $16,235,092.00, in non-borrowed cash to Borrower.

2.1.6    Ratable Share.  Lenders agree, severally and not jointly and on the terms and conditions to make the Initial Advance to Borrower and, upon satisfaction of the terms and conditions set forth in Section 2.6, to make Hotel Conversion Advances, Leasing Cost Advances, Carry Cost Advances and Office CapEx Project Advances to Borrower, in each case, in accordance with each Lender's ratable share of the Loan.  If Lender consists of more than one Person, the obligations and liabilities of each Person comprising Lender shall be several, and not joint under this Agreement.

2.1.7    Origination Discount. Borrower acknowledges that at closing, the Loan will be funded with a non-refundable discount (the "**Origination Discount**") of $60,000.  The Origination Discount shall be reflected as a dollar for dollar reduction in the Initial Advance to Borrower.  The parties intend that the Origination Discount shall be treated as consideration for the use or forbearance of money.  Each of Borrower and Lender acknowledges that the Origination Discount will constitute original issue discount (as that term is used in Section 1273(a)(1)(B) of

47

the Code) solely for U.S. federal, state and local income tax purposes and, as such, is not being advanced to Borrower.

Section 2.2    The Interest Rate.

2.2.1    Interest Rate.  Interest on the Note outstanding from time to time shall accrue from the Closing Date up to and including the date that the Loan is repaid in full at the Interest Rate.  Interest on the Note existing on the commencement of an Interest Period shall accrue for the entire Interest Period and shall be owed by Borrower for the entire Interest Period regardless of whether any principal portion of the Loan is repaid prior to the expiration of such Interest Period.

2.2.2    Interest Calculation.  Interest on the Note shall be calculated by multiplying (a) the actual number of days elapsed in the period for which the calculation is being made by (b) a daily rate based on a three hundred sixty (360)-day year (that is, the Interest Rate as then applicable to the Note, expressed as an annual rate divided by 360) by (c) the average daily Outstanding Principal Balance during such period.

2.2.3    Determination of Interest Rate.

(a)    So long as no Event of Default is continuing, interest on the Loan shall accrue for each Interest Period at a rate per annum equal to the sum of the Benchmark (determined as of the applicable Interest Determination Date), plus the Spread.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Outstanding Principal Balance and, to the extent not prohibited by applicable Legal Requirements, all other portions of the Debt, shall accrue interest at the Default Rate, calculated from the date such Event of Default occurs.  Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Lender shall elect, to the extent not prohibited by applicable Legal Requirements.

(b)    Notwithstanding anything to the contrary herein or in any other Loan Document (and any Interest Rate Protection Agreement shall be deemed not to be a "Loan Document" for purposes of this Section 2.2.3(b)), if a Benchmark Transition Event and its related Benchmark Replacement Date have both occurred prior to the Interest Determination Date in respect of any determination of any then-current Benchmark, then the "Benchmark Replacement" determined by Lender in accordance with the definition thereof will replace such Benchmark for all purposes hereunder and under any Loan Document in respect of any Benchmark setting, effective at 5:00 p.m. (New York City time) on the fifth (5th) U.S. Government Securities Business Day after the date notice of such Benchmark Replacement is provided, without any amendment to, or further action or consent of any other party to, this Agreement or any other Loan Document.  In connection with the implementation and administration of a Benchmark Replacement, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in any other Loan Document, any amendments implementing such Conforming Changes will become effective without any further action or consent of Borrower or any other party to this Agreement or any other Loan Document.  Lender will promptly notify Borrower in writing of (i) the implementation of any Benchmark Replacement, and (ii) the effectiveness of any Conforming Changes.

48

(c)    Any determination, decision or election that may be made by Lender pursuant to this Section 2.2.3, including, but not limited to, any determination with respect to a tenor, rate (including the Interest Rate) or adjustment or of the occurrence or non-occurrence of an event, circumstance or date and any decision to take or refrain from taking any action or any selection, will be conclusive and binding absent manifest error and may be made in its sole discretion and without consent from Borrower.

(d)    Borrower agrees to indemnify Lender upon demand, and to hold Lender harmless from any Losses which such Lender sustains or incurs as a consequence of (i) any voluntary prepayment of the Loan when the Benchmark is Term SOFR on a day that is not a Monthly Payment Date, or (ii) any voluntary prepayment of the Loan when the Benchmark is Term SOFR on a day that is a Monthly Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by such Lender to lenders of funds obtained by it in order to maintain the Loan when the Benchmark is Term SOFR hereunder (it being agreed that such interest and fees shall not include any loss or expense under any loans of funds obtained by such Lender in order to maintain Term SOFR for any period other than the applicable Interest Period) (the amounts referred to in clauses (i) and (ii) herein referred to collectively as the "**Breakage Costs**"); provided, however, that Borrower shall not indemnify Lender from any Losses arising solely from Lender's willful misconduct, gross negligence, fraud, bad faith or illegal acts.  Each Lender will provide to Borrower a statement detailing such Breakage Costs and the calculation thereof.

(e)    During any Benchmark Unavailability Period, interest shall accrue at the Reference Rate; provided, that if the Reference Rate shall be less than the Interest Rate as of the most recent Interest Determination Date, the interest shall accrue at said Interest Rate as of the most recent Interest Determination Date.

(f)    In connection with the use or administration of Term SOFR, Lender will have the right to make Conforming Changes from time to time and, notwithstanding anything to the contrary herein any amendments implementing such Conforming Changes will become effective without any further action or consent of Borrower or any other party. Lender will promptly notify Borrower of the effectiveness of any Conforming Changes in connection with the use or administration of Term SOFR.

(g)    The provisions of this Section 2.2.3 shall survive payment of the Note in full and the satisfaction of the Obligations.

2.2.4    Usury Savings. This Agreement and the other Loan Documents are subject to the express condition that at no time shall Borrower be required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate shall be deemed to be immediately reduced to the Maximum Legal Rate, and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of

49

principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable Legal Requirements, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

2.2.5    Unavailability of Tenor of Benchmark. Notwithstanding anything to the contrary herein or in any other Loan Document, at any time (including in connection with the implementation of a Benchmark Replacement), (i) if the then-current Benchmark is a term rate (including Term SOFR) and either (A) any tenor for such Benchmark is not displayed on a screen or other information service that publishes such rate from time to time as selected by the Lender in its reasonable discretion or (B) the administrator of such Benchmark or the regulatory supervisor for the administrator of such Benchmark has provided a public statement or publication of information announcing that any tenor for such Benchmark (1) is no longer representative or will no longer be representative as of a specified date or (2) will cease to be provided by the administrator permanently or indefinitely as of a specified date, then the Lender may modify the definition of "Interest Period" for any Benchmark settings at or after such time to remove such affected tenor and (ii) if a tenor that was removed pursuant to clause (i) above either (A) is subsequently displayed on a screen or information service for such Benchmark (including a Benchmark Replacement) or (B) is not, or is no longer, subject to an announcement that it is no longer or will no longer be representative for such Benchmark (including a Benchmark Replacement) or will cease to be provided by the administrator, then Lender may modify the definitions for all settings of such Benchmark at or after such time to reinstate such previously removed tenor.

Section 2.3    Loan Payments.

2.3.1    Payment Before Maturity Date. Borrower shall make a payment to Lender of interest only on the Closing Date for the initial Interest Period. On the Monthly Payment Date occurring on August 7, 2024 and on each Monthly Payment Date thereafter to and including the Maturity Date, Borrower shall make a payment to Lender equal to the Monthly Debt Service Payment Amount. Borrower shall also pay to Lender all amounts required in respect of Reserve Funds as set forth in Article VI.

2.3.2    Payment on Maturity Date.

(a)    Borrower shall pay to Lender on the Maturity Date (or on any earlier date on which repayment of the Loan in full is tendered to Lender in accordance herewith) the full amount of the Debt.

(b)    Subject to the provisions of this Section 2.3.2(b), Borrower shall have the one-time option (the "**Extension Option**") to extend the Maturity Date until the Extension Maturity Date. Borrower's right to so extend the Maturity Date shall be subject to the satisfaction of each of the following conditions precedent prior to each such extension:

50

(i)      Borrower shall have given Lender written notice of such extension (x) no later than thirty (30) days prior to the then current Maturity Date and (y) no earlier than one hundred twenty (120) days prior to the then current Maturity Date;

(ii)      no Event of Default shall have occurred and be continuing as of the first day of the Extension Period;

(iii)      Lender shall have received a title search from the title company issuing the Title Insurance Policy (x) confirming that the Mortgage remains a first-priority Lien against the Property, subject only to Permitted Encumbrances, and (y) showing title to the Property vested in Borrower;

(iv)      Borrower shall have paid all reasonable, out-of-pocket and documented costs and expenses actually incurred by Lender in connection with such extension, including reasonable legal fees and costs of retained firms (but excluding in-house counsel);

(v)      Guarantor continues to comply with the covenants contained in the Guaranty, the Environmental Indemnity, the Guaranty of Completion and the Guaranty of Payment, and Guarantor has provided to Lender a reaffirmation of the same in a form reasonably acceptable to Lender;

(vi)      Borrower shall have entered into an Interest Rate Protection Agreement for the Extension Period and complied with the provisions of Section 4.1.11 hereof;

(vii)      the representations and warranties made by Borrower in Article IIII of the Loan Agreement shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects as if remade upon the exercise of the Extension Option and on the first day of the Extension Period (unless, in each case, the same solely relate to a different time period), subject to changes to such representations and warranties disclosed to Lender in writing, so long as such update does not result from or otherwise constitute an Event of Default;

(viii)      Borrower shall have paid the Extension Fee on or prior to the Initial Maturity Date or the Extension Maturity Date, as applicable; and

(ix)      Hotel Conversion Substantial Completion shall have occurred; provided, that such condition shall be deemed satisfied to the extent the outstanding Punch List Items do not exceed $500,000 in the aggregate as of the Initial Maturity Date.

If Borrower is unable to satisfy all of the foregoing conditions within the applicable time frames for each, Lender shall have no obligation to extend the Maturity Date hereunder.

2.3.3    Late Payment Charge. If any principal, interest or any other sum due under the Loan Documents, other than the payment of Outstanding Principal Balance and any other amounts due on the Maturity Date, is not paid by Borrower on or before the date on which it is due, Borrower shall pay to Lender upon demand an amount equal to the lesser of four percent (4%) of such unpaid sum or the maximum amount permitted by applicable Legal Requirements in order to defray the expense incurred by Lender in handling and processing such delinquent payment and to compensate Lender for the loss of the use of such delinquent payment. Any such amount shall be secured by the Mortgage and the other Loan Documents.

2.3.4    Method and Place of Payment.

(a)    Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Lender not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Lender's office, and any funds received by Lender after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day.

(b)    Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the succeeding Business Day.

(c)    All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

Section 2.4    Prepayments.

2.4.1    Voluntary Prepayments. Except as otherwise provided herein, Borrower shall not have the right to prepay the Loan in whole or in part. Provided no Event of Default has occurred and be continuing, Borrower may, upon not less than fifteen (15) Business Days' prior written notice to Lender (or such shorter period of time as may be permitted by Lender in its sole discretion), prepay the Debt in whole (but not in part, other than as set forth herein) on any date with the payment of the Breakage Costs.

2.4.2    Mandatory Prepayments.

(a)    On each date on which Lender actually receives a distribution of Net Proceeds, and if Lender does not make such Net Proceeds available to Borrower for a Restoration in accordance with the terms and provisions of this Agreement, Lender shall apply such Net Proceeds to prepay the Outstanding Principal Balance of the Note in an amount equal to one hundred percent (100%) of such Net Proceeds together with interest that would have accrued on such amounts through the next Monthly Payment Date. Any prepayment received by Lender pursuant to this Section 2.4.2 on a date other than a Monthly Payment Date shall be held by Lender in an interest-bearing account for the benefit of Borrower as collateral security for the Loan and shall be applied by Lender on the next Monthly Payment Date. Notwithstanding anything contained in this Section 2.4.2 hereof to the contrary, in the event Lender uses Net Proceeds to prepay a portion of the

52

principal balance of the Loan and any accrued and unpaid interest thereon, Borrower may prepay the entire amount of the Loan outstanding after the application of such Net Proceeds on the next Monthly Payment Date without any requirement to give any prior notice of such prepayment.

(b)    All contributions made by HTC Investor to a Borrower Related Party under the Historic Tax Credit Documents that are required under such Historic Tax Credit Documents to be paid to a Borrower Related Party as capital contributions or otherwise shall, immediately upon receipt by such Borrower Related Party, be paid to Lender to prepay the Debt.

2.4.3    Release on Repayment or Prepayment.

(a)    Lender shall, upon the written request and at the reasonable expense of Borrower and subject to the further provisions of Section 2.4.3(b), upon payment in full of the Debt in accordance with the terms and provisions of the Loan Documents (excluding any indemnification or other Obligation that is expressly stated in any of the Loan Documents to survive the repayment of the Debt in full), release the Lien of the Mortgage and terminate the Assignment of Leases and all Uniform Commercial Code financing statements; provided, that (A) Borrower shall pay any reasonable, out-of-pocket and documented costs and expenses actually incurred by Lender in connection therewith (including Lender's reasonable attorneys' fees for the preparation and delivery of the release documentation (if Lender's retains a firm and such firm actually prepares such release documentation)), but excluding any administrative or processing fee and (B) Borrower shall have caused the delivery of all customary or reasonable documents and affidavits required by Lender.  In connection with such release, Lender shall deliver such other documentation reasonably requested by Borrower, including, without limitation, documentation evidencing the termination of the Pledge Agreement, all collateral assignment documents, account control arrangements and standing orders (provided that Borrower shall pay all of Lender's reasonable, out-of-pocket and documented expenses actually incurred in connection with the same, if any).

(b)    In connection with the release or satisfaction of the Mortgage and the Assignment of Leases, Borrower shall submit to Lender, not less than ten (10) days prior to the date on which Borrower intends to pay the Debt in full (or such later date reasonably approved by Lender), a release of Mortgage and Assignment of Leases for the Property or assignment of Mortgage and Note, as applicable, for execution by Lender. Such release or satisfaction shall (i) be in a form appropriate for recording in the jurisdiction in which the Property is located, (ii) be reasonably satisfactory to Lender, and (iii) contain such provisions as may be reasonably requested by Lender, if any, protecting the rights of Lender.  In addition, Borrower shall provide all other documentation (including, without limitation, UCC-3 financing statements) Lender reasonably requires to be delivered by Borrower in connection with such release of the Mortgage and Assignment of Leases and other Loan Documents.

Section 2.5    Change in Law; Taxes.

2.5.1    <u>Increased Costs Generally</u>.  If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit, compulsory loan or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender (except any reserve requirement reflected in the Interest Rate);

(b)    subject Recipient to any Taxes (other than (i) Indemnified Taxes, (ii) Taxes described in <u>clauses (b)</u> through <u>(d)</u> of the definition of Excluded Taxes, and (iii) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(c)    impose on any Lender any other material condition, cost or expense (other than Taxes) affecting this Agreement or the Loan made by the Lender; and the result of any of the foregoing shall be to increase the cost to the Lender of making, renewing, or maintaining the Loan or of maintaining its obligation to make the Loan, or to reduce any non *de minimis* amount receivable by the Lender hereunder (whether of principal, interest or any other amount),

then, within ten (10) Business Days after written demand from the Lead Lender, Borrower will pay to the Lead Lender (for its own account or for the account of the applicable Lender) such additional amount or amounts necessary to compensate such Lender for such additional costs incurred or reduction suffered which such Lender deems to be material as determined by such Lender in its reasonable discretion.  If any Lender becomes entitled to claim any additional amounts pursuant to this <u>Section 2.5.1</u>, such Lender shall provide Borrower with not less than ninety (90) days written notice specifying in reasonable detail the event by reason of which it has become so entitled and the additional amount and basis for such additional amount required to fully compensate such Lender for such additional cost or reduced amount incurred by such Lender.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by such Lender to Borrower shall be conclusive in the absence of manifest error.

2.5.2    <u>Payment Free of Taxes</u>.  Any and all payments by or on account of any Obligation of Borrower under the Loan Documents shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by such Withholding Agent, then such Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by Borrower shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 2.5.2</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

2.5.3    <u>Payment of Other Taxes by Borrower</u>.  Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Lead Lender, timely reimburse it for the payment of, any Other Taxes.

54

2.5.4    <u>Indemnification by Borrower</u>.  Borrower shall indemnify each Recipient, within ten (10) Business Days after written demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.5.4</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to Borrower by Lead Lender shall be conclusive absent manifest error.

2.5.5    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by Borrower to a Governmental Authority pursuant to this <u>Section 2.5</u>, Borrower shall deliver to Lead Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to Lead Lender.

2.5.6    <u>Status of Lenders</u>.

(a)    If any Lender is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document, then such Lender shall deliver to Borrower, at the time or times reasonably requested by Borrower, such properly completed and executed documentation reasonably requested by Borrower as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, each Lender, if reasonably requested by Borrower, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower as will enable Borrower to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Sections 2.5.6(b)(i)</u>, <u>(b)(ii)</u> and <u>(b)(iv)</u> below) shall not be required if in the applicable Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(b)    Without limiting the generality of the foregoing,

(i)    if any Lender is a U.S. Person, such Lender shall deliver to Borrower and Lead Lender on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Lead Lender), copies of executed IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(ii)    any Lender that is not a U.S. Person (a "**Foreign Lender**") shall, to the extent it is legally entitled to do so, deliver to Borrower and Lead Lender (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Lead Lender), whichever of the following is applicable:

A.    in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, copies of executed IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

B.    copies of executed IRS Form W-8ECI;

C.    in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate in appropriate form to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 871(h)(3)(B) of the Code, or a "controlled foreign corporation" related to Borrower described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) copies of executed IRS Form W-8BEN or IRS Form W-8BEN-E; or

D.    to the extent a Foreign Lender is not the beneficial owner, copies of executed IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, IRS Form W-8BEN-E, a U.S. Tax Compliance Certificate  in appropriate form, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate  in appropriate form on behalf of each such direct and indirect partner;

(iii)    any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Lead Lender (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Lead Lender), copies of any other executed form prescribed by applicable   as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or Lead Lender to determine the withholding or deduction required to be made; and

(iv)    if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of

56

FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Lead Lender at the time or times prescribed by applicable law and at such time or times reasonably requested by Borrower or Lead Lender such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Lead Lender as may be necessary for Borrower and Lead Lender to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount, if any, to deduct and withhold from such payment.  Solely for purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.  Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Lead Lender in writing of its legal inability to do so.

2.5.7    Treatment of Certain Refunds.  If any Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.5 (including by the payment of additional amounts pursuant to this Section 2.5), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.5.7 (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this Section 2.5.7, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.5.7 the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

2.5.8    Survival.  Each party's obligations under this Section 2.5 shall survive the resignation or replacement of Lead Lender or any assignment of rights by, or the replacement of, Lender, the termination of the commitments and the repayment, satisfaction or discharge of all Obligations.

2.5.9    Defined Terms.  For purposes of this Section 2.5, the term "applicable law" includes FATCA and the term "Lender" includes any issuing bank.

Section 2.6    Additional Advances.

57

2.6.1    _Generally_.  Lender shall, at the request of Borrower, upon the satisfaction of all applicable conditions set forth in this Section 2.6, make Advances from time to time in an amount not to exceed the aggregate Advance Maximum Amount.  The obligation of Lender to make the Advances shall be subject to the applicable conditions precedent set forth in below in this Section 2.6, all of which applicable conditions precedent must be satisfied prior to Lender making any such Advance.

2.6.2    Conditions for Hotel Conversion Advances.

(a)    _Conditions for All Hotel Conversion Advances_.  Lender shall make, from time to time, Hotel Conversion Advances to Bourse Borrower for Approved Hotel Conversion Expenses in an aggregate amount not to exceed the Hotel Conversion Advance Maximum Amount provided that the following conditions precedent, as applicable, are satisfied prior to Lender making any such Hotel Conversion Advance:

(i)    _Hotel Conversion Conditions_.   The Hotel Conversion Conditions shall have been satisfied.

(ii)    _Approved Hotel Conversion Expenses_.  A Hotel Conversion Advance shall be made solely for the purposes of paying Approved Hotel Conversion Expenses.

(iii)    _Hotel Conversion Advance Maximum Amount_.  In no event shall the aggregate amount of Hotel Conversion Advances advanced pursuant to this Agreement exceed the Hotel Conversion Advance Maximum Amount.

(iv)    _Officer's Certificate_.  Any request for a Hotel Conversion Advance shall be accompanied by (i) an Officer's Certificate from Bourse Borrower stating and certifying that:  (1) the items to be funded by the requested Hotel Conversion Advance Request are Approved Hotel Conversion Expenses, and a description thereof, (2) any work related to such Approved Hotel Conversion Expenses to be funded by the requested disbursement (or the relevant portion thereof as to which such request for funds relates) has been completed in a good and workmanlike manner and in compliance in all material respects with all applicable material Legal Requirements, (3) the Approved Hotel Conversion Expenses (or the relevant portions thereof) to be funded from the Hotel Conversion Advance in question have not been the subject of a previous Hotel Conversion Advance or credited towards any equity contribution obligation of Bourse Borrower, and (4) all previous disbursements of Hotel Conversion Advances have been used to pay (or reimburse Bourse Borrower for) the previously identified Approved Hotel Conversion Expenses and have been paid in full; (ii) a copy of any license, permit or other approval by any Governmental Authority required in connection with any work related to such Approved Hotel Conversion Expenses and not previously delivered to Lender; (iii) copies of all invoices with respect to which such Hotel Conversion Advance is being requested; and (iv) such other evidence as Lender shall reasonably request to demonstrate that any work related to the Approved Hotel Conversion Expenses to be funded by the requested Hotel

58

Conversion Advance is paid for or will be paid upon such disbursement to Bourse Borrower (or the portion thereof as to which such request for disbursement has been submitted has been completed and is paid for (other than any retention amount which is not a part of such disbursement request) or will be paid upon such disbursement to Bourse Borrower).

(v)    Lien Waivers.  With respect to a request for Hard Costs, Lender shall have received duly executed lien waivers, which shall be conditional lien waivers (for payments to be made from the pending Hotel Conversion Advance) and unconditional lien waivers (for all payments from prior Hotel Conversion Advances), as applicable, in the form set forth in **Exhibit B**, from Construction Manager and all first tier subcontractors for all work performed with respect to the Hotel Conversion prior to the date of such Hotel Conversion Advance with respect to the work; in no event shall Bourse Borrower be required to deliver lien waivers from materialmen and suppliers so long as Bourse Borrower has provided evidence to Lender that all such Persons (for all payments other those being funded from the pending Hotel Conversion Advance) have been paid in full for work performed and materials provided.

(vi)    Construction Consultant.  With respect to a request for Hard Costs, the Construction Consultant shall have confirmed performance of the portion of the Hotel Conversion associated with the Hotel Conversion Advance and Lender shall have received advice from the Construction Consultant, reasonably satisfactory to Lender, as to the Construction Consultant's determination based on on-site inspections of the Hotel Conversion and the data submitted to and reviewed by it as part of Bourse Borrower's request for Hotel Conversion Advance, of the value of the labor and materials in place, that the construction of the Hotel Conversion is proceeding reasonably satisfactorily and in substantial accordance with the schedule and that the work on account of which the disbursement of Hotel Conversion Advance is sought has been completed in a good and workmanlike manner to the Construction Consultant's reasonable satisfaction in substantial accordance with each of the Hotel Conversion Budget, the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work and in compliance in all material respects with all applicable material Legal Requirements.

(vii)    Hotel Conversion Report.  With respect to a request for Hard Costs, a Hotel Conversion Report with regard to the period since the last Hotel Conversion Report shall have been delivered to Lender by the Construction Consultant.

(viii)    Licenses and Permits.  Bourse Borrower shall have delivered to Lender evidence that (i) any and all building permits required for the continuous construction of the Hotel Conversion (being the conversion of the 3rd, 4th and 8th floors of the existing Improvements into hotel keys for all purposes of this clause (i)) in accordance with the Hotel Conversion Plans and Specifications in all material respects have been obtained in accordance with all material Legal Requirements (and that any and all notices required by any Governmental Authority or by any

59

applicable material Legal Requirement to be filed prior to commencement of construction of the Hotel Conversion as to the component of the Hotel Conversion that is the subject of the Hotel Conversion Advance shall have been filed), and (ii) all other material Governmental Approvals necessary for the construction and completion of such component of the Hotel Conversion, as contemplated by the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work, that is the subject of the Hotel Conversion Advance, have been obtained and are in full force and effect, including, without limitation, permits for cranes and hoists, scaffolds, sidewalk or road closures, and the final approval of the Hotel Conversion Plans and Specifications and for the commencement and undertaking of the work contemplated by this Agreement by any applicable Governmental Authorities for the component of the Hotel Conversion that is the subject of the Hotel Conversion Advance has been obtained.

(ix)    No Damage.  The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty, unless Lender shall be satisfied, in the reasonable good faith judgment of Lender, that sufficient insurance proceeds or other funds provided by Bourse Borrower will be available to effect the satisfactory restoration of the Improvements.

(x)    Buyout. Bourse Borrower shall have bought out eighty percent (80.0%) of the trades required to perform the Hotel Conversion (other than FF&E, OS&E and pre-opening expenses) in accordance with the Hotel Conversion Plans and Specifications.

(xi)    Borrower's Requisition.  Bourse Borrower's Draw Request shall be accompanied by the following if Bourse Borrower is making a request for Hard Costs:

A.    a completed and itemized Application and Certificate for Payment (AIA Document No. G702 and No. G703) attached hereto as **Exhibit E** or similar form approved by Lender, containing the certification of Construction Manager to whom such payment is made, as applicable, and Hotel Conversion Architect as to the accuracy of same, together with invoices relating to all items of Approved Hotel Conversion Expenses covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Hotel Conversion to the date of the requisition.  The cost breakdown shall also show the percentage of completion of each Line Item on the Hotel Conversion Budget, and the accuracy of the cost breakdown shall be certified by Bourse Borrower and by Hotel Conversion Architect.  All such applications for payment shall also show all Contractors, including Major Contractors, by name and trade, the total amount of each Construction Contract, the amount theretofore paid to each Contractor as of the date of such application, and the amount to be paid from the proceeds of the Advance to each Contractor;

60

B.    an anticipated cost report in the form set forth in **Exhibit G** executed by Bourse Borrower which sets forth, with respect to all costs to complete construction of the Hotel Conversion to Hotel Conversion Final Completion, on a cumulative basis and broken down by Line Item, percentage of completion, the original budgeted amount, the current budgeted amount pursuant to an updated Hotel Conversion Budget approved by Lender, costs incurred to date, projected costs to complete, explanations of any Hotel Conversion Budget variances, a summary of any budget reallocations (regardless of whether such reallocations required approval pursuant to this Agreement or if such reallocations were permitted without Lender's approval), a summary of permitted, approved, pending and anticipated Change Orders, an explanation of any variances from the approved Hotel Conversion Construction Schedule and an updated Hotel Conversion Construction Schedule for which Bourse Borrower has requested Lender's approval; and

C.    copies of all executed Change Orders, contracts and subcontracts, and, to the extent requested by Lender, of all inspection or test reports and other documents relating to the construction of the Hotel Conversion not previously delivered to Lender.

(xii)    Borrower's Equity.  Bourse Borrower shall have delivered evidence acceptable to Lender in its sole but good faith discretion that Bourse Borrower has funded at least $16,496,157.00 toward Approved Hotel Conversion Expenses.

(b)    Conditions of Final Hotel Conversion Advance.    Lender's obligation to disburse the final Advance for Retainage under the Construction Manager's Agreement shall be subject to receipt by Lender of the following:

(i)    Completion of Improvements.    Evidence reasonably satisfactory to Lender that Hotel Conversion Final Completion has been achieved, including a final Hotel Conversion Report from the Construction Consultant with respect to the same.

(ii)    Certificates.    Certificate of Hotel Conversion Architect substantially in the form attached hereto as **Exhibit H**.

(iii)    Other Documents.    Such documents, letters, affidavits, reports and assurances, as Lender, Lender's counsel and the Construction Consultant may reasonably require.

Lender acknowledges that the Property is within the Commonwealth of Pennsylvania and accordingly retainage is subject to Section 509 of the Pennsylvania Contractor and Subcontractor Payment Act, 73 P.S. Section 501 *et al*. (the "**CASPA**"). Under Section 509(a.1) of the CASPA, upon reaching substantial completion, a contractor or a subcontractor has the statutory right to a full release of retainage withheld upon the posting of a maintenance bond ("**CASPA Retainage**

61

**Bond**") from an approved surety in the amount of 120% of the applicable retainage.  In the event that a contractor or subcontractor posts a CASPA Retainage Bond with respect to the Property and names Lender as a co-obligee under such CASPA Retainage Bond, Lender agrees to review the CASPA Retainage Bond, and if such bond is reasonably acceptable to Lender, Lender agrees that Bourse Borrower may submit a draw for the applicable amount of retainage at issue and Lender shall fund such draw to the extent the applicable conditions to fund have been satisfied.

Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, Lender will make a Hotel Conversion Advance to fund the portion of the Retainage being held with respect to any Contractor engaged in the Hotel Conversion as of the date upon which the Construction Consultant certifies to Lender that such Contractor has satisfactorily completed all work in accordance with the provisions of its Contract, if the Contractor is a first tier subcontractor, such Contractor delivers final lien waiver(s) (which may be conditioned upon payment) for such Contract, and as to all other Contractors, including Contractors that are materialmen or suppliers, such Contractor provides evidence that it has been paid in full (other than with respect to payment of such Retainage) and any other applicable conditions to fund have been satisfied.

       2.6.3   Conditions for Leasing Cost Advances.  Lender shall make from time to time Leasing Cost Advances to Bourse Borrower for Lender's Share of Approved Leasing Expenses in an aggregate amount not to exceed the Leasing Cost Advance Maximum Amount provided that the following applicable conditions precedent are satisfied prior to Lender making any such Leasing Cost Advance:

       (a)   Approved Leasing Expenses.  A Leasing Cost Advance shall be made solely for the purposes of paying Lender's Share of Approved Leasing Expenses (and the same shall have been substantiated as Approved Leasing Expenses in a manner satisfactory to Lender); provided, that if any Approved Leasing Expenses with respect to any Lease executed by Bourse Borrower in accordance with the terms hereof exceeds the Leasing Cost Threshold, then Lender shall have no obligation to make a Leasing Advance with respect to such Lease unless and until Bourse Borrower shall have paid in full one hundred percent (100%) of the Approved Leasing Expenses under such Lease in excess of such Leasing Cost Threshold (and such payment shall have been substantiated in a manner reasonably satisfactory to Lender) or, if Lender delivers a Leasing Cost Shortfall Notice, Bourse Borrower shall have funded the resulting Leasing Cost Shortfall pursuant to the terms hereof.

       (b)   Leasing Cost Advance Maximum Amount.  In no event shall the aggregate amount of Leasing Cost Advances advanced pursuant to this Agreement exceed the Leasing Cost Advance Maximum Amount.

       (c)   Officer's Certificate.  Any request for a Leasing Cost Advance shall be accompanied by (i) an Officer's Certificate from Bourse Borrower stating and certifying that (1) the items to be funded by the requested Leasing Cost Advance request are Approved Leasing Expenses, and a description thereof, (2) any Tenant Improvement work related to such Approved Leasing Expenses to be funded by the requested disbursement (or the relevant portion thereof as to which such request for funds relates) has been

completed in a good and workmanlike manner and in compliance in all material respects with all applicable material Legal Requirements, (3) the Approved Leasing Expenses (or the relevant portions thereof) to be funded from the Leasing Cost Advance in question have not been the subject of a previous Leasing Cost Advance or credited towards any equity contribution obligation of Bourse Borrower, (4) all previous disbursements of Leasing Cost Advances have been used to pay (or reimburse Bourse Borrower for) the previously identified Approved Leasing Expenses and have been paid in full, and (5) Bourse Borrower has paid (or will concurrently pay) Bourse Borrower's Share of the Approved Leasing Expenses, (ii) with respect to Leasing Cost Advances for Tenant Improvement work, a copy of any license, permit or other approval by any Governmental Authority required in connection with any Tenant Improvement work related to such Approved Leasing Expenses and not previously delivered to Lender, (iii) with respect to Leasing Cost Advances for Tenant Improvement work, copies of all invoices as to which such Leasing Cost Advance is being requested, and (iv) such other evidence as Lender shall request to demonstrate that any Tenant Improvement work related to the Approved Leasing Expenses to be funded by the requested Leasing Cost Advance has been completed in substantial accordance with the terms and provisions (including plans therefor approved by the applicable Tenant) of the applicable Lease, and are paid for or will be paid upon such disbursement to Bourse Borrower (or the portion thereof as to which such request for disbursement has been submitted has been completed and is paid for (other than any retention amount which is not a part of such disbursement request) or will be paid upon such disbursement to Bourse Borrower).

(d)    Lease Approval.  No Leasing Cost Advance shall be made unless (i) the applicable Lease complies with the Leasing Guidelines, and (ii) Lender has approved such Lease if Lender's approval is required pursuant to the terms and provisions of Section 4.1.9 hereof.

(e)    Tenant Improvements.

(i)    The amount of Leasing Cost Advances for Tenant Improvements for any Lease shall be limited to, unless otherwise approved by Lender in its sole discretion, Lender's Share of the least of (x) amounts payable for such Tenant Improvements under such Lease, (y) the maximum amount available to be funded for such Lease pursuant to the Leasing Guidelines, and (z) the actual cost to complete or pay for the Tenant Improvements with respect to such Lease (or to reimburse Bourse Borrower for the costs actually incurred by Bourse Borrower to complete the applicable Tenant Improvements).

(ii)    If such Leasing Cost Advance is being made for the payment of costs of completing any Tenant Improvements, Lender shall have approved the plans and specifications for such Tenant Improvements to the extent Lender had the right under this Agreement to approve such Lease.

(f)    Leasing Commissions.  In connection with any Leasing Cost Advance for leasing commissions:  (i) Lender shall not be obligated to make any Leasing Cost Advance for any portion of Lender's Share of any Leasing Commission until the

63

executed Lease, as approved by Lender (to the extent Lender's approval of such Lease is required under this Agreement), is delivered to Lender, and (ii) with respect to final Leasing Commission payments, Bourse Borrower shall have furnished Lender with reasonably satisfactory evidence that upon payment of the requested Leasing Cost Advance, the broker's commission with respect to the Lease in question shall be paid and satisfied in full.

(g)    Tenant Improvement Allowances.  The maximum aggregate amount of Leasing Cost Advances for Tenant Improvement Allowances for any Lease shall be limited to Lender's Share of the lesser of (i) the maximum amount available to be funded for Tenant Improvement Allowances for such Lease pursuant to the Leasing Guidelines, and (ii) the actual amount of the Tenant Improvement Allowance that the Tenant is eligible to receive pursuant to the terms of its Lease.

(h)    Lien Waivers.  With respect to Leasing Cost Advances for Tenant Improvement work, Lender shall have received duly executed lien waivers, which shall be conditional lien waivers (for payments to be made from the pending Leasing Cost Advance) and unconditional lien waivers (for all payments from prior Leasing Cost Advances), as applicable, and otherwise substantially in the form set forth in **Exhibit B**, from each contractor engaged by Bourse Borrower for all work performed with respect to Tenant Improvements where the contract price under such contractor's contract is equal to or greater than $250,000; in no event shall Bourse Borrower be required to deliver lien waivers from materialmen and suppliers so long as Bourse Borrower has provided evidence to Lender that all such Persons have been paid in full for work performed and materials provided other than payments being funded from the pending Leasing Cost Advance).

(i)    Final Advance under Lease.  With respect to the final Leasing Cost Advance as to any particular Lease, (i) the Tenant under the applicable Lease has accepted the demised premises under its Lease and is in occupancy and is paying rent under the Lease (unless the Tenant is in a free rent period), (ii) the Tenant under the applicable Lease has provided an estoppel to Lender confirming such acceptance and stating that all Tenant Improvement work required to be completed or funded by Bourse Borrower pursuant to such Lease has been substantially completed to its reasonable satisfaction (in the case of Tenant Improvement work) or has been funded (in the case of a Tenant Improvement Allowance), and (iii) Bourse Borrower shall have furnished Lender with evidence that a certificate of occupancy (which may be a temporary certificate of occupancy) for the applicable demised premises under such Lease continues to remain in full force and effect (but excluding certificates of occupancy for portions of the demised premises that can only be obtained following the build-out of such space for or by a Tenant).

(j)    Borrower's Share.  Bourse Borrower shall have delivered evidence acceptable to Lender that Bourse Borrower has funded or is concurrently funding Borrower's Share of the Approved Leasing Expense to which the requested Advance relates.  Subject to satisfaction by Bourse Borrower of the other conditions set forth in this Section 2.6, upon delivery of such evidence, Lender shall fund Lender's Share of the Approved Leasing Expense to which the requested Advance relates into Borrower's Operating Account.

64

2.6.4    Conditions for Carry Cost Advances.  On each Monthly Payment Date, Lender shall make an Advance (each, a "**Carry Cost Advance**") for deposit into the Deposit Account (or, at Lender's option, self-funded to Lender by Lender with respect to Debt Service) for Lender's Share of the amount by which (a) the sum of the Debt Service payable on such Monthly Payment Date, plus the other Carry Costs to be paid or that are payable on such Monthly Payment Date in accordance with the Approved Annual Budget or that are approved Extraordinary Expenses, exceeds (b) the Gross Revenue collected to pay such amounts on such Monthly Payment Date pursuant to Section 6.16.1 hereof (any such deficiency, the "**Monthly Carry Cost Shortfall**"); provided, that Lender shall not be obligated to make Carry Cost Advances in an aggregate amount in excess of the Carry Cost Advance Maximum Amount.  In addition, Bourse Borrower shall have delivered evidence acceptable to Lender that Bourse Borrower has funded or will concurrently fund Borrower's Share of the Monthly Carry Cost Shortfall to which the requested Advance relates.  Subject to satisfaction by Bourse Borrower of the applicable conditions set forth in this Section 2.6, upon delivery of such evidence, Lender shall fund Lender's Share of the Monthly Carry Cost Shortfall to which the requested Advance relates into Borrower's Operating Account.

2.6.5    Conditions for Office CapEx Advances.  Lender shall make, from time to time, Office CapEx Project Advances to Bourse Borrower for Approved Office CapEx Project Expenses in an aggregate amount not to exceed the Office CapEx Project Advance Maximum Amount, provided that the following conditions precedent are satisfied prior to Lender making any such Office CapEx Project Advance:

(a)    Approved Office CapEx Project Expenses.  An Office CapEx Project Advance shall be made solely for the purposes of paying Approved Office CapEx Project Expenses.

(b)    Office CapEx Project Advance Maximum Amount.  In no event shall the aggregate amount of Office CapEx Project Advances advanced pursuant to this Agreement exceed the Office CapEx Project Advance Maximum Amount.

(c)    Officer's Certificate.  Any request for an Office CapEx Project Advance shall be accompanied by (i) an Officer's Certificate from Bourse Borrower stating and certifying that:  (1) the items to be funded by the requested Office CapEx Project Advance are Approved Office CapEx Project Expenses, and a description thereof, (2) any work related to such Approved Office CapEx Project Expenses to be funded by the requested disbursement (or the relevant portion thereof as to which such request for funds relates) has been completed in a good and workmanlike manner and in compliance in all material respects with all applicable material Legal Requirements, (3) the Approved Office CapEx Project Expenses (or the relevant portions thereof) to be funded from the Office CapEx Project Advance in question have not been the subject of a previous Office CapEx Project Advance or credited towards any equity contribution obligation of Bourse Borrower, and (4) all previous disbursements of Office CapEx Project Advances have been used to pay (or reimburse Bourse Borrower for) the previously identified Approved Office CapEx Project Expenses and have been paid in full; (ii) a copy of any license, permit or other approval by any Governmental Authority required in connection with any work related to such Approved Office CapEx Project Expenses and not previously delivered to

65

Lender; (iii) copies of all invoices with respect to which such Office CapEx Project Advance is being requested; and (iv) such other evidence as Lender shall reasonably request to demonstrate that any work related to the Approved Office CapEx Project Expenses to be funded by the requested Office CapEx Project Advance is paid for or will be paid upon such disbursement to Bourse Borrower (or the portion thereof as to which such request for disbursement has been submitted has been completed and is paid for (other than any retention amount which is not a part of such disbursement request) or will be paid upon such disbursement to Bourse Borrower).

(d)    Lien Waivers.  With respect to a request for Hard Costs, Lender shall have received duly executed lien waivers, which shall be conditional lien waivers (for payments to be made from the pending Office CapEx Project Advance) and unconditional lien waivers (for all payments from prior Office CapEx Project Advances), as applicable, in the form set forth in **Exhibit B**, from all contractors engaged by Bourse Borrower for all work performed with respect to the Office CapEx Project prior to the date of such Office CapEx Project Advance with respect to the work; in no event shall Bourse Borrower be required to deliver lien waivers from materialmen and suppliers so long as Bourse Borrower has provided evidence to Lender that all such Persons have been paid in full for work performed and materials provided other than payments being funded from the pending Office CapEx Project Advance.

(e)    Construction Consultant.  With respect to a request for Hard Costs, the Construction Consultant shall have confirmed performance of the portion of the Office CapEx Project associated with the Office CapEx Project Advance and Lender shall have received advice from the Construction Consultant, reasonably satisfactory to Lender, as to the Construction Consultant's determination based on on-site inspections of the Office CapEx Project and the data submitted to and reviewed by it as part of Bourse Borrower's request for Office CapEx Project Advance, of the value of the labor and materials in place, that the construction of the Office CapEx Project is proceeding reasonably satisfactorily and in substantial accordance with the schedule and that the work on account of which the disbursement of Office CapEx Project Advance is sought has been completed in a good and workmanlike manner to the Construction Consultant's reasonable satisfaction in substantial accordance with each of the Office CapEx Project Budget, the Office CapEx Project Plans and Specifications (if any) and in compliance in all material respects with all applicable material Legal Requirements.

(f)    Borrower's Equity.  With respect to each individual Office CapEx Project, Bourse Borrower shall have delivered evidence acceptable to Lender in its sole but good faith discretion that Bourse Borrower has funded Borrower's Share of the Approved Office CapEx Project Expenses with respect to such Office CapEx Project, as well as any and all costs incurred or to be incurred by Bourse Borrower in excess of Lender's Share and Borrower's Share of such Office CapEx Project (i.e., Bourse Borrower shall have funded all budgeted equity with respect to an individual Office CapEx Project, as well as any cost overruns incurred by Bourse Borrower with respect to an individual Office CapEx Project).

66

2.6.6    Conditions for All Advances.  In addition to the conditions set forth in Section 2.6.2, Section 2.6.3, Section 2.6.4 and Section 2.6.5 above, Lender's obligation to make Advances shall be subject to the following additional conditions precedent and provisions, all of which must be satisfied (or waived by Lender in writing) prior to Lender making any such Advance:

(a)    Draw Request.  Other than with respect to Carry Cost Advances, Bourse Borrower shall complete, execute and deliver to Lender a requisition in the form attached hereto as **Exhibit I** ("**Draw Request**"), together with invoices and documentation for such requested Advance.

(b)    No Default or Shortfalls.  On the date of such Advance, no monetary Default, material non-monetary Default or Event of Default has occurred is continuing and no Hotel Conversion Shortfall, Projected Carry Cost Shortfall or Leasing Cost Shortfall shall exist.

(c)    Representations and Warranties.  All representations and warranties made by Borrower in Article III of this Loan Agreement shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects as if remade on the date of such Advance (unless the same solely relate to a different time period), subject to changes to such representations and warranties disclosed to Lender in writing, so long as such update does not result from or otherwise constitute a monetary Default, a material non-monetary Default or an Event of Default.

(d)    No Liens; Date Down Endorsement.  Borrower shall have delivered to Lender (i) a title search for the Property indicating that the Property is free and clear from all Liens, claims and other encumbrances (other than Permitted Encumbrances), and (ii) an endorsement to the Title Insurance Policy in the form set forth in **Exhibit J** hereto.

(e)    Prior Conditions Satisfied.  All applicable conditions precedent (including, without limitation, any documents and/or other deliverables that Lender is or was permitted to require in connection with any prior Advance) shall continue to be satisfied (or expressly waived in writing by Lender in its sole discretion) as of the date of such subsequent Advance irrespective of whether or not such conditions are repeated in this Section 2.6.

(f)    Payment of Lender's Costs.  Borrower shall have paid in full (or such Advance shall be used to pay) (i) all of Lender's costs and expenses incurred in connection with such Advance (including any fees, costs and expenses of Construction Consultant in connection with the Hotel Conversion or an Office CapEx Project), all in accordance with the terms of this Agreement, and (ii) all title charges, if applicable.

(g)    Further Documents.  Lender shall have received such other documents and further approvals, documents and information pertaining to the requested Advance as Lender or its counsel may have reasonably requested, in form and substance reasonably satisfactory to Lender and its counsel.

2.6.7    Method of Disbursement of Loan Proceeds.

67

(a)      Procedure of Advances.

(i)      Each Draw Request for an Advance (other than a Carry Cost Advance) shall be submitted to at least ten (10) Business Days prior to the date of the requested Advance (the "**Requested Advance Date**").  Lender shall make the requested Advance on the Requested Advance Date so long as all conditions to such Advance are satisfied or waived.

(ii)     Lender shall not make more than (x) one (1) Carry Cost Advance in any calendar month, and (y) one (1) Hotel Conversion Advance, Leasing Cost Advance and Office CapEx Project Advance (in the aggregate) in any calendar month, in each case, unless otherwise approved by Lender in its sole discretion.

(iii)    Advances shall be in an amount of not less than $100,000 in the aggregate (other than the final Advance or a Carry Cost Advance).

(b)      Funds Advanced.  Each Advance made directly to Bourse Borrower shall be made by Lender by wire transfer (or other transfer) to the Borrower's Operating Account (other than the Carry Cost Advance for Debt Service which will be self-funded by Lender).  All proceeds of all Advances shall be used by Bourse Borrower only for the purposes for which such Advances were made.

(c)      Disbursement of Advances.  So long as the applicable conditions to Advances are satisfied, Lender shall fund to Bourse Borrower (i) Hotel Conversion Advances for Approved Hotel Conversion Expenses, (ii) Leasing Cost Advances for Lender's Share of Approved Leasing Expenses (iii) Carry Cost Advances for Lender's Share of Monthly Carry Cost Shortfalls, and (iv) Office CapEx Project Advances for Approved Office CapEx Project Expenses, in each case, in accordance with and subject to the limitations set forth in this Section 2.6.  Any Advance disbursed by Lender (whether the same are disbursed to Bourse Borrower or directly to a third party) shall be added to the Outstanding Principal Balance and shall constitute a portion of the Debt.

(d)      Advances Do Not Constitute a Waiver.  No Advance made prior to or without the fulfillment by Bourse Borrower of all of the applicable conditions precedent thereto, whether or not known to Lender, shall constitute a waiver by Lender of the requirement that all conditions, including the non-performed conditions, shall be required with respect to all Advances, and shall constitute a waiver of any of the conditions of Lender's obligation to make further Advances, nor, in the event Bourse Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding Lender from thereafter declaring such inability to be an Event of Default hereunder.

(e)      Direct Advances to Third Parties.  At Lender's option, upon and during the continuance of an Event of Default, Lender may make any or all Advances directly or through the Title Company to (i) any Contractor, (ii) the Construction Consultant to pay its fees with respect to the Hotel Conversion, (iii) Lender's counsel to pay the fees incurred by the same, (iv) to pay any expenses reasonably incurred by Lender

which are reimbursable by Bourse Borrower hereunder with respect to Advances (including, without limiting the generality of the foregoing, attorneys' fees and expenses and other fees and expenses incurred by Lender), provided that Bourse Borrower shall theretofore have received notice from Lender thereof, and (v) any other Person to whom Lender determines payment is due. Any portion of the Loan disbursed by Lender as set forth above shall be deemed disbursed as of the date on which the Person to whom such payment is made receives the same. The execution of this Agreement by Bourse Borrower shall, and hereby does, constitute an irrevocable authorization to disburse the Loan directly to any such Person or through the Title Company to such Persons in accordance with this Section 2.6.7(e). No further authorization from Bourse Borrower shall be necessary to warrant such direct Advances to such relevant Person, and all such Advances shall satisfy *pro tanto* the obligations of Lender hereunder and shall be secured by the Mortgage and the other Loan Documents as fully as if made directly to Bourse Borrower.

(f)      Conditions to Advance. All conditions precedent to the obligation of Lender to make Advances are imposed solely for the benefit of Lender and no other party may require satisfaction of any such condition precedent or be entitled to assume that Lender will refuse to make the Loan or any Advance in the absence of strict compliance with such conditions precedent. Any or all requirements of this Agreement may be waived by Lender in its sole and absolute discretion, in whole or in part, at any time and any such waiver shall not be deemed a modification of this Agreement.

Section 2.7      Force Funding.

2.7.1      Unadvanced Hotel Conversion Advances. If, as of the Initial Maturity Date (the "**Advance Expiration Date**"), any portion of the Hotel Conversion Advances remain unadvanced (i.e., the aggregate amount of Hotel Conversion Advances made by Lender is less than the Hotel Conversion Advance Maximum Amount) (such difference, the "**Unadvanced Hotel Conversion Amounts**"), then the Unadvanced Hotel Conversion Amounts shall be funded by Lender into the Hotel Conversion Rebalancing Reserve Account on the Advance Expiration Date; provided, that (i) if not less than five (5) Business Days prior to the Advance Expiration Date, Borrower sends a written notice (such written notice, an "**Unadvanced Hotel Conversion Termination Notice**") to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Hotel Conversion Amounts, then Borrower's ability to request and Lender's obligation to Advance all or any such portion of the Unadvanced Hotel Conversion Amounts shall terminate effective as of the Advance Expiration Date, and (ii) if Borrower does not timely deliver an Unadvanced Hotel Conversion Termination Notice pursuant to clause (i) above, Borrower may at any time after the Advance Expiration Date deliver an Unadvanced Hotel Conversion Termination Notice to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Hotel Conversion Amounts then held by Lender in the Hotel Conversion Rebalancing Reserve Account, then so long as no Event of Default exists and is continuing, Lender shall pay down a portion of the Outstanding Principal Balance on the next Monthly Payment Date in accordance with Section 2.4.1 hereof (unless the next Monthly Payment Date is within five (5) Business Days of Lender's receipt of the Unadvanced Hotel Conversion Termination Notice, in which event such funds shall be applied on the following Monthly Payment Date) by the amount specified by Borrower in the Unadvanced

Hotel Conversion Termination Notice (but in no event in respect of amounts funded with respect to a Hotel Conversion Shortfall).

2.7.2   Unadvanced Leasing Cost Advances.  If, as of the Advance Expiration Date, any portion of the Leasing Cost Advances remain unadvanced (i.e., the aggregate amount of Leasing Cost Advances made by Lender is less than the Leasing Cost Advance Maximum Amount) (such difference, the "**Unadvanced Leasing Cost Amounts**"), then the Unadvanced Leasing Cost Amounts shall be funded by Lender into the Leasing Cost Rebalancing Reserve Account on the Advance Expiration Date; provided, that (i) if not less than five (5) Business Days prior to the Advance Expiration Date, Borrower sends a written notice (such written notice, an "**Unadvanced Leasing Cost Termination Notice**") to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Leasing Cost Amounts, then Borrower's ability to request and Lender's obligation to Advance all or any such portion of the Unadvanced Leasing Cost Amounts shall terminate effective as of the Advance Expiration Date, and (ii) if Borrower does not timely deliver an Unadvanced Leasing Cost Termination Notice pursuant to clause (i) above, Borrower may at any time after the Advance Expiration Date deliver an Unadvanced Leasing Cost Termination Notice to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Leasing Cost Amounts then held by Lender in the Leasing Cost Rebalancing Reserve Account, then so long as no Event of Default exists and is continuing, Lender shall pay down a portion of the Outstanding Principal Balance on the next Monthly Payment Date in accordance with Section 2.4.1 hereof (unless the next Monthly Payment Date is within five (5) Business Days of Lender's receipt of the Unadvanced Leasing Cost Termination Notice, in which event such funds shall be applied on the following Monthly Payment Date) by the amount specified by Borrower in the Unadvanced Leasing Cost Termination Notice (but in no event in respect of amounts funded with respect to a Leasing Cost Shortfall).

2.7.3   Unadvanced Carry Cost Advances.  If, as of the Advance Expiration Date, any portion of the Carry Cost Advances remain unadvanced (i.e., the aggregate amount of Carry Cost Advances made by Lender is less than the Carry Cost Advance Maximum Amount) (such difference, the "**Unadvanced Carry Cost Amounts**"), then the Unadvanced Carry Cost Amounts shall be funded by Lender into the **Carry Cost Account** on the Advance Expiration Date; provided, that (i) if not less than five (5) Business Days prior to the Advance Expiration Date, Borrower sends a written notice (such written notice, an "**Unadvanced Carry Cost Termination Notice**") to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Carry Cost Amounts, then Borrower's ability to request and Lender's obligation to Advance all or any such portion of the Unadvanced Carry Cost Amounts shall terminate effective as of the Advance Expiration Date, and (ii) if Borrower does not timely deliver an Unadvanced Carry Cost Termination Notice pursuant to clause (i) above, Borrower may at any time after the Advance Expiration Date deliver an Unadvanced Carry Cost Termination Notice to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Carry Cost Amounts then held by Lender in the Carry Cost Account, then so long as no Event of Default exists and is continuing, Lender shall pay down a portion of the Outstanding Principal Balance on the next Monthly Payment Date in accordance with Section 2.4.1 hereof (unless the next Monthly Payment Date is within five (5) Business Days of Lender's receipt of the Unadvanced Carry Cost Termination Notice, in which event such funds shall be applied on the following Monthly Payment Date) by the amount specified by Borrower in the Unadvanced Carry

Cost Termination Notice (but in no event in respect of amounts funded with respect to a Projected Carry Cost Shortfall).

2.7.4    Unadvanced Office CapEx Project Advances.    If, as of the Advance Expiration Date, any portion of the Office CapEx Project Advances remain unadvanced (i.e., the aggregate amount of Office CapEx Project Advances made by Lender is less than the Office CapEx Project Advance Maximum Amount) (such difference, the "**Unadvanced Office CapEx Project Amounts**"), then the Unadvanced Office CapEx Project Amounts shall be funded by Lender into the Office CapEx Project Account on the Advance Expiration Date; provided, that (i) if not less than five (5) Business Days prior to the Advance Expiration Date, Borrower sends a written notice (such written notice, an "**Unadvanced Office CapEx Project Termination Notice**") to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Office CapEx Project Amounts, then Borrower's ability to request and Lender's obligation to Advance all or any such portion of the Unadvanced Office CapEx Project Amounts shall terminate effective as of the Advance Expiration Date, and (ii) if Borrower does not timely deliver an Unadvanced Office CapEx Project Termination Notice pursuant to clause (i) above, Borrower may at any time after the Advance Expiration Date deliver an Unadvanced Office CapEx Project Termination Notice to Lender of Borrower's election to forgo and terminate its ability to use all or any portion of the Unadvanced Office CapEx Project Amounts then held by Lender in the Office CapEx Project Account, then so long as no Event of Default exists and is continuing, Lender shall pay down a portion of the Outstanding Principal Balance on the next Monthly Payment Date in accordance with Section 2.4.1 hereof (unless the next Monthly Payment Date is within five (5) Business Days of Lender's receipt of the Unadvanced Office CapEx Project Termination Notice, in which event such funds shall be applied on the following Monthly Payment Date) by the amount specified by Borrower in the Unadvanced Office CapEx Project Termination Notice.

Section 2.8    Hotel Conversion.    Pursuant to the Hotel Conversion Scope of Work, Bourse Borrower intends to redevelop a portion of the Bourse Property into a hotel, as provided in the Hotel Conversion Scope of Work.    In connection with the foregoing, Hotel Conversion Commencement shall not occur unless and until Bourse Borrower satisfies the following conditions (provided, for avoidance of doubt, such conditions shall not be required to be satisfied in order to commence and complete Hotel Conversion Demolition) (collectively the "**Hotel Management Conversion Conditions**"):  (i) Bourse Borrower shall have proposed to Lender for its review the identity of any hotel manager and/or franchisor that Bourse Borrower desires to engage to manage such hotel, and Lender shall have approved same in its sole but good faith discretion; Lender hereby approves the hotel managers and franchisors identified on Schedule XV attached hereto; (ii) Lender shall have approved in its sole but good faith discretion any hotel management agreement and/or franchise agreement (as applicable), including the material terms thereof (*e.g.*, the terms of any PIP, FF&E reserve, key money, term, termination rights, material fees and expenses, etc.), (iii) any such hotel manager shall have provided a subordination, non-disturbance and attornment agreement to Lender, and any such franchisor shall have provided a comfort letter to Lender, in each case, in form and substance acceptable to Lender in its sole but good faith discretion, and (iv) Bourse Borrower, Guarantor and Lender shall enter into an amendment of this Agreement and the other Loan Documents to memorialize the satisfaction of the Hotel Conversion Management Conditions and the redevelopment of a portion of the Property as a hotel, including representations, warranties, covenants, events of default, reserves, cash management provisions (including the definition of Net Operating Income) and recourse

provisions, in each case, that are applicable to the financing of a hotel development property and the terms of the agreements relating to the partial conversion of the Property to a hotel, in form and substance acceptable to Lender in its sole but good faith discretion. Notwithstanding anything to the contrary in this Agreement or in any other Loan Document, in no event shall Guarantor's obligations with respect to achieving Hotel Conversion Substantial Completion be increased or expanded in any respect whatsoever (except to the extent the scope of work and/or the cost to perform the Hotel Conversion increases of expands), including any increase to the "Liability Cap" (as defined in the Guaranty of Completion).

Section 2.9    Release of 400 Market Street Property. On any Business Day, Borrower may obtain the release of the 400 Market Street Property and the release of 400 Market Borrower and the 400 Market Sole Member from the Loan Documents and from the Lien of the Mortgage, the 400 Market Pledge Agreement, 400 Market Master Tenant Pledge Agreement, the 400 Market Pledge Agreement Guaranty, the 400 Market DACA and the  400 Market Master Tenant Pledge Agreement Guaranty (the "**Release**"), provided that each of the following conditions are satisfied with respect to the Release:

(a)    Borrower shall have given Lender at least ten (10) Business Days' prior written notice of the Release; provided, that Borrower may revoke, or adjourn the date of the Release at any time by delivering written notice to Lender thereof at any time prior to the date of the Release (provided that Borrower shall reimburse Lender for all reasonable out-of-pocket costs and expenses incurred by Lender, if any, as a result of such revocation or adjournment, as applicable (including Breakage Costs));

(b)    Both immediately before the Release and immediately thereafter, no Event of Default shall be continuing;

(c)    At the closing of the Release, Borrower shall make the following payments: (i) a prepayment of the Outstanding Principal Balance in an amount equal to the Release Amount, (ii) all accrued and unpaid interest on the portion of the Outstanding Principal Balance being prepaid pursuant to subclause (i), (iii) any Breakage Costs (if any) applicable to such payment, and (iv) all reasonable out-of-pocket costs and expenses (including reasonable attorneys' fees) incurred by Lender in connection with the Release;

(d)    After giving effect to such Release, all representations and warranties made by Borrower in Article III of this Loan Agreement shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects as if remade on the date of the Release (unless the same solely relate to a different time period), subject to changes to such representations and warranties disclosed to Lender in writing, so long as such update does not result from or otherwise constitute a monetary Default, a material non-monetary Default or an Event of Default;

(e)    Lender and Borrower shall have executed and delivered such documents as Lender determines is necessary or appropriate to effectuate the Release, including, without limitation, a partial release of the Mortgage, the Assignment of Leases, the Pledge Agreement and appropriate UCC-3 financing statements; and

72

(f)     On date of the Release, the Title Company shall have issued the endorsement to the Title Insurance Policy in form attached hereto as Exhibit K.

Upon payment of the Release Amount and the effectuation of the Release of the 400 Market Street Property in accordance with the above, the payment of the "Guaranteed Obligations" under the Guaranty of Payment shall have been satisfied in full, as set forth in the Guaranty of Payment.

It is understood and agreed that no Release of the 400 Market Street Property shall impair or otherwise adversely affect the Liens, security interests and other rights of Lender under the Loan Documents with respect to the Bourse Property or the Bourse Borrower.

Section 2.10    Historic Tax Credit Documents. Borrower shall use commercially reasonable efforts to obtain historic tax credits with respect to the Property, enter into the Historic Tax Credit Documents and admit an HTC Investor as a 99% member in Master Tenant (collectively, the "**HTC Investment**"), and as a condition precedent to effectuating the HTC Investment, the following shall be satisfied:

(a)     Borrower shall have given Lender at least thirty (30) days prior written notice of the HTC Investment;

(b)     Both immediately before the HTC Investment and immediately thereafter, no Event of Default shall be continuing;

(c)     At the closing of the HTC Investment, Borrower shall make the payment required under Section 2.4.2(b) hereof;

(d)     Lender shall have approved the HTC Investor and the HTC Investor shall have otherwise satisfied the KYC Procedures;

(e)     Lender shall have reviewed and approved in writing the Historic Tax Credit Documents, which approval shall be in Lender's sole but good faith discretion. Lender hereby acknowledges that (i) pursuant to the terms of the Historic Tax Credit Documents, Master Tenant shall become the lessor under the Leases and the counterparty under the applicable service contracts with respect to the Property (which shall be collaterally assigned to Leasehold Borrower as set forth in clause (f) below), and (ii)  the Master Lease shall allow for Gross Revenues in excess of rent due and owing by Master Tenant under the Master Lease to be retained by Master Tenant (and the waterfall in Section 6.16.1 hereof shall be adjusted accordingly in a manner that is acceptable to Lender in its good faith discretion), provided that Lender shall have approved the terms of such Master Lease, including such rents payable thereunder;

(f)     To secure its obligations under the Master Lease, Master Tenant shall have collaterally assigned to Leasehold Borrower and granted to Leasehold Borrower a security interest in all Rents, Leases, contracts, personal property, fixtures, contractual claims, deposit accounts and all other real, personal, tangible and intangible property rights, interests and estates derived from the Property and the ownership and operation thereof, all of which shall be collaterally assigned by Leasehold Borrower to Lender to further secure Borrower's obligations to Lender with respect to the Loan, pursuant to an amendment to

73

the Mortgage and any other applicable Loan Documents, in each case, in form and content acceptable to Lender in its sole but good faith discretion;

(g)  To the extent that any insurance policy required to obtained by Borrower under this Agreement will instead be obtained and maintained by Master Tenant (including, without limitation, business interruption insurance), Lender shall have approved in its good faith discretion such insurance policy(ies) of Master Tenant and any modifications to Borrower's insurance policy(ies), including the rights of Lender with respect thereto as additional insured, loss payee/mortgagee and the like;

(h)  After giving effect to the HTC Investment, all representations and warranties made by Borrower in Article III of this Loan Agreement shall have been true and correct in all material respects on the date on which made and shall also be true and correct in all material respects as if remade on the date of the HTC Investment (unless the same solely relate to a different time period), subject to changes to such representations and warranties disclosed to Lender in writing, so long as such update does not result from or otherwise constitute a monetary Default, a material non-monetary Default or an Event of Default; and

(i)  Each Borrower Party shall deliver a reaffirmation of each Loan Document to which it is a party in form and substance reasonably acceptable to Lender prior to the effectuation of the HTC Investment;

(j)  Borrower shall, prior to the effectuation of the HTC Investment, deliver to Lender a legal opinion in substantially the same form as the legal opinion(s) delivered to Lender as of the Closing Date (or in such other form as is reasonably satisfactory to Lenders) with respect to the execution and enforceability of the applicable Historic Tax Credit Documents;

(k)  Borrower shall pay all of Lender's reasonable out-of-pocket costs and expenses in connection with the execution and delivery of the Historic Tax Credit Documents and the making of the HTC Investment, regardless of whether the HTC Investment is ultimately effectuated; and

(l)  Lender and Borrower shall have executed and delivered such Historic Tax Credit Documents, amendments to the Loan Documents (including amending and restating each of the Bourse Master Tenant Pledge Agreement and the 400 Market Master Tenant Pledge Agreement to reflect the applicable pledgor's ownership interest in the applicable Master Tenant upon effectuating the applicable HTC Investment) and such other documents as Borrower or Master Tenant may request and Lender determines are necessary or appropriate in Lender's sole but good faith discretion to effectuate the HTC Investment.

For purposes of clauses (e) and (k) above, Lender acknowledges that the Historic Tax Credit Documents, amendments to the Loan Documents and other documents necessary to effect the same shall provide that the Master Tenant shall not be a party to the Loan Documents or an obligor of

the Obligations, nor shall Master Tenant's assets directly secure the Obligations of Borrower under the Loan Documents.

**ARTICLE III**
**REPRESENTATIONS AND WARRANTIES**

Section 3.1    Borrower Representations.

Borrower represents and warrants to Lender as of the Closing Date and each other date on which the representations and warranties set forth herein are required to be remade that:

3.1.1    Organization.

(a)    Each of Borrower, Sole Member and each SPC Party (if any) is duly formed, organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified and in good standing in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification.  Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby. Borrower acknowledges and agrees that it is Borrower's understanding and intent that the Property constitutes "single asset real estate" for purposes of Section 362(d)(3) of the Bankruptcy Code.

(b)    Borrower's exact legal name is correctly set forth in the first paragraph of this Agreement.  Borrower is an organization of the type specified in the first paragraph of this Agreement.  Borrower is incorporated or organized under the laws of the state specified in the first paragraph of this Agreement.  Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Borrower) the address of Borrower set forth in the first paragraph of this Agreement (unless Borrower notifies Lender in writing of a change thereto in accordance with the terms hereof). Borrower is not subject to back-up withholding taxes.

(c)    Sole Member is a Delaware limited liability company.  Sole Member's principal place of business and chief executive office, and the place where Sole Member keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less than four (4) months, the entire period of the existence of Sole Member) is the same as Borrower's principal place of business (unless Borrower notifies Lender in writing of a change thereto in accordance with the terms hereof).  Sole Member's federal tax identification number is as follows:

75

(d)    Borrower's and Sole Member's respective federal tax identification numbers are as follows:

| Entity | EIN |
| --- | --- |
| LAK Bourse Owner LLC | 99-1716058 |
| LAK Bourse Master HTC Landlord LLC | 99-3567033 |
| LAK Bourse HTC Master Landlord Mezz LLC | 99-3508049 |
| LAK 400 Owner LLC | 99-2310784 |
| LAK Market Master HTC Landlord LLC | 99-3540618 |
| LAK Market HTC Master Landlord Mezz LLC | 99-3521721 |
| LAK Bourse Mezz LLC | 99-3590224 |
| LAK Bourse ML MM LLC | 99-3677349 |
| LAK 400 Market Mezz LLC | 99-3608498 |
| LAK Market ML MM LLC | 99-3677400 |

3.1.2    Proceedings.  This Agreement and the other Loan Documents have been duly authorized, executed and delivered by Borrower and constitute the legal, valid and binding obligations of Borrower, enforceable against Borrower in accordance with their respective terms, except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding at law or in equity).  The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Borrower Party including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable except as such enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws affecting the enforcement of creditors' rights generally, and by general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), and no Borrower Party has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

76

3.1.3    No Conflicts.  The execution and delivery of this Agreement and the other Loan Documents by Borrower and the performance of its Obligations hereunder and thereunder will not conflict with any provision of any law or regulation to which Borrower is subject, or conflict with, result in a breach of, or constitute a default under, any of the terms, conditions or provisions of any of Borrower's organizational documents, or any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other material agreement or instrument entered into by Borrower (as opposed to assumed by Borrower) to which Borrower is a party or by which Borrower's property or assets are bound, any order or decree applicable to Borrower (and not relating to the Property), where such conflict, breach or default would be reasonably expected to have a material adverse effect on Borrower's ability to perform under the Loan Documents, or result in the creation or imposition of any Lien on any of Borrower's assets or property (other than pursuant to the Loan Documents and the Permitted Encumbrances), nor will such action result in any violation of the provisions of any applicable material Legal Requirements, where such violation would be reasonably expected to have a material adverse effect on Borrower's ability to perform its obligations hereunder.

3.1.4    Litigation.  To Borrower's Knowledge, except as disclosed to Lender in writing, there is no action or proceeding pending or threatened (in writing) against Borrower, which, if adversely determined to Borrower, would be reasonably expected to have a material adverse effect on Borrower's ability to perform its obligations hereunder.

3.1.5    Agreements.  Borrower has not entered into (as opposed to assumed) any agreement or instrument which, in any event, would be reasonably likely to materially and adversely affect Borrower, the Property, the Collateral or Borrower's business, properties, operations or financial condition.  To Borrower's Knowledge, Borrower is not in default with respect to any order or decree of any court or any order, regulation or demand of any Governmental Authority, in each case not relating to the Property, which default would be reasonably likely to have consequences that would materially and adversely affect the financial condition or operations of Borrower or its properties or would be reasonably likely to have consequences that would materially and adversely affect its performance hereunder.  To Borrower's Knowledge, Borrower is not in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any Permitted Encumbrance entered into by Borrower (as opposed to assumed by Borrower) or any other agreement or instrument entered into by Borrower (as opposed to assumed by Borrower) which default would be reasonably likely to have consequences that would materially and adversely affect the financial condition or operations of Borrower or would, to Borrower's Knowledge, have consequences that would adversely affect its performance hereunder.  Borrower has no material financial obligation (contingent or otherwise) under any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument entered into by Borrower (as opposed to assumed by Borrower) other than any such obligations under and/or contemplated by the Loan Documents and the Permitted Indebtedness.

3.1.6    Consents.  No consent, approval, authorization or order of any court or Governmental Authority is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

77

3.1.7    Title.    Borrower has good, marketable and insurable fee simple title to the real property comprising part of the Property and, to Borrower's Knowledge, good title to the balance of the Property owned by it, free and clear of all Liens whatsoever except the Permitted Encumbrances.  The Permitted Encumbrances in the aggregate do not, and will not, (i) adversely affect (a) the operation or use of the Property (as currently used), or (b) Borrower's ability to pay its Obligations in a timely manner, or (ii) materially interfere with the benefits of the security intended to be provided by this Agreement and the other Loan Documents.  The Mortgage, when properly recorded in the appropriate records, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create (i) a valid, first priority, perfected Lien on the Property, subject only to Permitted Encumbrances and (ii) perfected security interests in and to, and perfected collateral assignments of, all personalty located on the Property (including the Leases), all in accordance with the terms thereof, in each case subject only to any Permitted Encumbrances.  The filing of a Uniform Commercial Code financing statement covering all personalty of Borrower with the Delaware Secretary of State will create perfected security interests in and to, and perfected collateral assignments of, all personalty, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances and such other Liens as are expressly permitted pursuant to the Loan Documents. To Borrower's Knowledge, there are no mechanics', materialmen's or other similar Liens or claims which have been filed for work, labor or materials affecting the Property which are or may be Liens prior to, or equal or coordinate with, the Lien of the Mortgage.  None of the Permitted Encumbrances, individually or in the aggregate, materially interfere with the benefits of the security intended to be provided by the Mortgage and this Agreement, materially and adversely affect the value of the Property, materially impair the use or operations of the Property or materially impair Borrower's ability to pay its Obligations in a timely manner.  Sole Member owns the Collateral free and clear of all Liens whatsoever other than the Lien of the Loan Documents.  The Pledge Agreement, together with any Uniform Commercial Code financing statements required to be filed in connection therewith, will create a valid, first priority, perfected security interest on Sole Member's interest in the Collateral, all in accordance with the terms thereof.

3.1.8    No Plan Assets.    As of the Closing Date and throughout the term of the Loan, (a) Borrower is not and will not be an "employee benefit plan," as defined in Section 3(3) of ERISA, subject to Title I of ERISA, (b) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R.  Section 2510.3-101, as modified by Section 3(42) of ERISA, (c) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (d) transactions by or with Borrower are not and will not be subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans.  As of the Closing Date, Borrower does not maintain, sponsor or contribute to a "pension plan" (within the meaning of Section 3(2) of ERISA) that is subject to Title IV of ERISA.  Borrower's representations in this Section 3.1.8 and in Section 4.2.10 below are based on the assumption that no portion of the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a (i) "benefit plan investor" within the meaning of Section 3(42) of ERISA, unless the Lender relied on an available prohibited transaction exemption, all of the conditions of which are satisfied or (ii) governmental plan which is subject to any provision which is similar to the prohibited transaction provisions of Title I of ERISA or Section 4975 of the Code ("**Applicable Similar Law**"), unless the acquisition and holding of the Loan or any interest therein does not give rise to a violation of any such Applicable Similar Law.

78

3.1.9    Compliance.  To Borrower's Knowledge, Borrower has not received from any Governmental Authority written notice of any material violation of any laws, rules and regulations of any federal, state, city or county government or any agency, body, or subdivision thereof applicable (or alleged to be applicable) to the Property, or any part thereof, including, without limitation, building codes, environmental, zoning, or other land use regulations, that has not been corrected to the satisfaction of the issuer of such notice, except as set forth on **Schedule IV** attached hereto or otherwise disclosed in writing to Lender.

3.1.10    Financial Information.  All reports, documents, instruments, information and financial data that have been delivered by Borrower to Lender with respect to the Loan (but excluding any reports, documents, instruments, information and financial data provided by Lender as seller to Borrower pursuant to the Purchase Agreement) (a) are true, complete and correct in all material respects, (b) in the case of financial data and reporting, have been prepared in accordance with an Acceptable Accounting Method throughout the periods covered, except as disclosed therein, and (c) when taken as a whole, are accurate, correct and sufficiently complete in all material respects to give Lender true and accurate knowledge of their subject matter and do not contain any material misrepresentation or omission.  Since the date of the financial statements, there has been no material adverse change in the financial condition, operations or business of Borrower or Guarantor from that set forth in said financial statements.

3.1.11    Condemnation.  To Borrower's Knowledge, Borrower has received no written notice of any pending or threatened condemnation or similar proceeding affecting the Property or any part thereof.

3.1.12    Intentionally Omitted.

3.1.13    Intentionally Omitted.

3.1.14    Tax Appeals; Assessments.  Except as set forth on **Schedule IV** attached hereto, Borrower has not filed any tax appeals with respect to the Property for the tax year in which the Closing Date is scheduled to occur.  Any consultants or other professionals engaged by Borrower to perform work with respect to appeals of taxes or special assessments on the Property prior to the Closing Date have been or will be paid in full on or prior to the Closing Date.  Except as may be disclosed in the public record or delivered to Borrower by Lender, Borrower has not received written notice from any Governmental Authority or other third party of any pending or threatened special assessments, liens or similar charges against Borrower and/or the Property arising out of any public improvements, the construction of the Property and/or any subsequent work or materials relating to the Property that will not be paid on or prior to the Closing Date.

3.1.15    Intentionally Omitted.

3.1.16    Assignment of Leases.  The Assignment of Leases creates a valid assignment of, or a valid security interest in, certain rights under the Leases, subject only to a license granted to Borrower to exercise certain rights and to perform certain obligations of the lessor under the Leases, including the right to operate the Property.  No Person other than Lender has any interest in or assignment of the Leases or any portion of the Rents due and payable or to become due and payable thereunder.

3.1.17 <u>Insurance</u>.  Borrower has obtained and has delivered to Lender original or complete copies of all of the Policies or ACORD certificates, with all premiums prepaid thereunder, reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  To Borrower's Knowledge, no Borrower Related Party has done, by act or omission, anything which would impair the coverage of any of the Policies.

3.1.18 <u>Intentionally Omitted</u>.

3.1.19 <u>Intentionally Omitted</u>.

3.1.20 <u>Intentionally Omitted.</u>

3.1.21 <u>Intentionally Omitted.</u>

3.1.22 <u>Leases</u>.  To Borrower's Knowledge, the rent roll attached hereto as **Schedule V** (the "**Rent Roll**") lists all tenants, licensees and occupants of the Property and is the rent roll maintained by Borrower and relied on by Borrower for internal administrative and accounting purposes.  To Borrower's Knowledge, the leases and license agreements on the Rent Roll are the only leases, licenses and occupancy agreements affecting the Property; Borrower has made available to Lender all copies of the leases and license agreements on the Rent Roll and (including any and all amendments and guarantees) affecting the Property or any portion thereof that were provided to Borrower by Lender; and all such leases and license agreements are in full force and effect, subject to **Schedule IV**.  Except as set forth on **Schedule IV**, Borrower has not sent, and to Borrower's Knowledge, Borrower has not received, any written notices of default under any lease or license agreement on the Rent Roll that remains uncured, and to Borrower's Knowledge, there are no existing monetary defaults or material non-monetary defaults under any of the leases or license agreements on the Rent Roll on the part of tenants thereunder.  The status of the leases and license agreements on the Rent Roll with respect to the Food Hall at the Bourse Property (as defined in the Purchase Agreement) is set forth on **Schedule V**.  To Borrower's Knowledge, except as shown in the Rent Roll, (i) no rent due or to become due under any lease or license agreement on the Rent Roll in respect of any period after the Closing Date has been paid by the tenant thereunder more than one (1) month in advance, (ii) Borrower is not holding any security deposits under the leases or license agreements on the Rent Roll, (iii) Borrower has not received any written notice of the exercise of any early termination options or rights under the leases or license agreements on the Rent Roll and (iv) no tenant or licensee under any lease or license agreement on the Rent Roll is party to any voluntary or involuntary proceedings in bankruptcy, reorganization or similar proceedings under the Federal bankruptcy laws or under any state laws relating to the protection of debtors, or subject to any general assignment for the benefit of the creditors.  To Borrower's Knowledge, the Leasing Costs (as defined in the Purchase Agreement) disclosed on **Schedule VI** attached hereto are the only Leasing Costs (as defined in the Purchase Agreement) that were due and payable as of December 20, 2023, and **Schedule VI** attached hereto sets forth the Leasing Costs (as defined in the Purchase Agreement) that will become due and payable with respect to Digitas's expansion of up to 6,500 square feet on the 6th floor of the Property pursuant to its lease.

3.1.23 <u>Filing and Recording Taxes</u>.  All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid under applicable Legal

Requirements in connection with the transfer of the Property to Borrower have been paid or are being paid simultaneously herewith.  All mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid under applicable Legal Requirements in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage, have been paid or are being paid simultaneously herewith.

3.1.24  <u>Special Purpose Bankruptcy Remote Entity</u>.  Borrower hereby represents and warrants that as of the formation of Borrower, Sole Member and each SPC Party through and including the Closing Date that none of Borrower, Sole Member nor any SPC Party has taken any of the actions prohibited (or failed to take any actions required to be taken) pursuant to the terms and provisions of this <u>Section 3.1.24</u>.  Borrower hereby represents and warrants to, and covenants with, Lender that with respect to each of Borrower, Sole Member and each SPC Party, as of the Closing Date and until such time as the Debt shall be paid in full:

(a)  Borrower does not own and will not own any asset or property other than (i) the Property, and (ii) incidental personal property necessary for the ownership or operation of the Property.  Sole Member (i) has been, is, and will be organized solely for the purpose of acquiring, owning, holding, selling, transferring, exchanging, managing and operating the Collateral, entering into the applicable Loan Documents with Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, and (ii) has not owned, does not own, and will not own any asset or property other than the Collateral. Master Tenant (i) has been, is, and will be organized solely for the purpose of being party to the Master Tenant Lease and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, and (ii) has not owned, does not own, and will not own any asset or property other than its leasehold interest in the Master Tenant Lease and any other assets required to conduct its business on the Property.

(b)  Borrower has not and will not engage in any business other than the acquisition, ownership, holding, leasing, management, operation, development and improvement of the Property and Borrower has and will conduct and operate its business as presently conducted and operated.  Sole Member has not engaged and will not engage in any business other than the ownership and management of the Collateral and Master Tenant has not engaged and will not engage in any business other than being party to the Master Tenant Lease and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing.

(c)  Such Person has not and will not enter into any contract or agreement with any Affiliate of such Person, except upon terms and conditions that are intrinsically fair and substantially similar to those that would be available on an arm's-length basis with third parties other than any such party.

(d)  Except with respect to any prior mortgage loan encumbering the Property which has been repaid in full prior to the Closing Date, such Person has not incurred and will not incur any Indebtedness, secured or unsecured, direct or contingent (including guaranteeing any obligation), other than Permitted Indebtedness, the Pledge Agreement and the Pledge Agreement Guaranty.

(e)    Such Person has not made and will not make any loans or advances to any third party (including any Affiliate), and has not and shall not acquire obligations or securities of its Affiliates, except as contemplated by the Loan Documents.

(f)    Such Person has been, is and intends to remain solvent and such Person has (either directly or through Manager) paid and intends to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due to the extent of available cash flow; provided, that, in each such case, the foregoing shall not require any direct or indirect partners, members or other direct or indirect owners of such Person to make any capital contributions to such Person; provided further, that, this Subsection shall not be breached to the extent there is insufficient cash flow from the Property or such Person's access to any cash flow is being restricted or constrained by Lender or Servicer or pursuant to Legal Requirements.

(g)    Such Person has done or caused to be done and will do or cause to be done all things necessary to observe material organizational formalities and preserve its existence, and such Person has not, will not, nor will such Person permit any SPC Party to amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of such Person or such SPC Party without the prior consent of Lender in any manner that (i) violates the special purpose covenants set forth in this Section 3.1.24, or (ii) amends, modifies or otherwise changes any provision thereof that (A) by its terms cannot be modified at any time when the Loan is outstanding, (B) by its terms cannot be modified without Lender's consent, or (C) is otherwise prohibited from being amended or modified pursuant to this Agreement or the other Loan Document;

(h)    Such Person has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates. Such Person's assets have not and will not be listed as assets on the financial statement of any other Person; provided, however, that such Person's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such Person and such Affiliates and to indicate that such Person's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person (other than Sole Member with respect to Borrower and among Borrower) and (ii) such assets shall be listed on such Person's own separate balance sheet. Such Person has filed and will file its own tax returns except to the extent such Person is treated as a Disregarded Entity for tax purposes and is not required to file tax returns under applicable Legal Requirements, in which case the Person treated as owning the assets owned by such Person for federal income tax purpose has filed and will file its own tax returns.

(i)    Such Person has been and will be, and at all times has and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Person), has and shall correct any known misunderstanding regarding its status as a separate entity, has and shall conduct business in its own name, has not and shall not identify itself or any of its Affiliates as a division or part of the other and has and shall maintain and utilize separate stationery, invoices and checks bearing its own

82

name, except in each case for business conducted on behalf of such Person by Manager pursuant to the terms and provisions of the Management Agreement, so long as Manager holds itself out as an agent or representative of such Person; provided, however, the foregoing shall not preclude Borrower from identifying the Property as a "Keystone" and/or "Lubert-Adler" property for marketing purposes.

(j)      Such Person has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations (provided that the foregoing shall not require any direct or indirect partners, members or other direct or indirect owners of such Person to make any capital contributions to such Person; provided further, that, this Subsection shall not be breached to the extent there is insufficient cash flow from the Property or such Person's access to any cash flow is being restricted or constrained by Lender or Servicer or pursuant to Legal Requirements

(k)      No such Person has or will seek or effect the liquidation, division, dissolution, winding up, liquidation, consolidation or merger, in whole or in part, of such Person, and such Person has not been the product of, the subject of, or otherwise involved in, in each case, any division (whether pursuant to Section 18-217 of the Act, Section 17-220 of the Delaware Revised Uniform Limited Partnership Act or otherwise).

(l)      Except as contemplated or permitted under the Cash Management Agreement and/or the other Loan Documents, such Person has not and will not commingle the funds and other assets of such Person with those of any Affiliate or any other Person, and has and will hold all of its assets in its own name.

(m)      Except as contemplated or permitted under the Cash Management Agreement and/or the other Loan Documents, such Person has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate.

(n)      Such Person has not and will not guarantee or become obligated for the debts of any other Person (other than Sole Member with respect to Borrower and among Borrower) and has not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person (other than Sole Member with respect to Borrower and among Borrower).

(o)      Intentionally Omitted.

(p)      Such Person has not permitted and will not permit any Affiliate independent access to its bank accounts, except for customary access by the Manager in accordance with the Management Agreement.

(q)      Such Person has paid and intends pay from its own funds its own liabilities and expenses, including all Property-related expenses and the salaries of its own employees (if any) from its own funds and has maintained and intends to maintain a sufficient number of employees (if any) in light of its contemplated business operations, in each such case, to the extent of available cash flow; provided, that, in each such case, the

83

foregoing shall not require any direct or indirect partners, members or other direct or indirect owners of such Person to make any capital contributions to such Person; provided further, that, this Subsection shall not be breached to the extent there is insufficient cash flow from the Property or such Person's access to any cash flow is being restricted or constrained by Lender or Servicer or pursuant to Legal Requirements, with it being understood that nothing in this Section 3.1.24(q) shall limit the right of such Person to share overhead expenses with Affiliates in compliance with Section 3.1.24(t).

(r)      Such Person has compensated and intends to compensate each of its consultants and agents from its funds for services provided to it and has paid and intends to pay from and to the extent of its own assets all obligations of any kind incurred, in each such case, to the extent of available cash flow; provided, that, in each such case, the foregoing shall not require any direct or indirect partners, members or other direct or indirect owners of such Person to make any capital contributions to such Person; provided further, that, this Subsection shall not be breached to the extent there is insufficient cash flow from the Property or such Person's access to any cash flow is being restricted or constrained by Lender or Servicer or pursuant to Legal Requirements;

(s)      Such Person will not, without the unanimous consent of all of its directors or members (including all Independent Directors) take any Material Action.

(t)      Such Person will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including shared office space and for services performed by any employee of an Affiliate.

(u)      Such Person will not pledge its assets to secure the obligations of any other Person (other than Sole Member with respect to Borrower and among Borrower).

(v)      Such Person will have no obligation to indemnify its officers, directors, members or partners, as the case may be, unless such obligation is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(w)      Such Person does not, and will not have any of its obligations guaranteed by any Affiliate and does not and will not permit any Affiliate to hold such Affiliate's credit out as available to pay the debts of such Person or pay the debts of such Person, other than, in each such case, as contemplated by the Loan Documents.

(x)      Such Person shall not buy or hold evidence of Indebtedness issued by any other Person other than Permitted Investments made in accordance with the terms and provisions of this Agreement and the other Loan Documents.

(y)      Such Person shall not form, acquire or hold any subsidiary (whether corporate, partnership, limited liability company or other) or own any equity interest in any other entity, other than Sole Member with respect to Borrower, Bourse Leasehold Sole Member as to LAK Bourse ML MM, LLC, 400 Market Leasehold Sole Member with respect to LAK Market ML MM, LLC and Permitted Investments made in accordance with the terms and provisions of this Agreement and the other Loan Documents.

84

(z)      Intentionally omitted.

(aa)      Intentionally omitted.

(bb)      If such Person is a limited partnership or a limited liability company other than a Single Member Delaware LLC, each SPC Party shall comply in all material respects with the terms and provisions of this Section 3.1.24.  Each SPC Party shall either be (i) a Single Member Delaware LLC in accordance with the terms and provisions of clause (cc) below or (ii) a corporation (A) whose sole asset is its interest in Borrower, (B) which has not been and shall not be permitted to engage in any business or activity other than owning an interest in Borrower, (C) which has not been and shall not be permitted to incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation), and (D) which has and will at all times own at least a 0.3% direct equity ownership interest in Borrower.  Each SPC Party will at all times comply, and will cause Borrower to comply, with each of the representations, warranties, and covenants contained in this Section 3.1.24 (to the extent applicable) as if such representation, warranty or covenant was made directly by such SPC Party.  Upon the withdrawal or the disassociation of an SPC Party from Borrower, to the extent permitted pursuant to the terms and provisions of this Agreement, Borrower shall immediately appoint a new SPC Party whose articles of incorporation or organization are substantially similar to those of such SPC Party.

(cc)      In the event a Required SPE is a Single Member Delaware LLC, its limited liability company agreement (the "**LLC Agreement**") shall provide that:

(i)      upon the occurrence of any event that causes the last remaining member ("**Member**") of such Person to cease to be the member of such Person (other than (A) upon an assignment by Member of all of its limited liability company interest in such Person, and the admission of the transferee in accordance with the Loan Documents and the LLC Agreement, or (B) the resignation of Member and the admission of an additional member of such Person in accordance with the terms of the Loan Documents and the LLC Agreement), any Person acting as Independent Director of such Person, shall, without any action of any other Person and simultaneously with the Member ceasing to be the member of such Person, automatically be admitted to such Person as a member with a 0% economic interest ("**Special Member**") and shall continue the existence of such Person without dissolution or division;

(ii)      Special Member may not resign from such Person or transfer its rights as Special Member unless (A) a successor Special Member has been admitted to such Person as a Special Member in accordance with requirements of Delaware law, and (B) after giving effect to such resignation or transfer, there remains at least two (2) Independent Directors of such Person in accordance with Section 3.1.24(dd) below;

(iii)      Special Member shall automatically cease to be a member of such Person upon the admission to such Person of the first substitute member;

85

(iv)    Special Member shall be a member of such Person that has no interest in the profits, losses and capital of such Person and has no right to receive any distributions of the assets of such Person;

(v)    pursuant to the applicable provisions of the limited liability company act of the State of Delaware (as the same may be amended, modified or replaced, the "**Act**"), Special Member shall not be required to make any capital contributions to such Person and shall not receive a limited liability company interest in such Person;

(vi)    Special Member, in its capacity as Special Member, may not bind such Person;

(vii)    except as required by any mandatory provision of the Act, Special Member, in its capacity as Special Member, shall have no right to vote on, approve or otherwise consent to any action by, or matter relating to, such Person, including, without limitation, the merger, consolidation or conversion of such Person; provided, however, such prohibition shall not limit the obligations of Special Member, in its capacity as Independent Director, to vote on such matters required by the Loan Documents or the LLC Agreement;

(viii)    upon the occurrence of any event that causes the Member to cease to be a member of such Person, to the fullest extent permitted by law, the personal representative of Member shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of Member in such Person agree in writing (A) to continue such Person and (B) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such Person effective as of the occurrence of the event that terminated the continued membership of Member in such Person;

(ix)    any action initiated by or brought against Member or Special Member under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law shall not cause Member or Special Member to cease to be a member of such Person and upon the occurrence of such an event, the business of such Person shall continue without dissolution; and

(x)    each of Member and Special Member waives any right it might have to agree in writing to dissolve such Person, upon the occurrence of any action initiated by or brought against Member or Special Member under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law, or the occurrence of an event that causes Member or Special Member to cease to be a member of such Person.

In order to implement the admission to such Person of Special Member, Special Member shall execute a counterpart to the LLC Agreement.  Prior to its admission to such Person as Special Member, Special Member shall not be a member of such Person but Special Member may serve as an Independent Director of such Person.

(dd)    The organizational documents of Master Tenant, Borrower and Sole Member (to the extent such Person is a corporation or a Single Member Delaware LLC) or each SPC Party (if Borrower or Sole Member is a limited partnership or a limited liability company other than a Single Member Delaware LLC) shall provide that at all times there shall be at least two (2) duly appointed independent directors/managers of such entity (each, an "**Independent Director**") who shall (i) not have been at the time of each such individual's initial appointment, and shall not have been at any time during the preceding five (5) years, and shall not be at any time while serving as Independent Director, either (A) a shareholder (or other equity owner) of, or an officer, director, manager (other than in its capacity as Independent Director), partner, member or employee of, Master Tenant, Borrower or Sole Member or any of their respective shareholders, partners, members, subsidiaries or affiliates, (B) a customer of, or supplier to, or other Person who derives any of its purchases or revenues from its activities with, Master Tenant, Borrower, Sole Member or any of their respective shareholders, partners, members, subsidiaries or affiliates (other than as an Approved Independent Director Provider), (C) a Person who Controls or is under common Control with any such shareholder, officer, director, partner, member, employee supplier, customer or other Person (other than as an Approved Independent Director Provider), or (D) a member of the immediate family of any such shareholder, officer, director, partner, member, employee, supplier, customer or other Person, (ii) be employed by, in good standing with and engaged by Borrower or Sole Member in connection with, in each case, an Approved Independent Director Provider, and (iii) have had at least three (3) years' prior experience as an Independent Director employed and in good standing with an Approved Independent Director Provider.

(ee)    The organizational documents of Master Tenant, Borrower and Sole Member (to the extent such Person is a corporation or a Single Member Delaware LLC) or each SPC Party (if Borrower is a limited partnership or a limited liability company other than a Single Member Delaware LLC) shall further provide that:

(i)    the board of directors or managers of such Person, and the members or partners of such entities (the "**Constituent Members**") shall not take any Material Action without the unanimous vote of the entire board of directors or managers, as applicable, and the Constituent Members including the two (2) Independent Directors appointed in accordance with the terms and provisions of Section 3.1.24(dd);

(ii)    no Independent Director of such Person may be removed or replaced without Cause and any resignation, removal or replacement of an Independent Director shall not be effective without two (2) Business Days' prior written notice to Lender accompanied by evidence that a replacement Independent Director satisfying the applicable terms and conditions hereof and of the applicable organizational documents shall have replaced such outgoing Independent Director;

(iii)    to the fullest extent permitted by applicable Legal Requirements, including Section 18-1101(c) of the Act, and notwithstanding any duty otherwise existing at law or in equity, each Independent Director shall consider only the interests of the Constituent Members and such Person (including such

87

Person's creditors) in acting or otherwise voting on a Material Action or any other matters provided for herein and the organizational documents of such Person (which such fiduciary duties to the Constituent Members and such Person (including such Person's creditors), in each case, shall be deemed to apply solely to the extent of their respective economic interests in such Person) exclusive of (x) all other interests (including, without limitation, all other interests of the Constituent Members), (y) the interests of other affiliates of the Constituent Members and such Person, and (z) the interests of any group of affiliates of which the Constituent Members or such Person is a part;

(iv)    other than as provided in clause (iii) above, the Independent Directors shall not have any fiduciary duties to any Constituent Members, any directors of a Required SPE or any other Person;

(v)    the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing under applicable Legal Requirements; and

(vi)    to the fullest extent permitted by applicable Legal Requirements, including Section 18-1101(e) of the Act, an Independent Director shall not be liable to a Required SPE or any other Person for breach of contract or breach of duties (including fiduciary duties), unless such Independent Director acted in bad faith or engaged in willful misconduct.

3.1.25 Tax Filings.  Borrower, or if Borrower is a Disregarded Entity, the Person treated as owning the assets owned by Borrower for federal income tax purpose, has filed, or caused to be filed, all U.S. federal, state, local and non-U.S. Tax returns, reports and other Tax-related documents required to be filed by it and has paid all Taxes payable by it that have become due, other than those not yet delinquent.  Borrower has established on its books such charges, accruals and reserves in respect of Taxes for all fiscal periods in accordance with an Acceptable Accounting Method.  Borrower believes that its Tax returns (if any) properly reflect the income and Taxes of Borrower for the periods covered thereby, subject only to reasonable adjustments required by the IRS or other applicable Tax authority upon audit.  Borrower has at all times been properly treated for U.S. federal income Tax purposes as a Disregarded Entity.

3.1.26 Solvency.  Borrower (a) has not entered into the transaction or any Loan Document with the actual intent to hinder, delay, or defraud any creditor and (b) received reasonably equivalent value in exchange for the Obligations.  Giving effect to the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured.  Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted.  Borrower does not intend to, and does not believe that it will, incur Indebtedness and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such Indebtedness and liabilities as they mature (taking into account the timing and

amounts of cash to be received by Borrower and the amounts to be payable on or in respect of Obligations of Borrower).  No petition in bankruptcy has been filed against Borrower or any Constituent Member of Borrower, and neither Borrower nor any Constituent Member of Borrower has ever made an assignment for the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors.

3.1.27  <u>Federal Reserve Regulations</u>.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

3.1.28  <u>Organizational Chart; Control</u>.

(a)     The organizational chart attached as **Schedule VII** is true, complete and correct on and as of the Closing Date.  No Person other than those Persons shown on **Schedule VII** has, directly or indirectly, any ownership interest in Borrower, Sole Member or Guarantor or right of Control over Borrower, Sole Member or Guarantor, in each case, in excess of (x) in the case of U.S. Persons, twenty percent (20%) of the direct or indirect interests in Borrower, and (y) in the case of non-U.S. Persons, ten percent (10%) of the direct or indirect interests in Borrower.

(b)     The Ownership and Control Condition is satisfied.

3.1.29  <u>Bank Holding Company</u>.  Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

3.1.30  <u>Investment Company Act</u>.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

3.1.31  <u>No Bankruptcy Filing</u>.  Borrower is not contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of its assets or property, and Borrower does not have any Knowledge of any Person contemplating the filing of any such petition against it.

3.1.32  <u>Full and Accurate Disclosure</u>.  To Borrower's Knowledge, no statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a material fact and Borrower has no knowledge that any such statement omits to state any material fact necessary to make the statements contained herein or therein not misleading.  To Borrower's Knowledge, there is no fact or circumstance presently known to

89

Borrower which has not been disclosed to Lender which is reasonably likely to have a Material Adverse Effect.

3.1.33 <u>Foreign Person</u>. Neither Borrower nor Guarantor is a "foreign person" within the meaning of Section 1445 or 7701 of the Code. In addition, if Borrower is a Disregarded Entity, the Person treated as owning the assets owned by Borrower for federal income tax purposes is not a "foreign person" within the meaning of Section 1445 or 7701 of the Code.

3.1.34 <u>No Change in Facts or Circumstances; Disclosure.</u> The information submitted by Borrower to Lender (as opposed to information submitted by Lender to Borrower) and all financial statements, reports, certificates and other documents submitted by Borrower to Lender (as opposed to submitted by Lender to Borrower) in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document (other than, in any such case, with respect to the Property), are accurate, complete and correct in all material respects. To Borrower's Knowledge, there has been no adverse change in any condition, fact, circumstance or event that would make the financial statements, reports, certificates or other documents submitted by Borrower in connection with the Loan (as opposed to submitted by Lender to Borrower) inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or would be reasonably likely to materially and adversely affect the use, operation or value of the Property or the business operations or the financial condition of Borrower, the Property or the Collateral.

3.1.35 <u>Intentionally Omitted.</u>

3.1.36 <u>Intentionally Omitted.</u>

3.1.37 <u>Perfection of Accounts</u>.

(a)    This Agreement, together with the other Loan Documents, creates a valid and continuing security interest (as defined in the Uniform Commercial Code) in the Clearing Account and the Accounts in favor of Lender, which security interest is prior to all other Liens, other than Permitted Encumbrances, and is enforceable as such against creditors of and purchasers from Borrower. Other than in connection with the Loan Documents and except for Permitted Encumbrances, Borrower has not sold or otherwise conveyed the Accounts; and

(b)    The Clearing Account and the Deposit Account constitute "deposit accounts" or "securities accounts" within the meaning of the Uniform Commercial Code, as set forth in the Clearing Account Agreement and the Cash Management Agreement, as applicable.

3.1.38 <u>Material Agreements</u>. To Borrower's Knowledge, the list of Service Contracts and License Agreements (both as defined in the Purchase Agreement), including, without limitation, all amendments, modifications, and supplements thereto, to be delivered to Lender pursuant to this Agreement will be correct and complete in all material respects. Except as set forth on **Schedule IV**, Borrower has not sent, and to Borrower's Knowledge, Borrower has not received, any written notices of default under any Service Contracts or License Agreements (both as defined in the Purchase Agreement) that remain uncured as of the Closing Date, and to

90

Borrower's Knowledge, there are no existing defaults under any of the Service Contracts or License Agreements (both as defined in the Purchase Agreement) on the part of any third party or Borrower thereunder.  To Borrower's Knowledge, Borrower has made available to Lender all copies of the Service Contracts and License Agreements (both as defined in the Purchase Agreement and including any and all amendments and guarantees) affecting the Property or any portion thereof that were provided to Borrower by Lender, and, to Borrower's Knowledge, all such Service Contracts and License Agreements (both as defined in the Purchase Agreement) are in full force and effect.

3.1.39  <u>Illegal Activity/Forfeiture</u>.

(a)    No portion of the Property is being or will be purchased, improved, equipped or furnished by Borrower with proceeds of any illegal activity.

(b)    There has not been and shall not be committed by Borrower or any of its Affiliates or, from and after the closing of the Loan, Borrower shall not knowingly permit any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording the federal government or any state or local government the right of forfeiture as against the Property or any part thereof or any monies paid in performance of the Obligations.  Borrower hereby covenants and agrees not to commit, or knowingly permit or suffer to exist any act or omission affording such right of forfeiture.

3.1.40  <u>Anti-Corruption; Anti-Money Laundering</u>.

(a)    Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan, is aware of and familiar with the provisions of the U.S. Foreign Corrupt Practices Act, as amended, and its purposes, and any other anti-corruption law applicable in a jurisdiction in which each of them may have conducted, or will conduct, business (hereinafter "**Anti-Corruption Laws**"), and has not, directly or indirectly, violated any Anti-Corruption Laws.  Without limitation of the generality of the foregoing, none of Borrower, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan has made or will make, directly or indirectly, any payment, loan or gift (or any offer, promise or authorization of any such payment, loan or gift), of any money or anything of value to or for the use of any Government Official under circumstances in which any of them knows or has reason to know that all or any portion of such money or thing of value has been or will be offered, given or promised, directly or indirectly, to any Government Official, for the purpose of inducing the Government Official to do any act or make any decision in his or its official capacity (including a decision to fail to perform his or its official function) or use his or its influence with a government or instrumentality thereof in order to affect any act or decision of such government or instrumentality or to assist either party in obtaining or retaining any business.

(b)      Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan, is not any of the following (each, a "**Restricted Person**"):  (i) a Person with whom dealings are prohibited or restricted under any Sanctions; (ii) a Person that is named as a "specially designated national and blocked person" on the most current list published by OFAC at its official website or any replacement website or other replacement official publication of such list or similarly named by any similar foreign governmental authority; (iii) a Person that is owned 50% or more by any Person described in clauses (i) or (ii); (iv) any other Person with which any Lender is prohibited from dealing under any Sanctions applicable to such Lender; or (v) a Person that derives more than 10% of its annual revenue from investments in or transactions with any Person described in clauses (i), (ii), (iii) or (iv) above.  None of Borrower, Sole Member, Guarantor or their officers, directors,  employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan (x) has, engaged in any activities (i) in breach of Sanctions, or (ii), directly or indirectly with or for the benefit of Restricted Persons or (iii) will use any of the proceeds from the Loan, directly or indirectly, to finance or facilitate any transaction with, investment in, or any dealing for the benefit of a Restricted Person or in any other manner, in each case, that results in a violation by any party to this Agreement of AML Laws, Sanctions, and Anti-Corruption Laws.

(c)      Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan have adopted and will continue to implement policies, procedures and internal controls for compliance with U.S. and non-U.S. anti-money laundering laws, including the Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001 (collectively, "**BSA/PATRIOT Act**"), and their implementing regulations (collectively, "**AML Laws**").

(d)      Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan have not, are not and, to the extent the relationship is ongoing, will not engage in any activities that may contravene federal, state and international regulations, including but not limited to AML Laws, Sanctions and Anti-Corruption Laws.

(e)      Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan are not foreign financial institutions or persons located in a foreign jurisdiction that has been designated by the U.S. Department of the Treasury as subject to any special measures imposed on such financial institutions and jurisdictions, pursuant to Section 311 special measures of the BSA/PATRIOT Act.

(f)      Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan are not prohibited foreign shell

banks, or being used to provide services to a foreign shell bank, as that term is defined for purposes of Sections 313/319 of the BSA/PATRIOT Act.

(g)    None of Borrower, Sole Member, Guarantor or their officers, directors,  employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan is a Senior Foreign Political Figure or a Politically Exposed Person (collectively, "**SFPF/PEP**"), or an immediate family member or close associate of a SFPF/PEP.

(h)    There has been no governmental inquiry or investigation or actual or threatened lawsuit by any person, or any internal investigation, relating to any possible violation of AML Laws, Sanctions and Anti-Corruption Laws by Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan.

(i)    The Borrower maintains books, records and accounts which, in reasonable detail, accurately and fairly reflect, in all material respects, all transactions, assets and liabilities and maintains a system of internal accounting controls that provide reasonable assurance that:  (i) its transactions are executed in accordance with management's authorization, (ii) its transactions are recorded as necessary to permit the preparation of financial statements in accordance with an Acceptable Accounting Method and to maintain accountability for its assets; (iii) access to its assets is permitted only in accordance with management's authorization; and (iv) it does not maintain any off-the-books accounts or more than one set of books, records or accounts.

Borrower will promptly notify Lender should there be any changes to the information set forth in the foregoing representations.

3.1.41 <u>Management Agreements</u>. Other than the Management Agreement, Borrower has not entered into any management agreement.

(b)    (i) The Management Agreement is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (ii) Borrower has not delivered or received any written notice of any uncured default under the Management Agreement, and, to Borrower's Knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a monetary default or material non-monetary default under the Management Agreement, (iii) to Borrower's Knowledge, all payments and other sums due and payable under the Management Agreement have been paid in full, and (iv) no party to the Management Agreement has commenced any action to which Borrower is a party, and Borrower has neither given nor received any notice, for the purpose of terminating the Management Agreement.

(c)    Neither the execution and delivery of the Loan Documents nor Borrower's performance thereunder will materially adversely affect the rights of Borrower under the Management Agreement or require the consent or approval of any Person

thereunder (other than consents and approvals which have been obtained and written copies of which have been delivered to Lender on or prior to the Closing Date).

(d)     Borrower has delivered true, correct and complete copies of the Management Agreement (including all amendments and supplements thereto) to Lender.

3.1.42  Intentionally Omitted.

3.1.43  Intentionally Omitted.

3.1.44  Trade Name; Other Intellectual Property.  Borrower owns the trademarks, trademark rights, patents, patent rights, trade names, trade name rights, service marks, service mark rights, websites, domain names and copyrights described on **Schedule VIII** (collectively, the "**Intellectual Property**").

3.1.45  Leasing Agreement.

(a)     Other than the Leasing Agreement, Borrower has not entered into any leasing agreement.

(b)     (i) The Leasing Agreement is in full force and effect and has not been amended, restated, replaced or otherwise modified (except, in each case, as expressly set forth herein), (ii) Borrower has not delivered or received any written notice of any uncured default under the Leasing Agreement, and, to Borrower's Knowledge, no event has occurred which, but for the passage of time, the giving of notice, or both, would constitute a monetary default or material non-monetary default under the Leasing Agreement, (iii) to Borrower's Knowledge, all payments and other sums due and payable under the Leasing Agreement have been paid in full, and (iv) no party to the Leasing Agreement has commenced any action to which Borrower is a party, and Borrower has neither given nor received any notice, for the purpose of terminating the Leasing Agreement.

(c)     Neither the execution and delivery of the Loan Documents nor Borrower's performance thereunder will materially adversely affect the rights of Borrower under the Leasing Agreement or require the consent or approval of any Person thereunder (other than consents and approvals which have been obtained and written copies of which have been delivered to Lender on or prior to the Closing Date).

(d)     Borrower has delivered true, correct and complete copies of the Leasing Agreement (including all amendments and supplements thereto) to Lender.

3.1.46  No Other Debt.  Borrower has not borrowed or received debt financing other than the Debt, and there is no other Indebtedness to which Borrower is a party or by which Borrower or Sole Member has bound Borrower, Sole Member, the Property or the Collateral or any excess cash flow or any residual interest in Borrower or the Property, whether secured or unsecured, in each case, other than Permitted Indebtedness and Permitted Transfers.

94

3.1.47 <u>Ground Lease</u>. Borrower hereby represents and warrants to Lender the following with respect to each Ground Lease:

(a) <u>Recording; Modification</u>. A memorandum of the Ground Lease has been duly recorded. The Ground Lease permits the interest of Borrower (as lessor and lessee) to be encumbered by a mortgage. There have not been amendments or modifications to the terms of the Ground Lease since its recordation, with the exception of written instruments which have been recorded. The Ground Lease may not be cancelled, terminated, surrendered or amended and Borrower's rights under the Ground Lease may not be waived without the prior written consent of Lender.

(b) <u>No Liens</u>. Except for the Permitted Encumbrances, Borrower's interest in the Ground Lease is not subject to any Liens or encumbrances superior to, or of equal priority with, the Mortgage other than the ground lessor's related fee interest. Such Ground Lease is, and shall remain, prior to any mortgage or Lien upon the ground lessor's related fee interest and such ground lessor has not entered into any agreement to subordinate the Ground Lease to any future mortgages or Liens upon the ground lessor's related fee interest.

(c) <u>Default</u>. The Ground Lease is in full force and effect and no default has occurred under the Ground Lease and there is no existing condition which, but for the passage of time and/or the giving of notice, could result in a default under the terms of the Ground Lease. All rents, additional rents and other sums due and payable under the Ground Lease have been paid in full. Borrower has not commenced any action or given or received any notice for the purpose of terminating the Ground Lease.

3.1.48 <u>Historic Tax Credit Documents</u>. As of the date hereof, no agreements have been entered into by and between any Borrower Party or HTC Investor with respect to the Property's historic tax credits.

3.1.49 <u>Labor Relations.</u> Borrower has no employees (and Borrower has never had any employees).

Section 3.2    <u>Survival of Representations</u>.

The representations and warranties set forth in <u>Section 3.1</u> are made as of the Closing Date (or as of another date specifically set forth herein) and shall survive for so long as any amount remains payable to Lender under this Agreement or any of the other Loan Documents. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Lender notwithstanding any investigation heretofore or hereafter made by Lender or on their behalf.

**ARTICLE IV**
**BORROWER COVENANTS**

Section 4.1    <u>Borrower Affirmative Covenants</u>. From and after the Closing Date until the repayment in full of the Debt (excluding any indemnification or other Obligation that is expressly

95

stated in this Agreement or any other Loan Document to survive the payment of the Debt in full), Borrower hereby covenants and agrees with Lender that:

4.1.1    Existence; Compliance with Legal Requirements.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits, trade names, and franchises, and comply, in all material respects, with all applicable material Legal Requirements applicable to it, the Property and the Collateral, in each case, as and to the extent required for the ownership, maintenance, management and operation of the Property.  There shall not be committed by Borrower, and Borrower shall not knowingly permit any other Person in occupancy of or involved with the operation or use of the Property to commit any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of the Obligations.  Borrower hereby covenants and agrees not to commit or knowingly permit or suffer to exist any act or omission affording such right of forfeiture.  After prior written notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (a) no Event of Default has occurred and is continuing; (b) such proceeding shall be conducted in accordance with all applicable Legal Requirements; (c) none of the Collateral, the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement (in which event any security being held by Lender pursuant to clause (f) below shall be promptly returned to Borrower and Borrower shall use same to comply with, or cure, any such violation); (e) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; and (f) Borrower shall furnish such security as may be reasonably required in the proceeding, or, if no security is required to be furnished in such proceeding, as may be reasonably requested by Lender, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith.  Lender may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the reasonable good faith judgment of Lender, the validity, applicability or violation of such Legal Requirement is finally established, the Collateral or the Property (or any part thereof or interest therein) could be in imminent danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien, and, once the violation has been resolved, Lender will, so long as no Event of Default has occurred and is continuing, return to Borrower any unapplied portion of the security. From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.1 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.2    Property Taxes and Other Charges.

(a)    Borrower shall pay all Property Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable; provided, however, Borrower's obligation to directly pay Property Taxes shall be suspended for so long as Borrower complies with Section 6.2 hereof.  Upon Lender's request, Borrower shall furnish to Lender receipts for the payment

96

of the Property Taxes and the Other Charges prior to the date the same shall become delinquent; provided, however, that Borrower is not required to furnish such receipts for payment of Property Taxes in the event that such Property Taxes have been paid by Lender pursuant to Section 6.2 hereof.  Borrower shall promptly discharge (or cause to be promptly discharged) any Lien or charge against the Property that is not a Permitted Encumbrance, and shall promptly pay for (or cause to be promptly paid) all utility services provided to the Property.  After prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, conducted in good faith and with due diligence, the amount or validity of any Property Taxes or Other Charges, provided that (i) no Event of Default has occurred and is continuing; (ii) such proceeding shall be permitted under and be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, canceled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Property Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith (in which event any security being held by Lender pursuant to clause (vi) below shall be promptly returned to Borrower and Borrower shall use same to pay such Property Taxes or Other Charges); (v) such proceeding shall suspend the collection of Property Taxes or Other Charges from the Property (unless applicable law requires the payment thereof); and (vi) Borrower shall furnish such security as may be required in the proceeding, or, if no security is required to be furnished in such proceeding and such taxes have not been paid, as may be reasonably requested by Lender, in an amount not to exceed one hundred ten percent (110%) of the contested amount, to ensure the payment of any such Property Taxes or Other Charges, together with all interest and penalties thereon.  Lender may pay over any such cash or other security held by Lender to the claimant entitled thereto at any time when, in the reasonable good faith judgment of Lender, the entitlement of such claimant is established, and, once the proceeding has been resolved, Lender will, so long as no Event of Default has occurred and is continuing, return to Borrower any unapplied portion of the security.

(b)    Borrower, or if Borrower is a Disregarded Entity, the Person treated as owning the assets owned by Borrower for federal income Tax purpose, as applicable, shall timely file (taking into account any effective extensions for filing) all Tax returns, U.S. and non-U.S., required to be filed by Borrower or such Person.  Borrower or such Person shall timely pay, as the same shall become due and payable, all Taxes levied or imposed upon it or its properties, income or assets, except those that are being contested in good faith by appropriate proceedings, diligently conducted and for which adequate reserves have been established on the books of Borrower in accordance with an Acceptable Accounting Method.  Borrower shall, throughout the duration of any Obligation, remain a Disregarded Entity.

(c)    Borrower shall at all times remain and continue to be a U.S. Person, and if Borrower is a Disregarded Entity, then the ultimate owner of Borrower shall remain a U.S. Person.

(d)    From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.2 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

97

(e)      Notwithstanding anything in this Agreement to the contrary, if after the Closing Date, Borrower successfully obtains a reassessment of the Property Taxes with respect to the Property that would result in the applicable Governmental Authority providing a credit against any transfer taxes paid by Borrower on the Closing Date to the extent such transfer taxes were determined solely based upon on the assessed value of the Property (i.e., the transfer tax paid on the Ground Lease, and not, for avoidance of doubt, based on the deed conveyed pursuant to the Purchase Agreement), then Borrower shall be entitled to retain one hundred percent (100%) of all such credits and distribute same to its direct or indirect owners.

4.1.3    Litigation.  Borrower shall give prompt notice to Lender of any litigation or governmental proceedings pending or threatened in writing against the Property, the Collateral or any Borrower Party of which it is aware and which would be reasonably likely to materially adversely affect such Person's ability to perform its Obligations hereunder or under the other Loan Documents.

4.1.4    Access to Property.  Borrower shall permit Lender, Construction Consultant and their respective representatives, upon forty eight (48) hours prior notice to enter upon the Property during normal business hours and inspect the Improvements and to examine any applicable plans and specifications, contracts, Governmental Approvals or other documentation relating to the Property or the construction of any Capital Improvements requested by Lender or the Construction Consultant, subject to the rights of Tenants and provided that each such inspection does not unreasonably interfere with the construction of the Hotel Conversion, the Office CapEx Projects, Tenant Improvements or the operation of the Property, such agents, representatives and employees of Lender comply with all safety and other reasonable rules and requirements instituted by (a) Borrower or Construction Manager with respect to the Hotel Conversion, the Office CapEx Projects, the Tenant Improvements and/or the Property, as the case may be, or (b) Tenants at the Property.  Borrower shall reasonably cooperate, and use commercially reasonable efforts to cause Manager and the contractors to reasonably cooperate with Lender and Construction Consultant to enable each Person to perform its functions hereunder. From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.4 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.5    Further Assurances; Supplemental Mortgage Affidavits.  Borrower shall, at Borrower's sole cost and expense:

(a)      execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the collateral at any time securing or intended to secure the Obligations, as Lender may reasonably require;

(b)      cure any defects in the execution and delivery by Borrower Party of the Loan Documents and execute and deliver to Lender such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or reasonably requested by Lender, to evidence, preserve and/or protect the Property, Collateral and any other collateral at any time securing or intended to secure the Obligations of Borrower under the Loan Documents, as Lender may reasonably require including, without

98

limitation, the execution and delivery of all such writings necessary to transfer any licenses with respect to the Property into the name of Lender or its designee after the occurrence, and during the continuance, of an Event of Default; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Lender shall reasonably require from time to time.

4.1.6    <u>Financial Reporting</u>.

(a)    Borrower shall keep and maintain or will cause to be kept and maintained proper and accurate books and records, in accordance with an Acceptable Accounting Method, reflecting the financial affairs of Borrower.  Lender shall have the right from time to time during normal business hours upon reasonable prior notice to Borrower to examine such books and records at the office of Borrower or other Person maintaining such books and records and to make such copies or extracts thereof as Lender shall desire.  After the occurrence and during the continuance of an Event of Default, Borrower shall pay any reasonable costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall reasonably determine to be necessary in the protection of Lender's interest.  Upon Lender's reasonable request, Borrower shall furnish to Lender such other information reasonably necessary and sufficient to fairly represent the financial condition of Borrower and the Property in all material respects.

(b)    Borrower shall furnish Lender annually, within ninety (90) days following the end of each calendar year, a complete copy of Borrower's and Guarantor's annual financial statements prepared (but not audited) by an independent accountant on behalf of Borrower or Individual Guarantor, and, in each case, prepared in accordance with an Acceptable Accounting Method, including statements of income and expense and cash flow for Borrower and the Property and a balance sheet for Borrower.  Borrower's annual financial statements shall be accompanied by an Officer's Certificate executed by a duly authorized financial officer of Borrower stating that such annual financial statement presents fairly the financial condition and the results of operations of Borrower and the Property in all material respects.

(c)    Borrower shall furnish Lender quarterly, within thirty (30) days following the end of each calendar quarter, each of the following items:

(i)    a complete copy of Borrower's quarterly financial statements (including monthly detail) prepared in accordance with an Acceptable Accounting Method, except for the exclusion of straight-line adjustments to revenue for Rent paid under any Leases, covering the Property, including statements of income and expense, a balance sheet for Borrower, a schedule of accounts payable and a schedule of accounts receivable.  Borrower's quarterly financial statements shall be accompanied by an Officer's Certificate executed by a duly authorized financial officer of Borrower stating that such quarterly financial

99

statement presents fairly the financial condition and the results of operations of Borrower and the Property in all material respects.

(ii)    Borrower's calculation of the Debt Yield and the Debt Service Coverage Ratio as of the applicable Calculation Date during such quarter;

(iii)    quarterly and year-to-date comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Lender;

(iv)    a quarterly report of any capitalized expenditures incurred for the applicable reporting period;

(v)    a leasing status report for the Property; and

(vi)    within ten (10) days of Lender's request, such other information concerning the Property or financial condition of Borrower as Lender shall reasonably request.

(d)    Borrower shall furnish Lender on or before the thirtieth (30th) day after the end of each calendar month the following items:

(i)    a current balance sheet of Borrower;

(ii)    monthly and year-to-date comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted and actual amounts for such periods, all in form satisfactory to Lender; and

(iii)    a Rent Roll for the subject month and quarter containing the names of all Tenants at the Property, the terms and expiration date of their respective Leases, the space occupied, the rents payable and the securities deposited thereunder, annualized expense reimbursement income detail paid by each Tenant, together with the name of any lease guarantor thereof.

(e)    Intentionally Omitted.

(f)    For the partial year period commencing on the Closing Date, and for each Fiscal Year thereafter, Borrower shall submit to Lender an Annual Budget not later than thirty (30) days prior to the commencement of such period or Fiscal Year in form reasonably satisfactory to Lender.  Each Annual Budget shall be subject to Lender's approval, such approval not to be unreasonably withheld, conditioned or delayed (each such Annual Budget, an "**Approved Annual Budget**").  In the event that Lender objects to a proposed Annual Budget submitted by Borrower which requires the approval of Lender hereunder, Lender shall advise Borrower of such objections within fifteen (15) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise such Annual Budget and resubmit the same

100

to Lender.  Lender shall advise Borrower of any objections to such revised Annual Budget within ten (10) days after receipt thereof (and deliver to Borrower a reasonably detailed description of such objections) and Borrower shall promptly revise the same in accordance with the process described in this clause (f) until Lender approves the Annual Budget. Until such time that Lender approves a proposed Annual Budget that requires the approval of Lender hereunder, the most recently Approved Annual Budget shall apply; provided that, such Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges.  The initial Approved Annual Budget is attached hereto as **Schedule IX**.

(g)    In the event that Borrower must incur an extraordinary Operating Expense or Capital Expenditure not set forth in the Approved Annual Budget (each an "**Extraordinary Expense**"), then Borrower shall promptly deliver to Lender a reasonably detailed explanation of such proposed Extraordinary Expense for Lender's approval, such approval not to be unreasonably withheld, conditioned or delayed; it being agreed that items of operating expenses actually incurred by Borrower and necessary for Borrower to discharge building code violations, or protect the life, health and safety of Persons at the Property or prevent imminent physical damage to the Property shall not require Lender's prior consent and are hereby deemed approved Extraordinary Expenses.

(h)    Intentionally Omitted.

(i)    Borrower shall furnish to Lender, within ten (10) Business Days after request (or as soon thereafter as may be reasonably possible), such further detailed information with respect to the operation of the Property and the financial affairs of Borrower as may be reasonably requested by Lender.

(j)    Borrower shall furnish to Lender, within ten (10) Business Days after Lender's request (or as soon thereafter as may be reasonably possible), financial and sales information from any Tenant designated by Lender (to the extent such financial and sales information is required to be provided under the applicable Lease, the same is received by Borrower after request therefore, and Borrower is not restricted under the applicable Lease from furnishing same).

(k)    Any reports, statements or other information required to be delivered under this Agreement shall be delivered in electronic form and prepared using Excel®.  Borrower agrees that Lender may disclose information regarding the Property and Borrower that is provided to Lender pursuant to this Section 4.1.6 in connection with any Secondary Market Transaction to such parties requesting such information in connection with such Secondary Market Transaction, so long as all such information is delivered in accordance with the provisions of Article IX hereof.

(l)    If Borrower fails to provide to Lender or its designee any of the financial statements, certificates, reports or information (the "**Required Records**") required by this Section 4.1.6 within the applicable time periods set forth in this Section 4.1.6, Lender shall have the option, upon fifteen (15) days' notice to Borrower, to gain access to Borrower's books and records and prepare or have prepared at Borrower's

expense, any Required Records not delivered by Borrower.  In addition, it shall be an Event of Default if any of the following shall occur:  (i) any failure of Borrower to provide to Lender any of the Required Records within the applicable time periods set forth in this Section 4.1.6, if such failure continues for fifteen (15) days after written notice thereof, or (ii) in the event of the failure of Borrower to permit Lender or its representatives to inspect said books, records and accounts upon request of Lender as required by this Section 4.1.6.

4.1.7    Title to the Property.  Borrower will warrant and defend (a) Borrower's title to the Property and every part thereof, subject only to Liens expressly permitted hereunder (including Permitted Encumbrances), (b) the validity and priority of the Lien of the Mortgage and the Assignment of Leases on the Property, subject only to Liens expressly permitted hereunder (including Permitted Encumbrances), (c) title to the Collateral and every part thereof, and (d) the validity and priority of Lender's security interest in the Collateral, subject only to the Liens and security interests created by the Loan Documents, in each case against the claims of all Persons whomsoever.  Borrower shall reimburse Lender for any losses, costs, damages or reasonable and documented out-of-pocket expenses (including reasonable attorneys' fees and court costs of retained firms (excluding in-house counsel)), in each case, actually incurred by Lender if an interest in the Property or the Collateral, other than as permitted hereunder, is claimed by another Person. From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.7 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.8    Estoppel Statements.

(a)    After request by Lender, Borrower shall within ten (10) Business Days furnish Lender with a statement, duly acknowledged and certified, stating (i) the unpaid principal amount of the Note, (ii) the Interest Rate of the Note, (iii) the date installments of interest and/or principal were last paid, (iv) any offsets or defenses to the payment of the Debt, if any, and (v) that this Agreement and the other Loan Documents have not been modified or if modified, giving particulars of such modification, provided, that, Borrower shall not be required to deliver such statement more than one time in any twelve (12) month period (other than (y) during the continuance of an Event of Default or (z) in connection with a Secondary Market Transaction).

(b)    Borrower shall use commercially reasonable efforts to obtain and deliver to Lender, upon request, an estoppel certificate from each Tenant under any Lease; provided that such certificate may be in the form required under such Lease; provided, further, that Borrower shall not be required to request or deliver such certificates more frequently than one time in any twelve (12)-month period (other than (y) during the continuance of an Event of Default or (z) in connection with a Secondary Market Transaction).

(c)    Borrower shall use commercially reasonable efforts to obtain and deliver to Lender, upon request, an estoppel certificate from each party to the Ground Lease; provided that such certificate may be in the form required under such Lease; provided, further, that Borrower shall not be required to request or deliver such certificates more frequently than one time in any twelve (12)-month period (other than (y) during the

102

continuance of an Event of Default or (z) in connection with a Secondary Market Transaction).

4.1.9    Leases.

(a)    Generally.  Subject to the terms of Section 4.1.9(b), Borrower may not enter into, amend, modify, terminate or grant a waiver of any provision or right of Borrower under, or enter into or permit or suffer any assignment or sublease of, any Lease for any portion of the Property, without Lender's prior written consent, which consent shall not unreasonably withheld.  Subject to the terms of Section 4.1.9(b), all proposed Leases and renewals of Leases shall be arm's-length transactions with bona fide, independent third-party Tenants and shall be leased based on the Leasing Guidelines and in all events at not less than rental rates and terms comparable to existing local market rates.  Within ten (10) days after the execution of a Lease or any renewals, amendments or modification of a Lease, Borrower shall deliver to Lender a copy thereof, together with Borrower's certification that such Lease (or such renewal, amendment or modification) was entered into in accordance with the terms of this Agreement.

(b)    Approvals.

(i)    Notwithstanding anything to the contrary in Section 4.1.9(a) above, any Lease and any renewals, amendments or modification of a Lease (provided such Lease or Lease renewal, amendment or modification is not a Major Lease, or a renewal, amendment or modification to a Major Lease), that meets the following requirements may be entered into by Borrower without Lender's prior consent:  (A) provides for economic terms, including rental rates and net effective rental rates that satisfy the Leasing Guidelines (it being expressly agreed and understood that a Lease that exceeds the Leasing Cost Threshold shall not comply with the Leasing Guidelines and shall require Lender's prior approval pursuant to this Section 4.1.9(b)), (B) with respect to non-residential leases (or proposed non-residential leases) unless a subordination, non-disturbance and attornment agreement is delivered pursuant to this Section 4.1.9, provides that it is subordinate to the Mortgage and the Assignment of Leases and that the Tenant thereunder will attorn to Lender and any purchaser at a foreclosure sale, (C) is with Tenants that are creditworthy, and (D) is written substantially in accordance with the applicable standard form of Lease which shall have been approved by Lender (subject to any commercially reasonable changes made in the course of negotiations with the applicable Tenant).  All other Leases (including Major Leases) and all renewals, amendments and modifications thereof executed after the Closing Date shall be subject to Lender's prior written approval, such approval not to be unreasonably withheld, conditioned or delayed.

(ii)    Borrower shall not permit or consent to any assignment or sublease of any Major Lease without Lender's prior written approval (other than assignments or subleases expressly permitted under any Major Lease pursuant to a unilateral right of the Tenant thereunder not requiring the consent of Borrower). Lender, at Borrower's sole cost and expense, shall execute and deliver its standard

form of subordination, non-disturbance and attornment agreement to Tenants under any future Lease entered into in accordance with the terms hereof, with such commercially reasonable changes as may be requested by such Tenants and which are in form and substance reasonably acceptable to Lender.

(iii)    Borrower shall have the right, without the consent or approval of Lender, to terminate or accept a surrender of any Lease that is not a Major Lease so long as such termination or surrender is (A) by reason of a tenant default, (B) in a commercially reasonable manner to preserve and protect the Property, or (C) that is set forth on Schedule XV attached hereto to the extent labeled "Termination" under the Strategy column; provided, the foregoing shall not prevent a Tenant from exercising a unilateral termination right under its Lease.

(c)    Covenants.  Borrower (i) shall observe and perform the material obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the material terms, covenants and conditions contained in the Leases upon the part of the Tenants thereunder to be observed or performed in a commercially reasonable manner; provided, however, Borrower shall not terminate or accept a surrender of a Lease without Lender's prior approval (such approval not to be unreasonably withheld, conditioned or delayed) (except as otherwise set forth in Section 4.1.9(b)(iii) above); (iii) shall not collect any of the Rents more than one month in advance (other than security deposits or payments of additional rent or operating expenses to the extent the same are paid less frequently than monthly under the Leases); and (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents).  Upon request, Borrower shall furnish Lender with executed copies of all Leases.  Borrower shall promptly send copies to Lender of all written notices of material default which Borrower shall send or receive under the Leases.

(d)    Security Deposits.  All security deposits of Tenants, whether held in cash or any other form, shall be held in compliance with all applicable Legal Requirements, and shall not be utilized or applied by Borrower except pursuant to the terms of the applicable Lease in connection with a Lease default.  During the continuance of an Event of Default, Borrower shall, upon Lender's request, if permitted by applicable Legal Requirements, cause all such security deposits (and any interest theretofore earned thereon) to be transferred into the Deposit Account or such other account as may be designated by Lender, which amounts shall be held and disbursed subject to the terms of the Leases, this Agreement and applicable Legal Requirements.  Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under any applicable Legal Requirements (i) shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as herein above described, and (ii) if in excess of $500,000, shall be (A) issued by an institution reasonably satisfactory to Lender, (B) if permitted pursuant to any applicable Legal Requirements, name Lender as payee or mortgagee thereunder (or at Lender's option, be fully assignable to Lender), and (C) otherwise be reasonably satisfactory to Lender.

(e)    Proceeding.  Borrower shall appear in and defend any action or proceeding arising under, occurring out of, or in any manner connected with, the Leases or

104

the obligations, duties, or liabilities of Borrower, any Tenant or any Lease guarantor, in each case, to the extent that, in Borrower's good faith judgment, it determines it is commercially appropriate and economic to do so.  Borrower shall pay all reasonable, out-of-pocket and documented costs and expenses of Lender, including reasonable attorneys' fees of retained firms (excluding in-house counsel), in any action or proceeding in which Lender may appear.

(f)    Deemed Approval.  The terms of this Section 4.1.9 shall be subject to the Deemed Approval Mechanics.

(g)    From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.9 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.10  Alterations.  Lender's prior approval shall be required in connection with any alterations to any Improvements (except Tenant Improvements under any Lease entered into in accordance with the terms of this Agreement (including any work performed by a Tenant pursuant to its Lease), the Hotel Conversion, Office CapEx Projects and any Restoration performed in accordance with the terms of this Agreement), (a) the cost of which is reasonably anticipated to exceed the Alteration Threshold, or (b) that are structural in nature, such approval not to be unreasonably withheld, conditioned or delayed.  If the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements shall at any time exceed the Alteration Threshold, Borrower shall promptly deliver to Lender as security for the payment of such amounts and as additional security for Borrower's Obligations any of the following:  (i) cash, or (ii) Letters of Credit.  Such security shall be in an amount equal to the excess of the total unpaid amounts incurred and to be incurred with respect to such alterations to the Improvements (other than such amounts to be paid or reimbursed by Tenants under the Leases) over the Alteration Threshold.  The security shall be disbursed by Lender to Borrower, subject to reasonable conditions imposed by Lender, toward completion of said alterations, with the balance being returned to Borrower upon substantial completion of such alterations.  From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.10 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.11  Interest Rate Protection Agreement.

(a)    On the Closing Date, Borrower shall (A) obtain and thereafter maintain an Interest Rate Protection Agreement (1) with a notional amount equal to the positive difference between (x) the Loan Amount minus (y) the Release Amount, (2) having a strike price equal to or less than the Capped Benchmark Rate, (3) with a term of not less than two (2) years and (4) with a Counterparty having a Minimum Counterparty Rating; and (B) deliver to Lender an executed Assignment of Interest Rate Protection Agreement which has been consented and agreed to by the Counterparty.  Borrower shall deliver to Lender an opinion of counsel with respect to the Interest Rate Protection Agreement (and the Counterparty thereunder) within ten (10) Business Days after the interest rate cap confirmation has been executed by Borrower, the Counterparty and any guarantor, such opinion to be reasonably acceptable to Lender; provided, however, that, if

105

such opinion is not delivered within such ten (10) Business Day period, such ten (10) Business Day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cause such opinion to be delivered.  On or prior to the expiration of the initial Interest Rate Protection Agreement or any subsequent Interest Rate Protection Agreement, Borrower shall (a) extend the term of the then-existing Interest Rate Protection Agreement or (b) purchase a new Interest Rate Protection Agreement having a term of not less than one (1) year and having a strike price equal to or less than the Capped Benchmark Rate.  In the event of any withdrawal of the rating of such Counterparty by any Rating Agency or downgrade of the rating of such Counterparty by any Rating Agency below the Minimum Counterparty Rating, Borrower shall notify Lender of such downgrade and shall replace the Interest Rate Protection Agreement not later than ten (10) Business Days following such downgrade or withdrawal with an Interest Rate Protection Agreement in form and substance reasonably satisfactory to Lender (and meeting the requirements set forth in this Section 4.1.11) from a Counterparty having a Minimum Counterparty Rating; provided, however, that if any Rating Agency withdraws or downgrades the credit rating of the Counterparty below the Minimum Counterparty Rating, Borrower shall not be required to replace the Counterparty under the Interest Rate Protection Agreement if within ten (10) Business Days following such downgrade or withdrawal, an Affiliate of such Counterparty with a Minimum Counterparty Rating delivers a guaranty reasonably acceptable to Lender guaranteeing such Counterparty's obligations under the Interest Rate Protection Agreement.  Any new or replacement Interest Rate Protection Agreement required to be delivered by Borrower to Lender under this Agreement shall be in form and substance substantially similar to the Interest Rate Protection Agreement in effect as of the Closing Date and Borrower shall provide Lender with an Assignment of Interest Rate Protection Agreement with respect thereto in substantially the form of Assignment of Interest Rate Protection Agreement, together with an opinion of counsel with respect thereto reasonably acceptable to Lender within ten (10) Business Days after the interest rate cap confirmation has been executed by Borrower, the Counterparty and any guarantor; provided, however, that, if such opinion is not delivered within such ten (10) Business Day period, such ten (10) Business Day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cause such opinion to be delivered. At the time Borrower enters into any Interest Rate Protection Agreement, the Counterparty and Borrower shall each be an "Eligible Contract Participant," as such term is defined under the Commodity Exchange Act, and shall otherwise satisfy all requirements under the Dodd Frank Wall Street Reform and Consumer Protection Act in connection with entering into the Interest Rate Protection Agreement.

(b)    Notwithstanding anything to the contrary contained in this Section 4.1.11 or elsewhere in this Agreement, within thirty (30) days following the occurrence of a Benchmark Replacement Date:

(i)    Borrower shall either (i) enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of, a Substitute Interest Rate Protection Agreement (and in connection therewith, but not prior to Borrower taking all the actions described in this clause (i), Borrower shall have the right to terminate any then-existing Interest Rate Protection Agreement) or

106

(ii) cause the then-existing Interest Rate Protection Agreement to be modified such that such then-existing Interest Rate Protection Agreement satisfies the requirements of a Substitute Interest Rate Protection Agreement as set forth below in the definition thereof; provided that any refund or other proceeds received in connection with, or as a result of, a rate conversion shall, so long as no Event of Default has occurred and is continuing, be released to Borrower to be used to purchase the Substitute Interest Rate Protection Agreement; and

(ii) in lieu of satisfying the condition described in Section 4.1.11 with respect to the Extension Period, Borrower shall instead enter into, make all payments under, and satisfy all conditions precedent to the effectiveness of a Substitute Interest Rate Protection Agreement on or prior to the first day of the Extension Period.

As used herein, "**Substitute Interest Rate Protection Agreement**" means an interest rate cap agreement between a Counterparty satisfying the Minimum Counterparty Rating and Borrower, obtained by Borrower and collaterally assigned to Lender pursuant to this Agreement and shall meet the requirements set forth in this Section 4.1.11.

From and after the occurrence of a Benchmark Replacement Date, all references to "**Interest Rate Protection Agreement**" herein (other than in the definition of "**Interest Rate Protection Agreement**") shall be deemed to refer or relate, as applicable, to a Substitute Interest Rate Protection Agreement.

4.1.12  Material Agreements; Material Construction Contracts.  Borrower shall (a) promptly perform and/or observe in a commercially reasonable matter, and shall use commercially reasonable efforts to cause Manager to perform and or observe, in all material respects, all of the covenants and agreements required to be performed and observed by it under each Material Agreement and Material Construction Contract, in each such case, to which Borrower is a party, and do all things necessary to preserve and to keep unimpaired, in all material respects, its rights thereunder, (b) promptly notify Lender in writing of the delivery of any written notice of any default of any of the material covenants and agreements by any party under any Material Agreement or Material Construction Contract in each such case to which Borrower is a party and of which it is aware, and (c) promptly enforce the performance and observance of all of the covenants and agreements required to be performed and/or observed by the other party under each Material Agreement and Material Construction Contract, in each such case to which Borrower is a party, in a commercially reasonable manner, in each case, in all material respects. From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.12 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.13  Performance by Borrower.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by Borrower, and shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document executed and delivered by Borrower without the prior consent of Lender. From and after execution of the Master

107

Lease, the foregoing requirements of this Section 4.1.13 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.14 Costs of Enforcement/Remedying Defaults.  In the event (a) that the Mortgage is foreclosed in whole or in part or that the Mortgage is put into the hands of an attorney for collection, suit, action or foreclosure, (b) that the Pledge Agreement encumbering the Collateral is foreclosed in whole or in part or that the Pledge Agreement is put into the hands of an attorney for collection, suit, action or foreclosure, (c) of the foreclosure of any mortgage (or pledge) encumbering the Property (or any direct or indirect ownership interests in Borrower) prior to or subsequent to the Mortgage (or Pledge Agreement) in which proceeding Lender is made a party, or (d) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of a Borrower Party or an assignment by a Borrower Party for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all reasonable, out-of-pocket and documented costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Lender in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein.

4.1.15 Anti-Corruption; Anti-Money Laundering.

(a)    In the event Borrower receives any notice that Master Tenant, Borrower, Sole Member, Guarantor or their officers, directors, employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan, or any Person that has a direct or indirect interest in the Property, become a Restricted Person or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall promptly notify Lender.  At Lender's option, it shall be an Event of Default hereunder if Master Tenant, Borrower, Sole Member, Guarantor or any Person having a direct or indirect interest in the Property becomes a Restricted Person or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

(b)    Lender may from time to time request, and Borrower shall provide to Lender, Borrower's name, address, tax identification number and/or such other identification information as shall be necessary for Lender to comply with AML Laws and Sanctions.

(c)    The funds utilized in the transaction by Master Tenant, Borrower, Sole Member, Guarantor or their officers, directors,  employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan  will not be directly or indirectly derived from activities that may contravene federal, state and international regulations, including but not limited to AML Laws, Sanctions, and Anti-Corruption Laws.

(d)    Master Tenant, Borrower, Sole Member, Guarantor or their officers, directors,  employees, affiliates, or to Borrower's Knowledge, brokers or other agents acting or benefiting in any capacity in connection with the Loan shall notify Lender regarding any and all possible violations of AML Laws, Sanctions and Anti-Corruption

108

Laws or suspicious activity in connection therewith, and provide as promptly as possible to Lender all notes, memoranda and reports regarding the investigation of such violations or activity.

4.1.16  Intentionally Omitted.

4.1.17  Maintenance of Property.  Borrower shall cause the Property to be maintained in good and safe working order and repair, reasonable wear and tear excepted, and complete and pay for any Improvements at any time in the process of construction, renovation or repair (other than any Improvements required to be paid for by a Tenant pursuant to its Lease). Borrower shall not use, maintain or operate the Property in any manner that would be reasonably likely to constitute a public or private nuisance or that would be reasonably likely to make void, voidable, or cancelable, or increases the premium of, any insurance then in force with respect thereto.  Borrower shall not make any change in the use of the Property that would be reasonably likely to materially increase the risk of fire or other hazard arising out of the operation of the Property, or do or knowingly permit to be done thereon anything that may in any way impair the value of the Property in any material respect or the Lien of the Mortgage.  Borrower shall not, without the prior written consent of Lender, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Property, regardless of the depth thereof or the method of mining or extraction thereof. From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.17 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.18  Management Agreement; Leasing Agreement.

(a)  Borrower shall cause Manager to manage the Property in accordance with the material terms and provisions of the Management Agreement, and cause Leasing Agent to manage the leasing and marketing of the Property in accordance with the material terms and provisions of the Leasing Agreement.  Borrower shall (i) diligently perform and observe all of the material terms, covenants and conditions of the Management Agreement and Leasing Agreement on the part of Borrower to be performed and observed, (ii) promptly notify Lender of any notice to Borrower of any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Management Agreement or Leasing Agreement on the part of Borrower to be performed and observed and to which Borrower is aware, (iii) intentionally omitted, and (iv) enforce the performance and observance of all of the material covenants required to be performed and observed by Manager under the Management Agreement and Leasing Agent under the Leasing Agreement.  If Borrower shall default in the performance or observance of any term, covenant or condition of the Management Agreement and/or Leasing Agreement on the part of Borrower to be performed or observed, then, without limiting Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Management Agreement and/or Leasing Agreement, as applicable, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the terms, covenants and conditions of the Management Agreement and/or Leasing Agreement, as applicable, on the part of

109

Borrower to be performed or observed.  Borrower hereby agrees to pay to Lender promptly following demand, all such sums so paid and expended by Lender, together with interest thereon at the Default Rate from the day on which Borrower receives such demand until paid.  All sums so paid and expended by Lender and the interest thereon shall be secured by the legal operation and effect of the Mortgage.

(b)    Lender shall have the right to require Borrower to replace the Manager and/or Leasing Agent with a Person which is not an Affiliate of, but is chosen by, Borrower and approved by Lender (such approval not to be unreasonably withheld, conditioned or delayed) upon the occurrence of any one or more of the following events: (i) at any time following the occurrence and during the continuance of an Event of Default, (ii) if Manager or Leasing Agent, as the case may be, shall be insolvent or a debtor in a bankruptcy proceeding (provided, however, if such bankruptcy or proceeding was involuntary and not consented to by Manager or Leasing Agent, as the case may be, upon the same not being dismissed within ninety (90) days of commencement of same), (iii) if Manager or Leasing Agent shall be in material default under the Management Agreement or Leasing Agreement, as applicable, beyond any applicable notice and cure period, or (iv) if at any time Manager or Leasing Agent, as the case may be, has engaged in gross negligence, fraud or willful misconduct.

(c)    From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.18 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.19  Intentionally Omitted.

4.1.20  O&M Program. Borrower covenants and agrees to implement and follow the terms and conditions of the O&M Program for the Property during the term of the Loan, including any extension or renewal thereof. Lender's requirement that Borrower comply with the O&M Program shall not be deemed to constitute a waiver or modification of any of Borrower's covenants and agreements with respect to environmental laws, hazardous substances and asbestos. Costs. Subject to the contest rights permitted hereunder and solely to the extent the same are pursued in accordance with this Agreement, Borrower shall pay when due all Operating Expenses, Debt Service and other costs and expenses required under this Agreement and all other contracts to which Borrower is a party for the construction and ownership of the Improvements in accordance with the provisions of this Agreement, including, without limitation, any repair and restoration of the Improvements.

4.1.22  Notice of Default.    Borrower shall promptly advise Lender of the occurrence of any monetary Default, material non-monetary Default or Event of Default, in each such case, of which Borrower has Knowledge.

4.1.23  Cooperate in Legal Proceedings.  Borrower shall reasonably cooperate with Lender with respect to any proceedings before any court, board or other Governmental Authority or tribunal (including any arbitration or mediation) which may in any way would be reasonably likely to adversely affect the rights of Lender hereunder or any rights obtained by Lender under any of the other Loan Documents and, in connection therewith, permit Lender, at its election and

110

expense, to participate in any such proceedings; provided, however, that if any such proceeding is reasonably likely to adversely affect Lender, such participation shall be at Borrower's reasonable expense.

4.1.24  <u>Intentionally Omitted</u>.

4.1.25  <u>Award and Insurance Benefits</u>.  Borrower shall reasonably cooperate with Lender in obtaining for Lender the benefits of any Net Proceeds lawfully or equitably payable in connection with the Property, and Lender shall be reimbursed for any reasonable, out-of-pocket and documented expenses incurred in connection therewith (including reasonable attorneys' fees and disbursements of retained firms (excluding in-house counsel)), and the payment by Borrower of the expense of an Appraisal on behalf of Lender in case of Casualty and/or Condemnation affecting the Property or any part thereof) out of such Net Proceeds.

4.1.26  <u>Organizational Identification Number</u>.  Borrower shall promptly notify Lender of any change in its organizational identification number.  If Borrower does not now have an organizational identification number and later obtains one, Borrower promptly shall notify Lender of such organizational identification number.

4.1.27  <u>Business and Operations</u>.  Borrower will continue to engage in the ownership, maintenance, construction, development, renovation, leasing, management and operation of the Property and the personal property related thereto, or make any change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business except as contemplated herein. Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership, maintenance, renovation, leasing, management and operation of the Property.  Except with respect to Permitted Equipment Financing, Borrower shall at all times during the term of the Loan continue to own all of the Equipment, Fixtures and Personal Property which are necessary to operate the Property in the manner required hereunder and in the manner in which it is currently operated or contemplated herein. From and after execution of the Master Lease, the foregoing requirements of this <u>Section 4.1.27</u> shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.28  <u>Intentionally Omitted</u>.

4.1.29  <u>Intentionally Omitted</u>.

4.1.30  <u>Licenses; Intellectual Property; Website</u>.  Borrower shall comply with the following covenants:

(a)    <u>Licenses</u>.  Borrower shall keep and maintain (or cause to be kept and maintained) all licenses required to be kept by Borrower for the legal use, occupancy and operation of the Property for its then current use and shall not transfer any such required licenses.

(b)    <u>Intellectual Property</u>.  To the extent Borrower owns any Intellectual Property, Borrower shall keep and maintain such Intellectual Property relating to the use

or operation of the Property and all such Intellectual Property shall be held by and (if applicable) registered in the name of Borrower.  To the extent Borrower owns any Intellectual Property, Borrower shall not transfer or let lapse any Intellectual Property without Lender's prior consent unless no longer useful or required for the operation of the Property.

From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.30 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.31  Intentionally Omitted.

4.1.32  Easements and Restrictions; Zoning.  Borrower shall submit to Lender for Lender's approval prior to the execution thereof by Borrower all proposed Easements, restrictions, and covenants which would affect the title to the Property, accompanied by a drawing showing the exact proposed location thereof.  Borrower shall not subject the Property or any part thereof to any Easement, restriction or covenant which is not a Permitted Encumbrance without the prior approval of Lender, such approval not to be unreasonably withheld, conditioned or delayed.  With respect to any and all existing Easements, restrictions, covenants or operating agreements which benefit or burden the Property, any Easement, restriction or covenant to which the Property may hereafter be subjected in accordance with the provisions hereof and any zoning or land use classification of the Property approved by Lender (such approval not to be unreasonably withheld, conditioned or delayed), Borrower shall:  (a) observe and perform the material obligations imposed upon Borrower or the Property; (b) not alter, modify or change the same, in any material respect, without the prior written approval of Lender, which approval shall not be unreasonably withheld, conditioned or delayed; (c) enforce its material rights thereunder in a commercially reasonable manner so as to preserve for the benefit of the Property the full benefits of the same; and (d) deliver to Lender a copy of any notice of material default received or delivered by Borrower in respect of the same promptly after Borrower's receipt or within a reasonable period of time before delivery of such notice or correspondence. From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.32 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.33  Ground Lease.

(a)    Borrower shall:

(i)    pay all rents, additional rents and other sums required to be paid by Borrower, as tenant under and pursuant to the provisions of the Ground Lease, as and when such rent or other charge is payable,

(ii)    diligently perform and observe all of the terms, covenants and conditions of the Ground Lease on the part of Borrower to be performed and observed, prior to the expiration of any applicable grace period therein provided; and

(iii)    promptly notify Lender of the giving of any written notice under the Ground Lease by or to Borrower of any default by Borrower in the

112

performance or observance of any of the terms, covenants or conditions of the Ground Lease on the part of Borrower to be performed or observed, and deliver to Lender a true copy of each such notice.

(b)     Borrower shall not, without the prior consent of Lender, surrender the fee or leasehold estates created by the Ground Lease or terminate or cancel the Ground Lease or modify, change, supplement, alter or amend the Ground Lease or waive any rights under the Ground Lease, either orally or in writing, and Borrower hereby assigns to Lender, as further security for the payment and performance of the Obligations and for the performance and observance of the terms, covenants and conditions of the Mortgage, this Agreement and the other Loan Documents, all of the rights, privileges and prerogatives of Borrower, as landlord and tenant under the Ground Lease, to surrender the fee and leasehold estates created by the Ground Lease or to terminate, cancel, modify, change, supplement, alter, amend or waive any rights under the Ground Lease in any material respect, and any such surrender of the fee and leasehold estates created by the Ground Lease or termination, cancellation, modification, change, supplement, alteration, amendment of or waiver of rights under the Ground Lease without the prior consent of Lender shall be void and of no force and effect.

(c)     If Borrower shall default in the performance or observance of any material term, covenant or condition of the Ground Lease on the part of Borrower to be performed or observed, then, without limiting the generality of the other provisions of the Mortgage, this Agreement and the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the material terms, covenants and conditions of the Ground Lease on the part of Borrower to be performed or observed or to be promptly performed or observed on behalf of Borrower, to the end that the rights of Borrower in, to and under the Ground Lease shall be kept unimpaired as a result thereof and free from default, even though the existence of such event of default or the nature thereof be questioned or denied by Borrower or by any party on behalf of Borrower.  If Lender shall make any payment or perform any act or take action in accordance with the preceding sentence, Lender will notify Borrower of the making of any such payment, the performance of any such act or the taking of any such action.  In any such event, subject to the rights of Tenants, subtenants and other occupants under the Leases, Lender and any Person designated as Lender's agent by Lender shall have, and are hereby granted, the right to enter upon the Property at any reasonable time, on reasonable notice and from time to time in accordance with the terms hereof for the purpose of taking any such action.  Lender may pay and expend such sums of money as Lender reasonably deems necessary for any such purpose and upon so doing shall be subrogated to any and all rights of the landlord under the Ground Lease.  Borrower hereby agrees to pay to Lender within five (5) days after demand, all such sums so paid and expended by Lender, together with interest thereon from the day of such payment at the Default Rate.  All sums so paid and expended by Lender and the interest thereon shall be secured by the legal operation and effect of the Mortgage.

(d)     If a party under the Ground Lease shall deliver to Lender a copy of any notice of default sent by said party, such notice shall constitute full protection to Lender

113

for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon. Borrower shall exercise each individual option, if any, to extend or renew the term of the Ground Lease upon demand by Lender made at any time within one (1) year prior to the last day upon which any such option may be exercised, and if Borrower shall fail to do so, Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Borrower will not subordinate or consent to the subordination of the Ground Lease to any mortgage, security deed, lease or other interest on or in the landlord's interest in all or any part of the Property, unless, in each such case, the written consent of Lender shall have been first had and obtained.

(e)      Unless Lender shall otherwise expressly consent in writing, there shall be no merger of the Ground Lease, nor of the leasehold estate or other estate created thereby, with the fee estate in the land demised thereunder by reason of the fact that the Ground Lease, or the leasehold estate or other estate created thereby, may be held directly or indirectly by or for the account of any person or entity who or which also holds the fee estate in the land demised thereunder.

(f)      Borrower acknowledges that pursuant to Section 365 of the Bankruptcy Code, it is possible that a trustee in bankruptcy of ground lessor, or ground lessor as a debtor-in-possession, could reject the Ground Lease, in which case, Borrower, as tenant, would have the election described in Section 365(h) of the Bankruptcy Code (which election, as the same may be amended from time to time, and together with any comparable right under any other state or federal law relating to bankruptcy, reorganization or other relief for debtors, whether now or hereafter in effect, is herein called the "*Election*") to treat the Ground Lease as terminated by such rejection or, in the alternative, to remain in possession for the balance of the term of the Ground Lease and any renewal or extension thereof that is enforceable by the tenant under applicable non-bankruptcy law. Borrower shall not consent to or accept the termination of the Ground Lease by exercise of the Election or otherwise without the prior written consent of Lender, which consent may be withheld, conditioned or delayed for any reason in Lender's sole and absolute discretion. Borrower acknowledges that since the Ground Lease is a primary part of the security for the Obligations, it is not anticipated that Lender would consent to termination of the Ground Lease.  In order to secure the covenant made in this paragraph and as security for the Obligations, Borrower assigns the Election and all rights related thereto to Lender. Borrower acknowledges and agrees that the foregoing assignment of the Election and related rights is one of the rights which Lender may use at any time in order to protect and preserve the other rights and interests of Lender under this Agreement and the other Loan Documents, since exercise of the Election in favor of terminating the Ground Lease would constitute waste hereunder. Borrower agrees that exercise of the Election in favor of preserving the right to possession under the Ground Lease shall not be deemed to constitute a taking or sale of the Property by Lender and shall not entitle Borrower to any credit against the Obligations. Borrower acknowledges and agrees that in the event the Election is exercised in favor of Borrower remaining in possession, Borrower's resulting rights under the Ground Lease, as adjusted by the effect of Section 365 of the Bankruptcy Code,

114

shall then be part of the Property and shall be subject to the Liens created by this Agreement, the Mortgage and the other Loan Documents.

(g)    If there shall be filed by or against Borrower a petition under the Bankruptcy Code, and Borrower, as the tenant under the Ground Lease, shall determine to reject the Ground Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Borrower shall apply to the bankruptcy court for authority to reject the Ground Lease. Lender shall have the right, but not the obligation, to serve upon Borrower within such ten (10) day period a notice stating that (i) Lender demands that Borrower assume and assign the Ground Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender agrees to cure or provide adequate assurance of prompt cure of all defaults and provide adequate assurance of future performance under the Ground Lease; provided, that such defaults are susceptible to cure. If Lender serves upon Borrower the notice described in the preceding sentence, Borrower shall not seek to reject the Ground Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the agreement provided for in clause (ii) of the preceding sentence. Effective upon the entry of an order for relief in respect of Borrower under the Bankruptcy Code, Borrower hereby assigns and transfers to Lender a non-exclusive right to apply to the bankruptcy court under Section 365(d)(4) of the Bankruptcy Code for an order extending the period during which the Ground Lease may be rejected or assumed.

4.1.34 Master Lease. From and after the execution of the Master Lease in accordance with the terms hereof, the following shall apply:

(a)    Borrower shall, and shall cause Master Tenant to, as applicable:

(i)    pay all rents, additional rents and other sums required to be paid by Master Tenant, as tenant under and pursuant to the provisions of the Master Lease and any other Historic Tax Credit Documents, as and when such rent or other charge is payable,

(ii)    diligently perform and observe all of the terms, covenants and conditions of the Master Lease and any other Historic Tax Credit Documents on the part of Borrower (as landlord) to be performed and observed and Master Tenant (as tenant) to be performed and observed, prior to the expiration of any applicable grace period therein provided; and

(iii)    promptly notify Lender of the giving of any written notice under the Master Lease and any other Historic Tax Credit Documents by or to Borrower or Master Tenant of any default by Borrower or Master Tenant in the performance or observance of any of the terms, covenants or conditions of the Master Lease and any other Historic Tax Credit Documents on the part of Borrower or Master Tenant to be performed or observed after the expiration of any applicable grace or cure period provided therein, and deliver to Lender a true copy of each such notice.

115

(b)    Borrower shall not (and shall not cause or permit Master Tenant to), without the prior consent of Lender, surrender the leasehold estate created by the Master Lease or terminate or cancel the Master Lease or any other Historic Tax Credit Documents or modify, change, supplement, alter or amend the Master Lease or any other Historic Tax Credit Documents or waive any rights under the Master Lease or any other Historic Tax Credit Documents, either orally or in writing, and Borrower hereby assigns to Lender, as further security for the payment and performance of the Obligations and for the performance and observance of the terms, covenants and conditions of the Mortgage, this Agreement and the other Loan Documents, all of the rights, privileges and prerogatives of Borrower, as landlord and tenant under the Master Lease, to surrender the fee or accept the surrender of the leasehold estate created by the Master Lease or to terminate, cancel, modify, change, supplement, alter, amend or waive any rights under the Master Lease or any other Historic Tax Credit Document in any material respect, and any such surrender of the fee and leasehold estates created by the Master Lease or termination, cancellation, modification, change, supplement, alteration, amendment of or waiver of rights under the Master Lease or any other Historic Tax Credit Document without the prior consent of Lender shall be void and of no force and effect.

(c)    If Borrower or Master Tenant shall default in the performance or observance of any material term, covenant or condition of the Master Lease or any other Historic Tax Credit Documents on the part of Borrower or Master Tenant to be performed or observed, then, without limiting the generality of the other provisions of the Mortgage, this Agreement and the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder, Lender shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the material terms, covenants and conditions of the Master Lease or any other Historic Tax Credit Documents on the part of Borrower or Master Tenant to be performed or observed or to be promptly performed or observed on behalf of Borrower or Master Tenant, to the end that the rights of Borrower and Master Tenant in, to and under the Master Lease or any other Historic Tax Credit Document shall be kept unimpaired as a result thereof and free from default, even though the existence of such event of default or the nature thereof be questioned or denied by Borrower or Master Tenant or by any party on behalf of Borrower or Master Tenant.  If Lender shall make any payment or perform any act or take action in accordance with the preceding sentence, Lender will notify Borrower and Master Tenant of the making of any such payment, the performance of any such act or the taking of any such action.  In any such event, subject to the rights of Tenants, subtenants and other occupants under the Leases, Lender and any Person designated as Lender's agent by Lender shall have, and are hereby granted, the right to enter upon the Property at any reasonable time, on reasonable notice and from time to time in accordance with the terms hereof for the purpose of taking any such action.  Lender may pay and expend such sums of money as Lender reasonably deems necessary for any such purpose and upon so doing shall be subrogated to any and all rights of Borrower and Master Tenant under the Master Lease.  Borrower hereby agrees to pay to Lender within five (5) days after demand, all such sums so paid and expended by Lender, together with interest thereon from the day of such payment at the Default Rate.  All sums so paid and expended by Lender and the interest thereon shall be secured by the legal operation and effect of the Mortgage.

116

(d) If a party under the Master Lease or any other Historic Tax Credit Documents shall deliver to Lender a copy of any notice of default sent by said party, such notice shall constitute full protection to Lender for any action taken or omitted to be taken by Lender, in good faith, in reliance thereon.  Master Tenant shall exercise each individual option, if any, to extend or renew the term of the Master Lease upon demand by Lender made at any time within one (1) year prior to the last day upon which any such option may be exercised, and if Master Tenant shall fail to do so, Borrower hereby expressly authorizes and appoints Lender its attorney-in-fact to exercise any such option in the name of and upon behalf of Borrower, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest.  Neither Borrower nor Master Tenant will subordinate or consent to the subordination of the Master Lease to any mortgage, security deed, lease or other interest (other than to the Mortgage) on or in the landlord's interest in all or any part of the Property, unless, in each such case, the written consent of Lender shall have been first had and obtained.

(e) Unless Lender shall otherwise expressly consent in writing, there shall be no merger of the Master Lease, nor of the leasehold estate or other estate created thereby, with the lessor estate in the land demised thereunder by reason of the fact that the Master Lease, or the leasehold estate or other estate created thereby, may be held directly or indirectly by or for the account of any person or entity who or which also holds the fee estate in the land demised thereunder.

(f) Borrower acknowledges that pursuant to Section 365 of the Bankruptcy Code, it is possible that a trustee in bankruptcy of the lessor under the Master Lease, or the lessor under the Master Lease as a debtor-in-possession, could reject the Master Lease, in which case, Master Tenant, as tenant, would have the Election to treat the Master Lease as terminated by such rejection or, in the alternative, to remain in possession for the balance of the term of the Master Lease and any renewal or extension thereof that is enforceable by the tenant under applicable non-bankruptcy law. Neither Borrower nor Master Tenant shall permit the termination of the Master Lease by exercise of the Election or otherwise without the prior written consent of Lender, which consent may be withheld, conditioned or delayed for any reason in Lender's sole and absolute discretion. Borrower acknowledges that since the Master Lease is a primary part of the security for the Obligations, it is not anticipated that Lender would consent to termination of the Master Lease.  In order to secure the covenant made in this paragraph and as security for the Obligations, Borrower shall cause Master Tenant to assign the Election and all rights related thereto to Lender. Borrower acknowledges and agrees that the foregoing assignment of the Election and related rights is one of the rights which Lender may use at any time in order to protect and preserve the other rights and interests of Lender under this Agreement and the other Loan Documents, since exercise of the Election in favor of terminating the Master Lease would constitute waste hereunder. Borrower agrees that exercise of the Election in favor of preserving the right to possession under the Master Lease shall not be deemed to constitute a taking or sale of the Property by Lender and shall not entitle Borrower to any credit against the Obligations. Borrower acknowledges and agrees that in the event the Election is exercised in favor of Master Tenant remaining in possession, Master Tenant's resulting rights under the Master Lease, as adjusted by the effect of Section 365 of the Bankruptcy Code, shall then be part of the Property and shall

117

be subject to the Liens created by this Agreement, the Mortgage and the other Loan Documents.

(g)    If there shall be filed by or against Master Tenant a petition under the Bankruptcy Code, and Master Tenant, as the tenant under the Master Lease, shall determine to reject the Master Lease pursuant to Section 365(a) of the Bankruptcy Code, then Borrower shall give Lender not less than ten (10) days' prior notice of the date on which Master Tenant shall apply to the bankruptcy court for authority to reject the Master Lease.  Lender shall have the right, but not the obligation, to serve upon Master Tenant within such ten (10) day period a notice stating that (i) Lender demands that Master Tenant assume and assign the Master Lease to Lender pursuant to Section 365 of the Bankruptcy Code and (ii) Lender agrees to cure or provide adequate assurance of prompt cure of all defaults and provide adequate assurance of future performance under the Master Lease; provided, that such defaults are susceptible to cure.  If Lender serves upon Master Tenant the notice described in the preceding sentence, Borrower shall not cause Master Tenant to seek to reject the Master Lease and shall comply with the demand provided for in clause (i) of the preceding sentence within thirty (30) days after the notice shall have been given, subject to the performance by Lender of the agreement provided for in clause (ii) of the preceding sentence. Effective upon the entry of an order for relief in respect of Master Tenant under the Bankruptcy Code, Borrower shall cause Master Tenant to assign and transfer to Lender a non-exclusive right to apply to the bankruptcy court under Section 365(d)(4) of the Bankruptcy Code for an order extending the period during which the Master Lease may be rejected or assumed.

4.1.35  Purchase of Material Under Conditional Sale Contract.  Borrower shall not permit any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Property, unless previously authorized by Lender in writing or same relate to Permitted Equipment Financing. From and after execution of the Master Lease, the foregoing requirements of this Section 4.1.35 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.1.36  After-Acquired Property.  Borrower hereby grants to Lender a first Lien security interest in and to all equipment and other personal property owned, leased or licensed by Borrower, whether or not used in the maintenance and/or operation of the Improvements, immediately upon acquisition of same or any part of same following the Closing Date.

4.1.37  Special Purpose Bankruptcy Remote Entity.  Each Required SPE shall at all times continue to be a Special Purpose Bankruptcy Remote Entity, in accordance with Section 3.1.24 of this Agreement.

4.1.38  Intentionally Omitted.

4.1.39  Construction Consultant.

118

(a)     Borrower acknowledges that (i) the Construction Consultant will be retained by Lender to act as a consultant and only as a consultant to Lender in connection with the Hotel Conversion and Office CapEx Projects and has no duty to Borrower, (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Lender, (iii) Lender reserves the right to make any and all decisions required to be made by Lender under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Lender under this Agreement and to accept or not accept any matter or thing required to be accepted by Lender under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (iv) Lender reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Lender or any other Person, and (v) Lender reserves the right to replace the Construction Consultant with another construction consultant at any time and without prior notice to or approval by Borrower.

(b)     The Construction Consultant shall perform the following services on behalf of Lender:

(i)     prepare the Hotel Conversion Reports;

(ii)     review and advise Lender whether, in the opinion of the Construction Consultant, the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work are satisfactory;

(iii)     review Draw Requests and Change Orders;

(iv)     make inspections and visits;

(v)     attend all meetings of any nature relating to the Hotel Conversion;

(vi)     review any contracts, Governmental Approvals or other documentation relating to the Hotel Conversion or Office CapEx Projects requested by Lender or the Construction Consultant; and

(vii)     take such other actions deemed necessary by Lender or the Construction Consultant in order to effectively administer and review the Hotel Conversion and the Office CapEx Projects.

(c)     The reasonable, out-of-pocket and documented fees, costs and expenses of the Construction Consultant in connection with the Hotel Conversion and the Office CapEx Projects shall be paid by Borrower (or such costs and expenses incurred by Lender on account thereof shall be reimbursed to Lender), after Borrower receives the Construction Consultant's invoice approved by Lender for payment to the extent such fees are set forth in the Hotel Conversion Budget or, if not set forth in the Hotel Conversion

119

Budget, within fifteen (15) days of request therefor, but neither Lender nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, or (ii) any approval by the Construction Consultant of construction of the Hotel Conversion or the Office CapEx Projects.  Neither Lender nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Hotel Conversion or the Office CapEx Projects or the absence therefrom of defects.

4.1.40   Office CapEx Projects.

(a)     The Office CapEx Project Budget and any applicable Office CapEx Project Plans and Specifications and any amendments, modifications or supplements to any of the foregoing shall, in each such case, be subject to the prior written approval of Lender in its sole but good faith discretion.  The Office CapEx Project Budget in effect as of the Closing Date is attached hereto as Schedule XIII.  Notwithstanding the foregoing, Borrower may, from time to time, with prior written notice to Lender, (i) reallocate amounts allocated to a Line Item in the Office CapEx Project Budget to another Line Item in the Office CapEx Project Budget (A) if Borrower elects to not pursue such Office CapEx Project, (B) if Borrower has bought out a trade with respect to any work for the same scope of work as covered by the related Line Item at a lower price than is set forth in the Office CapEx Project Budget and Borrower has completed 75% of the work relating to such Line Item, and/or (C) Borrower has commenced and completed such Office CapEx Project and all contractors, materialmen and other Persons engaged by Borrower for all work performed with respect to such Office CapEx Project have been paid in full (or will be upon receipt of a pending Office CapEx Project Advance) and Borrower has delivered to Lender lien waivers from all such contractors that have performed work, and with respect to materialmen and other Persons that have provided materials or supplies evidence reasonably acceptable to Lender, in any such case, demonstrating that such contractors, materialmen and other Persons have been paid in full with respect to such Office CapEx Project for work performed and materials provided (or will be upon receipt of a pending Office CapEx Project Advance), and/or (ii) enter into (or authorize) change orders necessitated by field conditions or other change orders as to an individual Office CapEx Project that would not result in an increase of construction costs in excess of $50,000 for any single change order, or would not, inclusive of such change order, increase the additional cost of all change orders as to such individual Office CapEx Project permitted and effectuated without Lender's consent, to an amount in excess of $250,000; provided, that in no event shall Lender be required to fund in excess of the Office CapEx Project Advance Maximum Amount in the aggregate with respect to all Office CapEx Projects.

(b)     With respect to each Office CapEx Project commenced by Borrower, Borrower shall (i) diligently pursue construction of such Office CapEx Project through completion thereof, and cause lien-free completion of such Office CapEx Project (other than Permitted Encumbrances) in a good and workmanlike manner, and (ii) promptly pay all sums and perform such duties as may be necessary to complete such Office CapEx Project, in each case, in accordance with any applicable Office CapEx Project Plans and Specifications prepared by Borrower, the Office CapEx Project Budget, any Lease to the extent applicable, in each such case, in all material respects, and in compliance with all

120

applicable material Legal Requirements and all applicable Governmental Approvals, in each case, in all material respects, and in compliance with the terms and conditions of this Agreement, and free and clear of all Liens, encumbrances and security instruments (other than the Permitted Encumbrances).

(c)    Unless submitted to Lender in connection with a request for an Advance, within fifteen (15) days after each calendar month, with respect to all ongoing Office CapEx Projects, Borrower shall deliver to Lender (i) copies of any change orders entered into during such calendar month with respect to such Office CapEx Projects, and (ii) a monthly cost report for such Office CapEx Projects on a cumulative basis and broken down by Line Item, showing percentage of such Office CapEx Projects finalized, explanations of the Office CapEx Project Budget variances, a summary of any approved reallocations, and a summary of approved and pending change orders.  Additionally, Borrower shall deliver to Lender such other information as Lender may reasonably request and other information necessary and sufficient to represent the amount paid for by Borrower in connection with all ongoing Office CapEx Projects, all in form reasonably satisfactory to Lender.

Section 4.2    Borrower Negative Covenants.  From and after the Closing Date until the repayment of the Debt in full, Borrower hereby covenants and agrees with Lender that:

4.2.1    Due on Sale and Encumbrance; Transfers of Interests.

(a)    Except as provided in Article VIII hereof, without the prior written consent of Lender, neither Borrower nor any other Person having a direct or indirect ownership or beneficial interest in Borrower shall sell, convey, mortgage, grant, bargain, encumber, pledge, assign or transfer any interest, direct or indirect, in Master Tenant, Borrower, the Property, the Collateral or any part thereof, whether voluntarily or involuntarily, in violation of the covenants and conditions set forth in the Mortgage and this Agreement (collectively, a "**Transfer**").

(b)    A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower or Master Tenant agrees to sell the Property, the Collateral or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower or Master Tenant leasing all or substantially all of the Property for other than actual occupancy by a Tenant thereunder or a sale, assignment or other Transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Leases or any Rents (other than pursuant to the Ground Lease or the Master Lease); (iii) if a Person owning a direct or indirect interest in Borrower or Master Tenant is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Person owning a direct or indirect interest in Borrower or Master Tenant is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new limited partnership interests; (v) if a Person owning a direct or indirect interest in Borrower or Master Tenant is a limited liability company, any merger or

121

consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest or the creation or issuance of new membership interests, or Borrower or Master Tenant dividing into two (2) or more separate entities and allocating any of its assets, liabilities, rights and/or obligations between or among such entities; (vi) if a Person owning a direct or indirect interest in Borrower or Master Tenant is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Person owning a direct or indirect interest in Borrower or the creation or issuance of new legal or beneficial interests; (vii) a change in Control of Borrower, Sole Member or Master Tenant; (viii) entering into any PACE Loan (provided if Borrower desires to obtain a PACE Loan, Lender's approval shall be required, such approval not to be unreasonably withheld or delayed, but such approval may be conditioned on any amendments to this Agreement and the other Loan Documents that Lender determines are necessary to permit a PACE Loan); (ix) any action for partition of the Property (or any portion thereof or interest therein) or any similar action instituted or prosecuted by Borrower, Master Tenant or by any other Person, pursuant to any contractual agreement or other instrument or under applicable Legal Requirements (including, without limitation, common law); (x) with respect to any limited liability company or limited partnership, the division of any assets and liabilities of such entity amongst one or more new or existing entities; and (xi) any surrender, termination, cancellation, change, amendment, supplementation or other modification of the Ground Lease or the Master Lease.

4.2.2    Liens.  Borrower shall not create, incur, assume or suffer to exist any Lien on any portion of the Property or the Collateral or permit any such action to be taken, except for Permitted Encumbrances and Permitted Transfers; provided, however, after prior notice to Lender, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any mechanic's or materialmen's Liens; provided that (a) no Event of Default has occurred and is continuing; (b) such proceeding shall be permitted under, and be conducted in accordance with, the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (c) neither the Property nor any part thereof or interest therein will be in imminent danger of being sold, forfeited, terminated, cancelled or lost; (d) Borrower shall promptly upon final determination thereof pay the amount of any claim resulting in such Lien, together with all costs, interest and penalties which may be payable in connection therewith; (in which event any security being held by Lender pursuant to clause (f) below shall be promptly returned to Borrower and Borrower shall use same to pay such claim), (e) such proceeding shall suspend the collection of any claims resulting in such contested Lien (unless applicable law requires the payment thereof); and (f) Borrower shall furnish such security as may be required in the proceeding, or, if no security is required to be furnished in such proceeding, as may be reasonably requested by Lender, to insure the payment of any claim resulting in such contested Lien, together with all interest and penalties thereon, and, once the proceeding has been resolved, Lender will return to Borrower the security to pay such claim. From and after execution of the Master Lease, the foregoing requirements of this Section 4.2.2 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.2.3    Dissolution.  No Required SPE shall (a) engage in any division, dissolution, liquidation or consolidation or merger with or into any or nor more other business entities, (b) engage in any business activity not related to the ownership and operation of the Property or the Collateral, as the case may be, (c) Transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of such Person except to the extent expressly permitted by the Loan Documents, or (d) cause, permit or suffer such Required SPE to (i) dissolve, divide, wind up or liquidate or take any action, or omit to take an action, as a result of which such Person would be dissolved, divided, wound up or liquidated in whole or in part, or (ii) amend, modify, waive or terminate the certificate of incorporation or bylaws of such Person in any matter that violates the special purpose covenants set forth in Section 3.1.24, in each case, without obtaining the prior consent of Lender, not to be unreasonably withheld, conditioned or delayed.

4.2.4    Change in Business.  Neither Borrower nor Master Tenant shall enter into any line of business other than the ownership and operation of the Property and personal property related thereto.

4.2.5    Debt Cancellation.  Neither Borrower nor Master Tenant shall cancel or otherwise forgive or release any material claim or debt (other than termination of Leases in accordance herewith) owed to Borrower or Master Tenant by any Person, except for adequate consideration and in the ordinary course of Borrower's business.

4.2.6    Indebtedness.  Borrower shall not directly or indirectly create, incur or assume any Indebtedness other than (a) the Debt, (b) obligations with respect to the Hotel Conversion, (c) obligations with respect to the Office CapEx Projects, (d) obligations with respect to any Restoration, (e) obligations to Tenants under Leases entered into in accordance with the terms hereof, (f) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, and (g) Permitted Equipment Financing, which in the case of such unsecured trade payables set forth in the preceding clause (f) (i) are not evidenced by a note, (ii) do not, together with Permitted Equipment Financing, evidence underlying obligations that exceed, at any time, a maximum aggregate amount of three percent (3.0%) of the Outstanding Principal Balance and (iii) are paid within ninety (90) days of the date invoiced (collectively, "**Permitted Indebtedness**"). From and after execution of the Master Lease, the foregoing requirements of this Section 4.2.6 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.2.7    Zoning.  Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance under any existing zoning ordinance or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Lender in its sole but good faith discretion.  From and after execution of the Master Lease, the foregoing requirements of this Section 4.2.7 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.2.8    No Joint Assessment.  Borrower shall not suffer, permit or initiate the joint assessment of the Property (i) with any other real property constituting a tax lot separate from the

Property, and (ii) with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property. From and after execution of the Master Lease, the foregoing requirements of this Section 4.2.8 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.2.9    Principal Place of Business.  No Required SPE shall (i) change its principal place of business or the place where it keeps its books and records (which location is set forth in the introductory paragraph of this Agreement), including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, in each instance, (A) without first giving Lender seven (7) days' prior notice and (B) taking all action reasonably required by Lender for the purpose of perfecting or protecting the Lien and security interest of Lender created pursuant to this Agreement and the other Loan Documents, or (ii) change its name, organizational structure, type of entity, or jurisdiction of organization or incorporation without (A) obtaining the prior written consent of Lender, not to be unreasonably withheld, conditioned or delayed, and (B) taking all action reasonably required by Lender for the purpose of perfecting or protecting the Lien and security interest of Lender created pursuant to this Agreement and the other Loan Documents.  At the request of Lender, Borrower shall execute a certificate in form reasonably satisfactory to Lender listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

4.2.10  ERISA.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(b)    Borrower's covenant in clause (a) above is based on the assumption that no portion of  the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a "benefit plan investor" as defined in Section 3(42) of ERISA and with respect to which Borrower is a party in interest (as defined in Section 3(14) of ERISA) or a disqualified person (as defined in Section 4975 of the Code) unless the conditions of an available prohibited transaction exemption are satisfied.

(c)    Borrower shall deliver to Lender such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Lender, that (A) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to any state statute regulating investments of, or fiduciary obligations with respect to, governmental plans; and (C) one or more of the following circumstances is true:

124

(i)    Equity interests in Borrower are publicly offered securities, within the meaning of 29 C.F.R. §2510.3-101(b)(2);

(ii)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower is held by "benefit plan investors" within the meaning of 29 C.F.R. §2510.3-101(f)(2) as modified by Section 3(42) of ERISA;

(iii)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. §2510.3-101(c) or (e); or

(iv)    The assets of Borrower are not otherwise "plan assets" of one or more "employee benefit plans" (as defined in Section 3(3) of ERISA) subject to Title I of ERISA, within the meaning of 29 C.F.R. §2510.3-101.

4.2.11    No Distributions.  During a Cash Management Sweep Period, Borrower shall not make any distributions to any direct or indirect owner of Borrower.

4.2.12    Budget.  Except to the extent otherwise expressly permitted hereunder, Borrower shall not amend, modify or supplement the Approved Annual Budget without the prior written consent of Lender, not to be unreasonably withheld, conditioned, or delayed.

4.2.13    Material Agreement; Material Construction Contracts.  Except to the extent otherwise expressly permitted hereunder, Borrower shall not enter into, or amend, modify, or supplement, in any material respect, or terminate any Material Agreement or Material Construction Contract in each such case to which Borrower is a party without the prior written approval of Lender, such approval not to be unreasonably withheld, conditioned, or delayed (except that such approval shall be in Lender's sole but good faith discretion if the counterparty under such agreement is a Borrower Related Party). From and after execution of the Master Lease, the foregoing requirements of this Section 4.2.13 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

4.2.14    Affiliate Transactions.  Borrower shall not enter into, or be a party to, any transaction with an Affiliate, unless Lender shall have consented to the same in writing in its sole but good faith discretion.

4.2.15    Intentionally Omitted. Prohibition Against Termination or Modification of Management Agreement or Leasing Agreement.  Borrower shall not (i) surrender, terminate, cancel, or modify, in any material respect, or renew or extend the Management Agreement or Leasing Agreement (other than automatic renewals or extensions pursuant to the terms thereof), (ii) other than the Management Agreement, enter into any other agreement relating to the management of the Property with Manager or any other Person, or other than the Leasing Agreement, enter into any other agreement relating to the leasing of the Property with Leasing Agent or any other Person, (iii) consent to the assignment by Manager of its interest under the Management Agreement, or the assignment by Leasing Agent of its interest under the Leasing Agreement (unless pursuant to a unilateral right of Manager or Leasing Agent under the terms of any such Management Agreement or Leasing Agreement), or (iv) waive or release any of its material rights and remedies under the Management Agreement or Leasing Agreement, in each of

125

the foregoing clauses (i) through (iv), without the express consent of Lender, which consent shall not be unreasonably withheld, conditioned or delayed. From and after execution of the Master Lease, the foregoing requirements of this Section 4.2.16 shall apply, *mutatis mutandis*, to Master Tenant, and Borrower shall cause Master Tenant to comply with all such requirements.

**ARTICLE V**
**INSURANCE, CASUALTY AND CONDEMNATION**

Section 5.1    Insurance.

5.1.1    Insurance Policies.  (a) Borrower shall obtain and maintain, or cause to be maintained, insurance for Borrower and the Property providing at least the following coverages:

(i)    comprehensive all risk "special form" insurance including, but not limited to, loss caused by any type of windstorm or hail (including named storms) on the Improvements and the personal property at the Property, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation; (B) containing an agreed amount endorsement with respect to the Improvements and personal property at the Property waiving all co insurance provisions; and (C) providing for no deductible in excess of Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) for all such insurance coverage, except for windstorm and earthquake, which shall provide for no deductible in excess of five percent (5%) of the total insurable value of the Property. In addition, Borrower shall obtain:  (x) whether or not any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area," flood hazard insurance in an amount no less than Five Million and No/100 Dollars ($5,000,000.00), with a deductible not to exceed Five Hundred Thousand and No/100 Dollars ($500,000.00); (y) wind, hail and named windstorm (including storm surge) insurance in amounts and in form and substance and with limits and deductibles satisfactory to Lender; and (z) earthquake insurance in amounts and in form and substance and with limits and deductibles satisfactory to Lender; provided that the insurance pursuant to clauses (y) and (z) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this clause (i);

(ii)    commercial general liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Property, such insurance (A) to be on the "occurrence" form with a combined limit, excluding umbrella coverage, of not less than One Million and No/100 Dollars ($1,000,000.00) and an aggregate limit of not less than Two Million and No/1000 Dollars ($2,000,000.00) with a deductible or self-insured retention not to exceed Twenty-Five Thousand and No/100 Dollars ($25,000.00); (B) to continue at not less than the aforesaid limit until required to be changed by Lender by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards:  (1) premises and operations; (2) products and

126

completed operations on an "if any" basis; (3) independent contractors, (4) contractual liability for all insured contracts; and (5) contractual liability covering the Lender Indemnitees, to the extent the same is available;

(iii)     business income interruption/rental loss insurance (A) with loss payable to Lender; (B) covering all risks required to be covered by the insurance provided for in clauses (i), (vi) and (xi) of this Section 5.1.1(a) for a period commencing at the time of loss for such length of time as it takes to repair or replace with the exercise of due diligence and dispatch,; (C) containing an extended period of indemnity endorsement which provides that after the physical loss to the Improvements and Personal Property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of twelve (12) months from the date that the Property is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period; and (D) in an amount equal to one hundred percent (100%) of the projected gross income from the Property for a period from the date of loss to a date (assuming total destruction) which is twenty-four (24) months from the date that the Property is repaired or replaced and operations are resumed.  The amount of such business income insurance shall be determined prior to the Closing Date and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Property for the succeeding twelve (12)-month period.  All proceeds payable to Lender pursuant to this clause (iii) shall be held by Lender and shall be applied to the obligations secured by the Loan Documents from time to time due and payable hereunder and under the Note; provided, however, that nothing herein contained shall be deemed to relieve Borrower of its obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such business income insurance;

(iv)     at all times during which structural construction, repairs or alterations are being made with respect to the Improvements, and only if the Property coverage form does not otherwise apply, (A) general and excess/umbrella liability insurance covering claims not covered by or under the terms or provisions of the commercial general and excess/umbrella liability insurance policies required in subsections (ii) and (viii) herein; and (B) the insurance provided for in subsections (i), (iii), (vi), and (xi) herein written in a so-called builder's risk completed value form (1) on a non-reporting basis, (2) against all risks insured against pursuant to subsections (i), (vi), and (xi) herein, (3) including permission to occupy the Property, and (4) with an agreed amount endorsement waiving co-insurance provisions;

(v)     workers' compensation, for any employees of Borrower and subject to the statutory limits of the state in which the Property is located, and employer's liability insurance with a limit of at least One Million and No/100 Dollars ($1,000,000.00) per accident and per disease per employee, and One

127

Million and No/100 Dollars ($1,000,000.00) for disease aggregate in respect of any work or operations on or about the Property, or in connection with the Property, its operation (if applicable) or any Capital Expenditures;

(vi)     boiler and machinery/equipment breakdown insurance, if applicable, in amounts as shall be reasonably required by Lender on terms consistent with the commercial property insurance policy required under clause (i) of this Section 5.1.1(a);

(vii)    umbrella liability insurance in addition to primary coverage in an amount not less than Fifty Million and No/100 Dollars ($50,000,000.00) per occurrence and in the aggregate on terms consistent with the commercial general liability insurance policy required under clause (ii) and commercial auto liability coverage required under clause (viii) of this Section 5.1.1(a);

(viii)   commercial auto liability coverage for all owned and non-owned vehicles, including rented and leased vehicles containing minimum limits per occurrence, including umbrella coverage, of One Million and No/100 Dollars ($1,000,000.00) (if applicable);

(ix)     liquor liability insurance required in connection with the sale of alcoholic beverages at the Property, if applicable;

(x)      insurance against employee dishonesty in an amount not less than one (1) month of gross revenue from the Property and with a deductible acceptable to Lender (if applicable);

(xi)     ordinance or law coverage to compensate for the cost of demolition and rebuilding of the undamaged portion of the Property along with any increased cost of construction with no sublimit for Coverage A, and sublimits of no less than ten percent (10%) each for Coverages B and C.  If the Property cannot be rebuilt to the same size or configuration due to Legal Requirements, if commercially available, Borrower will secure broadened "downzoning" coverage that provides full replacement cost basis in the event the property is not repaired or replaced;

(xii)    Environmental Liability Insurance Policy covering the Property scheduled thereon with a coverage limit of $5,000,000 for each incident and in the aggregate (such coverage limits, the "**PLL Policy Limit**", and such policy satisfying the requirements of this clause (xii), a "**PLL Policy**") with self-insured retention of no more than $50,000 per incident for clean-up costs and legal liability third-party claims. Such PLL Policy shall be for term of at least three (3) years past the Extension Maturity Date (the "**Required PLL Period**"); provided, however, Borrower may obtain such PLL Policy with a term of three (3) years so long as at least ten (10) Business Days prior to the expiration thereof, Borrower renews, extends or replaces such PLL Policy for a term not less than the Required PLL Period. Such PLL Policy (i) name the Lender as an additional named insured

128

with its successors and/or assigns as their interests may appear with an automatic right of assignment to one designated lender party in the event of default throughout the policy term; (ii) in the event the policy is cancelled by the insurers, a copy of such cancellation notice shall also be emailed to Lender; and (iii) shall, throughout the policy term, include the same coverages, terms, conditions and endorsements (and shall not be amended in any way that would have material or adverse impacts on the Properties, or cancelled, without the prior written consent of Lender) as the PLL Policy approved on the Closing Date;

    (xiii)   the insurance required under Section 5.1.1(a)(i)-(iv) and (vii) above shall cover perils of terrorism and acts of terrorism and Borrower shall maintain insurance for loss resulting from perils and acts of terrorism on terms (including amounts) consistent with those required under Section 5.1.1(a)(i)-(iv) and (vii) above at all times during the term of the Loan.  If "acts of terrorism" or other similar acts or events or "fire following" such acts or events are hereafter excluded from Borrower's comprehensive all risk insurance policy or policies required under Sections 5.1.1(a)(i) and 5.1.1(a)(iii) above, Borrower shall obtain an endorsement to such policy or policies, or a separate policy from an insurance provider which satisfies the requirements of Section 5.1.2, insuring against all such excluded acts or events and "fire following" such acts or events ("**Terrorism Insurance**") in an amount not less than the sum of 100% of the Full Replacement Cost and the business income/rent loss insurance required in Section 5.1.1(a)(iii) above; provided that such endorsement or policy shall be in form and substance reasonably satisfactory to Lender.  Notwithstanding the foregoing, for so long as the Terrorism Risk Insurance Act of 2002, as extended and modified by the Terrorism Risk Insurance Program Reauthorization Act of 2015 ("**TRIPRA**") is in effect (including any extensions thereof or if another federal governmental program is in effect relating to "acts of terrorism" which provides substantially similar protections as TRIPRA), Lender shall accept terrorism insurance which covers against "covered acts" as defined by TRIPRA (or such other program) as full compliance with this Section 5.1.1(a)(xiii) as it relates to the risks that are required to be covered hereunder but only in the event that TRIPRA (or such other program) continues to cover both domestic and foreign acts of terrorism; provided, that in the event that TRIPRA is no longer in effect, Borrower shall not be required to expend for Terrorism Insurance more than two hundred percent (200%) of the premiums for all other insurance coverage required hereunder, exclusive of earthquake and terrorism premiums (the "**Terrorism Cap**" ), and if the cost of such Terrorism Insurance exceeds the Terrorism Cap, Borrower shall obtain and maintain the maximum amount of Terrorism Insurance that can be purchased with funds equal to the Terrorism Cap; and

    (xiv)   upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Lender from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Property located in or around the region in which the Property is located.

(b)      All insurance provided for in Section 5.1.1(a) shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or, in the singular, the "**Policy**") and, to the extent not specified above, shall be subject to the reasonable approval of Lender as to deductibles.  Prior to the expiration dates of the Policies theretofore furnished to Lender, certificates of insurance evidencing the Policies, shall be delivered by Borrower to Lender.

(c)      Any blanket insurance Policy shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of Section 5.1.1 (any such blanket policy, an "**Acceptable Blanket Policy**"). To the extent that the Policies are maintained pursuant to an Acceptable Blanket Policy that covers more than one location within a five hundred foot radius of the Property (the "**Radius**"), the limits of such Acceptable Blanket Policy must be sufficient to maintain coverage on a total insured value basis in compliance with the provisions of Section 5.1.1 for each such location within the Radius, including the Property.

(d)      All Policies of insurance required herein shall name Borrower as an insured, or an additional insured (as appropriate) if coverages are provided by another entity.  In the case of liability policies, Lender and its successors and/or assigns shall be named as an additional insured, as its interests may appear, and in the case of property policies, including but not limited to boiler and machinery, flood, earthquake and terrorism insurance, shall contain a standard noncontributing mortgagee clause in favor of Lender providing that the loss thereunder shall be payable to Lender.  Borrower shall not procure or permit any of its constituent entities to procure any other insurance coverage which would be on the same level of payment as the Policies or would adversely impact in any way the ability of Lender or Borrower to collect any proceeds under any of the Policies.

(e)      All Policies of insurance provided for in Section 5.1.1(a), except for the Policies referenced in Section 5.1.1(a)(v) and (a)(viii), shall contain clauses or endorsements to the effect that:

(i)      no act or negligence of Borrower, or anyone acting for Borrower, or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof or foreclosure of similar action, shall in any way affect the validity or enforceability of the insurance insofar as Lender is concerned;

(ii)      the Policy shall not be canceled without at least thirty (30) days' written notice to Lender, except for ten (10) days' written notice for cancellation due to non-payment of premium; and

(iii)      each Policy shall provide that the issuers thereof shall give ten (10) days' written notice to Lender if the issuers elect not to renew prior to its expiration.  If the issuers cannot or will not provide notice, Borrower shall be obligated to provide such notice; and

130

(iv)    Lender shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder.

(f)    If at any time Lender is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Lender shall have the right, without notice to Borrower, to take such action as Lender deems necessary to protect its interest in the Property, including, without limitation, the obtaining of such insurance coverage as Lender in its sole discretion deems appropriate and all premiums incurred by Lender in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Lender upon demand and until paid shall be secured by the Mortgage and shall bear interest at the Default Rate.

(g)    In the event of foreclosure of the Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Lender or other transferee in the event of such other transfer of title.

5.1.2    Insurance Company.  The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and (A) each having a rating by (1)  "A-" or better by S&P or (2) "A-:VIII" by A.M.  Best (provided, however for multi-layered policies, (A) if four (4) or fewer insurance companies issue the Policies, then at least 75% of the insurance coverage represented by the Policies must be provided by insurance companies with a rating of "A-" or better by S&P or "A-:VIII" by A.M. Best, with no carrier below "BBB" with S&P or "A-:VII" by A.M.  Best, or (B) if five (5) or more insurance companies issue the Policies, then at least sixty percent (60%) of the insurance coverage represented by the Policies must be provided by insurance companies with a rating of "A-" or better by S&P or "A-:VIII" by A.M.  Best, with no carrier below "BBB" with S&P) or "A-:VII" by A.M.  Best.

Section 5.2    Casualty and Condemnation.

5.2.1    Casualty.  If the Property shall sustain a Casualty, Borrower shall give prompt notice of such Casualty to Lender and shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "**Restoration**") and otherwise in accordance with Section 5.3, it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Lender may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.  In the event of a Casualty where the loss does not exceed the Restoration Threshold, in Lender's reasonable good faith determination, Borrower may settle and adjust such claim; provided that (a) no Event of Default has occurred and is continuing and (b) such adjustment is carried out in a commercially reasonable and timely manner.  In the event of a Casualty where the loss exceeds the Restoration Threshold, in Lender's reasonable good faith determination, or if an Event of Default then exists, Borrower may settle and adjust such claim

131

only with the consent of Lender (which consent shall not be unreasonably withheld, conditioned or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost, in any such adjustments.  Notwithstanding any Casualty, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.

5.2.2    Condemnation.  Borrower shall give Lender prompt notice of any actual or threatened (in writing) Condemnation by any Governmental Authority of all or any part of the Property of which it is aware and shall deliver to Lender a copy of any and all papers served in connection with such proceedings.  Provided no Event of Default has occurred and is continuing and in the event of a Condemnation where the value of the taking does not exceed the Restoration Threshold, in Lender's reasonable good faith determination, Borrower may settle and compromise such Condemnation; provided that the same is effected in a commercially reasonable and timely manner.  In the event a Condemnation where the value of the taking exceeds the Restoration Threshold, in Lender's reasonable good faith determination, or if an Event of Default then exists, Borrower may settle and compromise the Condemnation only with the consent of Lender (which consent shall not be unreasonably withheld or delayed) and Lender shall have the opportunity to participate, at Borrower's reasonable cost, in any litigation and settlement discussions in respect thereof and Borrower shall from time to time deliver to Lender all instruments reasonably requested by Lender to permit such participation.  Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Lender, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings.  Notwithstanding any Condemnation, Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement.  Lender shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note.  If the Property or any portion thereof is taken by any Governmental Authority, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of Section 5.3.  If the Property is sold, through foreclosure or otherwise, prior to the receipt by Lender of the Award, Lender shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt.

5.2.3    Casualty    Proceeds.    Notwithstanding    the    last    sentence    of Section 5.1.1(a)(iii) and provided no Event of Default exists hereunder, proceeds received by Lender on account of the business interruption insurance specified in Section 5.1.1(a)(iii) above with respect to any Casualty shall be deposited by Lender directly into the Deposit Account but (a) only to the extent it reflects a replacement for (i) lost Rents that would have been due under Leases existing on the date of such Casualty, and/or (ii) lost Rents under Leases that had not yet been executed and delivered at the time of such Casualty which Borrower has proven to the insurance company would have been due under such Leases (and then only to the extent such proceeds disbursed by the insurance company reflect a replacement for such past due Rents) and (b) only to the extent necessary to fully pay debt service, make the required monthly reserve deposits and pay operating expenses approved by Lender pursuant to the terms of this Agreement. All other such proceeds shall be held by Lender and disbursed in accordance with Section 5.3 hereof.

Section 5.3    Delivery of Net Proceeds.

5.3.1    Minor Casualty or Condemnation.  If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, and provided no Event of Default shall have occurred, the Net Proceeds will be disbursed by Lender to Borrower upon receipt, and promptly after receipt of the Net Proceeds, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement.  If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to the terms hereof, such Net Proceeds shall, until completion of the Restoration, be held in trust for Lender and shall be segregated from other funds of Borrower to be used to pay for the cost of Restoration in accordance with the terms hereof.

5.3.2    Major Casualty or Condemnation.  (a) If a Casualty or Condemnation has occurred to the Property and the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration is equal to or greater than the Restoration Threshold, then Lender shall make the Net Proceeds available for the Restoration, provided that each of the following conditions are met:

(i)    no Event of Default shall have occurred and be continuing;

(ii)    (1) in the event the Net Proceeds are Insurance Proceeds, less than thirty percent (30%) of the total floor area of the Improvements on the Property has been damaged, destroyed or rendered unusable as a result of such Casualty or (2) in the event the Net Proceeds are Condemnation Proceeds, less than fifteen percent (15%) of the land constituting the Property is taken, and such land is located along the perimeter or periphery of the Property, and no portion of the Improvements is located on such land;

(iii)    Leases demising in the aggregate a percentage amount equal to or greater than sixty percent (60%) of the total rentable space in the Property which has been demised under executed and delivered Leases in effect as of the date of the occurrence of such Casualty or Condemnation, whichever the case may be, shall remain in full force and effect during and after the completion of the Restoration without abatement of rent beyond the time required for Restoration, notwithstanding the occurrence of any such Casualty or Condemnation, whichever the case may be, and will make all necessary repairs and restorations thereto that are not being made by Borrower as part of the Restoration at their sole cost and expense;

(iv)    Borrower shall commence the Restoration as soon as reasonably practicable (but in no event later than one hundred and twenty (120) days after such Casualty or Condemnation, whichever the case may be, occurs) and shall diligently pursue the same to satisfactory completion;

(v)    Lender shall be satisfied in its reasonable discretion that the cost of Restoration and all Operating Expenses and Debt Service that will be incurred during the Restoration will be covered out of (1) the Net Proceeds, (2) the

133

insurance coverage referred to in Section 5.1.1(a)(iii), if applicable, or (3) by other funds of Borrower;

(vi)    Lender shall be satisfied in its reasonable discretion that the Restoration will be completed on or before the earliest to occur of (1) the date six (6) months prior to the Initial Maturity Date, (2) the earliest date required for such completion under the terms of any Lease, (3) such time as may be required under applicable Legal Requirements or (4) six (6) months prior to the expiration of the insurance coverage referred to in Section 5.1.1(a)(iii);

(vii)    intentionally omitted;

(viii)    intentionally omitted;

(ix)    the Property and the use thereof after the Restoration will be in material compliance with and permitted under all applicable material Legal Requirements;

(x)    the Restoration shall be done and completed by Borrower in a diligent fashion and in material compliance with the Ground Lease and all applicable material Legal Requirements;

(xi)    such Casualty or Condemnation, as applicable, does not result in the loss of all access to the Property or the related Improvements;

(xii)    the Loan to Value Ratio shall be equal to or less than seventy percent (70%); and

(xiii)    Borrower shall deliver, or cause to be delivered, to Lender a signed detailed budget approved in writing by Borrower's architect or engineer stating the entire cost of completing the Restoration, which budget shall be reasonably acceptable to Lender.

(b)    With respect to a Casualty or Condemnation where the Net Proceeds in connection therewith are equal to or greater than the Restoration Threshold or the cost of completing the Restoration is equal to or greater than the Restoration Threshold, such Net Proceeds shall be paid directly to Lender and held by Lender in an interest-bearing account and, until disbursed in accordance with the provisions of this Section 5.3.2, shall constitute additional security for the Debt.  The Net Proceeds shall be disbursed by Lender to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence reasonably satisfactory to Lender that (i) all requirements set forth in Section 5.3.2(a) have been satisfied, (ii) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement or being disputed by Borrower in accordance with the terms hereof) in connection with the Restoration have been paid for in full, and (iii) there exist no notices of pendency, stop orders, mechanic's or materialman's Liens or notices of intention to file same, or any other Liens or encumbrances of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the reasonable

134

satisfaction of Lender and discharged of record or in the alternative fully insured to the reasonable satisfaction of Lender by the title company issuing the Title Insurance Policy.

(c)    All plans and specifications required in connection with the Restoration shall be subject to prior approval of Lender and an independent architect selected by Lender (the "**Casualty Consultant**"), which approval shall not be unreasonably withheld, conditioned or delayed by Lender and the Casualty Consultant. The plans and specifications shall require that the Restoration be completed in a first-class workmanlike manner at least equivalent to the quality and character of the original work in the Improvements (provided, however, that in the case of a partial Condemnation, the Restoration shall be done to the extent reasonably practicable after taking into account the consequences of such partial Condemnation), so that upon completion thereof, the Property shall be at least equal in value and general utility to the Property prior to the damage or destruction; it being understood, however, that Borrower shall not be obligated to restore the Property to the precise condition of the Property prior to such Casualty provided the Property is restored, to the extent practicable, to be of at least equal value and of substantially the same character as prior to the Casualty.  Borrower shall restore all Improvements such that when they are fully restored and/or repaired, such Improvements and their contemplated use comply in all material respects with all applicable material Legal Requirements.  The identity of the general contractor or construction manager, as the case may be, as well as the contract under which such Person is to be engaged, shall be subject to approval of Lender and the Casualty Consultant, which approval shall not be unreasonably withheld, conditioned or delayed by Lender and the Casualty Consultant.  All reasonable, out-of-pocket and documented costs and expenses incurred by Lender in connection with recovering, holding and advancing the Net Proceeds for the Restoration including, without limitation, reasonable attorneys' fees of retained firms (excluding in-house counsel) and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by Borrower.

(d)    In no event shall Lender be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage.  The term "**Casualty Retainage**" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until the Restoration has been fifty percent (50%) completed, such fifty percent (50%) completion to be certified by the Casualty Consultant, it being understood that upon such fifty percent (50%) completion of such Restoration, such Casualty Retainage would be reduced to an amount equal to five percent (5%) of the costs actually incurred for work in place as part of such Restoration.  The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above in this Section 5.3.2(d), be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant certifies to Lender that the Restoration has been substantially completed in accordance with the provisions of this Section 5.3.2(d) and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Lender receives evidence

135

reasonably satisfactory to Lender that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Lender will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Lender that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and/or evidence of payment in full (except to the extent payment is expected from the Casualty Retainage once disbursed) of all sums due to the contractor, subcontractor or materialman as may be reasonably requested by Lender or by the title company issuing the Title Insurance Policy.

(e)    Lender shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month.

(f)    If at any time the Net Proceeds or the undisbursed balance thereof shall not, in the reasonable good faith opinion of Lender in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall, at its option, either (i) deposit the deficiency (the "**Net Proceeds Deficiency**") with Lender before any further disbursement of the Net Proceeds shall be made or (ii) provide Lender with (A) cash, (B) Letters of Credit, (C) a completion bond or guaranty reasonably acceptable to Lender or (D) evidence reasonably satisfactory to Lender that Borrower has paid from its own funds (including by contribution from its direct or indirect owners) the Net Proceeds Deficiency.  Any Net Proceeds Deficiency deposited with Lender shall be held by Lender and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 5.3.2 shall constitute additional security for the Debt.

(g)    The excess, if any, of the Net Proceeds and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Lender after the Casualty Consultant certifies to Lender that the Restoration has been substantially completed in accordance with the provisions of this Section 5.3.2, and the receipt by Lender of evidence reasonably satisfactory to Lender that all costs incurred in connection with achieving substantial completion of the Restoration have been paid in full (or will be paid in full upon receipt of same), shall be remitted by Lender to Borrower, provided no Event of Default shall have occurred and shall be continuing under any of the Loan Documents.

(h)    All Net Proceeds not required (i) to be made available for the Restoration or (ii) to be returned to Borrower as excess Net Proceeds pursuant to Section 5.3.2(g) may be applied by Lender toward the payment of the Debt, whether or not then due and payable, in such order, priority and proportions as Lender in its sole discretion shall deem proper or, at the discretion of the Lender, may be paid, in whole or in part, to Borrower for such purposes as Lender shall designate.  Upon payment in full of the Debt (excluding any indemnification or other Obligation that is expressly stated in this

136

Agreement or any other Loan Document to survive the payment of the Debt in full), any remaining Net Proceeds shall be paid to Borrower.

## ARTICLE VI
## RESERVE FUNDS

Section 6.1     Cash Management Arrangements.  Subject to the terms of the Master Lease entered into in accordance with the terms hereof, Borrower shall (and shall cause Manager to) cause all Rents and other Gross Revenue to be transmitted directly into a trust account (the "**Clearing Account**") established and maintained by Borrower at an Eligible Institution selected by Borrower and reasonably approved by Lender (the "**Clearing Bank**").  Subject to the terms of the Master Lease entered into in accordance with the terms hereof, Borrower shall cause each Tenant at the Property to pay all Rent directly into the Clearing Account pursuant to the terms hereof. Subject to the terms of the Master Lease entered into in accordance with the terms hereof, Borrower hereby agrees that Borrower shall execute and deliver a Tenant Direction Letter addressed to (A) each Tenant existing as of the Closing Date within three (3) Business Days after the Closing Date, and (B) any new Tenant pursuant a Lease executed after the Closing Date in accordance with the terms hereof, concurrently with the execution of such Lease.  Borrower hereby irrevocably constitutes and appoints Lender as the attorney-in-fact of Borrower, coupled with an interest, to, upon Borrower's failure to deliver any such Tenant Direction Letter as provided above, execute and deliver such Tenant Direction Letter in the name of and on behalf of Borrower. Subject to the terms of the Master Lease entered into in accordance with the terms hereof, without in any way limiting the foregoing, if Borrower, Manager or any of their respective Affiliates receive any Rents or other Gross Revenue from the Property, then (i) such amounts shall be deemed to be collateral for the Obligations and shall be held in trust for the benefit of, and as the property of Lender, (ii) such amounts shall not be commingled with any other funds or property of Borrower, Manager or any of their respective Affiliates, and (iii) Borrower, Manager or such Affiliate shall deposit such amounts in the Clearing Account within two (2) Business Day of receipt thereof. Funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account and applied and disbursed in accordance with this Agreement.  Funds in the Deposit Account that are invested shall be invested in Permitted Investments.  Lender may also establish subaccounts (which shall at all times be Eligible Accounts) of the Deposit Account and/or may establish ledger or book entry accounts and not actual accounts (such subaccounts are referred to herein as "**Accounts**").  The Deposit Account and all the Accounts will be under the sole control and dominion of Lender, and Borrower shall have no right of withdrawal therefrom.  Borrower shall pay for all reasonable, out-of-pocket and documented expenses of opening and maintaining the Clearing Account, the Deposit Account and all of the Accounts.

Section 6.2     Property Tax Funds.

6.2.1     Deposits of Property Tax Funds.  On the Closing Date, Borrower shall deposit into an Account controlled by Lender (the "**Property Tax Account**") the amount of $400,621.79 and, thereafter, on each Monthly Payment Date, an amount equal to one-twelfth of the Property Taxes that Lender reasonably and in good faith estimates will be payable during the next ensuing twelve (12) months which Property Taxes are not the responsibility of Tenants pursuant to Leases, in order to accumulate sufficient funds to pay all such Property Taxes at least ten (10) days prior to their respective due dates.  Amounts deposited into the Property Tax Account

137

are referred to herein as the "**Property Tax Funds**." If, at any time, Lender reasonably and in good faith determines that the Property Tax Funds (after taking into account the Property Taxes that are the responsibility of Tenants pursuant to their Leases) will not be sufficient to pay the Property Taxes, Lender shall notify Borrower of such determination and the monthly deposits for Property Taxes shall be increased by the amount that Lender reasonably and in good faith estimates is sufficient to make up the deficiency at least ten (10) days prior to the respective due dates for the Property Taxes; provided that if Borrower receives notice of any deficiency after the date that is ten (10) days prior to the date that Property Taxes are due, Borrower will deposit such amount into the Property Tax Account within three (3) Business Day after its receipt of such notice.

6.2.2    Release of Property Tax Funds.  Lender shall apply the Property Tax Funds to payments of Property Taxes.  In making any payment relating to Property Taxes, Lender may do so according to any bill, statement or estimate procured from the appropriate public office (with respect to Property Taxes) without inquiry into the accuracy of such bill, statement or estimate or into the validity of any tax, assessment, sale, forfeiture, tax Lien or title or claim thereof.  If the amount of the Property Tax Funds shall exceed the amounts due for Property Taxes, Lender shall credit such excess against future payments to be made to the Property Tax Funds.  Any Property Tax Funds remaining after the Debt has been paid in full (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Document to survive the payment of the Debt in full) shall be returned to Borrower.

Section 6.3    Insurance Funds.

6.3.1    Deposits of Insurance Funds.  On the Closing Date, Borrower shall deposit into an Account controlled by Lender (the "**Insurance Account**") the amount of $0, and, thereafter, on each Monthly Payment Date, an amount equal to one-twelfth of the Insurance Premiums that Lender reasonably and in good faith estimates will be payable for the renewal of the coverage afforded by the Policies upon the expiration thereof in order to accumulate sufficient funds to pay all such Insurance Premiums at least thirty (30) days prior to the expiration of the Policies.  Amounts deposited pursuant into the Insurance Account are referred to herein as the "**Insurance Funds**." If at any time, Lender reasonably and in good faith determines that the Insurance Funds will not be sufficient to pay the Insurance Premiums, Lender shall notify Borrower of such determination and the monthly deposits for Insurance Premiums shall be increased by the amount that Lender reasonably and in good faith estimates is sufficient to make up the deficiency at least thirty (30) days prior to expiration of the Policies.  Notwithstanding the foregoing, Lender agrees that upon delivery to Lender by Borrower of evidence reasonably satisfactory to Lender that the Policies of insurance required to be maintained by Borrower pursuant to Section 5.1.1 are maintained pursuant to blanket insurance Policies covering the Property and other properties and which blanket insurance Policies otherwise comply with the requirements of Section 5.1.1 and the Insurance Premiums payable in connection therewith have been prepaid for not less than one year in advance (or, for the period of coverage under the Policies as to which certificates are delivered at closing, such period, if less than one year), then Borrower shall not be required to make monthly payments of the Insurance Funds pursuant to this Section 6.3.1.  Upon request of Lender, Borrower shall provide evidence reasonably satisfactory to Lender that the Insurance Premiums payable in connection with such blanket insurance Policies are paid as soon as appropriate evidence is reasonably available.  As of the Closing Date, an

138

Acceptable Blanket Policy is in effect with respect to the Policies required as of the Closing Date pursuant to Section 5.1.1.

6.3.2    Release of Insurance Funds.  Lender shall apply the Insurance Funds, if any, to the payment of Insurance Premiums.  In making any payment relating to Insurance Premiums, Lender may do so according to any bill, statement or estimate procured from the insurer or its agent, without inquiry into the accuracy of such bill, statement or estimate.  If the amount of the Insurance Funds shall exceed the amounts due for Insurance Premiums, Lender shall credit such excess against future payments to be made to the Insurance Premiums.  Any Insurance Funds remaining after the Debt has been paid in full (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Document to survive the payment of the Debt in full) shall be returned to Borrower.

6.3.3    Acceptable Blanket Policy. Notwithstanding anything to the contrary contained in Section 6.3.1, in the event that an Acceptable Blanket Policy is in effect with respect to the Policies required pursuant to Section 5.1.1, provided that (a) no Event of Default has occurred and is continuing, and (b) all Insurance Premiums payable in connection with such Acceptable Blanket Policy have been prepaid not less than one year in advance of the due date for such Insurance Premiums, deposits into the Insurance Account to pay for Insurance Premiums pursuant to Section 6.3.1 above shall be suspended to the extent that Insurance Premiums relate to such Acceptable Blanket Policy.

Section 6.4    Replacement Funds.

6.4.1    Replacement Fund.  On the Closing Date, Borrower shall deposit into an Account controlled by Lender (the "**Replacement Account**"), the amount of $0, and, thereafter, on each Monthly Payment Date an amount equal to the product of (x) $0.25, multiplied by (y) the total amount of rentable square feet in the building located on the Property (i.e., the retail and office space), to be utilized for payment of Capital Expenditures.  Amounts deposited into the Replacement Account are referred to herein as the "**Replacement Funds**."

6.4.2    Release of Replacement Funds.

(a)    Lender shall disburse to Borrower the Replacement Funds upon satisfaction by Borrower of each of the following conditions:  (i) Borrower shall submit a request for payment to Lender at least ten (10) days prior to the date on which Borrower requests such payment be made and specifies the Capital Expenditures to be paid, (ii) on the date such payment is to be made, no Event of Default shall be continuing, (iii) Lender shall have received a certificate from Borrower (A) stating that the items to be funded by the requested disbursement are Capital Expenditures, (B) stating that all Capital Expenditures at the Property (other than stored materials or deposits) to be funded by the requested disbursement have been completed in a good and workmanlike manner and in accordance in all material respects with all applicable material Legal Requirements, such certificate to be accompanied by a copy of any license, permit or other approval required by any Governmental Authority in connection with the Capital Expenditures, (C) identifying each Person that supplied materials or labor in connection with the Capital Expenditures to be funded by the requested disbursement, and (D) stating that each such

139

Person has been paid in full or will be paid in full upon such disbursement, and, at Lender's option, if the cost of any individual Capital Improvement exceeds $250,000 such certificate to be accompanied by (x) lien waivers (which may be conditional if payment is to be made from the disbursement) from contractors engaged by Borrower (excluding materialmen and suppliers), (y) evidence that all materialmen and suppliers have been paid in full or will be paid in full for work performed and materials provided, or (z) other evidence of payment reasonably satisfactory to Lender, unless and except in each case such to the extent such disbursement is to be used to pay such Person, (iv) at Lender's option, if the disbursement of Replacement Funds is in excess of $250,000, a title search for the Property indicating that the Property is free from all Liens other than Permitted Encumbrances and other Liens not previously approved by Lender, and (v) Lender shall have received such other evidence as Lender shall reasonably request that the Capital Expenditures at the Property to be funded by the requested disbursement (other than stored materials and deposits) have been completed and are paid for or will be paid upon such disbursement to Borrower.  Lender shall not be required to disburse Replacement Funds more frequently than once each calendar month, nor in an amount less than $10,000 (or a lesser amount if the total amount of Replacement Funds is less than $10,000, in which case only one disbursement of the amount remaining in the account shall be made).

(b)     If the disbursement of Replacement Funds is in excess of $250,000, Borrower shall permit Lender and Lender's agents and representatives (including, without limitation, Lender's engineer, architect, or inspector) or third parties to enter onto the Property during normal business hours (subject to the rights of Tenants under their Leases and upon reasonable advance written notice) to inspect the progress of any Capital Expenditures and all materials being used in connection therewith and to examine all plans and shop drawings, if any, relating to such Capital Expenditures, provided that each such inspection does not unreasonably interfere with the construction of the Capital Expenditures, the Hotel Conversion, the Office CapEx Projects, or Tenant Improvements or the operation of the Property, and such agents, representatives and employees of Lender comply with all safety and other reasonable rules and requirements instituted by Borrower (or its agents and representatives, including any contractor) with respect to the Capital Expenditures, Hotel Conversion, the Office CapEx Projects, Tenant Improvements and/or the Property or Tenants at the Property, Borrower shall use commercially reasonable efforts to cause all contractors and subcontractors to cooperate with Lender or Lender's representatives or such other Persons described above in connection with inspections described in this Section 6.4.2(b).

(c)     In addition to any insurance required under the Loan Documents, Borrower shall provide or cause to be provided workmen's compensation insurance, builder's risk, and public liability insurance and other insurance to the extent required under applicable Legal Requirements in connection with Capital Expenditures.  All such policies shall be in form and amount reasonably satisfactory to Lender.

(d)     Nothing in this Section 6.4.2 shall (i) make Lender responsible for making or completing the Capital Expenditures; (ii) require Lender to expend funds in addition to the Replacement Funds to complete any Capital Expenditures; (iii) obligate

140

Lender to proceed with the Capital Expenditures; or (iv) obligate Lender to demand from Borrower additional sums to complete any Capital Expenditures.

(e)     Any Replacement Funds remaining after the Debt has been paid in full (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Document to survive the payment of the Debt in full) shall be returned to Borrower.

Section 6.5     Rollover Funds.

6.5.1     Deposits of Rollover Funds.  On the Closing Date, (i) Borrower shall deposit into an Account controlled by Lender (the "**Rollover Account**"), the amount of $9,794,600.98, which shall be made available to Borrower pursuant to Section 6.5.2 hereof solely to fund the exiting leasing costs set forth on **Schedule VI** with respect to the Digitas Lease, and (ii) Lender shall deposit into the Rollover Account, the amount of $591,516.82 which shall be made available to Borrower pursuant to Section 6.5.2 hereof solely to fund the leasing costs set forth on **Schedule VI** attached hereto that will become due and payable with respect to Digitas's expansion of up to 6,500 square feet on the 6th floor of the Property pursuant to the Digitas Lease, provided that as a condition to such disbursement, Borrower shall fund Borrower's Share of the remaining 50% of the amount due to Digitas with respect to such space, provided, further that if Digitas fails to exercise the Digitas Expansion Option (as defined in the Purchase Agreement) prior to the outside date therefor set forth in the Digitas Lease, then the amount deposited pursuant to this clause (ii) shall be applied to prepay the Debt. In addition, in the event that Borrower receives (i) any rejection, termination, surrender or cancellation of any Lease (including in any bankruptcy case) or any lease buy-out or surrender payment from any Tenant (including any payment relating to unamortized Tenant Improvements and/or leasing commissions), or (ii) any forfeited or applied security deposit, including any letter of credit, in connection with a default under a Lease (individually or collectively, a "**Lease Termination Fee**"), Borrower shall immediately deposit such Lease Termination Fee into the Rollover Account.  Amounts deposited into the Rollover Account are referred to herein as the "**Rollover Funds**" and shall be utilized for the payment of Tenant Improvements, Tenant Improvement Allowances and Leasing Commissions incurred in connection with the terms and provisions hereof.

6.5.2     Release of Rollover Funds.  Within ten (10) days after Lender's receipt of a written request from Borrower, and provided that on the date such disbursement is to be made no Event of Default shall exist and remain uncured, Lender shall disburse to Borrower the requested Rollover Funds upon satisfaction by Borrower of each of the following conditions, as applicable:

(a)     Releases for Tenant Improvements.  For each disbursement request relating to Tenant Improvements:  (i) Borrower's request shall specify the Tenant Improvement costs for which such disbursement is requested; (ii) Lender shall have received and, to the extent required hereby, approved the Lease in respect of which Borrower is obligated to complete the Tenant Improvements for which such disbursement is requested to the extent Lender's consent is required under this Agreement; (iii) Lender shall have received a certificate from Borrower (A) stating that all Tenant Improvements at the Property (other than stored materials or deposits) to be funded by the requested

141

disbursement have been or are in the process of being performed in good and workmanlike manner and in accordance in all material respects with all applicable material Legal Requirements, (B) identifying each Person that supplied materials or labor in connection with the Tenant Improvements to be funded by the requested disbursement, and (C) stating that each such Person has been paid in full or upon such disbursement will be paid in full with respect to the Tenant Improvements to be funded by the requested disbursement for all amounts then invoiced by and due and owing to such Person, at Lender's option, if the cost of any individual Tenant Improvement exceeds $250,000, such certificate to be accompanied by lien waivers from contractors engaged by Borrower (other than materialmen and suppliers so long as Borrower has provided evidence to Lender that all such Persons have been or upon disbursement will be paid in full for work performed and materials provided) (which may be conditioned upon payment) or other evidence of payment reasonably satisfactory to Lender, unless such disbursement is to be used to pay such Person; (iv) at Lender's option, if the disbursement of Rollover Funds is in excess of $250,000, Lender shall have received a title search for the Property indicating that the Property is free from all Liens, other than Permitted Encumbrances and other Liens  not previously approved by Lender; and (v) Lender shall have received such other evidence as Lender shall reasonably request that the Tenant Improvements at the Property to be funded by the requested disbursement (other than stored materials and deposits) have been completed and are paid for or will be paid for upon such disbursement to Borrower.

(b)    Release for Tenant Improvement Allowances and Leasing Commissions.  For each disbursement request relating to Tenant Improvement Allowances or Leasing Commissions, as applicable:  (i) Borrower's request shall specify the Tenant Improvement Allowances or Leasing Commissions for which such disbursement is requested; (ii) Lender shall have received and, to the extent required hereby, approved the Lease in respect of which Borrower is obligated to pay the Tenant Improvement Allowances or Leasing Commissions for which such disbursement is requested; (iii) in the case of Tenant Improvement Allowances, Borrower shall certify to Lender that all conditions under the applicable Lease(s) for the release of the Tenant Improvement Allowances to be funded by the requested disbursement have been satisfied in all material respects and shall provide to Lender copies of the documentation (if any) provided by the applicable Tenant pursuant to its Lease in support of its request for payment of such Tenant Improvement Allowances; and (iv) in the case of Leasing Commissions, Borrower shall certify to Lender that all conditions to the payment of the Leasing Commissions to be funded by the requested disbursement have been satisfied in all material respects and shall provide to Lender copies of invoices and bills for such Leasing Commissions.

(c)    Lender shall not be required to disburse Rollover Funds more frequently than once each calendar month, nor in an amount less than $10,000 (or a lesser amount if the total amount of Rollover Funds is less than $10,000, in which case only one disbursement of the amount remaining in the account shall be made).

(d)    Any Rollover Funds remaining after the Debt has been paid in full (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Document to survive the payment of the Debt in full) shall be returned to Borrower.

142

Section 6.6    Hotel Conversion Rebalancing Reserve Account.

6.6.1    Deposit in Hotel Conversion Rebalancing Reserve Account.  At any time and from time to time during the term of the Loan, Lender shall have the right (but not the obligation) to notify Borrower in writing (the "**Hotel Conversion Shortfall Notice**") that, as determined in Lender's sole but good faith discretion (a) the cost of all Hotel Conversion Expenses necessary to achieve Hotel Conversion Final Completion that remain unpaid at the time in question exceeds the Hotel Conversion Expenses Available Amount (taking into account amounts on deposit in the Hotel Conversion Rebalancing Reserve Account, any Cost Savings and/or budget reallocations permitted pursuant to Section 7.5 hereof ), or (b) the cost of completing any Line Item in the Hotel Conversion Budget exceeds the Hotel Conversion Expenses Available Amount allocated to such Line Item in the Hotel Conversion Budget (taking into account amounts on deposit in the Hotel Conversion Rebalancing Reserve Account that are attributable to such Line Item, any Cost Savings and/or budget reallocations permitted pursuant to Section 7.5 hereof) (the amount of any such deficiency under clauses (a) and (b), being herein referred to as the "**Hotel Conversion Shortfall**").  If Lender at any time shall deliver a Hotel Conversion Shortfall Notice to Borrower, Borrower shall within thirty (30) days of delivery of the Hotel Conversion Shortfall Notice, deposit into an Account controlled by Lender (the "**Hotel Conversion Rebalancing Reserve Account**") such Hotel Conversion Shortfall.  Failure to timely make such deposit as set forth herein shall be an immediate Event of Default.  For the avoidance of doubt, a Hotel Conversion Shortfall may exist whether or not Lender delivers a Hotel Conversion Shortfall Notice to Borrower.  Lender shall have no obligation to make further Advances until the sums required to be deposited in the Hotel Conversion Rebalancing Reserve Account pursuant to this Section 6.6.1 have been exhausted and, in any event, the Hotel Conversion Budget is back "in balance".

6.6.2    Release of Hotel Conversion Rebalancing Reserve Funds.  Provided that no monetary Default, material non-monetary Default, Event of Default, Hotel Conversion Shortfall, Projected Carry Cost Shortfall or Leasing Cost Shortfall has occurred and is continuing, amounts on deposit in the Hotel Conversion Rebalancing Reserve Account from time to time shall be disbursed to Borrower in the same manner as if the same were Hotel Conversion Advances under this Agreement (and, for the avoidance of doubt, subject to the same conditions precedent to the receipt of Hotel Conversion Advances hereunder).  So long as any amounts are on deposit in the Hotel Conversion Rebalancing Reserve Account from time to time, Lender shall not make any further Hotel Conversion Advances until all such amounts are utilized in accordance with the immediately preceding sentence.  Upon the occurrence and during the continuance of an Event of Default, Lender in its sole discretion may apply amounts in the Hotel Conversion Rebalancing Reserve Account to the remaining Hotel Conversion Expenses or to the immediate payment of any Obligations.  Any amounts remaining in the Hotel Conversion Rebalancing Reserve Account remaining after the Debt has been paid in full (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Document to survive the payment of the Debt in full) shall be returned to Borrower.

Section 6.7    Carry Cost Account.

6.7.1    Deposits into the Carry Cost Account.   If as of any time, Lender determines in its sole but good faith discretion that a Projected Carry Cost Shortfall is projected for the succeeding three (3)-month period, then Lender shall notify Borrower of such determination (a

143

"**Projected Carry Cost Shortfall Notice**") and Borrower shall, within thirty (30) days of delivery of such Projected Carry Cost Shortfall Notice from Lender, deposit the amount of such Projected Carry Cost Shortfall into an Account controlled by Lender (the "**Carry Cost Account**").  Failure to timely make such deposit as set forth herein shall be an immediate Event of Default.  Amounts deposited from time to time into the Carry Cost Account pursuant to this Section 6.7.1 are referred to herein as the "**Carry Cost Funds**."

6.7.2    Release of Carry Cost Funds.  Provided that no monetary Default, material non-monetary Default, Event of Default, Hotel Conversion Shortfall, Projected Carry Cost Shortfall or Leasing Cost Shortfall has occurred and is continuing, Lender shall apply amounts, if any, in the Carry Cost Account toward the Monthly Carry Cost Shortfall existing on any Monthly Payment Date as determined by Lender in its sole but good faith discretion; provided, that Borrower shall be obligated to first request a Carry Cost Advance to fund any Monthly Carry Cost Shortfall for any particular month prior to requesting a disbursement from the Carry Cost Account in order to fund such Monthly Carry Cost Shortfall, and in no event shall Lender be required to apply Carry Cost Reserve Funds on any Monthly Payment Date to the extent such disbursement would cause a Projected Carry Cost Shortfall as determined by Lender in its sole and absolute discretion.  Any Carry Cost Reserve Funds (other than any Unadvanced Carry Cost Amount funded into the Carry Cost Account pursuant to Section 2.7.3 hereof) shall be disbursed to Borrower so long as no monetary Default, Event of Default or Projected Carry Cost Shortfall is then continuing, upon the earlier of (x) payment in full of the Obligations (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Document to survive the payment of the Debt in full), and (y) the first Calculation Date on which (i) no Debt Yield Event is then continuing for two (2) consecutive quarters, and (ii) no Debt Service Coverage Ratio Event is then continuing for two (2) consecutive quarters.

Section 6.8    Excess Cash Funds.

6.8.1    Deposits into the Cash Collateral Account.  Upon the occurrence and during the continuance of a Cash Management Sweep Period, all Excess Cash Flow shall be deposited into an Account controlled by Lender (the "**Cash Collateral Account**") to be held as additional collateral for the Loan.  All funds deposited into the Cash Collateral Account shall be referred to as "**Excess Cash Funds**."

6.8.2    Release of Excess Cash Funds.  Excess Cash Funds shall be held by Lender in the Cash Collateral Account as additional security for Borrower's Obligations.  Any Excess Cash Funds on deposit in the Cash Collateral Account not previously disbursed or applied shall, upon the termination of such Cash Management Sweep Period, be disbursed to Borrower.  Any Excess Cash Funds remaining after payment in full of the Debt (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Documents to survive payment of the Debt in full) shall be returned to Borrower.

Section 6.9    Outstanding Hotel Conversion Shortfall. Notwithstanding anything in this Agreement to the contrary (including Sections 6.6.1, 6.7.1 and/or 6.10.1 hereof), if Lender has delivered to Borrower a Hotel Conversion Shortfall Notice, a Projected Carry Cost Shortfall Notice or a Leasing Cost Shortfall Notice, and the amount of all outstanding unfunded shortfalls is equal to or less than $2,000,000.00, then Borrower shall not be obligated to fund the resulting shortfall

144

into the applicable Account, but instead may fund the same using equity funds until the Loan is back "in balance" (provided that Lender shall have no obligation to make further Advances until all such outstanding shortfalls have been funded and the Loan is back "in balance").

Section 6.10    Leasing Cost Account.

6.10.1    Deposit in Leasing Cost Rebalancing Reserve Account.  At any time and from time to time during the term of the Loan, Lender shall have the right (but not the obligation) to notify Borrower in writing (the "**Leasing Cost Shortfall Notice**") that, as determined in Lender's sole but good faith discretion with respect to any executed Lease (or as a condition to Lender granting its consent to the execution of any Lease), the costs estimated to achieve Individual Lease Completion of such Lease exceeds the Leasing Cost Available Amount allocated to such Lease (the amount of any such deficiency being herein referred to as the "**Leasing Cost Shortfall**").  If Lender at any time shall deliver a Leasing Cost Shortfall Notice to Borrower, Borrower shall within thirty (30) days of delivery of the Leasing Cost Shortfall Notice, deposit into an Account controlled by Lender (the "**Leasing Cost Rebalancing Reserve Account**") an amount equal to such Leasing Cost Shortfall.  Failure to timely make such deposit as set forth herein shall be an immediate Event of Default.  For the avoidance of doubt, a Leasing Cost Shortfall may exist whether or not Lender delivers a Leasing Cost Shortfall Notice to Borrower. Lender shall have no obligation to make further Advances until the sums required to be deposited in the Leasing Cost Rebalancing Reserve Account pursuant to this Section 6.10.1 have been exhausted and, in any  such case, such Lease is back "in balance."

6.10.2    Release of Leasing Cost Rebalancing Reserve Funds.  Provided that no monetary Default, material non-monetary Default, Event of Default, Hotel Conversion Shortfall, Leasing Cost Shortfall, Projected Carry Cost Shortfall or Leasing Cost Shortfall has occurred and is continuing, amounts on deposit in the Leasing Cost Rebalancing Reserve Account from time to time shall be disbursed to Borrower in the same manner as if the same were Leasing Cost Advances under this Agreement (and, for the avoidance of doubt, subject to the same conditions precedent to the receipt of Leasing Cost Advances hereunder).  So long as any amounts are on deposit in the Leasing Cost Rebalancing Reserve Account from time to time, Lender shall not make any further Leasing Cost Advances until all such amounts are utilized in accordance with the immediately preceding sentence.  Upon the occurrence and during the continuance of an Event of Default, Lender in its sole discretion may apply amounts in the Leasing Cost Rebalancing Reserve Account to the remaining costs and expenses under such Lease or to the immediate payment of any Obligations.  Any amounts remaining in the Leasing Cost Rebalancing Reserve Account after payment in full of the Debt (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Documents to survive payment of the Debt in full) shall be returned to Borrower.

Section 6.11    Office CapEx Project Account.

6.11.1    Deposits into the Office CapEx Project Account.  The Unadvanced Office CapEx Project Amounts advanced by Lender pursuant to Section 2.7.4 hereof shall be deposited into an Account controlled by Lender (the "**Office CapEx Project Account**").  Amounts deposited from time to time into the Office CapEx Project Account pursuant to Section 2.7.4 and this Section

145

6.11.1 are referred to herein as the "**Office CapEx Project Reserve Funds**".  Office CapEx Project Reserve Funds shall be held by Lender as additional collateral of the Loan.

6.11.2  Release of Office CapEx Project Reserve Funds.  Amounts on deposit in the Office CapEx Project Account from time to time shall be disbursed to Borrower as Office CapEx Project Advances as if the same were Office CapEx Project Advances under this Agreement (and, for the avoidance of doubt, subject to the same applicable conditions precedent to the receipt of Office CapEx Project Advances as if such conditions precedent were set forth herein, *mutatis mutandis*).  Upon the occurrence and during the continuance of an Event of Default, Lender in its sole discretion may apply amounts in the Office CapEx Project Account to the immediate payment of the Obligations. Any amounts remaining in the Office CapEx Project Account after payment in full of the Debt (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Documents to survive payment of the Debt in full) shall be returned to Borrower.

Section 6.12    Free Rent Account. On the Closing Date, Borrower shall deposit in an Account controlled by Lender funds in an amount equal to $0 (the "**Free Rent Account**"). Amounts on deposit from time to time in the Free Rent Account pursuant to this Section 6.12 are referred to as "**Free Rent Funds**."  If Borrower executes a Lease pursuant to and in accordance with the terms hereof, and such Lease provides for any free rent period, and Borrower desires for the Rent that would otherwise be payable under such Lease during a free rent period to constitute Net Operating Income, then Borrower shall deposit into the Free Rent Account the minimum rent that such Tenant would have otherwise owed during the months of free rent under such Lease. Provided that no monetary Default, material non-monetary Default or Event of Default has occurred and is continuing, with respect to any month for which a free rent period under a Lease has expired and Borrower has reserved for such month pursuant to this Section 6.12, on the applicable Monthly Payment Date, Lender will transfer the amount of minimum rent such Tenant would have owed during such month from the Free Rent Account into the Deposit Account, which shall be applied pursuant to Section 6.16.1.

Section 6.13    Casualty and Condemnation Account.  Borrower shall pay, or cause to be paid, into an Account controlled by Lender (the "**Casualty and Condemnation Account**") all Insurance Proceeds or Awards due to any Casualty or Condemnation in accordance with the provisions of Section 5.2 and Section 5.3.  Amounts deposited from time to time into the Casualty and Condemnation Account pursuant to this Section 6.13 are referred to herein as the "**Casualty and Condemnation Funds**."  All Casualty and Condemnation Funds shall be held, disbursed and/or applied in accordance with the provisions of Section 5.2 and Section 5.3 hereof.

Section 6.14    Intentionally Omitted.

Section 6.15    Intentionally Omitted.

Section 6.16    Property Cash Flow Allocation.

6.16.1  Order of Priority of Funds in Deposit Account.  On each Monthly Payment Date during the term of the Loan, except during the continuance of an Event of Default, all funds

146

in the Deposit Account shall be applied on such Monthly Payment Date in the following order of priority:

(i)    First, to the Property Tax Account, to make the required payments of Property Tax Funds as and when required under Section 6.2;

(ii)    Second, to the Insurance Account, to make any required payments of Insurance Funds as and when required under Section 6.3;

(iii)    Third, to the payment of all fees, costs and expenses due to Lender under the Loan Documents that are due and unpaid, including any Servicing Fees that are due and unpaid (which payment of Servicing Fees, at Lender's option, may be made directly to Servicer);

(iv)    Fourth, to Lender, funds sufficient to pay the Monthly Debt Service Payment Amount (without duplication of any amounts paid pursuant to clause (iii) above);

(v)    Fifth, to the Replacement Account, to make the required payments of Replacement Funds as required under Section 6.4;

(vi)    Sixth, to Lender, of any other amounts then due and payable under the Loan Documents (other than the Outstanding Principal Balance);

(vii)    Seventh, to Borrower, funds in an amount equal to the Monthly Operating Expense Budgeted Amount and approved Extraordinary Expenses as well as amounts that were payable pursuant to this clause (vii) but were not paid (or were paid by Borrower from equity in excess of Borrower's Share of the Monthly Operating Expense Budgeted Amount and approved Extraordinary Expenses) on any such prior Monthly Payment Date solely due to the insufficiency of amounts on deposit in the Deposit Account to make such payments; and

(viii)    Lastly, all amounts remaining after payment of the amounts set forth in clauses (i) through (vii) above (the "**Excess Cash Flow**"):  (A) during the continuance of a Cash Management Sweep Period, to the Cash Collateral Account to be held or disbursed in accordance with Section 6.12, or (B) provided no Cash Management Sweep Period is then continuing, to Borrower.

6.16.2 Failure to Make Payments.  The failure of Borrower to make all of the payments required under clauses (i) through (vi) of Section 6.16.1 in full on each Monthly Payment Date shall constitute an Event of Default under this Agreement; provided, however, if adequate funds are available in the Deposit Account for such payments, the failure by Lender to allocate such funds into the appropriate Accounts shall not constitute an Event of Default.

6.16.3 Application After Event of Default.  Notwithstanding anything to the contrary contained in this Article VI, upon the occurrence and during the continuance of an Event of Default, Lender, at its option, may apply any Gross Revenue then in the possession of Lender, Servicer or Cash Management Bank (including any Reserve Funds on deposit in any Account) to

147

the payment of the Debt in such order, proportion and priority as Lender may determine in its sole and absolute discretion.  Lender's right to withdraw and apply any of the foregoing funds shall be in addition to all other rights and remedies provided to Lender under the Loan Documents.

6.16.4  Waterfall Shortfall.  All funds in the Deposit Account shall be calculated by Lender two (2) Business Days prior to the applicable Monthly Payment Date (the "**Waterfall Calculation Date**") in order for Lender to determine whether there are sufficient funds in the Deposit Account to make each of Borrower's monthly payment obligations under Section 6.16.1(i)-(vii) hereof, or whether the funds on deposit in the Deposit Account are insufficient funds to make such payments (the amount of any such deficiency being referred to as a "**Waterfall Shortfall**").  If a Waterfall Shortfall exists, Lender shall notify Borrower of the amount of such Waterfall Shortfall, and, subject to Section 6.16.5 hereof, Borrower shall deposit funds via wire transfer into the Deposit Account on or prior to the applicable Monthly Payment Date to cover such Waterfall Shortfall.  All funds in the Deposit Account shall be applied to the payment obligations on the Monthly Payment Date.  Any amounts which are remitted into the Deposit Account on or after the Waterfall Calculation Date (other than by Borrower pursuant to this Section 6.16.4) shall remain on deposit in the Deposit Account and shall be applied in accordance herewith on the immediately succeeding Monthly Payment Date.

6.16.5  Application in Respect of Carry Costs.  Notwithstanding anything in this Section 6.16 to the contrary, Borrower's obligation on each Monthly Payment Date to fund the Monthly Carry Cost Shortfall pursuant to clauses (i)-(vii) of Section 6.16.1 hereof shall be satisfied in the following order of priority:  (i) *first*, Lender shall apply amounts then on deposit in the Deposit Account to fund Carry Costs due on such Monthly Payment Date in accordance with the payment priority waterfall of Section 6.16.1 hereof; (ii) *second*, solely to the extent a deficiency exists after application of amounts in the preceding clause (i) and so long as the applicable conditions precedent in Section 2.6 hereof have been satisfied, Lender shall make a Carry Cost Advance on such Monthly Payment Date to fund the Monthly Carry Cost Shortfall, if any, on such Monthly Payment Date, which Carry Cost Advance shall be applied in accordance with the payment priority waterfall of Section 6.16.1 hereof; and (iii) *last*, solely to the extent a deficiency exists after application of amounts in the preceding clauses (i) and (ii) and so long as the conditions precedent in Section 6.7.2 hereof have been satisfied, Lender shall disburse funds from the Carry Cost Account to fund the Monthly Carry Cost Shortfall, if any, on such Monthly Payment Date, which disbursement shall be applied in accordance with the payment priority waterfall of Section 6.16.1 hereof.  Nothing in this Section 6.16.5 or elsewhere in this Agreement shall affect the obligation of Borrower to timely pay all Carry Costs when due, whether or not there are sufficient amounts to pay the same as provided in this Section 6.16.5.

Section 6.17    Security Interest in Reserve Funds and Interest on Reserve Funds.

6.17.1  Grant of Security Interest.  Borrower shall be the owner of the Reserve Funds.  Borrower hereby pledges, assigns and grants a security interest to Lender, as security for payment of the Debt and the performance of all other terms, conditions and covenants of the Loan Documents on Borrower's part to be paid and performed, in all of Borrower's right, title and interest in and to the Reserve Funds.  The Reserve Funds shall be under the sole dominion and control of Lender, subject to the terms of this Agreement.

148

6.17.2  <u>Interest on Reserve Funds</u>.  Interest accrued, if any, on the Reserve Funds shall become part of the applicable Reserve Fund.

6.17.3  <u>Income Taxes</u>.  Borrower shall report on its U.S. federal, state and local income tax returns all interest or income accrued on the Reserve Funds.

6.17.4  <u>Prohibition Against Further Encumbrance</u>.  Borrower shall not, without the prior consent of Lender, further pledge, assign or grant any security interest in the Reserve Funds or permit any Lien or encumbrance to attach thereto, or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Lender as the secured party, to be filed with respect thereto.

6.17.5  <u>Reserve Fund Indemnification</u>.  Borrower shall indemnify Lender and hold Lender harmless from and against any and all Losses arising from or in any way connected with the Reserve Funds, the sums deposited therein or the performance of the obligations for which the Reserve Funds were established, except to the extent arising from the gross negligence, willful misconduct, fraud, bad faith, or illegal acts of Lender, its agents or employees.

6.17.6  <u>Reserve Fund Fees and Expenses</u>.  Borrower acknowledges and agrees that it solely shall be, and shall at all times remain, liable to Lender or Servicer for all actual, out-of-pocket and documented fees, charges, costs and expenses in connection with the Reserve Funds, this Agreement and the enforcement hereof, including, without limitation, any monthly or annual fees or charges as may be assessed by Cash Management Bank in connection with maintaining the Reserve Funds and the reasonable, out-of-pocket and documented fees and expenses of legal counsel to Lender and Servicer as needed to enforce, protect or preserve the rights and remedies of Lender and/or Servicer under this Agreement.

Section 6.18  <u>Provisions Regarding Letters of Credit</u>.

6.18.1  <u>Security for Debt</u>.  Each Letter of Credit delivered under this Agreement shall be additional security for the payment of the Debt.  Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right, at its option, to draw on any Letter of Credit and to apply all or any part thereof to the payment of the items for which such Letter of Credit was established or to apply each such Letter of Credit to payment of the Debt in such order, proportion or priority as Lender may determine.  Upon payment in full of the Debt (excluding any indemnification or other Obligation that is expressly stated in this Agreement or any other Loan Documents to survive payment of the Debt in full), any such Letter of Credit shall be promptly returned to Borrower.

6.18.2  <u>Additional Rights of Lender</u>.  In addition to any other right Lender may have to draw upon a Letter of Credit pursuant to the terms and conditions of this Agreement, Lender shall have the additional rights to draw in full any Letter of Credit:  (a) with respect to any evergreen Letter of Credit, if Lender has received a notice from the issuing bank that the Letter of Credit will not be renewed and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (b) with respect to any Letter of Credit with a stated expiration date, if Lender has not received a notice from the issuing bank that it has renewed the Letter of Credit at least thirty (30) days prior to the date on

149

which such Letter of Credit is scheduled to expire and a substitute Letter of Credit is not provided at least thirty (30) days prior to the date on which the outstanding Letter of Credit is scheduled to expire; (c) upon receipt of notice from the issuing bank that the Letter of Credit will be terminated (except if the termination of such Letter of Credit is permitted pursuant to the terms and conditions of this Agreement or a substitute Letter of Credit is provided); or (d) if the bank issuing the Letter of Credit shall cease to be an Eligible Institution.  If the issuer of any such Letter of Credit ceases to be an Eligible Institution and Lender has not drawn on such Letter of Credit pursuant to this Section 6.18.2, then Borrower shall deliver to Lender a replacement Letter of Credit satisfactory to Lender within thirty (30) days after such issuer ceases to be an Eligible Institution.  If Lender attempts to draw on any Letter of Credit in accordance with this Section 6.18.2 and the applicable issuer of such Letter of Credit fails to honor such draw request, whether due to bankruptcy or insolvency, downgrade of the issuer of such Letter of Credit or for any other reason, Borrower shall within ten (10) Business Days of demand therefor pay Lender any amounts that Lender was entitled to draw on such Letter of Credit and such issuer failed to pay to Lender Notwithstanding anything to the contrary contained in the above, Lender is not obligated to draw any Letter of Credit upon the happening of an event specified in clauses (a), (b), (c) or (d) above and shall not be liable for any losses sustained by Borrower due to the insolvency of the bank issuing the Letter of Credit if Lender has not drawn the Letter of Credit.

Section 6.19    Intentionally Omitted.

Section 6.20    Eligible Accounts.  If the Clearing Account, the Deposit Account or any Account ceases to be an Eligible Account (whether as a result of Clearing Bank or Cash Management Bank ceasing to be Eligible Institutions or otherwise), then Lender shall be permitted in its sole discretion to cause and/or direct any funds held in the Clearing Account, the Deposit Account or any such Account to be remitted to an account held by Lender or Servicer (and to direct all future deposits to be remitted to such other Lender designated account), and Lender or Servicer shall be permitted to continue to hold and disburse all such funds in accordance with this Agreement until a replacement Eligible Account for each of the Clearing Account, the Deposit Account and/or any Account (as applicable) has been approved by Lender in its reasonable discretion.

## ARTICLE VII
## CONSTRUCTION COVENANTS, REPRESENTATIONS AND WARRANTIES

Section 7.1    Hotel Conversion.

(a)    As of the Closing Date, Bourse Borrower shall have furnished to Lender the Hotel Conversion Scope of Work, which shall be a narrative of the scope of the Hotel Conversion, including any drawings or designs related thereto, if any.

(b)    Prior to Hotel Conversion Commencement, each of the following conditions shall be satisfied (collectively, the "**Hotel Conversion Conditions**"), and Borrower may not cause Hotel Conversion Commencement to occur unless and until all such conditions have been satisfied:

150

(i)    Bourse Borrower shall have furnished to Lender, for Lender's approval pursuant to Section 7.2 below an updated Hotel Project Budget;

(ii)    Bourse Borrower shall have furnished to Lender, for Lender's approval, not to be unreasonably withheld, conditioned or delayed, a true and complete set of the Hotel Conversion Plans and Specifications with respect to the portion of the Improvements subject to the Hotel Conversion, such Hotel Conversion Plans and Specifications to be consistent with the Hotel Conversion Scope of Work in all material respects, and which shall comply in all material respects with all applicable material Legal Requirements and all Governmental Approvals, and are the Hotel Conversion Plans and Specifications that shall be the basis for all Governmental Approvals required to effectuate the Hotel Conversion and such Hotel Conversion Plans and Specifications shall have been approved by any applicable Governmental Authority to the extent such approval is required for construction of the Hotel Conversion, and shall be the same Hotel Conversion Plans and Specifications submitted to Construction Manager and to all Contractors performing work at the Property with respect to the portion of the Improvements subject to the Hotel Conversion. Notwithstanding the foregoing, the depiction of FF&E, interior design and/or OS&E specifications shall not be required to be set forth in the Hotel Conversion Plans and Specifications unless and until Borrower is requesting a Hotel Conversion Advance from Lender to fund same;

(iii)    Lender shall have received evidence confirming that the Hotel Conversion is permitted "as of right", and that, with respect to the component of Hotel Conversion that Bourse Borrower intends to commence, all appropriate Governmental Authorities shall have issued all Governmental Approvals required for the commencement of construction of such component of the Hotel Conversion in accordance with each of the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work, in each such case, in all material respects.  Each addition to or modification of the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work shall be subject to approval in writing by Lender, to the extent Lender's approval is required under this Agreement (such approval not to be unreasonably withheld, conditioned or delayed), and, to the extent required by law, by the appropriate Governmental Authorities;

(iv)    (x) Lender shall have received the Hotel Conversion Architect's Contract and shall have approved the same in writing, such approval not to be unreasonably withheld, conditioned or delayed, (y) the Hotel Conversion Architect's Contract shall be in full force and effect and (z) Hotel Conversion Architect shall have delivered a certificate (the "**Architect's Certificate**") substantially in the form attached hereto as **Exhibit D**;

(v)    Lender shall have received a Hotel Conversion Construction Schedule with respect to the portion of the Improvements subject to the Hotel Conversion, which shall be consistent with the Preliminary Hotel Conversion Construction Schedule in all material respects, and which shall have been reviewed and approved by Lender in writing (such approval not to be unreasonably withheld,

151

conditioned, or delayed).   Any such updated Hotel Conversion Construction Schedule shall contain a reasonably detailed construction schedule based on the status of the Hotel Conversion and the development and construction of the Hotel Conversion at such time, including the estimated dates of commencement and completion (broken down by trade) for each stage of the Hotel Conversion and other milestones (including the Hotel Conversion Major Milestones) to be approved by Lender (such approval not to be unreasonably withheld, conditioned, or delayed);

(vi)    (x) Lender shall have received the Construction Manager's Agreement in a form acceptable to Lender and shall have approved the same in writing, such approval not to be unreasonably withheld, conditioned or delayed, (y) the Construction Manager's Agreement shall be in full force and effect and (z) Bourse Borrower and Construction Manager shall have delivered the Assignment of Construction Manager's Agreement to Lender in form and substance reasonably acceptable to Lender;

(vii)    (x) Lender shall have received the Development Agreement in a form acceptable to Lender and shall have approved the same in writing, such approval not to be unreasonably withheld, conditioned or delayed, (y) the Development Agreement shall be in full force and effect and (z) Bourse Borrower and Developer shall have delivered the Assignment of Development Agreement to Lender in form and substance reasonably acceptable to Lender;

(viii)   Bourse Borrower shall have delivered to Lender and Construction Consultant, and Lender shall have approved, such approval not to be unreasonably withheld, conditioned, or delayed, a list certified by Bourse Borrower, of all Major Contractors who, at such time, are then being proposed to be engaged to supply labor or materials for the Hotel Conversion.  After Hotel Conversion Commencement, such list may be amended from time to time subject to the approval of Lender and Construction Consultant, such approval not to be unreasonably withheld, conditioned or delayed. After Hotel Conversion Commencement, if requested by Lender, Bourse Borrower shall use commercially reasonable efforts to cause to be delivered to Lender a "will serve" letter from such Major Contractors (including engineers and architects) then directly engaged by Bourse Borrower as Lender shall designate reasonably satisfactory to Lender;

(ix)    the Hotel Management Conversion Conditions have been satisfied;

(x)    Bourse Borrower or Construction Manager shall have obtained such builder's risk insurance policy as shall be required by Lender and that otherwise complies with Section 5.1 of this Agreement; and

(xi)    Bourse Borrower shall have bought out sixty percent (60.0%) of the trades required to perform the Hotel Conversion (other than FF&E,

152

OS&E and pre-opening expenses) in accordance with the Hotel Conversion Plans and Specifications.

(c)    Prior to Hotel Conversion Demolition, each of the following conditions shall be satisfied (collectively, the "**Hotel Conversion Demolition Conditions**"), and Borrower may not cause Hotel Conversion Demolition to occur unless and until all such conditions have been satisfied:

(i)    Bourse Borrower shall have furnished to Lender, for Lender's approval, not to be unreasonably withheld, conditioned or delayed, a true and complete set of the demolition plans and specifications with respect to the portion of the Improvements subject to the Hotel Conversion Demolition, such demolition plans and specifications to be consistent with the Hotel Conversion Scope of Work in all material respects, and which shall comply in all material respects with all applicable material Legal Requirements and all Governmental Approvals, and are the demolition plans and specifications that shall be the basis for all Governmental Approvals required to convert effectuate the Hotel Conversion Demolition and such demolition plans and specifications shall have been approved by any applicable Governmental Authority to the extent such approval is required for Hotel Conversion Demolition;

(ii)    Lender shall have received evidence confirming that the Hotel Conversion is permitted "as of right", and that, with respect to the portion of the Improvements subject to Hotel Conversion Demolition, all appropriate Governmental Authorities shall have issued all Governmental Approvals required for the Hotel Conversion Demolition in accordance with the demolition plans and specifications and the Hotel Conversion Scope of Work, in each such case, in all material respects;

(iii)    Bourse Borrower shall have delivered to Lender for its review and approval a set of "preliminary room plans", and Lender shall have approved same, such approval not to be unreasonably withheld, conditioned or delayed;

(d)    Bourse Borrower shall not commence any work on any stage or phase of the Hotel Conversion unless all required Governmental Approvals, if any, have been issued or obtained from the appropriate Governmental Authorities with respect to the commencement of such stage or phase of construction.

(e)    Bourse Borrower hereby acknowledges and agrees that neither Lender nor the Construction Consultant's approval of any Hotel Conversion Plans and Specifications (and revisions thereto) or the Hotel Conversion Scope of Work (or any revisions thereto), nor its inspection of the performance of the construction, nor its right to inspect such work, shall impose upon Lender and/or Construction Consultant any obligation or liability, including, without limitation, any obligation or liability that might arise as a result of such work not being performed in accordance with Legal Requirements or with the Hotel Conversion Plans and Specifications (and revisions thereto) or the Hotel

153

Conversion Scope of Work (and revisions thereto) approved by Lender and Construction Consultant.  The review or approval by Lender and Construction Consultant of any Hotel Conversion Plans and Specifications or the Hotel Conversion Scope of Work or, in either case, any revisions thereto is without any representation or warranty whatsoever with respect to the adequacy, correctness or efficiency thereof.  Neither the granting by Lender and/or Construction Consultant of its approval of any Hotel Conversion Plans and Specifications or the Hotel Conversion Scope of Work or, in either case, any revisions thereto, shall in any manner constitute or be deemed to constitute a judgment or acknowledgment by Lender as to their legality or compliance with Legal Requirements.

(f)    From and after Hotel Conversion Commencement in accordance with the terms hereof:

(i)    Bourse Borrower shall diligently pursue construction and completion of the Hotel Conversion, and shall promptly pay all sums and perform such duties as may be necessary to complete such construction of the Hotel Conversion, in each case, in accordance with each of the Hotel Conversion Plans and Specifications, the Hotel Conversion Scope of Work and the Hotel Conversion Construction Schedule, in each case, in all material respects, as well as in accordance with all applicable material Legal Requirements, all applicable Governmental Approvals and the terms and conditions of this Agreement, free and clear of all Liens, encumbrances and security instruments (other than the Permitted Encumbrances); and

(ii)    Bourse Borrower shall promptly correct (or cause the responsible Contractor to correct) all defects in the Hotel Conversion or any material departure from the applicable Hotel Conversion Plans and Specifications or the Hotel Conversion Scope of Work not previously approved by Lender to the extent required hereunder.  Bourse Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or material departures from the applicable Hotel Conversion Plans and Specifications or the Hotel Conversion Scope of Work are discovered by, or brought to the attention of, Lender shall not constitute a waiver of Lender's right to require compliance with this covenant.

Section 7.2    Hotel Conversion Budget.

(a)    Prior to Hotel Conversion Commencement in accordance with the terms hereof, Bourse Borrower shall prepare for Lender's review and approval the Hotel Conversion Budget, which shall be consistent with the Preliminary Hotel Conversion Budget, in all material respects, and shall detail all Hotel Conversion Expenses to be incurred by Bourse Borrower until Hotel Conversion Final Completion in accordance with each of the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work, in each case, in all material respects, which shall be Bourse Borrower's estimate of the Hotel Conversion Expenses to be incurred by Bourse Borrower until Hotel Conversion Final Completion (including completion of all punch list items and obtaining a permanent certificate of occupancy with regard to the Hotel Conversion as a whole) in accordance

154

with each of the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work, in each case, in all material respects,  and in compliance in all material respects with all applicable material Legal Requirements.  Any revision to the Hotel Conversion Budget will be subject to Lender's approval, in its sole and absolute discretion (except as expressly set forth in Section 7.5).

(b)    Bourse Borrower represents and warrants, on each date that Bourse Borrower submits a revised Hotel Conversion Budget to Lender, that such Hotel Conversion Budget is its good faith estimate of the Hotel Conversion Expenses to be incurred by Bourse Borrower until Hotel Conversion Final Completion in accordance with the Hotel Conversion Plans and Specifications in all material respects and all material Legal Requirements.

(c)    If Bourse Borrower becomes aware of any change in Hotel Conversion Expenses which will increase a category or Line Item reflected on the Hotel Conversion Budget, Bourse Borrower shall promptly notify Lender in writing and promptly submit to Lender for its approval (in its sole but good faith discretion) a revised Hotel Conversion Budget, to the extent Lender's approval is required under the terms of this Agreement.  Subject to the terms of this Agreement, any reallocation of any category or Line Items in the Hotel Conversion Budget in connection with cost overruns shall be subject to Lender's approval in its sole but good faith discretion, to the extent Lender's approval is required under the term of this Agreement.  Lender shall have no obligation to make any further Advances unless and until the revised Hotel Conversion Budget so submitted by Bourse Borrower pursuant to this clause (c) is approved by Lender in its sole but good faith discretion, to the extent Lender's approval is required under this Agreement, and Lender reserves the right to require the funding of a Hotel Conversion Shortfall if required pursuant to Section 6.6.1 hereof.

Section 7.3    Intentionally Omitted.

Section 7.4    Change Orders.  Bourse Borrower shall not permit any Change Orders or deviations from any Hotel Conversion Plans and Specifications, the Hotel Conversion Scope of Work, the Hotel Conversion Construction Schedule or the Hotel Conversion Budget or any amendment, modification or supplement to any Material Construction Contract during construction without the prior written consent of Lender (such consent not to be unreasonably withheld, conditioned or delayed), in each such case, to the extent Lender's consent is required under this Agreement. Any Change Orders shall clearly delineate the proposed changes to the applicable Hotel Conversion Plans and Specifications with bubbles or other clear method of indicating revisions to the prior version.  Notwithstanding the foregoing or anything else to the contrary contained in this Agreement or any other Loan Document, Bourse Borrower may permit (w) Minor Field Changes, (x) Change Orders that are not Material Change Orders without Lender's consent, (y) amendments, modifications or supplements to Construction Contracts that are not Material Construction Contracts without Lender's consent, (z) non-material amendments, modifications or supplements to Material Construction Contracts without Lender's consent and (aa) in connection with any of the events described in the foregoing clauses (w)-(z), to the extent Lender's approval is not otherwise required pursuant to the terms of this Agreement, corresponding changes to the Hotel Conversion Plans and Specifications and the Hotel Conversion

155

Construction Schedule, in each case, without Lender's consent, so long as Bourse Borrower shall deliver to Lender and Construction Consultant a copy of such amendment, modification or supplement to the Hotel Conversion Plans and Specifications, the Hotel Conversion Construction Schedule, such Material Construction Contract or Change Order promptly follow execution thereof.

Section 7.5    Cost Savings and Contingency.

(a)    Reallocation of Cost Savings to Contingency.

(i)    With respect to Hard Costs set forth in the Hotel Conversion Budget, after Bourse Borrower has delivered to Lender reasonably satisfactory evidence that the requirements set forth in the definition of "Cost Savings" have been satisfied, Bourse Borrower may revise the Hotel Conversion Budget from time to time to reallocate demonstrated Cost Savings available under any Line Item for Hard Costs in the Hotel Conversion Budget (but not for any Soft Costs in the Hotel Conversion Budget) to the "Hard Cost Contingency" Line Item or any Line Item for Hard Costs in the Hotel Conversion Budget (and, with respect to funds reallocated to the "Hard Cost Contingency" Line Item, subsequently utilized in accordance with Section 7.5(b)).  Bourse Borrower shall not have the right to reallocate as Cost Savings any amounts required to be set aside as retainage as to a Construction Contract.

(ii)    With respect to Soft Costs set forth in the Hotel Conversion Budget, after Bourse Borrower has delivered to Lender reasonably satisfactory evidence that the requirements set forth in the definition of "Cost Savings" have been satisfied, Bourse Borrower may revise the Hotel Conversion Budget from time to time to reallocate demonstrated Cost Savings available under any Line Item for Soft Costs in the Hotel Conversion Budget to the "Soft Cost Contingency" Line Item, the "Hard Cost Contingency" Line Item or any other Soft Costs or Hard Costs in the Hotel Conversion Budget (and, with respect to funds reallocated to the "Soft Cost Contingency" Line Item" or the "Hard Cost Contingency" Line Item, subsequently utilized in accordance with Section 7.5(b)).

(b)    Reallocation of Contingency to Other Line Items.

(i)    Subject to the prior written approval of Lender in its sole but good faith discretion, Bourse Borrower may reallocate "Hard Cost Contingency" in the Hotel Conversion Budget to other Line Items for Hard Costs in the Hotel Conversion Budget; provided, that Lender's consent shall not be required with respect to any such reallocation of "Hard Cost Contingency" to other Line Items of the Hotel Conversion Budget if the amount so reallocated (together with all other amounts of "Hard Cost Contingency" previously reallocated), when expressed as a percentage of total "Hard Cost Contingency" in the Hotel Conversion Budget (taking into account demonstrated Cost Savings reallocated pursuant to Section 7.5(a)(i)), is equal to or less than the percentage of completion of the Hotel Conversion at the time of such reallocation.

156

(ii)    Subject to the prior written approval of Lender in its sole but good faith discretion, Bourse Borrower may reallocate "Soft Cost Contingency" in the Hotel Conversion Budget to other Line Items for Soft Costs or Hard Costs in the Hotel Conversion Budget; provided, that Lender's consent shall not be required with respect to any such reallocation of "Soft Cost Contingency" to other Line Items of the Hotel Conversion Budget if the amount so reallocated (together with all other amounts of "Soft Cost Contingency" previously reallocated), when expressed as a percentage of total "Soft Cost Contingency" in the Hotel Conversion Budget (taking into account demonstrated Cost Savings reallocated pursuant to Section 7.5(a)(ii)), is equal to or less than the percentage of completion of the Hotel Conversion at the time of such reallocation.

Section 7.6    Stored Materials and Deposits.

(a)    Stored Materials.  Lender shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Hotel Conversion (the "**Stored Materials**"), unless the following conditions are satisfied at Borrower's sole cost and expense:

(i)    Bourse Borrower shall deliver to Lender bills of sale or other evidence reasonably satisfactory to Lender of the cost of, and, subject to the payment therefor, Bourse Borrower's title in and to such Stored Materials;

(ii)    the Stored Materials are identified to the Property and Bourse Borrower, and are segregated so as to adequately give notice to all third parties of Bourse Borrower's title in and to such materials;

(iii)    the Stored Materials are stored at the Property or at such other third-party owned and operated site as Lender shall approve (such approval not to be unreasonably withheld, conditioned or delayed), and are protected against theft and damage in a manner reasonably satisfactory to Lender, including, if requested by Lender, storage in a bonded warehouse in the greater metropolitan area in which the Property is located;

(iv)    the Stored Materials will be paid for in full with the funds to be disbursed, and all Lien rights or claims of the supplier will be released upon full payment;

(v)    Lender has or will have upon payment with disbursed funds a perfected, first priority security interest in the Stored Materials;

(vi)    the Stored Materials are insured for an amount equal to their replacement costs in accordance with Section 5.1 of this Agreement;

(vii)    if required by Lender, the Construction Consultant shall certify that it has inspected such Stored Materials and they are in good condition and suitable for use in connection with the Hotel Conversion; and

(viii)    The aggregate cost of Stored Materials at any one time shall not exceed the amount set forth on Schedule XVI attached hereto unless otherwise approved by Lender acting in its sole discretion.

(b)    Deposits.  Upon satisfaction of the applicable conditions precedent to Advance for Hotel Conversion Advances in Section 2.6 hereof, Lender shall fund deposits for materials, machinery or other Personal Property approved by Lender up to the amounts approved by Lender ("**Deposits**"), such approval not to be unreasonably withheld, conditioned or delayed; provided, that Lender shall fund such deposits so long as the aggregate amount of all outstanding Deposits at any given time does not exceed the lesser of (i) ten percent (10%) of the total contract sum under the applicable Contract, and (ii) the amounts set forth on Schedule XVI attached hereto .

Section 7.7    "As-built" Drawings.  Upon Hotel Conversion Substantial Completion, Bourse Borrower shall diligently pursue obtaining a set of (x) final "as built" drawings for the Hotel Conversion and (y) final conformed Hotel Conversion Plans and Specifications certified to by the Hotel Conversion Architect, and upon its receipt of the foregoing items, shall deliver same to Lender.

## ARTICLE VIII
## PERMITTED TRANSFERS

Section 8.1    Due on Sale.  The Loan is not assumable and the Loan shall be due upon a sale of the Property.

Section 8.2    Permitted Transfers.

(a)    Notwithstanding anything to the contrary contained herein, the following Transfers (herein, the "**Permitted Transfers**") shall be permitted without Lender's consent:

(i)    a Lease entered into in accordance with this Agreement;

(ii)    a Permitted Encumbrance;

(iii)    the sale, Transfer or issuance of shares of common stock or other beneficial ownership interests in Guarantor or any other entity holding a direct or indirect interest in Borrower that is a publicly traded entity (a "**Traded Security**"), provided such Traded Security is listed on the New York Stock Exchange or another nationally recognized stock exchange, or the conversion of any such interests into a Traded Security;

(iv)    a Transfer of any personal property in accordance with the terms of the Loan Documents or which is being replaced or which is no longer necessary in connection with the operation of the Property free from the Lien of the Mortgage;

158

(v)    (A) the foreclosure of the Property or the Collateral or acceptance of a deed in lieu of foreclosure or conveyance in lieu of foreclosure by Lender and/or (B) the acquisition of the collateral pledged to the "lender" as security for any mezzanine loan created pursuant to the Loan Documents upon a foreclosure or acceptance of a conveyance in lieu of foreclosure;

(vi)    a Condemnation that occurs in accordance with Article V hereof;

(vii)    a Transfer of the Property (or entering into a contract to do so), but only as long as with respect to this clause (vii), the Debt is paid in full contemporaneously with the closing under (but not the entering into of) the contract with respect to such Transfer;

(viii)    Transfers by devise or descent or by operation of law upon the death of a natural person;

(ix)    A Transfer of indirect interests in Borrower related to or in connection with the estate planning of such transferor to (A) such interest holder or to family members (i.e., a sibling, parent, spouse, child (or step-child), grandchild or other lineal descendant of the related Person) of such interest holder (or to partnerships or limited liability companies directly or indirectly Controlled solely by such interest holder or one or more of such family members of such interest holder) or (B) a trust established for the benefit of such interest holder and/or such interest holder's family member(s);

(x)    a Transfer (but not a pledge (other than a pledge or assignment of solely the economic interests or rights to distributions), mortgage, Lien or other encumbrance) of an indirect interest in Borrower;

(xi)    a pledge by the general partner of any Person that owns a direct or indirect interest in Borrower that is a commingled private equity fund of any rights of the general partner to call capital from the limited partners in such fund (including any incidental remedial rights permitted under the operative governing documents related to the enforcement of defaults by any limited partner) in connection with a subscription credit facility, provided that the collateral for such credit facility shall only be the general partner's right to call capital from the limited partners in such fund (including any incidental remedial rights permitted under the operative governing documents related to the enforcement of any defaults by any limited partner) and provided that the foreclosure of such pledge would not result in a Transfer of the ownership interests in Borrower (directly or indirectly) unless such Transfer meets the requirements set forth in the immediately succeeding clause (b).

(b)    In connection with any proposed Permitted Transfer under clauses (viii), (ix), (x) and (xi) above:

159

(i)     Borrower, Sole Member and SPC Party shall each continue to be Special Purpose Bankruptcy Remote Entities;

(ii)     Borrower shall pay all reasonable, out-of-pocket and documented costs and expenses of Lender, if any, in connection with any Transfer (including, without limitation, attorneys fees of retained firms (excluding in-house counsel)), whether or not such Transfer is deemed to be a Permitted Transfer;

(iii)     Neither such transferee nor any Affiliate thereof shall have ever been indicted or convicted of, or pled guilty or no contest to a violation of the AML Laws or Sanctions and is not a Restricted Person;

(iv)     each such Transfer shall be conditioned upon Borrower's ability to, after giving effect to the equity Transfer in question, (A) remake in all material respects the representations contained herein relating to ERISA matters and AML Laws and Sanctions, and (B) continue to comply in all material respects with the covenants contained herein relating to ERISA matters and AML Laws, Sanctions and Anti-Corruption Laws;

(v)     intentionally omitted;

(vi)     in connection with any Transfer in which (A) a Person that did not previously own (x) in the case of a U.S. Person, twenty percent (20%), and (y) in the case of a non-U.S Person, ten percent (10%), or more of the aggregate direct and/or indirect ownership interests (at any tier of ownership) in Borrower or Master Tenant shall acquire such (x) in the case of a U.S. Person, twenty percent (20%), and (y) in the case of a non-U.S Person, ten percent (10%), direct and/or indirect ownership interest (at any tier of ownership) in Borrower or Master Tenant, or (B) a Person that did not previously Control Borrower or Master Tenant shall acquire Control of Borrower or Master Tenant, Borrower shall, at least twenty (20) days before such Permitted Transfer, notify Lender of the proposed Transfer and provide copies of all instruments effectuating such Transfer, and any organizational documents that Lender shall reasonably require as to such Person (or Persons that Control such Person), and such other information as Lender shall reasonably request regarding the proposed transferee so as to conduct such background checks, investigations and other record searches as Lender shall reasonably require (and satisfy any regulatory requirements and/or internal compliance, "know your customer" and/or committee requirements of Lender), at Borrower's sole cost and expense (collectively, the "**KYC Procedures**"), and if Lender, within twenty (20) days of receiving such notice from Borrower, sends a notice to Borrower that it has in good faith determined that such Transfer will result in a violation of its legal, regulatory or internal organizational requirements, such Transfer shall not constitute a Permitted Transfer;

(vii)     at all times, the Ownership and Control Condition shall continue to be satisfied; and

(viii)   the Transfer shall be permitted pursuant to the terms of the Ground Lease and the Historic Tax Credit Documents.

(c)   Notwithstanding anything to the contrary contained herein or in the other Loan Documents, no Transfers of Sole Member's direct interests in Borrower shall be permitted at any time without Lender's prior written consent, which consent may be granted or withheld in Lender's sole and absolute discretion.

(d)   With respect to any contract of sale for the Property that is not consummated, at the option of Borrower, Borrower shall cause any forfeited earnest money deposits to be (i) paid to Lender (to be applied to the Outstanding Principal Balance) in accordance with the terms of this Agreement or (ii) deposited into the Cash Collateral Account, which such amounts shall be disbursed to Borrower pursuant to Section 6.8.2.

**ARTICLE IX**
**SECONDARY MARKET TRANSACTION**

Section 9.1   Sale of Loan.

9.1.1   Lender shall have the right (a) to sell, finance or otherwise transfer the Loan or any portion thereof or (b) to issue or sell one or more participation interests in the Loan (collectively, "**Secondary Market Transactions**") without the consent of Borrower or any other Person.  At Lender's election, each note and/or component comprising the Loan may be subject to one or more Secondary Market Transactions.

9.1.2   If requested by Lender, Borrower shall reasonably cooperate with Lender in satisfying the market standards which may be required in the marketplace in connection with any Secondary Market Transactions, including, without limitation, to:

(a)   provide (i) updated financial and other information with respect to the Property or Borrower, (ii) updated budgets relating to the Property, and (iii) updated Appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate verification of the Updated Information through opinions of counsel acceptable to Lender (but not through letters of auditors);

(b)   assist Lender in obtaining opinions of counsel, which may be relied upon by Lender and its successors, assigns and participants customary in Secondary Market Transactions with respect to the Property and Borrower and its Affiliates, which opinions shall be reasonably satisfactory to Lender; in no event shall non-consolidation opinions be required;

(c)   provide updated, in all material respects, as of the closing date of the Secondary Market Transaction, representations and warranties made in Article III of this Agreement to the extent applicable;

161

(d)    execute amendments to the Loan Documents and Borrower's organizational documents and such other documents reasonably requested by Lender, including, without limitation, those documents required pursuant to Section 9.5 below; provided, however, that Borrower shall not be required to modify or amend any Loan Document, organizational document or any other document, if such modification or amendment would (i) change the interest rate, the stated maturity or the amortization of principal as set forth herein or in the Note, (ii) alter the rights or increase the obligations of Borrower or Guarantor under the Loan Documents, the organizational documents or any other document in any non de minimis respect, or (iii) subject to Section 9.5, modify or amend any other economic or other term of the Loan detrimental to Borrower or Guarantor; and

(e)    at Lender's request, make such representatives of Borrower requested by Lender available to meet with any investors or prospective investors in any potential Secondary Market Transaction at Borrower's offices.

9.1.3    Lender may disclose to an assignee (or proposed assignee), participant (or proposed participant), underwriter, investor (or proposed investor), lender (or proposed lender), regulator or other Governmental Authority and their representatives (including, without limitation, any commission or agency established pursuant to a legislative act of the United States Congress, the New York State Assembly and/or the applicable legislative body of the state in which the Property is located), accountants, and/or attorneys, contractors, representatives or agents of any of the foregoing, any information relating to the Loan and any Person that is a party to a Loan Document; provided, however, that, prior to any such disclosure of non-public or confidential information (it being agreed that all reports, statements and other information delivered to Lender pursuant to Section 4.1.6 hereof and/or the Guaranty are deemed confidential information for all purposes of this Agreement and the other Loan Documents), any such Person shall be advised of the confidentiality of any non-public or confidential information received by it, except to the extent such Person is a Governmental Authority.

Section 9.2    Intentionally Omitted.

Section 9.3    Servicing and Trust Expenses.  At the option of Lender, the Loan may be serviced by one or more servicers/trustees (the "**Servicer**") selected by Lender and Lender may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to the Servicer pursuant to a servicing agreement ("**Servicing Agreement**") between Lender and Servicer.  The initial Servicer(s) shall be Trimont Real Estate Advisors.  Borrower shall be responsible for the customary costs relating to or arising under the Servicing Agreement, including the standard monthly servicing fee due to the Servicer under the Servicing Agreement which shall not be an amount in excess of $25,000 per annum, any customary fees or costs payable to Servicer in connection with each Advance or disbursement of Reserve Funds, and any customary special servicing and similar fees as more particularly set forth in Section 11.13 hereof incurred an Event of Default  (collectively, the "**Servicing Fees**").

Section 9.4    Register.

162

(a)    <u>Register</u>.  Borrower hereby designates Lead Lender to serve as Borrower's agent, solely for purposes of this <u>Section 9.4</u>, to maintain at one of its offices in the United States of America a register for the recordation of the names and addresses of each Lender, and the principal amount (and stated interest) of the Loan (or portions thereof) owing to each Lender pursuant to the terms hereof from time to time and each repayment with respect to the principal amount of the Loan of each Lender (the "**Register**").  Failure to make any such recordation, or any error in such recordation shall not affect Borrower's or any Lender's obligations in respect of the Loan.  Without limiting the terms and provisions of <u>Section 9.1</u> hereof, no assignment, sale, negotiation, pledge, hypothecation or other transfer of any part of any Lender's interest in and to the Loan shall be effective until such Lender shall have provided Lead Lender with written notice of such transfer and Lead Lender shall have registered such assignee's name and address in the Register.  The entries in the Register shall be conclusive absent manifest error, and Borrower and each Lender shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(b)    <u>Participation Registry</u>.

(i)    Lender may at any time, without the consent of, or notice to, Borrower, sell participations to any Person  (each, a "**Participant**") in all or a portion of Lender's rights and/or obligations under this Agreement; <u>provided</u> that (i) Lender's obligations under this Agreement shall remain unchanged, (ii) Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) Borrower shall continue to deal solely and directly with such Lender in connection with Lender's rights and obligations under this Agreement.  Each Lender that sells a participation interest in the Loan shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loan or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in the Loan or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations and Section 1.163-5(b) of the proposed United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(ii)    Borrower authorizes each Lender to disclose to any assignee or participant of such Lender (each, a "**Transferee**"), any prospective Transferee, any Affiliate of such Lender, any lender to such Lender or participant, any

163

derivative counterparty or any Rating Agency any and all financial or other information in such Lender's possession concerning Borrower and its Affiliates which has been delivered to such Lender by or on behalf of Borrower pursuant to this Agreement or which has been delivered to such Lender by or on behalf of Borrower in connection with such Lender's credit evaluation of Borrower and its Affiliates prior to becoming a party to this Agreement, provided, however, that, prior to any such disclosure of non-public or confidential information (it being agreed that all reports, statements and other information delivered to Lender pursuant to Section 4.1.6 hereof and/or the Guaranty are deemed confidential information for all purposes of this Agreement and the other Loan Documents), any such Transferee or other Person shall be advised of the confidentiality of any non-public or confidential information received by it, except to the extent such Person is a Governmental Authority.

(iii)     Borrower agrees that, at Lender's sole cost and expense, provided such costs and expenses are reasonable, (A) Borrower shall execute and deliver to Lender any amendment and/or other document that may be reasonably necessary to effectuate such an assignment but in no event shall Borrower be required to sign any documents which would either (x) increase, except to a de minimis extent, its obligations or (y) decrease, except to a de minimis extent, its rights, under the Loan Documents and (B) upon the request by Lender, Borrower shall execute and deliver to such Lender one or more substitute notes of Borrower evidencing such Lender's ratable share of the Loan, with appropriate insertions as to payee and principal amount; each such substitute note shall be dated as of the Closing Date.

(iv)     Borrower agrees that each Participant shall be entitled to the benefit of Section 2.5 (subject to the requirements and obligations therein, including the requirements under Section 2.5.6 (it being understood that the documentation required under Section 2.5.6 shall be delivered to the participating Lender)), to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to Section 9.1 hereof, provided that Participant shall not be entitled to receive any greater payment under Section 2.5, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in a Legal Requirement that occurs after the participant acquired the applicable participation.

(c)     This Section 9.4, the Register and the Participant Register are intended to be construed so that the Note is at all times maintained in "registered form" within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations (or any other successor provision of such regulations).

Section 9.5    Severance Documentation.  Lender, without in any way limiting Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time (whether prior to or after any Secondary Market Transaction), to require Borrower to execute and deliver "component" notes and/or one or more substitute notes evidencing the portion of the Loan held by

164

a particular Lender (and the term "**Note**" as used in this Agreement and in all the other Loan Documents shall include all such component notes and/or substitute notes but shall exclude any Note replaced by the same), and/or modify the Loan in order to create one or more senior and subordinate notes (*e.g.*, an A/B or A/B/C structure) or pari passu notes and/or one or more additional components of the Note or Notes (including the implementation of a mezzanine loan structure secured by a pledge of direct and indirect ownership interests, which may require the creation of additional borrower entities), reduce the number of components of the Note or Notes, revise the interest rate for each component, reallocate the principal balances of the Notes and/or the components, eliminate the component structure and/or the multiple note structure of the Loan (including the elimination of the related allocations of principal and interest payments) or divide the Loan into one or more pari passu or mezzanine and mortgage component(s); provided that, in each case, (i) the Outstanding Principal Balance and the aggregate monthly payments required of all components immediately after the effective date of such modification equals the Outstanding Principal Balance and the aggregate monthly payments required immediately prior to such modification, (ii) the weighted average of the interest rates for all components immediately after the effective date of such modification equals the interest rate of the original Note immediately prior to such modification (provided that such weighted average interest rate may result in "rate creep" upon the occurrence of an Event of Default and/or the application of Net Proceeds pursuant hereto), and (iii) such modification or amendment shall not alter the rights or increase the obligations of Borrower or Guarantor under the Loan Documents, or modify or amend any other economic or other term of the Loan in a manner that is detrimental to Borrower or Guarantor (other than to a de minimis degree).  At Lender's election, each note comprising the Loan may be subject separately to one or more Secondary Market Transactions.  Lender shall have the right to modify the Note and/or Notes and any components in accordance with this Section 9.5 and, provided that such modification shall comply with the terms of this Section 9.5, such modification shall become immediately effective.  If requested by Lender, Borrower shall promptly execute an amendment to the Loan Documents to evidence any such modification.  Borrower shall (1) cooperate with all reasonable requests of Lender in order to establish the "component" notes, and (2) execute and deliver such documents as shall be reasonably required by Lender in connection therewith, all in form and substance reasonably satisfactory to Lender, including, without limitation, the severance of security documents if requested; provided, however, that Borrower shall not be required to modify or amend any Loan Document in connection with the creation of any such "component" notes, modification of the Loan or other transaction contemplated by this Section 9.5 if, in each case such modification or amendment would breach any of the requirements in the foregoing clauses (i)-(iii) of this Section 9.5.  In the event Borrower fails to execute and deliver such documents to Lender within ten (10) Business Days following such request by Lender, Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower hereby ratifying all that such attorney shall do by virtue thereof.

Section 9.6    Secondary Market Transaction Expenses.  In connection with any Secondary Market Transaction, severance or other transaction permitted pursuant to Section 9.1 or 9.5, Lender shall pay all expenses (including legal fees) incurred by or on behalf of Lender, Borrower, Guarantor and/or their respective Affiliates in connection therewith, provided that Borrower shall remain liable for payment of the legal expenses of Borrower, Guarantor and/or their respective Affiliates other than the reasonable out-of-pocket costs and expenses of any opinions.

**ARTICLE X**
**DEFAULTS**

Section 10.1    Event of Default.

(a)    Each of the following events shall constitute an event of default hereunder (an "**Event of Default**"):

(i)    if (A) the Obligations are not paid in full on the Maturity Date, (B) any regularly scheduled monthly payment of interest is not paid in full on the applicable Monthly Payment Date (unless a Carry Cost Advance was, at the time in question, available to be drawn by Borrower pursuant to the terms hereof to pay any such Monthly Debt Service Payment Amount, Borrower has complied with all advance obligations with respect thereto, and Lender failed to Advance the same when due, and/or funds sufficient to pay such Monthly Debt Service Payment Amount have been deposited into the Carry Cost Account and Lender fails to make such payment), or (C) any deposit of Reserve Funds is not made on the required deposit date therefor (unless a Carry Cost Advance was, at the time in question, available to be drawn by Borrower pursuant to the terms hereof to fund such deposit of Reserve Funds, Borrower has complied with all advance obligations with respect thereto, and Lender failed to Advance the same when due, and/or funds sufficient to fund such deposit of Reserve Funds have been deposited into the Carry Cost Account and Lender fails to make such payment);

(ii)    if any other amount payable pursuant to this Agreement, the Note or any other Loan Document (other than as set forth in the foregoing clause (i)) is not paid in full when due and payable in accordance with the provisions of the applicable Loan Document, with such failure continuing for ten (10) Business Days after Lender delivers written notice thereof to Borrower (unless, in any such case, Advances were, at the time in question, available to be drawn by Borrower pursuant to the terms hereof to pay any such amounts, Borrower has complied with all advance obligations with respect thereto, and Lender failed to Advance the same when due, and/or funds sufficient to pay any such amounts have been deposited with Lender pursuant to the terms of this Agreement or any other Loan Document and Lender fails to make such amounts available to Borrower to pay such amounts in violation of the terms of this Agreement or any other Loan Document);

(iii)    subject to Borrower's right to contest as set forth in this Agreement, if any of the Property Taxes or Other Charges are not paid when due (unless, a Carry Cost Advance was, at the time in question, available to be drawn by Borrower pursuant to the terms hereof to pay any such Property Taxes or Other Charges, Borrower has complied with all advance obligations with respect thereto, and Lender failed to Advance the same when due, and/or funds sufficient to pay any such Property Taxes or Other Charges have been deposited with Lender pursuant to the terms of this Agreement or any other Loan Document and Lender fails to make such amounts available to Borrower to pay such amounts in violation of the terms of this Agreement or any other Loan Document);

166

(iv)      if the Policies are not kept in full force and effect, or if copies of the Policies are not delivered to Lender as and when required pursuant to the terms hereof, (unless, in any such case, a Carry Cost Advance was, at the time in question, available to be drawn by Borrower pursuant to the terms hereof to pay for any such Policies, Borrower has complied with all advance obligations with respect thereto, and Lender failed to Advance the same when due, and/or funds sufficient to pay for such Policies have been deposited with Lender pursuant to the terms of this Agreement or any other Loan Document and Lender fails to make such amounts available to Borrower to pay such amounts in violation of the terms of this Agreement or any other Loan Document);

(v)      if any representation or warranty made by any Borrower Party herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made, repeated or deemed repeated; provided, that if such false or misleading representation or warranty was not an intentional misrepresentation or warranty and is susceptible of being cured, so long as such misrepresentation does not have a Material Adverse Effect, such Borrower Party shall have the right to cure the underlying facts or circumstances that cause the applicable representation or warranty to have been false or misleading (as opposed to merely providing notice to Lender of such facts or circumstances) within fifteen (15) Business Days after the earlier of (A) written notice from Lender, and (B) such Borrower Party otherwise obtaining knowledge (or Knowledge with respect to Borrower) of such false or misleading representation or warranty; provided, further, that no Default or Event of Default shall have occurred hereunder with respect to any breach of a representation or warranty made by such Borrower Party to the extent (I) such representation or warranty was made by Lender under the Purchase Agreement, (II) based on information contained in any such representation or warranty made by Lender under the Purchase Agreement, or (III) based on information delivered by Lender to Borrower in connection with the sale of the Property pursuant to the Purchase Agreement, in each such case, in Lender's capacity as seller under the Purchases Agreement;

(vi)      if any Borrower Party (1) shall make an assignment for the benefit of creditors (other than in favor of Lender) or (2) has admitted in writing in any legal proceeding its inability to pay its debts (other than admissions made in court proceedings that Borrower is subjected to (and are not initiated by Borrower) to the extent that such admissions are required to be made in such proceeding in order to comply with law or a court or Governmental Authority order or to preclude a claim of perjury); provided that it shall not be an Event of Default under this clause (vi) with respect to Guarantor, if one or more Supplemental Guarantors and/or Replacement Guarantors shall have assumed or otherwise agreed to become liable for all of the liabilities and obligations of the Guarantor under the Loan Documents executed by such Guarantor, in each instance, in accordance with the terms hereunder;

167

(vii)    if a receiver, liquidator or trustee shall be appointed for any Borrower Party or if any Borrower Party shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, any Borrower Party, or if any proceeding for the dissolution or liquidation of any Borrower Party shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to by such Borrower Party, upon the same not being discharged, stayed or dismissed within ninety (90) days of commencement of the same; provided that it shall not be an Event of Default under this clause (vii) with respect to Guarantor, if one or more Supplemental Guarantors and/or Replacement Guarantors shall have assumed or otherwise agreed to become liable for all of the liabilities and obligations of the Guarantor under the Loan Documents executed by such Guarantor, in each instance, in accordance with the terms hereunder;

(viii)    subject to Borrower's right to contest as set forth in this Agreement, if the Property becomes subject to any mechanic's, materialman's or other Lien (other than a Lien for local real estate taxes and assessments not then due and payable);

(ix)    if any Borrower Party attempts to assign its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents; provided that it shall not be an Event of Default under this clause (ix) with respect to Guarantor, if one or more Supplemental Guarantors and/or Replacement Guarantors shall have assumed or otherwise agreed to become liable for all of the liabilities and obligations of the Guarantor under the Loan Documents executed by such Guarantor, in each instance, in accordance with the terms hereunder;

(x)    if a Release of the 400 Market Street Property has not occurred in accordance with the terms hereof by November 13, 2024;

(xi)    if Borrower breaches any representation in Section 3.1.40, or any covenant in Section 2.4.2(b) or Sections 4.2.3, 4.2.6, 4.2.7, 4.2.8, 4.2.10, 4.2.11 or 4.2.14;

(xii)    if a Required SPE fails to be a Special Purpose Bankruptcy Remote Entity; provided, however, the same shall not constitute an Event of Default if (x) such breach is inadvertent and non-recurring, and (y) such breach is curable, if such Required SPE, as applicable, shall promptly cure such breach within ten (10) days after Borrower obtains Knowledge of such breach;

(xiii)    if any Borrower Party fails to comply with the covenants as to the AML Laws, Sanctions and Anti-Corruption Laws as set forth in Section 4.1.1;

(xiv)    if Borrower breaches the covenants set forth in Section 4.1.6 hereof and such breach is not cured within ten (10) Business Days of Borrower receiving notice of the same;

(xv)    if one or more judgments or decrees shall be entered against Master Tenant, Borrower or Sole Member involving in the aggregate a liability in excess of $250,000, and the same shall not have been vacated, bonded, satisfied or stayed pending appeal within sixty (60) days from the date of entry of such judgment;

(xvi)    Guarantor breaches any of the Guarantor Financial Covenants; provided that it shall not be an Event of Default under this clause (xvi) if one or more Supplemental Guarantors and/or Replacement Guarantors shall have assumed or otherwise agreed to become liable for all of the liabilities and obligations of the Guarantor under the Loan Documents executed by such Guarantor, in each instance, in accordance with the terms hereunder;

(xvii)    if the Property shall be taken (other than as a result of a Condemnation in accordance with this Agreement), sequestered on execution or other process of law in any action against Borrower; and such action is not stayed or bonded over in a manner reasonably acceptable to Lender within ten (10) Business Days thereof, or is not capable of being bonded over or stayed in a manner acceptable to Lender;

(xviii)    if after execution of the Historic Tax Credit Documents in accordance with the terms hereof, (A) the Historic Tax Credit Documents are terminated by Borrower and/or Master Tenant without Lender's consent, (B) the Historic Tax Credit Documents are amended without Lender's consent, or (C) if there shall be a default under the Historic Tax Credit Documents beyond any applicable notice or grace period;

(xix)    any failure of Borrower to obtain and/or maintain an Interest Rate Protection Agreement in accordance with the terms hereof;

(xx)    if any Loan Documents shall fail to be in full force and effect except if caused by the actions or inactions of Lender;

(xxi)    if there shall be a default or breach by any Borrower Party under any of the other Loan Documents, beyond applicable notice and/or cure periods, if any, contained in such Loan Documents;

(xxii)    Borrower fails to comply with any of the terms, covenants or conditions of Section 9.5 after expiration of ten (10) Business Days after notice thereof from Lender;

(xxiii)    the occurrence of a direct or indirect Transfer in Borrower, Master Tenant or the Property in violation of this Agreement or the failure of the Ownership and Control Condition to be satisfied;

169

(xxiv)  the occurrence of Milestone Non-Compliance;

(xxv)   if any Draw Request is fraudulently submitted by Borrower;

(xxvi) if Hotel Conversion Commencement occurs prior to satisfaction of the Hotel Conversion Conditions or if Hotel Conversion Demolition occurs prior to satisfaction of the Hotel Conversion Demolition Conditions;

(xxvii) if, following Hotel Conversion Commencement, there is any cessation at any time in construction of the Hotel Conversion for more than fifteen (15) consecutive Business Days after notice thereof and a failure to resume construction after such period, other than as a result of Force Majeure;

(xxviii)if, following Hotel Conversion Commencement, Lender, the Construction Consultant or either of their representatives are not permitted at all reasonable times upon not less than three (3) Business Days' notice to enter upon the Property in violation of this Agreement to inspect the Hotel Conversion and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Hotel Conversion Plans and Specifications or the Hotel Conversion Scope of Work, or if Borrower shall fail to furnish to Lender or its authorized representative, when requested upon not less than five (5) Business Days' notice, copies of the Hotel Conversion Plans and Specifications and the Hotel Conversion Scope of Work in each such case to the extent not previously delivered;

(xxix) if, following Hotel Conversion Commencement, any Governmental Approval is withdrawn, suspended, cancelled, terminated or any stop work order is issued with respect to the Hotel Conversion, unless Borrower restates and confirms in all respects such Governmental Approval or terminates such stop work order within a period of sixty (60) days thereafter;

(xxx)   if any Borrower Party shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement or the other Loan Documents not specified in clauses (i) through (xxix) above or specified in such other Loan Document, and such Default shall continue for ten (10) days after notice to such Borrower Party from Lender, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Lender in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30)-day period and provided, further, that Borrower shall have commenced to cure such Default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed sixty (60) days.

(b)     Upon the occurrence and during the continuance of an Event of Default, Lender may, in addition to any other rights or remedies available to it pursuant to

170

this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Lender deems advisable to protect and enforce its rights against Borrower and in and to the Property, including, without limitation, declaring the Debt to be immediately due and payable, and Lender may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and the Property, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) of Section 10.1(a) with respect to Borrower and/or SPC Party only, the Debt and all other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 10.2    Remedies.

(a)      Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Lender against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Lender at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Lender shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to the Property.  Any such actions taken by Lender shall be cumulative and concurrent and may be pursued independently, singly, successively, together or otherwise, at such time and in such order as Lender may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents.  Without limiting the generality of the foregoing, if an Event of Default is continuing (i) Lender is not subject to any "one action" or "election of remedies" law or rule, and (ii) all Liens and other rights, remedies or privileges provided to Lender shall remain in full force and effect until Lender has exhausted all of its remedies against the Property and the Collateral and the Mortgage and the Pledge Agreement has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Obligations or the Obligations have been paid in full.

(b)      With respect to Borrower, the Property and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Lender to resort to the Property or the Collateral for the satisfaction of any of the Debt in any preference or priority, and Lender may seek satisfaction out of the Property and/or the Collateral, or any part thereof, in its absolute discretion in respect of the Debt.

(c)      In addition to all remedies conferred upon it by law and by the terms of this Agreement and the other Loan Documents, upon the occurrence and during the existence of an Event of Default, Lender may pursue any one or more of the following remedies concurrently or successively, on its own or through a court appointed receiver, it being the intent hereof that none of such remedies shall be to the exclusion of any other, and with full rights to reimbursement from Borrower and Guarantor:

171

(i)      take possession of the Property and complete any renovation work at the Property, including, without limitation, the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others and to employ watchmen to protect such Property from injury. Without restricting the generality of the foregoing and for the purposes aforesaid to be exercised during the existence and continuance of an Event of Default, Borrower hereby appoints and constitutes Lender its lawful attorney-in-fact with full power of substitution to complete any construction work at the Property in the name of Borrower;

(ii)     except as set forth herein, use Reserve Funds to complete any construction work at the Property;

(iii)    retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims which may be Liens or security interests, or to avoid such bills and claims becoming Liens against the Property, or as may be necessary or desirable for the completion of any construction work at the Property or for the clearance of title to such Property;

(iv)     execute all applications and certificates in the name of Borrower which may be required by any of the contracts;

(v)      prosecute and defend all actions or proceedings in connection with any construction work at the Property; and

(vi)     take any action and require such performance as it deems necessary to be furnished hereunder and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction.

(d)      Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to partially foreclose the Mortgage and/or the Pledge Agreement in any manner and for any amounts secured by the Mortgage then due and payable as determined by Lender in its sole discretion, including the following circumstances:  (i) in the event Borrower defaults beyond any applicable grace period in the payment of one or more scheduled payments of principal and interest, Lender may foreclose the Mortgage and/or the Pledge Agreement to recover such delinquent payments, or (ii) in the event Lender elects to accelerate less than the entire Outstanding Principal Balance, Lender may foreclose the Mortgage and/or the Pledge Agreement to recover so much of the principal balance of the Loan as Lender may accelerate and such other sums secured by the Mortgage and/or the Pledge Agreement as Lender may elect. Notwithstanding one or more partial foreclosures, the Property and the Collateral shall remain subject to the Mortgage and the Pledge Agreement to secure payment of the sums secured by the Mortgage and/or the Pledge Agreement and not previously recovered.

(e)     Upon the occurrence and during the continuance of an Event of Default, Lender shall have the right from time to time to sever the Note and the other Loan Documents into one or more separate notes, mortgages and other security documents (the "**Severed Loan Documents**") in such denominations as Lender shall determine in its sole discretion for purposes of evidencing and enforcing its rights and remedies provided hereunder.  Borrower shall execute and deliver to Lender from time to time, promptly after the request of Lender, a severance agreement and such other documents as Lender shall request in order to effect the severance described in the preceding sentence, all in form and substance reasonably satisfactory to Lender.  Borrower hereby absolutely and irrevocably appoints Lender as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect the aforesaid severance, Borrower ratifying all that its' said attorney shall do by virtue thereof; provided, however, Lender shall not make or execute any such documents under such power until three (3) days after notice has been given to Borrower by Lender of Lender's intent to exercise its rights under such power.  Borrower shall not be obligated to pay any costs or expenses incurred in connection with the preparation, execution, recording or filing of the Severed Loan Documents and the Severed Loan Documents shall not contain any representations, warranties or covenants not contained in the Loan Documents and any such representations and warranties contained in the Severed Loan Documents will be given by Borrower only as of the Closing Date.

(f)     Any amounts recovered from the Property or any other collateral for the Loan during the continuance of an Event of Default may be applied by Lender toward the payment of any interest and/or principal of the Loan and/or any other amounts due under the Loan Documents in such order, priority and proportions as Lender in its sole discretion shall determine.

Section 10.3     Right to Cure Defaults.  Upon the occurrence and during the continuance of an Event of Default, Lender may, but without any obligation to do so and without notice to or demand on Borrower (except as otherwise provided in any of the Loan Documents and/or required by applicable Legal Requirements) and without releasing Borrower from any obligation hereunder or being deemed to have cured any Event of Default hereunder, make, do or perform any Obligation in such manner and to such extent as Lender may deem necessary.  Lender is authorized to enter upon the Property for such purposes, or appear in, defend, or bring any action or proceeding to protect its interest in the Property for such purposes, and the cost and expense thereof (including reasonable attorneys' fees to the extent permitted by law), with interest as provided in this Section 10.3, shall constitute a portion of the Debt and shall be due and payable to Lender upon demand.  All such costs and expenses incurred by Lender in remedying such Event of Default or such failed payment or act or in appearing in, defending, or bringing any action or proceeding shall bear interest at the Default Rate, for the period after such cost or expense was incurred until the date of payment to Lender.  All such costs and expenses incurred by Lender together with interest thereon calculated at the Default Rate shall be deemed to constitute a portion of the Debt and be secured by the Liens, claims and security interests provided to Lender under the Loan Documents and shall be immediately due and payable upon demand by Lender therefor.

Section 10.4     Remedies Cumulative.  The rights, powers and remedies of Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which

173

Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise.  Lender's rights, powers and remedies may be pursued singly, concurrently or otherwise, at such time and in such order as Lender may determine in Lender's sole discretion.  No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient.  A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.  Notwithstanding anything contained in this Agreement or any of the other Loan Documents providing that certain rights, remedies or privileges are only available to Lender during the "continuance" of an Event of Default (or words of similar import), Borrower expressly acknowledges and agrees that it does not have the right to cure an Event of Default once the same has occurred under this Agreement or any other Loan Document without the consent of Lender, which consent may be withheld, delayed or denied by Lender in its sole and absolute discretion.

Section 10.5    Supplemental Guarantees. If Guarantor causes an Event of Default to occur pursuant to clauses (vi), (vii), (ix) or (xvi) of Section 10.1(a) above solely with respect to Guarantor or a Springing Recourse Event to occur pursuant to clauses (i)-(vi) solely with respect to Guarantor (collectively, a "**Supplemental Guarantor Event of Default/Recourse Event**"), Borrower shall have the right to cause a Supplemental Guarantor to deliver the Supplemental Guarantees in accordance with and subject to the satisfaction of each of the following terms and conditions in order to cure such Supplemental Guarantor Event of Default/Recourse Event:

(a)    an Affiliate of Borrower which satisfies the Eligibility Requirements (as defined below) and, together with Guarantor, collectively satisfy the Guarantor Financial Covenants and that is otherwise acceptable to Lender in its sole but good faith discretion (each such Person(s), a "**Supplemental Guarantor**") shall execute and deliver to Lender, within sixty (60) days following the Supplemental Guarantor Event of Default/Recourse Event (such timeframe, the "**Supplemental Deadline**"), (I) a recourse guaranty in form and substance identical in all non-de minimis respects, to the Guaranty delivered to Lender as of the Closing Date (a "**Supplemental Recourse Guaranty**"), (II) an environmental indemnity in form and substance identical in all non-de minimis respects, to the Environmental Indemnity delivered to Lender as of the Closing Date (a "**Supplemental EIA**"), (III) a completion guaranty in form and substance identical in all non-de minimis respects to the Guaranty of Completion delivered to Lender as of the Closing Date (a "**Supplemental Completion Guaranty**"), and (IV) a payment guaranty in form and substance identical in all non-de minimis respects to the Guaranty of Payment delivered to Lender as of the Closing Date (a "**Supplemental Payment Guaranty**", and together with the Supplemental Recourse Guaranty, the Supplemental EIA and the Supplemental Completion Guaranty, collectively, the "**Supplemental Guarantees**"), which, in each case, shall reflect any necessary changes reasonably acceptable to Lender to reflect the organizational structure of Supplemental Guarantor if different than the Guarantor. The Supplemental Guarantees shall be provided by each Supplemental Guarantor in addition to the guarantees and indemnities provided by Guarantor as of the Closing Date, and each Supplemental Guarantor and the then existing Guarantor shall be jointly and severally liable with respect to any liability under the Supplemental Guarantees

174

and the guarantees and indemnities provided by Guarantor as of the Closing Date, whether such liability accrued prior to, on or after the date such Supplemental Guaranty was executed and delivered to Lender, provided that the Event of Default and/or Springing Recourse Event (as applicable) giving rise to the Supplemental Guarantor Event of Default/Recourse Event shall be deemed cured notwithstanding the fact that the Guarantor has not been released from the Guaranty, the Environmental Indemnity, the Guaranty of Completion and the Guaranty of Payment and that the facts and circumstances giving rise to such Supplemental Guarantor Event of Default/Recourse Event continue to exist with respect to the Guarantor;

(b)     Each Borrower Party shall deliver a reaffirmation of each Loan Document to which it is a party in form and substance reasonably acceptable to Lender prior to the expiration of the Supplemental Deadline;

(c)     Borrower shall, prior to the Supplemental Deadline deliver to Lender a legal opinion in substantially the same form as the legal opinion(s) delivered to Lender as of the Closing Date (or in such other form as is reasonably satisfactory to Lenders) with respect to the execution and enforceability of the Supplemental Guaranty;

(d)     Borrower shall, at least twenty (20) days prior to the Supplemental Deadline, deliver to Lender such documents regarding the proposed Supplemental Guarantor(s) as Lender shall reasonably require so that Lender may conduct its KYC Procedures, at Borrower's sole cost and expense, and if Lender, sends a notice to Borrower that it has in good faith determined that such Supplemental Guarantor(s) does not satisfy Lender's KYC Procedures, then Borrower may provide a new Supplemental Guaranty from other Person(s) in accordance with this Section 10.5; and

(e)     Borrower and such Supplemental Guarantor shall pay all of Lender's reasonable out-of-pocket costs and expenses in connection with the delivery of the Supplemental Guarantees, regardless of whether such supplement is ultimately consummated.

For the purposes of this Section 10.5 and Section 10.6, "Eligibility Requirement" shall mean that such Person (i) is not an Embargoed Person and has never been convicted of, or pled guilty or no contest to, any felony, including money laundering, terrorism or terrorism activities, (ii) has not been party to any bankruptcy proceedings, voluntary or involuntary, made an assignment for the benefit of creditors or taken advantage of any insolvency act, or any act for the benefit of debtors or the subject of any material governmental or regulatory investigation which resulted in a final, non-appealable conviction for criminal activity involving moral turpitude or a civil proceeding in which such Person has been found liable in a final non-appealable judgment for attempting to hinder, delay or defraud creditors, each within seven (7) years prior to the date of determination, (iii) if such Person is not a bank or an insurance company, has no material then outstanding and unpaid judgments against such Person, and (iv) otherwise satisfies Lender's KYC Procedures.

Section 10.6   Replacement Guarantees. If Guarantor causes an Event of Default to occur pursuant to clauses (vi), (vii), (ix) or (xvi) of Section 10.1(a) above solely with respect to Guarantor

175

or a Springing Recourse Event to occur pursuant to clauses (i)-(vi) solely with respect to Guarantor (collectively, a "**Replacement Guarantor Event of Default**"), Borrower shall have the right to cause a Replacement Guarantor to deliver the Replacement Guarantees in accordance with and subject to the satisfaction of each of the following terms and conditions in order to cure such Replacement Guarantor Event of Default/Recourse Event and replace the Guarantor:

(a)     an Affiliate of Borrower which satisfies the Eligibility Requirements and the Guarantor Financial Covenants and that is otherwise acceptable to Lender in its sole but good faith discretion (each such Person(s), a "**Replacement Guarantor**") shall execute and deliver to Lender, within sixty (60) days following the Replacement Guarantor Event of Default/Recourse Event (such timeframe, the "**Replacement Deadline**"), (I) a recourse guaranty in form and substance identical in all non-de minimis respects, to the Guaranty delivered to Lender as of the Closing Date (a "**Replacement Recourse Guaranty**"), (II) an environmental indemnity in form and substance identical in all non-de minimis respects, to the Environmental Indemnity delivered to Lender as of the Closing Date (a "**Replacement EIA**"), (III) a completion guaranty in form and substance identical in all non-de minimis respects to the Guaranty of Completion delivered to Lender as of the Closing Date (a "**Replacement Completion Guaranty**"), and (IV) a payment guaranty in form and substance identical in all non-de minimis respects to the Guaranty of Payment delivered to Lender as of the Closing Date (a "**Replacement Payment Guaranty**", and together with the Replacement Recourse Guaranty, the Replacement EIA and the Replacement Completion Guaranty, collectively, the "**Replacement Guarantees**"), which, in each case, shall reflect any necessary changes reasonably acceptable to Lender to reflect the organizational structure of Replacement Guarantor if different than the Guarantor. If a Replacement Guarantor delivers the Replacement Guarantees in accordance with the terms hereof, then each Replacement Guarantor shall be liable for all liabilities accruing prior to, on or after the date such Replacement Guarantees was executed and delivered to Lender (including liabilities of Guarantor under the guarantees and indemnities provided by Guarantor as of the Closing Date), and Guarantor shall be released from all liability under guarantees and indemnities provided by Guarantor, provided that, the Event of Default and/or Springing Recourse Event giving rise to the Replacement Guarantor Event of Default/Recourse Event shall be deemed cured notwithstanding that the facts and circumstances giving rise to such Replacement Guarantor Event of Default/Recourse Event continue to exist with respect to the Guarantor;

(b)     Each Borrower Party shall deliver a reaffirmation of each Loan Document to which it is a party in form and substance reasonably acceptable to Lender prior to the expiration of the Replacement Deadline;

(c)     Borrower shall, prior to the Replacement Deadline deliver to Lender a legal opinion in substantially the same form as the legal opinion(s) delivered to Lender as of the Closing Date (or in such other form as is reasonably satisfactory to Lenders) with respect to the execution and enforceability of the Replacement Guaranty;

(d)     Borrower shall, at least twenty (20) days prior to the Replacement Deadline, deliver to Lender such documents regarding the proposed Replacement Guarantor(s) as Lender shall reasonably require so that Lender may conduct its KYC

Procedures, at Borrower's sole cost and expense, and if Lender, sends a notice to Borrower that it has in good faith determined that such Replacement Guarantor(s) does not satisfy Lender's KYC Procedures, then Borrower may provide a new Replacement Guaranty from other Person(s) in accordance with this Section 10.6; and

(e)     Borrower and such Replacement Guarantor shall pay all of Lender's reasonable out-of-pocket costs and expenses in connection with the delivery of the Replacement Guarantees, regardless of whether such replacement is ultimately consummated.

## ARTICLE XI
## MISCELLANEOUS

Section 11.1     Successors and Assigns.

All covenants, promises and agreements in this Agreement, by or on behalf of Borrower and Lender, as applicable, shall inure to the benefit of the respective legal representatives, successors and assigns of Lender and Borrower, as applicable.

Section 11.2     Lender's Discretion.

Whenever pursuant to this Agreement Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Lender, the decision of Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the sole discretion of Lender and shall be final and conclusive.  Whenever pursuant to this Agreement Lender's right to approve or disapprove is to be reasonably exercised, or any arrangement or term is to be reasonably satisfactory to Lender, Lender's approval shall not be unreasonably withheld, conditioned or delayed; provided, that such qualification of reasonability shall be disregarded at any time that there exists any Event of Default.

Section 11.3     Governing Law.

(a)     **THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED IN THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE**

177

**CREATION, PERFECTION AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT TO THE MORTGAGE OR THE ASSIGNMENT OF LEASES SHALL BE GOVERNED BY, AND CONSTRUED ACCORDING TO, THE LAW OF THE STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, COMMONWEALTH OR DISTRICT, AS APPLICABLE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES AND RELINQUISHES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT AND THE NOTE, AND THIS AGREEMENT AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

(b)     **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT LENDER'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:**

**CT CORPORATION SYSTEM**
**28 LIBERTY STREET**
**NEW YORK, NY 10005**

**AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO LENDER OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE**

**AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.**

Section 11.4    Modification, Waiver in Writing.

No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

Section 11.5    Delay Not a Waiver.

Neither any failure nor any delay on the part of Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under any other Loan Document, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement or any other Loan Document, Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.  Lender shall have the right to waive or reduce any time periods that Lender is entitled to under the Loan Documents in its sole and absolute discretion.

Section 11.6    Notices.

All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "**Notice**") required, permitted, or desired to be given hereunder shall be in writing and delivered (i) by hand or (ii) by reputable overnight commercial courier, in each case addressed to the party to be so notified at its address hereinafter set forth or to such other address as such party may hereafter specify in accordance with the provisions of this Section 11.6.  Any Notice shall be deemed to have been received:  (a) on the date of delivery by hand if delivered prior to 5:00 p.m. (New York City time) on a Business Day (otherwise on the next Business Day), or (b) on the next Business Day after sent by an overnight commercial courier, in each case addressed to the parties as follows:

> If to Lender:        KREF Lending III LLC
> 30 Hudson Yards, Suite 7500
> New York, New York 10001
> Attention:  Real Estate General Counsel
> Email:  RECreditNotices@kkr.com

179

| and to: | Gibson, Dunn & Crutcher LLP |
|---|---|
| | 200 Park Avenue |
| | New York, New York 10166 |
| | Attention:  Eric Meer, Esq. |
| | Email:  EMeer@gibsondunn.com |

| If to Borrower: | LAK Bourse Owner, LLC |
|---|---|
| | LAK Bourse Master HTC Landlord, LLC |
| | LAK 400 Owner LLC |
| | LAK Market Master HTC Landlord, LLC |
| | c/o Keystone Development + Investment |
| | 1001 Conshohocken State Road, Suite 2-201 |
| | West Conshohocken Pennsylvania 19428 |
| | Attention:  Rich Gottlieb and Jamie Reyle |
| | Email:  rich@keystone.us and jreyle@keystone.us |

| and to: | Lubert-Adler, L.P. |
|---|---|
| | 2400 Market Street, Suite 301 |
| | Philadelphia, Pennsylvania 19203 |
| | Attention:  Dean Adler and Jessica Morgan |
| | Email:  dadler@lubertadler.com and jmorgan@lubertadler.com |

| and to: | Klehr Harrison Harvey Branzburg LLP |
|---|---|
| | 1835 Market Street, 14th Floors |
| | Philadelphia, Pennsylvania 19103 |
| | Attention:  Bradley A. Krouse, Esq. |
| | Email:  bkrouse@klehr.com |

Any party may change the address to which any such Notice is to be delivered by furnishing ten (10) days' prior written notice of such change to the other parties in accordance with the provisions of this Section 11.6.  Notices shall be deemed to have been given on the date as set forth above if there is an inability to actually deliver any such Notice because of a changed address of which no Notice was given, or there is a rejection or refusal to accept any Notice offered for delivery.  Notice for any party may be given by its respective counsel.  Additionally, Notice from Lender may also be given by Servicer and/or Lender's legal counsel identified in this Section 11.6, and Lender hereby acknowledges and agrees that Borrower shall be entitled to rely on any Notice given by Servicer or such counsel as if it had been sent by Lender.  For the avoidance of doubt, any Notice provided via electronic mail ("email"), including as a .pdf attachment to an email, shall not be deemed delivered for purposes of this Section 11.6 unless such Notice is also provided via one of the means specified in clause (i) or (ii) of the first sentence of this Section 11.6, and in such case, the second sentence of this Section 11.6 shall control with respect to the deemed delivery date of any such Notice.

Section 11.7    Trial by Jury.

**BORROWER AND LENDER EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.    THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE WITH REGARD TO THE LOAN DOCUMENTS.    EACH PARTY IS HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER.**

Section 11.8    Headings.

The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 11.9    Severability.

Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Legal Requirements, but if any provision of this Agreement shall be prohibited by or invalid under applicable Legal Requirements, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

Section 11.10    Preferences.

Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the Obligations of Borrower hereunder.  To the extent Borrower makes a payment or payments to Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lender.

Section 11.11    Waiver of Notice.

Borrower shall not be entitled to any notices of any nature whatsoever from Lender except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Lender to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Lender to Borrower.

Section 11.12  <u>Remedies of Borrower</u>.  In the event that a claim or adjudication is made that Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where, by law or under this Agreement or the other Loan Documents, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, neither Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedy shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

Section 11.13  <u>Expenses; General Indemnity; Mortgage Tax Indemnity; ERISA Indemnity</u>.

(a)  Other than as expressly provided in this Agreement or any other Loan Documents, Borrower shall pay or, if Borrower fails to pay, reimburse Lender within twelve (12) Business Days following receipt of written notice from Lender, for all reasonable and documented actual,   third-party out-of-pocket costs and expenses (including any such third party attorneys' fees and disbursements) incurred by Lender in connection with (i) the ongoing performance of and compliance with agreements and covenants of Borrower and Guarantor contained in this Agreement and the other Loan Documents on their respective parts to be performed or complied with after the date of this Agreement, including, without limitation, confirming compliance with environmental and insurance requirements (but excluding monthly servicing fees due to the Servicer under the Servicing Agreement); (ii) Lender's and Servicer's (subject to <u>Section 9.3</u> hereof) ongoing performance of and compliance with all agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the Closing Date (other than monthly servicing fees due to the Servicer under the Servicing Agreement); (iii) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Borrower; (iv) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Lender all required legal opinions, and other similar expenses incurred, in creating and perfecting the Liens in favor of Lender pursuant to this Agreement and the other Loan Documents; (v) enforcing or preserving any rights, in response to third-party claims or the prosecuting or defending of any action or proceeding or other litigation or otherwise, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property or any other security given for the Loan; (vi) enforcing any obligations of or collecting any payments due from Borrower and Guarantor under this Agreement, the other Loan Documents or with respect to the Property; (vii) following the transfer of the Loan to "special servicing" after an Event of Default or written notice from Borrower or its Affiliate that an Event of Default is imminently likely to occur, any "special servicing" fees; (viii) Construction Consultant's fees and expenses in connection with the Hotel Conversion, as provided in this Agreement; and (ix) any cost or expense relating to a restructuring of the credit arrangements provided under this Agreement in the nature of a "work out" or of any insolvency or bankruptcy proceedings (including, without limitation, loan servicing or special servicing fees, loan advances, and "work-out" and/or liquidation fees); provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the gross negligence, illegal acts, fraud or willful misconduct of Lender.  Any

costs due and payable to Lender may be paid to Lender pursuant to the Cash Management Agreement.

(b)    Borrower shall indemnify, defend and hold harmless Lender and Servicer and their respective officers, directors, agents, employees (and the successors and assigns of the foregoing) (each, a "**Lender Indemnitee**") from and against any and all Losses (including, without limitation, the actual reasonable and documented out-of-pocket fees and disbursements of third party counsel for the Lender Indemnitees in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not the Lender Indemnitees shall be designated a party thereto), other than consequential, punitive and similar damages that may be imposed on, incurred by, or asserted against the Lender Indemnitees in any manner relating to or arising out of (i) any breach by Borrower of its obligations under, or any material misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, other than a breach of any material misrepresentation to the extent (I) such representation or warranty was made by Lender, or (II) based on information contained in any such representation or warranty made by Lender, or (III) based on information delivered by Lender to Borrower, in each such case, in Lender's capacity as seller under the Purchases Agreement, or (ii) the use or intended use of the proceeds of the Loan (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to the Lender Indemnitees hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of the Lender Indemnitees or results from events or circumstances first occurring from and after a foreclosure or conveyance in lieu of foreclosure with respect to the Property and which is not due to acts, omissions or conditions taken by or at the direction of Borrower, Guarantor, or any Borrower Related Party or any Person acting on behalf of Borrower, any Guarantor or any of their respective Affiliates; and provided further that Borrower will not be liable for the expenses of more than one (1) such separate counsel to defend the Lender Indemnitees unless a Lender Indemnitee shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the other Lender Indemnitees. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable Legal Requirements to the payment and satisfaction of all Indemnified Liabilities incurred by the Lender Indemnitees.  Notwithstanding anything to the contrary herein, this Section 11.13(b) shall not apply to Taxes other than Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Lender Indemnitee from and against any and all Losses imposed upon or incurred by or asserted against any Lender Indemnitee and directly or indirectly arising out of or in any way relating to (i) any Tax on the making and/or recording of the Mortgage, the Note or any of the other Loan Documents, or (ii) any transfer Taxes incurred in connection with a foreclosure of the Mortgage by Lender or its designee.

(d)    Borrower shall, at its sole cost and expense, protect, defend, indemnify, release and hold harmless each Lender Indemnitee from and against any and all

Losses (including, without limitation, reasonable attorneys' fees and costs of retained firms (excluding in-house counsel)) incurred in the investigation, defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Lender's sole discretion) that Lender may incur, directly or indirectly, as a result of a default under Sections 3.1.8 and/or 4.2.11 of this Agreement.

(e)     The indemnification obligations of Borrower under this Section 11.13(c) and (d) shall survive the repayment of the Loan for one (1) year.

Section 11.14  Schedules Incorporated.

The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 11.15  Offsets, Counterclaims and Defenses.

Any assignee of Lender's interest in and to this Agreement and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 11.16  No Joint Venture or Partnership; No Third-Party Beneficiaries.

(a)     Borrower and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy in common, or joint tenancy relationship between Borrower and Lender nor to grant Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)     This Agreement and the other Loan Documents are solely for the benefit of Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Lender if, in Lender's sole discretion, Lender deems it advisable or desirable to do so.

Section 11.17  Publicity.

184

All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, Lender, KKR, KKR & Co. Inc., Kohlberg Kravis Roberts & Co. L.P. or any of their Affiliates shall be subject to the prior written approval of Lender, not to be unreasonably withheld. All news releases, publicity or advertising by Lender, Servicer or their respective Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, Borrower, Guarantor or any of their Affiliates shall be subject to the prior reasonable approval of Borrower, Guarantor or such Affiliate, as the case may be, provided, Borrower's, Guarantor's or such Affiliate's approval shall not be required:  (i) during the continuance of an Event of Default, (ii) in connection with a Secondary Market Transaction made in accordance with the terms of this Agreement, (iii) in connection with any release, publicity or advertisement that is required pursuant to Legal Requirements or otherwise to comply with applicable securities laws or disclosure requirements, including, without limitation, U.S. Securities and Exchange Commission filing, or (iv) in connection with Lender's customary "tombstone" publications that do not disclose the name of Borrower, Guarantor or any of their respective Affiliates.

Section 11.18  Waiver of Marshalling of Assets.

To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower, Borrower's members or partners and others with interests in Borrower, and of the Property, and shall not assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lender under the Loan Documents to a sale of the Property for the collection of the Debt without any prior or different resort for collection or of the right of Lender to the payment of the Debt out of the net proceeds of the Property in preference to every other claimant whatsoever.

Section 11.19  Waiver of Offsets/Defenses/Counterclaims.

Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents or otherwise to offset any obligations to make the payments required by the Loan Documents.  No failure by Lender to perform any of its obligations hereunder shall be a valid defense to, or result in any offset against, any payments which Borrower is obligated to make under any of the Loan Documents.

Section 11.20  Conflict; Construction of Documents; Reliance.

In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control.  The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations

185

or recommendations of Lender or any parent, subsidiary or Affiliate of Lender.  Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lender's exercise of any such rights or remedies.  Borrower acknowledges that Lender engages in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 11.21  Brokers and Financial Advisors.

Borrower hereby represents that it has not retained or consulted with any financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender Indemnitees harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Lender Indemnitee's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person in connection with the transactions contemplated herein, provided that (x) this Section 11.21 shall in no way limit Lender's or its Affiliate's obligations pursuant to Section 8.5 of the Purchase Agreement, and (ii) Lender and its Affiliates shall remain responsible for any claims of any financial advisors, brokers, underwriters, placement agents, agents or finders retained or consulted by Lender or its Affiliates during its period of ownership of the Property prior to the Closing Date. The provisions of this Section 11.21 shall survive the expiration and termination of this Agreement and the payment of the Debt.

Section 11.22  Exculpation and Recourse.

Subject to the qualifications below, Lender shall not enforce the liability and obligation of Borrower to perform and observe the obligations contained in the Note, this Agreement, the Mortgage or the other Loan Documents by any action or proceeding wherein a money judgment or any deficiency judgment or other judgment establishing personal liability shall be sought against any Borrower Related Party or any principal, director, officer, employee, beneficiary, shareholder, partner, member, trustee, agent or any legal representatives, successors or assigns of any of the foregoing (collectively, the "**Exculpated Parties**"), except that Lender may bring a foreclosure action, an action for specific performance or any other appropriate action or proceeding to enable Lender to enforce and realize upon its collateral under the Note, this Agreement, the Mortgage and the other Loan Documents, or in the Property, the Rents, or any other collateral given to Lender pursuant to the Loan Documents; provided, however, that, except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against Borrower only to the extent of Borrower's interest in the Property, in the Rents and in any other collateral given to Lender, and Lender, by accepting the Note, this Agreement, the Mortgage and the other Loan Documents, shall not sue for, seek or demand any deficiency judgment against Borrower, any other Borrower Related Party or any Exculpated Party, in any such action or proceeding under or by reason of or under or in connection with the Note, this Agreement, the Mortgage or the other Loan Documents.  The provisions of this Section 11.22 shall not, however, (a) constitute a waiver, release or impairment of any obligation evidenced or secured by any of the Loan Documents; (b) impair the right of Lender to name Borrower as a party defendant in any action or suit for

186

foreclosure and sale of the Property under the Mortgage; (c) affect the validity or enforceability of any indemnity, guaranty, or similar instrument made in connection with the Loan or any of the rights and remedies of Lender thereunder; (d) impair the right of Lender to obtain the appointment of a receiver; (e) impair the enforcement of the Assignment of Leases; (f) impair the right of Lender to enforce the provisions of the Guaranty, the Environmental Indemnity, the Guaranty of Completion or the Guaranty of Payment; (g) constitute a prohibition against Lender to seek a deficiency judgment against Borrower solely in order to fully realize on any security given by Borrower in connection with the Loan or to commence any other appropriate action or proceeding in order for Lender to exercise its remedies against such security; or (h) constitute a waiver of the right of Lender to enforce the liability and obligation of Borrower, by money judgment or otherwise, to the extent of any actual Losses incurred by Lender (including out-of-pocket attorneys' fees and costs reasonably incurred) arising out of or in connection with the following:

(a)     fraud, gross negligence, willful misconduct, intentional material misrepresentation, or failure to disclose a material fact by Borrower in connection with the Loan, provided, that, with respect to any intentional material misrepresentation or failure to disclose a material fact by Borrower in connection with the Loan, there shall be no liability under this clause (a) to the extent (A)(I) such representation or warranty was made by Lender under the Purchase Agreement, (II) based on information contained in any such representation or warranty made by Lender under the Purchase Agreement, or (III) based on information delivered by Lender to Borrower in connection with the sale of the Property pursuant to the Purchase Agreement, in each such case, in Lender's capacity as seller under the Purchases Agreement, or (B) failure to disclose such material fact is because Lender failed to disclose same in its capacity as seller under the Purchase Agreement;

(b)     the removal or destruction of any portion of the Property or Improvements, or damage to the Property or Improvements caused by the willful misconduct or gross negligence of any Borrower Related Party; provided, that, Borrower may sell or replace Personal Property or fixtures, or replace obsolete Personal Property or fixtures, in each case in the ordinary course of business;

(c)     any intentional material physical waste of the Property caused by any Borrower Related Party; provided, that the Property's failure to generate sufficient cash flow to prevent or remediate waste to the Property shall not constitute intentional material physical waste of the Property so long as such insufficiency does not arise from the intentional misappropriation or conversion of revenues by any Borrower Related Party; provided further, that, Borrower shall have no liability under this clause (c) to the extent that (i) the Property fails to generate sufficient cash flow to prevent such material physical waste of the Property, so long as such insufficiency does not arise from the intentional misappropriation or conversion of revenues by any Borrower Related Party, (ii) Borrower's access to cash flow from the Property is restricted or constrained by Lender or Servicer or by Legal Requirements in an amount sufficient to prevent such material physical waste of the Property, (iii) funds to prevent such material physical waste of the Property are available in an Account for such purpose (or, in any such case, would have been available but for Lender's election to apply same to the Debt upon the occurrence of an Event of Default) and Lender or Servicer failed to pay (or make such funds available to Borrower to pay) same for any reason or no reason whatsoever, or (iv) Carry Cost Advances are

187

available to fund such amounts and Lender failed to Advance same for any reason or no reason whatsoever;

(d)    the forfeiture by Borrower of the Property, or any portion thereof, because of the conduct or purported conduct of criminal activity by any Borrower Related Party;

(e)    failure of Borrower to (A) obtain and maintain the Policies required to be obtained and maintained in accordance with the provisions of this Agreement, and/or (B) pay when due any and all Insurance Premiums required to be paid in connection therewith until such time as Borrower is no longer the owner of all or any portion of the Property; provided, that, Borrower shall have no liability under this clause (e) to the extent that (i) the Property fails to generate sufficient cash flow to maintain such Policies, so long as such insufficiency does not arise from the intentional misappropriation or conversion of revenues by any Borrower Related Party, (ii) Borrower's access to cash flow from the Property is restricted or constrained by Lender or Servicer or by Legal Requirements, (iii) funds to pay such amounts are available in the Insurance Account and/or the Carry Cost Account (or, in any such case, would have been available but for Lender's election to apply same to the Debt upon the occurrence of an Event of Default) and Lender or Servicer failed to pay (or make such funds available to Borrower to pay) same for any reason or no reason whatsoever, or (iv) Carry Cost Advances are available to fund such amounts and Lender failed to Advance same for any reason or no reason whatsoever;

(f)    failure by Borrower to pay when due any and all Property Taxes; provided, that, Borrower shall have no liability under this clause (f) to the extent that (A) the Property fails to generate sufficient cash flow to pay such Property Taxes, so long as such insufficiency does not arise from the intentional misappropriation or conversion of revenues by any Borrower Related Party, (B) Borrower's access to cash flow from the Property is restricted or constrained by Lender or Servicer or by Legal Requirements, (C) funds to pay such amounts are available in the Property Tax Account and/or the Carry Cost Account (or, in any such case, would have been available but for Lender's election to apply same to the Debt upon the occurrence of an Event of Default) and Lender or Servicer failed to pay (or make such funds available to Borrower to pay) same for any reason or no reason whatsoever, or (D) Carry Cost Advances are available to fund such amounts and Lender failed to Advance same for any reason or no reason whatsoever; for the avoidance of doubt, in no event shall Property Taxes include transfer taxes due upon a foreclosure of the Mortgage and Borrower's failure to pay the same shall not result in any liability under this clause (f);

(g)    the misappropriation or intentional misapplication of or by any Borrower Related Party of:  (A) any Net Proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards received in connection with a Condemnation of all or a portion of the Property, (C) any Rents or Gross Revenue of any nature (including any Lease Termination Fees), which shall include the failure of any Borrower Related Party Party to deposit such amounts in the Clearing Account in accordance with this Agreement, (D) any Advances or disbursements of Reserve Funds, and (E) any proceeds or

188

contributions paid under the Historic Tax Credit Documents or any Master Tenant Capital Contributions;

(h)      subject to Borrower's right to contest pursuant to this Agreement, failure to pay charges for labor or materials or other charges that can create Liens on any portion of the Property (provided that there shall be no liability under this clause (h) to the extent that such liability is due to the failure of Borrower to pay charges for labor or materials or other charges that can create Liens on any portion of the Property and such liability constitutes "Guaranteed Obligations" (as defined under the Guaranty of Completion), it being agreed that Lender's recourse for such amounts shall be solely under the terms of the Guaranty of Completion; provided, that, Borrower shall have no liability under this clause (h) to the extent that (A) the Property fails to generate sufficient cash flow to pay such charges, so long as such insufficiency does not arise from the intentional misappropriation or conversion of revenues by any Borrower Related Party, (B) Borrower's access to cash flow from the Property is restricted or constrained by Lender or Servicer or by Legal Requirements, (C) funds to pay such amounts are available in the Carry Cost Account or the Cash Collateral Account and/or any other applicable Reserve Account (or, in any such case, would have been available but for Lender's election to apply same to the Debt upon the occurrence of an Event of Default) and Lender or Servicer failed to pay (or make such funds available to Borrower to pay) same for any reason or no reason whatsoever, or (D) Carry Cost Advances, Hotel Conversion Advances and/or Office CapEx Project Advances (as applicable) are allocated to fund such amounts and are available to fund such amounts and Lender failed to Advance same for any reason or no reason whatsoever;

(i)      any breach of the covenants contained in Section 4.1.37 of this Agreement that a Required SPE shall be a Special Purpose Bankruptcy Remote Entity that does not result in the substantive consolidation of the assets and liabilities of Required SPE with any other Person; provided that no liability shall arise under this clause (i) to the extent Section 3.1.24(d) was breached solely as a result of insufficient cash flow from the Property or Borrower's access to such cash flow is being restricted or constrained by Lender or Servicer or pursuant to Legal Requirements;

(j)      if any of the terms, covenants or conditions of the Ground Lease shall in any manner be modified, changed, supplemented, altered or amended without the consent of Lender except as otherwise permitted by this Agreement;

(k)      (A) any obligation of Borrower to indemnify any Person that, immediately prior to any acquisition of title to the Collateral pursuant to a UCC foreclosure sale, a UCC strict foreclosure, an assignment in lieu of foreclosure or other enforcement action under the Loan Documents (collectively, an "**Equity Collateral Enforcement Action**"; and the date on which an Equity Collateral Enforcement Action is consummated, an "**Equity Collateral Transfer Date**"), was a Borrower Related Party, to the extent such obligation continues to be the obligation of the transferee at such Equity Collateral Enforcement Action and is not expressly waived in writing by the Persons covered by such indemnification obligation and (B) any obligation of Borrower accruing prior to, on or after the Equity Collateral Transfer Date to pay (1) amounts due under any contract between

189

Borrower, on the one hand, and any Borrower Related Party, on the other hand (unless such contract is assumed in writing by the Person acquiring the Collateral on or after the Equity Collateral Transfer Date) or (2) amounts due under any contract between Borrower, on the one hand, and any Person that is not a Borrower Related Party, on the other hand, that has been entered into without Lender to the extent such prior written approval was required under this Agreement (unless such contract was assumed in writing by the Person acquiring the Collateral on or after the Equity Collateral Transfer Date);

(l)     the failure of a Borrower Related Party to remit to Lender all proceeds or contributions paid by an HTC Investor to such Borrower Related Party under the Historic Tax Credit Documents;

(m)     failure by Borrower to deliver to Lender on demand (at any time after the occurrence and during the continuance of an Event of Default) any security deposits, advance deposits or any other deposits collected with respect to the Property, including upon a foreclosure or deed in lieu thereof, except to the extent any such deposits were applied pursuant to the terms and conditions of any of the Leases (including, without limitation, in connection with a Lease default) and/or any such application of such funds is prevented by bankruptcy, receivership, or similar judicial proceeding in which Borrower is legally preventing from directing the disbursement of such sums;

(n)     if (x) Hotel Conversion Commencement occurs prior to satisfaction of the Hotel Conversion Conditions, or (y) Hotel Conversion Demolition occurs prior to satisfaction of the Hotel Conversion Demolition Conditions;

(o)     other than a Permitted Transfer, the occurrence, without the prior written consent of Lender, of any voluntary Transfer that is not a "Springing Recourse Event" pursuant to clause (viii) below (except no liability shall arise pursuant to this clause (o) solely as a result of any foreclosure or deed-in-lieu of foreclosure of the Mortgage or other exercise of remedies under the Loan, or the death, disability or incapacity of an individual);

(p)     the effectuation of an HTC Investment, including, without limitation, the execution of a Historic Tax Credit Document, in violation of the terms of this Agreement; and/or

(q)     if after execution of the Historic Tax Credit Documents in accordance with the terms hereof, any of the terms, covenants or conditions of the Historic Tax Credit Documents shall in any manner be modified, changed, supplemented, altered or amended without the consent of Lender;

(r)     any termination, rejection, cancellation to or of the Ground Lease or any surrender of the leasehold estate created by the Ground Lease unless, in each case, such action was consented to by Lender in writing; and/or

(s)     if after execution of the Historic Tax Credit Documents in accordance with the terms hereof, any termination, rejection, cancellation to or of the

190

Historic Tax Credit Documents or any surrender of the leasehold estate created by the Master Lease unless, in each case, such action was consented to by Lender in writing.

Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Debt or to require that all collateral shall continue to secure all of the Debt owing to Lender in accordance with the Loan Documents, and (B) the Debt shall be fully recourse to Borrower in the event that (each, a "**Springing Recourse Event**"):

(i)       any Borrower Party files a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law;

(ii)       any Borrower Related Party solicits or causes to be solicited petitioning creditors for the filing by any Person(s) of any involuntary petition against any Borrower Party under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law (other than a filing made, filed, or joined in, by or at the request of Lender);

(iii)       an involuntary petition is filed against any Borrower Party under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law by any Person (other than a filing made, filed, or joined in, by or at the request of Lender) in which any Borrower Related Party colludes with such Person;

(iv)       any Borrower Related Party consents to, or otherwise joins in, or colludes in the filing of, any involuntary petition filed against any Borrower Party by any other Person under the Bankruptcy Code or any other federal or state bankruptcy or insolvency law (other than a filing made, filed, or joined in, by or at the request of Lender),

(v)       any Borrower Related Party consents to, or joins in, an application for the appointment of a custodian, receiver, trustee or examiner for any Borrower Party or any portion of the Property or the Collateral or colludes with any Person in filing such an application (other than an application made, filed, or joined in, by or at the request of Lender);

(vi)       any Borrower Party makes an assignment for the benefit of creditors, or admitting in any legal proceeding, its insolvency or inability to pay its debts as they become due (provided, that if such Borrower Party is required by applicable Legal Requirements to admit the same in a legal proceeding and such Borrower Party is in fact insolvent or unable to pay its debts as they become due, then such admission, in and of itself, shall not be a Springing Recourse Event;

(vii)       Borrower fails to obtain Lender's prior written consent to any (x) voluntary Indebtedness, provided that no liability shall arise under this clause (x) to the extent sub-clauses (ii)-(iii) of Section 4.2.6(g) were breached solely as a result of insufficient cash flow from the Property or Borrower's access to such cash flow is being restricted or constrained by Lender or Servicer or pursuant to

191

Legal Requirements, or (y) voluntary Lien, in each case, secured by the Property or the Collateral (other than, in each case, Permitted Indebtedness and/or Permitted Encumbrances);

(viii)    any of the following Transfers (other than Permitted Transfers) occurs without the prior written consent of Lender in violation of this Agreement:  (A) a sale or voluntary conveyance of all or any non-de minimis portion of the Property constituting real property, or a ground lease or master lease for all or substantially all of Borrower's interest in the Property (it being understood there shall be no recourse under this provision for mechanic or materialmen Liens, customary easements, space Leases or the Ground Lease or the execution of the Master Lease in accordance with the terms hereof); or (B) a direct or indirect Transfer in Borrower which results in the Ownership and Control Condition no longer being satisfied (except no liability shall arise pursuant to this clause (viii) solely as a result of any foreclosure or deed-in-lieu of foreclosure of the Mortgage or other exercise of remedies under the Loan, or the death, disability or incapacity of an individual);

(ix)    any breach of the covenants contained in Section 4.1.37 of this Agreement that a Required SPE shall be a Special Purpose Bankruptcy Remote Entity that results in, and is cited as a material factor in, the substantive consolidation of the assets and liabilities of such Required SPE with any other Person (other than a substantive consolidation petitioned, filed, or joined in, by or at the request of Lender);

(x)    any Borrower Related Party in bad faith interferes with or hinders the prosecution of any enforcement action or exercise of rights or remedies by Lender under any Loan Document, or in bad faith seeks a defense, judicial intervention or injunctive or other equitable relief of any kind, or asserts in a pleading filed in connection with a judicial proceeding any bad faith defense against Lender or any right in connection with any security for the Loan;

(xi)    if Borrower shall opt into Article 8 of the UCC or cause the Collateral to be treated as "securities" governed by and within the meaning of Article 8, or if Borrower or any Affiliate of Borrower causes Borrower to amend or otherwise modify its organizational documents in order to elect to be governed by Article 8 of the UCC; and/or

(xii)    any Borrower Related Party asserts, claims, seeks or otherwise alleges that the Pledge Agreement is invalid or unenforceable, and/or asserting, claiming or otherwise alleging any other equitable argument, remedy or relief against the enforcement of the Pledge Agreement as a result of Lender also being the beneficiary under the Mortgage.

Section 11.23  Prior Agreements.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated

192

hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

Section 11.24   Acknowledgment and Consent to Bail-In of Affected Financial Institutions.

(a)      Notwithstanding anything to the contrary herein, in any Loan Document or in any other agreement, arrangement or understanding between Borrower and Lender, each party hereto acknowledges and accepts that any liability of any Affected Financial Institution arising under this Agreement or any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(i)      the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(ii)      the effect of the Write-Down and Conversion Powers by the applicable Resolution Authority in relation to any such liabilities arising hereunder, including, if applicable:  (1) a reduction, in full or in part, in the principal amount, or outstanding amount due (including any accrued but unpaid interest) in respect of any such liability, or a cancellation of any such liability; (2) a conversion of all, or part of, any such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or (3) the variation of the terms of any Loan Document in connection with the exercise of the Write-Down and Conversion Powers of the applicable Resolution Authority.

(b)      The following definitions apply only to this Section 11.24:

(i)      "**Affected Financial Institution**" means (a) any EEA Financial Institution or (b) any UK Financial Institution.

(ii)      "**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

(iii)      "**Bail-In Legislation**" means (a) with respect to an EEA Member Country which has implemented, or which at any time implements, Article 55 of Directive 2014/59/EU (as amended or re-enacted or successor thereto) establishing a framework for the recovery and resolution of credit institutions and investment firms, the relevant implementing law or Regulation as described in the EU Bail-In Legislation Schedule from time to time and (b) with respect to the United Kingdom, Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United

193

Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings.

(iv)    "**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

(v)    "**EEA Member Country**" means any member state of the European Union, Iceland, Liechtenstein and Norway.

(vi)    "**EEA Resolution Authority**" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any Affected Financial Institution and/or which otherwise has authority to exercise or regulate a Bail-In Action.

(vii)    "**EU Bail-In Legislation Schedule**" means the document described as such and published by the Loan Market Association (or any successor Person) from time to time.

(viii)    "**Regulation**" includes any regulation, rule, official directive, request or guideline (whether or not having the force of law) of any governmental, intergovernmental or supranational body, agency, department or of any regulatory, self-regulatory or other authority or organization.

(ix)    "**Resolution Authority**" means an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

(x)    "**UK Financial Institution**" means any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

(xi)    "**UK Resolution Authority**" means the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

(xii)    "**Write-Down and Conversion Powers**"  means, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers

194

of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom, any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

Section 11.25 <u>Joint and Several Liability</u>.  If more than one Person has executed this Agreement as "Borrower," the representations, covenants, warranties and obligations of all such Persons hereunder shall be joint and several.

Section 11.26 <u>Creation of Security Interest</u>.  Notwithstanding any other provision set forth in this Agreement, the Note, the Mortgage or any of the other Loan Documents, Lender may at any time create a security interest in all or any portion of its rights under this Agreement, the Note, the Mortgage and any other Loan Document (including, without limitation, the advances owing to it) in favor of (i) any Federal Reserve Bank, any Federal Home Loan Bank or the central reserve bank or similar authority of any other country to secure any obligation of Lender to such bank or similar authority (a "**Central Bank Pledge**") or (ii) the trustee, administrator or receiver (or their respective nominees, collateral agents or collateral trustees) of a mortgage pool securing covered mortgage bonds issued by a German mortgage bank, or any other Person permitted to issue covered mortgage bonds, under German Pfandbrief legislation, as such legislation may be amended and in effect from time to time, on any substitute or successor legislation (a "**Pfandbrief Pledge**").  In the event that the interest of Lender that is assigned in connection with a Central Bank Pledge is foreclosed upon and transferred to the pledge thereof, Lender shall have no further liability hereunder with respect to the interest that was the subject of such transfer and the assignee shall be Lender with respect to such interest.  Lender shall not be required to notify Borrower of any Central Bank Pledge or Pfandbrief Pledge.  Borrower agrees to execute, within fifteen (15) Business Days after request therefor is made by Lender, any documents or any amendments, amendments and restatements, and/or modifications to any Loan Documents and/or additional documents (including, without limitation, amended, amended and restated, modified and/or additional promissory notes) and/or estoppel certificates reasonably requested by Lender in order to make the Loan Documents eligible under German pfandbrief legislation; provided, however, that Borrower shall not be required to enter into any such documents and amendments which would increase Borrower's obligations or decrease Borrower's rights under the Loan Documents or adversely affect the economic or other terms of the Loan, and Lender shall reimburse Borrower's reasonable out-of-pocket expenses incurred in connection with the foregoing (other than in connection with delivering an estoppel certificate).

Section 11.27 <u>Set-Off</u>.

In addition to any rights and remedies of Lender provided by this Agreement and by law, the Lender shall have the right, without prior notice to Borrower, any such notice being expressly

195

waived by Borrower to the extent permitted by applicable Legal Requirements, upon any amount becoming due and payable by Borrower hereunder (whether at the stated maturity, by acceleration or otherwise) to set-off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by Lender to or for the credit or the account of Borrower.  Lender agrees promptly to notify Borrower after any such set-off and application made by Lender; provided that the failure to give such notice shall not affect the validity of such set-off and application.

Section 11.28  Lead Lender.  Notwithstanding anything to the contrary contained in this Agreement or any of the other Loan Documents, if at any time there is more than one Lender hereunder, each such Lender shall deliver a written notice to Borrower designating one Lender or an affiliate thereof as the "Lead Lender" (such Lender, at all times thereafter and until resignation or replacement of such Lender by written notice to Borrower, the "**Lead Lender**").  As of the Closing Date, the initial Lead Lender is KREF Lending III LLC.  Each Lender hereby appoints Lead Lender to serve as non-fiduciary administrative agent and collateral agent for each Lender and hereby agrees that Lead Lender shall be the sole party authorized to grant or withhold consents or approvals hereunder on behalf of each Lender (subject, in each case, to appointment of a servicer to receive such notices, requests and other communications and/or to grant or withhold consents or approvals, as the case may be).  No Lender shall have any liabilities or responsibilities to Borrower on account of the failure of any other Lender to perform its obligations hereunder or to any Lender on account of the failure of Borrower to perform its obligations hereunder or under any other Loan Document.  Borrower hereby acknowledges and agrees that any one or more co-lender agreements may at any time be entered into between Lenders (each, a "**Co-Lender Agreement**") pursuant to which, among other things, Lenders shall agree upon rights of Lenders as among themselves and the manner in which Lead Lender shall administer the Loan.  Any Co-Lender Agreement will be solely for the benefit of the Lenders, and neither any Borrower Related Party nor any other Person shall be a third-party beneficiary of any of the provisions therein, or have any rights thereunder or be entitled to rely on any of the provisions contained therein.  No Lender shall have any obligation to disclose to any Borrower Related Party or any of its Affiliates the contents of any Co-Lender Agreement.  The Borrower Related Party's obligations under the Loan Documents are and will be independent of any Co-Lender Agreement and shall remain unmodified by the provisions thereof (although Borrower acknowledges that with respect to certain approvals, calculations and other decisions hereunder, any Co-Lender Agreement may require Lead Lender to consult with or receive the approval of one or more Lenders prior to providing its own approval or determination regarding the same).

Section 11.29  Negation of Implied Right to Cure Events of Default.  Notwithstanding anything contained in this Agreement or any of the other Loan Documents providing that certain rights, remedies or privileges are only available to Lender during the "continuance" of an Event of Default (or words of similar import), Borrower expressly acknowledges and agrees that it does not have the right to cure an Event of Default once the same has occurred under this Agreement or any other Loan Document without the consent of Lender, which consent may be withheld, delayed or denied by Lender in its sole and absolute discretion.

[NO FURTHER TEXT ON THIS PAGE]

196

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**LENDER:**

**KREF LENDING III LLC**,
a Delaware limited liability company

By: _____
Name: Paul Fine
Title:   Authorized Signatory

[Signature Page to Loan Agreement]

**BORROWER**:

**LAK BOURSE OWNER, LLC,**
a Delaware limited liability company

By: _____

Name: Marc Rash
Title: Authorized Signatory

**LAK 400 OWNER, LLC,**
a Delaware limited liability company

By: _____

Name: Marc Rash
Title: Authorized Signatory

**LAK BOURSE MASTER HTC LANDLORD,
LLC,** a Delaware limited liability company

By: _____

Name: Marc Rash
Title: Authorized Signatory

**LAK MARKET MASTER HTC LANDLORD,
LLC,** a Delaware limited liability company

By: _____

Name: Marc Rash
Title: Authorized Signatory

[Signature Page to Loan Agreement]

## SCHEDULE I

**Hotel Conversion Scope of Work**

[Attached]

 **FASTRACK CONSTRUCTION, INC.**

**The Bourse Redevelopment – Demolition, Shell Work, Finishes & Elevators**

**Overview**

The scope of work entails the renovation of five floors of an existing building from commercial space to hotel, lobby and back of house of spaces.  The building is presently used as commercial space which will remain open on the floors that hotel is not going on.

**Demolition & Shell Work**

- **Interior demolition** - will occur on the floors that the hotel is going on.
- **Shell work** - entails some minor exterior masonry patching and cornice repair that entails netting and limited repair. The existing skylights are to remain, and no work is to be performed on the skylights. The existing roof is in good condition and no new roofing work is planned.

**Finishes**

- **Lobby & BOH** - Portions of the Lower Level and Street Level will be converted to Hotel back of house, Lobby/Café, and an Event space.  Lobby/Café design will be established by the hotel brand and hotel partners.
- **Hotel Rooms & Corridors** - Floors 3,4, and 8 will be converted to new hotel rooms with minor floor leveling to accommodate the new hotel rooms. Room and corridor designs will be established by the hotel brand and hotel partners.  Rooms will be LVT floors, tiled bathrooms and wall covering on walls.  Suites will have some minor upgrades.  Corridors will have carpet with padding and wall covering.
- **FF&E** – Furnishing of the vanities, carpet, wall covering, bathroom mirrors, signage and specialty lights are part of the FF&E budget.  The installation of all these items is part of the construction budget.  All window treatments, furniture, TV's, etc. are furnished and installed in the FF&E budget.
- **Elevators** – All elevators are to remain.  Only cab finishes and controls will be updated. There will be one new elevator added in the 5th street existing shaft for the hotel.

**The Bourse Redevelopment – Mechanical, Electrical and Plumbing**

**Overview**

The hotel component will be as independent as possible from the existing office component. Allowing for cleaner condo of the building elements if desired at some point in the future.  That said we are utilizing much of the building infrastructure.

Even with the above there will always be some shared components as they share one envelope and a complete divorce of the two components would be prohibitive and, in some cases, impossible.

Below is the design guidance being provided to the MEP engineers and the contractors.

**HVAC**

- **Heating – Cooling** - New VRF systems for each room. Condensers on the roof. Abandoned solar panels to be removed to make room for condenser units. Existing stacked mechanical closet to be used for VFR piping.
- **Makeup air** – take the existing vacant elevator shaft at the northwest corner of the building and convert this to a fresh air shaft. Install a VRF unit on each floor to condition the fresh air that will be distributed to the hotel rooms. There are no obstructions at the top of shaft and a duct can be extended through roof for fresh air draws. No fan required.
- **Exhaust** - will require one louver installed in a window on each floor.  Exhaust ducted to each bathroom and suite kitchen with a single inline fan drawing from each location. Location of louver on alley street to avoid conflict with historic preservation.
- **Controls** - Either expand the existing automation system or new for the hotel component. The Hotel operator may be able to provide some guidance on a system that integrates room manage with temperature controls.

**Plumbing**

- **Sanitary** - connects to the existing 4 - 6" risers located at each corner of the atrium (engineers believe this is sufficient for new fixture count).
- **Cold Water** - we need to have an engineer determine if the existing duplex pump system will handle the volume of the morning rush.  If the pumps have the capacity, we need a new dedicated riser for the hotel rooms.
- **Hot Water** - there is an existing abandoned boiler in penthouse with a 277/480V 600-amp feed that will be removed.  Reuse this location and existing electrical feed to feed new electric boilers.  These boilers will feed a vertical riser loop.  At the vertical riser loop on each floor an additional electrical water heater will be installed and connected to a horizontal loop on each floor.

**Electrical**

- **Hotel Room Power** - We will connect at existing load connection points at each floor. Hotel rooms will use significantly less power than the prior office use, so the existing feed size is sufficient.  The larger suites may have their own panel, but the standard rooms will have centralized panels located in electrical rooms on floor.
- **Metering** - The mains for every load connection point of the hotel will need to be metered. A central meter reading system would be preferred.
- **Low Voltage, TV – Internet –** hotel developer will provide some insight into this, we assume we will need cable to each room and distributed wireless access throughout the hotel floors, lobbies, amenities and restaurant.

**Lobby and Lower-Level Amenities**

- **Kitchen Exhaust -** 3 units will remain in use for kitchens for event and restaurant spaces. Units were installed by MRP and have been well maintained.
- **HVAC Cooling**– It's our intention to divorce the hotel components from the existing central plant systems.  An area in the lower level will be used as a mechanic room utilizing existing sidewalk grills and lower-level windows as intake and exhaust air system.   This location will house AC units for cooling the hotel lobby & restaurant.
- **HVAC Heating** – the existing basement boiler plant will be utilized with new pumps and piping added to the new hotel AC units to provide heat as needed via hot water circulation.
- **Electrical** – Ample power is available for the existing food hall for all our hotel lobby, restaurant, and event space needs.

**Plumbing** – as above, ample plumbing exists both supply and waste for hotel and event space uses on lobby level. The lower level is below the city sewer system and may need addition/replacement of sewage ejections pumps for amenities.

## <u>SCHEDULE II</u>

### Leasing Guidelines

[Attached]

## Leasing Parameters
### Minimum Leasing Guidelines / Minimum Net Effective Rent

| Space Type | Office | | | | Retail | | | |
|---|---|---|---|---|---|---|---|---|
| Lease Type | Floors 5-6 | Floors 7 | Floors 8-9 | Floor 10 | 4th Street | 5th Street | Lower Level[8] | Storage |
| **New Leases** | | | | | | | | |
| Market Base Rents[1]: | $37.00 | $37.50 | $38.00 | $34.00 | $40.00 | $50.00 | $25.00 | $15.00 |
| Market Term (mos.) [2][3]: | 65 | 65 | 65 | 65 | 126 | 126 | 126 | 84 |
| Market Concessions (mos.)[4]: | 5 | 5 | 5 | 5 | 6 | 6 | 6 | 0 |
| Market TI Allowance PSF [5]: | $40.00 | $40.00 | $40.00 | $40.00 | $100.00 | $100.00 | $100.00 | $0.00 |
| Market Leasing Commission ($/%): | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 0.00% |
| Lease Type: | MG | MG | MG | MG | NNN | NNN | NNN | None |
| **UW Minimum Net Effective Starting Rent** | $24.18 | $24.61 | $25.03 | $21.62 | $25.77 | $34.60 | $12.54 | $15.00 |
| **Renewal Leases** | | | | | | | | |
| Market Base Rents[1]: | $37.00 | $37.50 | $38.00 | $34.00 | $40.00 | $50.00 | $25.00 | $15.00 |
| Market Term (mos.) [2][3]: | 65 | 65 | 65 | 65 | 126 | 126 | 126 | 84 |
| Market Concessions (mos.)[6]: | 2 | 2 | 2 | 2 | 3 | 3 | 3 | 0 |
| Market TI Allowance PSF [7]: | $10.00 | $10.00 | $10.00 | $10.00 | $20.00 | $20.00 | $20.00 | $0.00 |
| Market Leasing Commission ($/%): | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 7.00% | 0.00% |
| Lease Type: | MG | MG | MG | MG | MG | MG | MG | None |
| **UW Minimum Net Effective Starting Rent** | $31.43 | $31.88 | $32.32 | $28.73 | $34.34 | $43.40 | $20.75 | $15.00 |

### KKR Notes / Constraints

(1) Market Leasing Assumptions for leases to the Property (Minimum Base Rent PSF).

(2) Minimum Lease Term = 36 Months. Maximum Lease Term = 180 Months.

(3) Lease term equates to the earlier of (i) lease maturity, or (ii) early termination option.

(4) Maximum Free Rent for New Leases for office space = 1 month per lease year. Maximum Free Rent for New Leases for retail space = 1.0 month per lease year.

(5) Maximum TI for office space = $8.00 PSF per lease year. Maximum TI for ground floor retail space = $10.00 PSF per lease year. Maximum TI for lower level retail space = $10.00 PSF per lease year.

(6) Maximum Free Rent for New Leases for office space = 0.5 month per lease year. Maximum Free Rent for New Leases for retail space = 0.5 month per lease year.

(7) Maximum TI for office space = $2.00 PSF per lease year. Maximum TI for ground floor retail space = $2.00 PSF per lease year. Maximum TI for lower level retail space = $2.00 PSF per lease year.

(8) For the Lower Level, the total of the (i) Tenant Improvement Allowance, and (ii) Lower Level Buildout Cost included in the Preliminary Hotel Conversion Budget shall not exceed $5,000,000.

Note: Leases with economic terms for the applicable space that (i) equate to an amount greater than or equal to the "Minimum Net Effective Rent" shown above (which, for the avoidance of doubt, shall be based on the aggregate amount shaded above and not on a component-by-component basis) and (ii) are not in violation of the "Constraints" detailed above, shall be deemed compliant with the Minimum Net Effective Rents.

## <u>SCHEDULE III</u>

**Intentionally Omitted**

## <u>SCHEDULE IV</u>

**Exceptions to Representations and Warranties**

[Attached]

**Schedule 9.1.3**
**Schedule of Lease Defaults and Food Hall Lease Status**

**Bourse + 400 Market**
**Schedule of Tenants with Monetary Defaults, exclusive of Bourse Food Hall tenants**

| Building | Tenant | A/R outstanding as of 12/22/23 | A/R outstanding as of 6/23/24 |
|---|---|---|---|
| Bourse | Piano Software, Inc. | $45,471.73 | ($2,193.41) |
| Bourse | Everstream Solutions LLC | | $44,147.66 |
| 400 Market | Philadelphia Youth Network | $51,127.29 | $15,390.07 |
| 400 Market | Deardorff Associates, Inc. | | $69,892.31 |
| 400 Market | Fox Television | $24,765.12 | $24,765.12 |

**Bourse Food Hall**
**Schedule of Existing Tenant Defaults**

| Food Hall Tenant | Lease Status | Lease Exp Date | Tenant Status | Tenant Default Status |
|---|---|---|---|---|
| Rebel Taco PA LLC (t0001251) | MTM | 9/30/2023 | Occupying | Default - failure to pay rent due (TT has inconsistently been paying verbally agreed to percentage rent, but not rent per lease) |
| Bricco Pizza Romana LLC (t0001262) | MTM | 10/31/2023 | Non-Occupying | Default - failure to pay rent due (TT has inconsistently been paying verbally agreed to percentage rent, but not rent per lease) |
| Baby Buns Bourse, LLC (t0002309) | Active | 6/30/2024 | Non-Occupying | Default - abandonment of Premises; failure to pay rent due |
| The Hot Dog Factory (t0001259) | Active | 8/31/2025 | Non-Occupying | Default - abandonment of Premises; failure to pay rent due |
| Baby Buns Bourse, LLC (t0001260) | Active | 9/30/2025 | Non-Occupying | Default - abandonment of Premises; failure to pay rent due |
| Chaat and Chai LLC (t0002300) | Active | 9/30/2025 | Non-Occupying | Default - abandonment of Premises; failure to pay rent due |
| Grubhouse, LLC (t0001263) | Active | 9/30/2025 | Occupying | Default - failure to pay rent due; occasional abandonment of Premises (seasonal shut downs) |
| Marino Brothers (Bourse Retail Holdings (t0001258)) | Active | 9/30/2025 | Occupying | Default - failure to pay rent (TT has been paying verbally agreed to percentage rent, but not rent per lease) |
| Rustica Rosticceria (Bourse Retail Holdings, Inc. (t0001253) | Active | 9/30/2025 | Occupying | Default - failure to pay rent (TT has been paying verbally agreed to percentage rent, but not rent per lease); previous abandonment of Premises (closed at Covid, reopened 2022) |
| FreeBryd Chicken Philadelphia, LLC (t0001261) | Active | 10/31/2025 | Non-Occupying | Default - failure to pay rent (TT had been paying verbally agreed to percentage rent, but not rent per lease); abandonment of Premises |
| TaKorean Bourse LLC (t0001256) | Active | 10/31/2025 | Non-Occupying | Default - abandonment of Premises; failure to pay rent due |
| Taps Bourse, LLC (t0002307) | Active | 11/30/2025 | Non-Occupying | Default - abandonment of Premises; failure to pay rent due |
| Saigon Noodle Bar Bourse LLC (t0001252) | Active | 6/30/2026 | Non-Occupying | Default - abandonment of Premises; failure to pay rent due |

**Schedule 9.1.14**
**Capital Expenditures**

**Bourse + 400 Market**
**Ongoing Building Capex**

| Property | Project | Status |
|---|---|---|
| Bourse | 5th Street Chiller - Rebuild | In process; lead time for parts |
| Bourse | 4th Street Chiller - Refrigerant and Leak Repairs | Completed. |

## SCHEDULE V

**Rent Roll**

[Attached]

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 218 of 326

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Food Hall (of240051) | FH02.03 | Rebel Taco PA LLC (t0085867) | Retail Net | 717.00 | 10/01/2018 | | | 5.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11.11 | 0.00 | 0.00 |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MKTNG | Misc | FH02.03 | GLA | 717.00 | 01/01/2022 | | 500.00 | 0.69 | 6,000.00 | 8.36 | 0.00 | 6,000.00 | | |
| | | TSREV | Misc | FH02.03 | GLA | 717.00 | 01/01/2022 | | 163.80 | 0.22 | 1,965.60 | 2.74 | 0.00 | 1,965.60 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 10/01/2018 | | 10/01/2018 | | 717.00 | Lease | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Food Hall (of240051) | FH04 | Saigon Noodle Bar Bourse LLC (t0085868) | Retail Net | 508.00 | 05/01/2019 | 06/30/2026 | 86 | 5.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 05/01/2019 | 06/30/2026 | 05/01/2019 | 86 | 508.00 | Lease | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Food Hall (of240051) | FH05 | Bourse Retail Holdings, Inc. (t0085869) | Retail Net | 549.00 | 10/01/2018 | 09/30/2025 | 84 | 5.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3.58 | 0.00 | 0.00 |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TSREV | Misc | FH05 | GLA | 549.00 | 01/01/2022 | 09/30/2025 | 163.80 | 0.29 | 1,965.60 | 3.58 | 0.00 | 1,965.60 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 10/01/2018 | 09/30/2025 | 10/01/2018 | 84 | 549.00 | Lease | Tenant will begin to pay Percentage Rent only beginning 12/1/2022. | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Food Hall (of240051) | FH10 | TaKorean Bourse LLC (t0085872) | Retail Net | 632.00 | 10/15/2018 | 10/31/2025 | 85 | 5.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 10/15/2018 | 10/31/2025 | 10/15/2018 | 85 | 632.00 | Lease | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Food Hall (of240051) | FH11 | Bourse Retail Holdings, Inc. (t0085873) | Retail Net | 632.00 | 10/01/2018 | 09/30/2025 | 84 | 5.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 12.60 | 10,500.00 | 0.00 |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 219 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount |  |  |
|  |  |  | MKTNG | Misc | FH11 | GLA | 632.00 | 01/01/2022 | 09/30/2025 | 500.00 | 0.79 | 6,000.00 | 9.49 | 0.00 | 6,000.00 |  |  |
|  |  |  | TSREV | Misc | FH11 | GLA | 632.00 | 01/01/2022 | 09/30/2025 | 163.80 | 0.25 | 1,965.60 | 3.11 | 0.00 | 1,965.60 |  |  |
|  |  | Amendment | Type | Status | From | To | Move In | Term | Area | Description |  |  | Notes |  |  |  |  |
|  |  |  | Original Lease | Activated | 10/01/2018 | 09/30/2025 | 10/01/2018 | 84 | 632.00 | Lease |  |  | Tenant will begin paying percentage rent only as of 12/1/2022. |  |  |  |  |
| Bourse Food Hall (of240051) | FH13 | The Hot Dog Factory (t0085874) | Retail Net | 392.00 | 09/01/2020 | 08/31/2025 | 60 | 3.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|  |  | Amendment | Type | Status | From | To | Move In | Term | Area | Description |  |  | Notes |  |  |  |  |
|  |  |  | Original Lease | Activated | 09/01/2020 | 08/31/2025 | 09/01/2020 | 60 | 392.00 | Lease |  |  |  |  |  |  |  |
| Bourse Food Hall (of240051) | FH14 | Baby Buns Bourse, LLC (t0085875) | Retail Net | 350.00 | 10/01/2018 | 09/30/2025 | 84 | 5.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |
|  |  | Amendment | Type | Status | From | To | Move In | Term | Area | Description |  |  | Notes |  |  |  |  |
|  |  |  | Original Lease | Activated | 10/01/2018 | 09/30/2025 | 10/01/2018 | 84 | 350.00 | Lease |  |  |  |  |  |  |  |
| Bourse Food Hall (of240051) | FH16, S.18R, S.8 | FreeBryd Chicken Philadelphia, LLC (t0085876) | Retail Net | 532.00 | 11/01/2018 | 10/31/2025 | 84 | 5.58 | 7,883.06 | 14.82 | 94,596.72 | 177.81 | 0.00 | 24.18 | 6,800.00 | 0.00 |
|  |  | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount |  |  |
|  |  |  | BRRTL | Rent | FH16 | GLA | 532.00 | 11/01/2023 | 10/31/2024 | 7,883.06 | 14.81 | 94,596.72 | 177.81 | 0.00 | 94,596.72 |  |  |
|  |  |  | BRRTL | Rent | FH16 | GLA | 532.00 | 11/01/2024 | 10/31/2025 | 8,119.56 | 15.26 | 97,434.72 | 183.14 | 0.00 | 97,434.72 |  |  |
|  |  | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount |  |  |
|  |  |  | MKTNG | Misc | FH16 | GLA | 532.00 | 01/01/2022 | 10/31/2025 | 500.00 | 0.94 | 6,000.00 | 11.27 | 0.00 | 6,000.00 |  |  |
|  |  |  | STORG | Misc | S.18R | GLA | 0.00 | 01/01/2022 | 10/31/2025 | 225.00 | 0.00 | 2,700.00 | 0.00 | 0.00 | 2,700.00 |  |  |
|  |  |  | TSREV | Misc | FH16 | GLA | 532.00 | 01/01/2022 | 10/31/2025 | 163.80 | 0.30 | 1,965.60 | 3.69 | 0.00 | 1,965.60 |  |  |
|  |  |  | STORG | Misc | S.8 | GLA | 0.00 | 02/01/2022 | 10/31/2025 | 183.33 | 0.00 | 2,199.96 | 0.00 | 0.00 | 2,199.96 |  |  |
|  |  |  | BRRTL | Rent | FH16 | GLA | 532.00 | 11/01/2023 | 10/31/2024 | 7,883.06 | 14.81 | 94,596.72 | 177.81 | 0.00 | 94,596.72 |  |  |
|  |  |  | BRRTL | Rent | FH16 | GLA | 532.00 | 11/01/2024 | 10/31/2025 | 8,119.56 | 15.26 | 97,434.72 | 183.14 | 0.00 | 97,434.72 |  |  |
|  |  | Amendment | Type | Status | From | To | Move In | Term | Area | Description |  |  | Notes |  |  |  |  |

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 11/01/2018 | 10/31/2025 | 11/01/2018 | 84 | 532.00 | Lease | | | | | | | |
| | | Expansion | Activated | 11/01/2018 | 10/31/2025 | 11/01/2018 | 84 | 0.00 | Cold Storage Agreement | | | | | | | |
| | | Expansion | Activated | 11/01/2018 | 10/31/2025 | 11/01/2018 | 84 | 0.00 | Dry Storage Agreement | | | | | | | |
| **Bourse Food Hall (of240051)** | **FH17** | **Bricco Pizza Romana LLC (t0085877)** | **Retail Net** | **697.00** | **11/01/2018** | **10/31/2026** | **96** | **5.58** | **10,827.39** | **15.53** | **129,928.68** | **186.41** | **0.00** | **11.43** | **0.00** | **0.00** |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BRRTL | Rent | FH17 | GLA | 697.00 | 11/01/2022 | 10/31/2026 | 10,827.39 | 15.53 | 129,928.68 | 186.41 | 0.00 | 129,928.68 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MKTNG | Misc | FH17 | GLA | 697.00 | 01/01/2022 | 10/31/2026 | 500.00 | 0.71 | 6,000.00 | 8.60 | 0.00 | 6,000.00 | | |
| | | TSREV | Misc | FH17 | GLA | 697.00 | 01/01/2022 | 10/31/2026 | 163.80 | 0.23 | 1,965.60 | 2.82 | 0.00 | 1,965.60 | | |
| | | BRRTL | Rent | FH17 | GLA | 697.00 | 11/01/2022 | 10/31/2026 | 10,827.39 | 15.53 | 129,928.68 | 186.41 | 0.00 | 129,928.68 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Superseded | 11/01/2018 | 10/31/2026 | 11/01/2018 | 96 | 697.00 | Lease | | | | | | | |
| | | * Termination | Activated | 10/31/2026 | 10/31/2026 | 10/31/2026 | 1 | | Termination | | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bourse Food Hall (of240051)** | **FH18** | **Grubhouse, LLC (t0085878)** | **Retail Net** | **551.00** | **10/01/2018** | **09/30/2025** | **84** | **5.67** | **6,900.00** | **12.52** | **82,800.00** | **150.27** | **0.00** | **14.46** | **0.00** | **0.00** |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BRRTL | Rent | FH18 | GLA | 551.00 | 10/01/2023 | 09/30/2024 | 6,900.00 | 12.52 | 82,800.00 | 150.27 | 0.00 | 82,800.00 | | |
| | | BRRTL | Rent | FH18 | GLA | 551.00 | 10/01/2024 | 09/30/2025 | 6,900.00 | 12.52 | 82,800.00 | 150.27 | 0.00 | 82,800.00 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | MKTNG | Misc | FH18 | GLA | 551.00 | 01/01/2022 | 09/30/2025 | 500.00 | 0.90 | 6,000.00 | 10.88 | 0.00 | 6,000.00 | | |
| | | TSREV | Misc | FH18 | GLA | 551.00 | 01/01/2022 | 09/30/2025 | 163.80 | 0.29 | 1,965.60 | 3.56 | 0.00 | 1,965.60 | | |
| | | BRRTL | Rent | FH18 | GLA | 551.00 | 10/01/2023 | 09/30/2024 | 6,900.00 | 12.52 | 82,800.00 | 150.27 | 0.00 | 82,800.00 | | |
| | | BRRTL | Rent | FH18 | GLA | 551.00 | 10/01/2024 | 09/30/2025 | 6,900.00 | 12.52 | 82,800.00 | 150.27 | 0.00 | 82,800.00 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 10/01/2018 | 09/30/2025 | 10/01/2018 | 84 | 551.00 | Lease | | | | | | | |

Case 2:26-cv-05284-CFK  Document 1-4  Filed 07/28/26  Page 220 of 326

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 221 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Food Hall (of240051) | FH01 | VACANT | | 450.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH01A | VACANT | | 506.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH06 | VACANT | | 288.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH07 | VACANT | | 373.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH08 | VACANT | | 425.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH09 | VACANT | | 392.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH12 | VACANT | | 692.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH15 | VACANT | | 496.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH16A | VACANT | | 300.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH19 | VACANT | | 340.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH19A | VACANT | | 226.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH22 | VACANT | | 410.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH23 | VACANT | | 397.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH24.25 | VACANT | | 599.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH26 | VACANT | | 203.00 | | | | | | | | | | | | |

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Food Hall (of240051) | FH26A | VACANT | | 208.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH27 | VACANT | | 398.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH28.29 | VACANT | | 602.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | FH32 | VACANT | | 2,434.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | S.17 | VACANT | | 0.00 | | | | | | | | | | | | |
| Bourse Food Hall (of240051) | S.4R | VACANT | | 0.00 | | | | | | | | | | | | |
| Bourse Mall (of240053) | 110A, 110B, B-B1, E-E1 | Lion Re:Sources, Inc. (t0085919) | Office Net | 7,469.00 | 01/01/2024 | 12/31/2034 | 132 | 0.42 | 24,065.00 | 3.22 | 288,780.00 | 38.66 | 0.00 | 6.35 | 24,065.00 | 0.00 |

| | | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2024 | 12/31/2024 | 24,065.00 | 5.00 | 288,780.00 | 60.00 | 0.00 | 288,780.00 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2025 | 12/31/2025 | 24,606.46 | 5.11 | 295,277.52 | 61.35 | 0.00 | 295,277.52 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2026 | 12/31/2026 | 25,159.96 | 5.22 | 301,919.52 | 62.73 | 0.00 | 301,919.52 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2027 | 12/31/2027 | 25,725.49 | 5.34 | 308,705.88 | 64.14 | 0.00 | 308,705.88 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2028 | 12/31/2028 | 26,303.05 | 5.46 | 315,636.60 | 65.58 | 0.00 | 315,636.60 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2029 | 12/31/2029 | 26,896.65 | 5.58 | 322,759.80 | 67.06 | 0.00 | 322,759.80 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2030 | 12/31/2030 | 27,502.28 | 5.71 | 330,027.36 | 68.57 | 0.00 | 330,027.36 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2031 | 12/31/2031 | 28,119.95 | 5.84 | 337,439.40 | 70.11 | 0.00 | 337,439.40 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2032 | 12/31/2032 | 28,753.66 | 5.97 | 345,043.92 | 71.69 | 0.00 | 345,043.92 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2033 | 12/31/2033 | 29,399.41 | 6.10 | 352,792.92 | 73.30 | 0.00 | 352,792.92 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2034 | 12/31/2034 | 30,061.20 | 6.24 | 360,734.40 | 74.95 | 0.00 | 360,734.40 | | |

Wednesday, June 26, 2024
10:25 AM

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 222 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2024 | 12/31/2024 | 24,065.00 | 5.00 | 288,780.00 | 60.00 | 0.00 | 288,780.00 | | |
| | | | STORG | Misc | B-B1 | GLA | 2,656.00 | 01/01/2024 | 12/31/2034 | 2,656.00 | 1.00 | 31,872.00 | 12.00 | 0.00 | 31,872.00 | | |
| | | | TAXUO | Misc | 110A, 110B, E-E1 | GLA | 4,813.00 | 05/01/2024 | 12/31/2034 | 1,296.74 | 0.26 | 15,560.88 | 3.23 | 0.00 | 15,560.88 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2025 | 12/31/2025 | 24,606.46 | 5.11 | 295,277.52 | 61.35 | 0.00 | 295,277.52 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2026 | 12/31/2026 | 25,159.96 | 5.22 | 301,919.52 | 62.73 | 0.00 | 301,919.52 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2027 | 12/31/2027 | 25,725.49 | 5.34 | 308,705.88 | 64.14 | 0.00 | 308,705.88 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2028 | 12/31/2028 | 26,303.05 | 5.46 | 315,636.60 | 65.58 | 0.00 | 315,636.60 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2029 | 12/31/2029 | 26,896.65 | 5.58 | 322,759.80 | 67.06 | 0.00 | 322,759.80 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2030 | 12/31/2030 | 27,502.28 | 5.71 | 330,027.36 | 68.57 | 0.00 | 330,027.36 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2031 | 12/31/2031 | 28,119.95 | 5.84 | 337,439.40 | 70.11 | 0.00 | 337,439.40 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2032 | 12/31/2032 | 28,753.66 | 5.97 | 345,043.92 | 71.69 | 0.00 | 345,043.92 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2033 | 12/31/2033 | 29,399.41 | 6.10 | 352,792.92 | 73.30 | 0.00 | 352,792.92 | | |
| | | | BROFF | Rent | 110A, 110B, E-E1 | GLA | 4,813.00 | 01/01/2034 | 12/31/2034 | 30,061.20 | 6.24 | 360,734.40 | 74.95 | 0.00 | 360,734.40 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 01/01/2024 | 12/31/2034 | 01/01/2024 | 132 | 4,813.00 | Lease | | |
| | | Expansion | Activated | 01/01/2024 | 12/31/2034 | 01/01/2024 | 132 | 2,656.00 | Storage | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Mall (of240053) | 3100, 3200, SCC21 | Consulate of Mexico (t0085916) | Office Net | 12,238.00 | 04/20/2012 | 12/31/2024 | 153 | 12.17 | 19,295.83 | 1.58 | 231,549.96 | 18.92 | 0.21 | 2.17 | 13,473.67 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 3100, 3200 | GLA | 10,728.00 | 05/01/2024 | 12/31/2024 | 19,295.83 | 1.79 | 231,549.96 | 21.58 | 0.00 | 231,549.96 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | STORG | Misc | SCC21 | GLA | 1,510.00 | 01/01/2024 | 12/31/2024 | 2,208.08 | 1.46 | 26,496.96 | 17.54 | 0.00 | 26,496.96 | | |
| | | BROFF | Rent | 3100, 3200 | GLA | 10,728.00 | 05/01/2024 | 12/31/2024 | 19,295.83 | 1.79 | 231,549.96 | 21.58 | 0.00 | 231,549.96 | | |
| | | CAMRC | CAM | 3100 | GLA | 6,797.00 | 05/01/2024 | 06/30/2024 | 169.48 | 0.02 | 2,033.76 | 0.29 | 0.00 | 2,033.76 | | |

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | TAXRC | CAM | 3100 | GLA | 6,797.00 | 05/01/2024 | 06/30/2024 | 43.14 | 0.00 | 517.68 | 0.07 | 0.00 | 517.68 |  |  |
|  |  | CAMRC | CAM | 3100 | GLA | 6,797.00 | 07/01/2024 | 12/31/2024 | 126.49 | 0.01 | 1,517.88 | 0.22 | 0.00 | 1,517.88 |  |  |
|  |  | TAXRC | CAM | 3100 | GLA | 6,797.00 | 07/01/2024 | 12/31/2024 | 11.17 | 0.00 | 134.04 | 0.02 | 0.00 | 134.04 |  |  |

| Property | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Renewal | Activated | 01/01/2024 | 12/31/2024 | 01/01/2024 | 12 | 1,510.00 | Renewal |  |  |  |
|  |  | Renewal | Activated | 05/01/2024 | 12/31/2024 | 05/01/2024 | 8 | 10,728.00 | Renewal |  |  |  |
| Bourse Mall (of240053) | 0100 | VACANT |  | 459.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 110C | VACANT |  | 4,061.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 110D | VACANT |  | 4,520.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 112 | VACANT |  | 4,609.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 19B | VACANT |  | 226.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 3300 | VACANT |  | 13,321.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 3400 | VACANT |  | 3,149.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 400 | VACANT |  | 34,732.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | 5SC | VACANT |  | 256.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | CC-100 | VACANT |  | 2,734.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | CC-101 | VACANT |  | 2,823.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | CC-102 | VACANT |  | 26,477.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | CC-16 | VACANT |  | 84.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | CC-17 | VACANT |  | 85.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | CC-18 | VACANT |  | 79.00 |  |  |  |  |  |  |  |  |
| Bourse Mall (of240053) | CC-19 | VACANT |  | 58.00 |  |  |  |  |  |  |  |  |

Case 2:26-cv-05284-CFK  Document 1-4  Filed 07/28/26  Page 224 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Mall (of240053) | CC-20 | VACANT | | 66.00 | | | | | | | | | | | | |
| Bourse Mall (of240053) | CC-21 | VACANT | | 60.00 | | | | | | | | | | | | |
| Bourse Mall (of240053) | CC-22 | VACANT | | 57.00 | | | | | | | | | | | | |
| Bourse Mall (of240053) | CC-23 | VACANT | | 211.00 | | | | | | | | | | | | |
| Bourse Mall (of240053) | CC-25 | VACANT | | 1,160.00 | | | | | | | | | | | | |
| Bourse Mall (of240053) | SCC07 | VACANT | | 150.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0500, 0605, 0606, 0607, 0608 | Lion Re:Sources, Inc. (t0085914) | Office Net | 54,941.00 | 01/01/2024 | 12/31/2034 | 132 | 0.42 | 153,376.96 | 2.79 | 1,840,523.52 | 33.50 | 0.00 | 1.74 | 153,376.96 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2024 | 12/31/2024 | 153,376.96 | 2.79 | 1,840,523.52 | 33.50 | 0.00 | 1,840,523.52 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2025 | 12/31/2025 | 156,810.77 | 2.85 | 1,881,729.24 | 34.25 | 0.00 | 1,881,729.24 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2026 | 12/31/2026 | 160,336.15 | 2.91 | 1,924,033.80 | 35.02 | 0.00 | 1,924,033.80 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2027 | 12/31/2027 | 163,953.10 | 2.98 | 1,967,437.20 | 35.81 | 0.00 | 1,967,437.20 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2028 | 12/31/2028 | 167,661.62 | 3.05 | 2,011,939.44 | 36.62 | 0.00 | 2,011,939.44 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2029 | 12/31/2029 | 171,415.92 | 3.12 | 2,056,991.04 | 37.44 | 0.00 | 2,056,991.04 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2030 | 12/31/2030 | 175,261.79 | 3.19 | 2,103,141.48 | 38.28 | 0.00 | 2,103,141.48 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2031 | 12/31/2031 | 179,199.23 | 3.26 | 2,150,390.76 | 39.14 | 0.00 | 2,150,390.76 | | |
| | | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2032 | 12/31/2032 | 183,228.24 | 3.33 | 2,198,738.88 | 40.02 | 0.00 | 2,198,738.88 | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 225 of 326

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2033 | 12/31/2033 |  | 187,348.81 | 3.41 | 2,248,185.72 | 40.92 | 0.00 | 2,248,185.72 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2034 | 12/31/2034 |  | 191,560.95 | 3.48 | 2,298,731.40 | 41.84 | 0.00 | 2,298,731.40 |  |  |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2024 | 12/31/2024 | 153,376.96 | 2.79 | 1,840,523.52 | 33.50 | 0.00 | 1,840,523.52 |  |  |
|  |  | TAXUO | Misc | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 05/01/2024 | 12/31/2034 | 7,971.50 | 0.14 | 95,658.00 | 1.74 | 0.00 | 95,658.00 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2025 | 12/31/2025 | 156,810.77 | 2.85 | 1,881,729.24 | 34.25 | 0.00 | 1,881,729.24 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2026 | 12/31/2026 | 160,336.15 | 2.91 | 1,924,033.80 | 35.02 | 0.00 | 1,924,033.80 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2027 | 12/31/2027 | 163,953.10 | 2.98 | 1,967,437.20 | 35.81 | 0.00 | 1,967,437.20 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2028 | 12/31/2028 | 167,661.62 | 3.05 | 2,011,939.44 | 36.62 | 0.00 | 2,011,939.44 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2029 | 12/31/2029 | 171,415.92 | 3.12 | 2,056,991.04 | 37.44 | 0.00 | 2,056,991.04 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2030 | 12/31/2030 | 175,261.79 | 3.19 | 2,103,141.48 | 38.28 | 0.00 | 2,103,141.48 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2031 | 12/31/2031 | 179,199.23 | 3.26 | 2,150,390.76 | 39.14 | 0.00 | 2,150,390.76 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2032 | 12/31/2032 | 183,228.24 | 3.33 | 2,198,738.88 | 40.02 | 0.00 | 2,198,738.88 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2033 | 12/31/2033 | 187,348.81 | 3.41 | 2,248,185.72 | 40.92 | 0.00 | 2,248,185.72 |  |  |
|  |  | BROFF | Rent | 0500, 0605, 0606, 0607, 0608 | GLA | 54,941.00 | 01/01/2034 | 12/31/2034 | 191,560.95 | 3.48 | 2,298,731.40 | 41.84 | 0.00 | 2,298,731.40 |  |  |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Original Lease | Activated | 01/01/2024 | 12/31/2034 | 01/01/2024 | 132 | 54,941.00 | Lease |  |  |  |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 226 of 326

Wednesday, June 26, 2024
10:25 AM

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0604 | Nucleus Group Holdings, Inc. (t0085891) | Office Net | 3,135.00 | 08/01/2020 | 01/31/2026 | 66 | 3.83 | 10,060.74 | 3.21 | 120,728.88 | 38.51 | 0.97 | 1.74 | 21,244.86 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0604 | GLA | 3,135.00 | 08/01/2023 | 07/31/2024 | 10,060.74 | 3.20 | 120,728.88 | 38.51 | 0.00 | 120,728.88 | | |
| | | BROFF | Rent | 0604 | GLA | 3,135.00 | 08/01/2024 | 07/31/2025 | 10,337.66 | 3.29 | 124,051.92 | 39.57 | 0.00 | 124,051.92 | | |
| | | BROFF | Rent | 0604 | GLA | 3,135.00 | 08/01/2025 | 01/31/2026 | 10,622.43 | 3.38 | 127,469.16 | 40.66 | 0.00 | 127,469.16 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0604 | GLA | 3,135.00 | 01/01/2023 | 06/30/2024 | 244.99 | 0.07 | 2,939.88 | 0.93 | 0.00 | 2,939.88 | | |
| | | TAXRC | CAM | 0604 | GLA | 3,135.00 | 01/01/2023 | 06/30/2024 | 8.77 | 0.00 | 105.24 | 0.03 | 0.00 | 105.24 | | |
| | | BROFF | Rent | 0604 | GLA | 3,135.00 | 08/01/2023 | 07/31/2024 | 10,060.74 | 3.20 | 120,728.88 | 38.51 | 0.00 | 120,728.88 | | |
| | | TAXUO | Misc | 0604 | GLA | 3,135.00 | 05/01/2024 | 01/31/2026 | 454.86 | 0.14 | 5,458.32 | 1.74 | 0.00 | 5,458.32 | | |
| | | CAMRC | CAM | 0604 | GLA | 3,135.00 | 07/01/2024 | 01/31/2026 | 596.25 | 0.19 | 7,155.00 | 2.28 | 0.00 | 7,155.00 | | |
| | | TAXRC | CAM | 0604 | GLA | 3,135.00 | 07/01/2024 | 01/31/2026 | 9.48 | 0.00 | 113.76 | 0.03 | 0.00 | 113.76 | | |
| | | BROFF | Rent | 0604 | GLA | 3,135.00 | 08/01/2024 | 07/31/2025 | 10,337.66 | 3.29 | 124,051.92 | 39.57 | 0.00 | 124,051.92 | | |
| | | BROFF | Rent | 0604 | GLA | 3,135.00 | 08/01/2025 | 01/31/2026 | 10,622.43 | 3.38 | 127,469.16 | 40.66 | 0.00 | 127,469.16 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 08/01/2020 | 01/31/2026 | 08/01/2020 | 66 | 3,135.00 | Lease | Sublease to Momentum Telecom, Inc.; 8/1/2022 to 11/30/2025 | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0610 | Society Hill Family Dentistry LLC (t0085894) | Office Net | 3,970.00 | 05/24/2014 | 12/31/2029 | 188 | 10.08 | 7,609.17 | 1.92 | 91,310.04 | 23.00 | 2.53 | 1.74 | 11,036.67 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2024 | 12/31/2024 | 7,609.17 | 1.91 | 91,310.04 | 23.00 | 0.00 | 91,310.04 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2025 | 12/31/2025 | 7,609.17 | 1.91 | 91,310.04 | 23.00 | 0.00 | 91,310.04 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2026 | 12/31/2026 | 7,940.00 | 2.00 | 95,280.00 | 24.00 | 0.00 | 95,280.00 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2027 | 12/31/2027 | 7,940.00 | 2.00 | 95,280.00 | 24.00 | 0.00 | 95,280.00 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2028 | 12/31/2028 | 8,270.83 | 2.08 | 99,249.96 | 25.00 | 0.00 | 99,249.96 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2029 | 12/31/2029 | 8,270.83 | 2.08 | 99,249.96 | 25.00 | 0.00 | 99,249.96 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0610 | GLA | 3,970.00 | 01/01/2023 | 06/30/2024 | 589.72 | 0.14 | 7,076.64 | 1.78 | 0.00 | 7,076.64 | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 227 of 326

Notes : 1. * Future Active lease / Future Active Amendment    2. ** Pending Amendments    3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TAXRC | CAM | 0610 | GLA | 3,970.00 | 01/01/2023 | 06/30/2024 | 247.43 | 0.06 | 2,969.16 | 0.74 | 0.00 | 2,969.16 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2024 | 12/31/2024 | 7,609.17 | 1.91 | 91,310.04 | 23.00 | 0.00 | 91,310.04 | | |
| | | TAXUO | Misc | 0610 | GLA | 3,970.00 | 05/01/2024 | 12/31/2029 | 576.02 | 0.14 | 6,912.24 | 1.74 | 0.00 | 6,912.24 | | |
| | | CAMRC | CAM | 0610 | GLA | 3,970.00 | 07/01/2024 | 12/31/2029 | 698.47 | 0.17 | 8,381.64 | 2.11 | 0.00 | 8,381.64 | | |
| | | TAXRC | CAM | 0610 | GLA | 3,970.00 | 07/01/2024 | 12/31/2029 | 248.35 | 0.06 | 2,980.20 | 0.75 | 0.00 | 2,980.20 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2025 | 12/31/2025 | 7,609.17 | 1.91 | 91,310.04 | 23.00 | 0.00 | 91,310.04 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2026 | 12/31/2026 | 7,940.00 | 2.00 | 95,280.00 | 24.00 | 0.00 | 95,280.00 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2027 | 12/31/2027 | 7,940.00 | 2.00 | 95,280.00 | 24.00 | 0.00 | 95,280.00 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2028 | 12/31/2028 | 8,270.83 | 2.08 | 99,249.96 | 25.00 | 0.00 | 99,249.96 | | |
| | | BROFF | Rent | 0610 | GLA | 3,970.00 | 01/01/2029 | 12/31/2029 | 8,270.83 | 2.08 | 99,249.96 | 25.00 | 0.00 | 99,249.96 | | |

| | | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Original Lease | Activated | 05/24/2014 | 12/31/2029 | 05/24/2014 | 188 | 3,970.00 | 2nd Amendment | | | |
| | | | Assignment | Activated | 08/23/2023 | | 08/23/2023 | | | From Scott Bonomo DMD, LLC | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0701 | * CoreWeave, Inc. (t0089582) | Office Gross | 4,807.00 | 07/01/2024 | 09/30/2027 | 39 | -0.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 62,122.48 | 0.00 |

| | | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | * BRABT | Rent | 0701 | GLA | 4,807.00 | 07/01/2024 | 10/31/2024 | -14,421.00 | -3.00 | -173,052.00 | -36.00 | 0.00 | -173,052.00 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2024 | 06/30/2025 | 14,421.00 | 3.00 | 173,052.00 | 36.00 | 0.00 | 173,052.00 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2025 | 06/30/2026 | 14,781.53 | 3.07 | 177,378.36 | 36.90 | 0.00 | 177,378.36 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2026 | 06/30/2027 | 15,150.06 | 3.15 | 181,800.72 | 37.82 | 0.00 | 181,800.72 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2027 | 09/30/2027 | 15,530.62 | 3.23 | 186,367.44 | 38.77 | 0.00 | 186,367.44 | | |

| | | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | * BRABT | Rent | 0701 | GLA | 4,807.00 | 07/01/2024 | 10/31/2024 | -14,421.00 | -3.00 | -173,052.00 | -36.00 | 0.00 | -173,052.00 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2024 | 06/30/2025 | 14,421.00 | 3.00 | 173,052.00 | 36.00 | 0.00 | 173,052.00 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2025 | 06/30/2026 | 14,781.53 | 3.07 | 177,378.36 | 36.90 | 0.00 | 177,378.36 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2026 | 06/30/2027 | 15,150.06 | 3.15 | 181,800.72 | 37.82 | 0.00 | 181,800.72 | | |
| | | | * BROFF | Rent | 0701 | GLA | 4,807.00 | 07/01/2027 | 09/30/2027 | 15,530.62 | 3.23 | 186,367.44 | 38.77 | 0.00 | 186,367.44 | | |

| | | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | * Original Lease | Activated | 07/01/2024 | 09/30/2027 | 07/01/2024 | 39 | 4,807.00 | New Lease | | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 228 of 326

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0704, 0704B, 0706, 0725 | Gerson Lehrman Group, Inc. (t0085910) | Office Net | 15,718.00 | 03/01/2022 | 02/28/2030 | 96 | 2.25 | 49,537.90 | 3.15 | 594,454.80 | 37.82 | 0.00 | 1.74 | 0.00 | 101,119.20 |

| | | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2024 | 02/28/2025 | 5,940.89 | 3.15 | 71,290.68 | 37.82 | 0.00 | 71,290.68 | | |
| | | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2024 | 02/28/2025 | 43,597.01 | 3.15 | 523,164.12 | 37.82 | 0.00 | 523,164.12 | | |
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2025 | 02/28/2026 | 6,090.12 | 3.23 | 73,081.44 | 38.77 | 0.00 | 73,081.44 | | |
| | | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2025 | 02/28/2026 | 44,692.12 | 3.23 | 536,305.44 | 38.77 | 0.00 | 536,305.44 | | |
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2026 | 02/28/2027 | 6,242.49 | 3.31 | 74,909.88 | 39.74 | 0.00 | 74,909.88 | | |
| | | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2026 | 02/28/2027 | 45,810.29 | 3.31 | 549,723.48 | 39.74 | 0.00 | 549,723.48 | | |
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2027 | 02/29/2028 | 6,398.00 | 3.39 | 76,776.00 | 40.73 | 0.00 | 76,776.00 | | |
| | | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2027 | 02/29/2028 | 46,951.51 | 3.39 | 563,418.12 | 40.73 | 0.00 | 563,418.12 | | |
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2028 | 02/28/2029 | 6,558.23 | 3.47 | 78,698.76 | 41.75 | 0.00 | 78,698.76 | | |
| | | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2028 | 02/28/2029 | 48,127.31 | 3.47 | 577,527.72 | 41.75 | 0.00 | 577,527.72 | | |
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2029 | 02/28/2030 | 6,721.60 | 3.56 | 80,659.20 | 42.79 | 0.00 | 80,659.20 | | |
| | | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2029 | 02/28/2030 | 49,326.17 | 3.56 | 591,914.04 | 42.79 | 0.00 | 591,914.04 | | |
| | | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2024 | 02/28/2025 | 5,940.89 | 3.15 | 71,290.68 | 37.82 | 0.00 | 71,290.68 | | |
| | | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2024 | 02/28/2025 | 43,597.01 | 3.15 | 523,164.12 | 37.82 | 0.00 | 523,164.12 | | |
| | | | TAXUO | Misc | 0704, 0704B, 0706 | GLA | 13,833.00 | 05/01/2024 | 02/28/2030 | 2,280.56 | 0.16 | 27,366.72 | 1.97 | 0.00 | 27,366.72 | | |
| | | | CAMRC | CAM | 0704, 0704B, 0706 | GLA | 13,833.00 | 07/01/2024 | 02/28/2030 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | | TAXRC | CAM | 0704, 0704B, 0706 | GLA | 13,833.00 | 07/01/2024 | 02/28/2030 | 7.28 | 0.00 | 87.36 | 0.00 | 0.00 | 87.36 | | |
| | | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2025 | 02/28/2026 | 6,090.12 | 3.23 | 73,081.44 | 38.77 | 0.00 | 73,081.44 | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 229 of 326

Wednesday, June 26, 2024
10:25 AM

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2025 | 02/28/2026 | 44,692.12 | 3.23 | 536,305.44 | 38.77 | 0.00 | 536,305.44 | | |
| | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2026 | 02/28/2027 | 6,242.49 | 3.31 | 74,909.88 | 39.74 | 0.00 | 74,909.88 | | |
| | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2026 | 02/28/2027 | 45,810.29 | 3.31 | 549,723.48 | 39.74 | 0.00 | 549,723.48 | | |
| | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2027 | 02/29/2028 | 6,398.00 | 3.39 | 76,776.00 | 40.73 | 0.00 | 76,776.00 | | |
| | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2027 | 02/29/2028 | 46,951.51 | 3.39 | 563,418.12 | 40.73 | 0.00 | 563,418.12 | | |
| | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2028 | 02/28/2029 | 6,558.23 | 3.47 | 78,698.76 | 41.75 | 0.00 | 78,698.76 | | |
| | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2028 | 02/28/2029 | 48,127.31 | 3.47 | 577,527.72 | 41.75 | 0.00 | 577,527.72 | | |
| | | BROFF | Rent | 0725 | GLA | 1,885.00 | 03/01/2029 | 02/28/2030 | 6,721.60 | 3.56 | 80,659.20 | 42.79 | 0.00 | 80,659.20 | | |
| | | BROFF | Rent | 0704, 0704B, 0706 | GLA | 13,833.00 | 03/01/2029 | 02/28/2030 | 49,326.17 | 3.56 | 591,914.04 | 42.79 | 0.00 | 591,914.04 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 03/01/2022 | 02/28/2030 | 05/01/2022 | 96 | 13,833.00 | Lease | | | | | | |
| | | Expansion | Activated | 01/01/2023 | 02/28/2030 | 01/01/2023 | 86 | 1,885.00 | 1st Amendment | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0705 | Henderson Engineers, Inc. (t0085892) | Office Net | 2,981.00 | 11/01/2021 | 05/31/2027 | 67 | 2.58 | 9,605.06 | 3.22 | 115,260.72 | 38.67 | 0.01 | 1.74 | 18,107.38 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2023 | 10/31/2024 | 9,605.06 | 3.22 | 115,260.72 | 38.66 | 0.00 | 115,260.72 | | |
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2024 | 10/31/2025 | 9,893.21 | 3.31 | 118,718.52 | 39.82 | 0.00 | 118,718.52 | | |
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2025 | 10/31/2026 | 10,190.01 | 3.41 | 122,280.12 | 41.02 | 0.00 | 122,280.12 | | |
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2026 | 05/31/2027 | 10,945.71 | 3.67 | 131,348.52 | 44.06 | 0.00 | 131,348.52 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TAXRC | CAM | 0705 | GLA | 2,981.00 | 07/24/2023 | 06/30/2024 | 2.51 | 0.00 | 30.12 | 0.01 | 0.00 | 30.12 | | |
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2023 | 10/31/2024 | 9,605.06 | 3.22 | 115,260.72 | 38.66 | 0.00 | 115,260.72 | | |
| | | TAXUO | Misc | 0705 | GLA | 2,981.00 | 05/01/2024 | 05/31/2027 | 432.52 | 0.14 | 5,190.24 | 1.74 | 0.00 | 5,190.24 | | |
| | | CAMRC | CAM | 0705 | GLA | 2,981.00 | 07/01/2024 | 05/31/2027 | 475.88 | 0.16 | 5,710.56 | 1.91 | 0.00 | 5,710.56 | | |
| | | TAXRC | CAM | 0705 | GLA | 2,981.00 | 07/01/2024 | 05/31/2027 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2024 | 10/31/2025 | 9,893.21 | 3.31 | 118,718.52 | 39.82 | 0.00 | 118,718.52 | | |
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2025 | 10/31/2026 | 10,190.01 | 3.41 | 122,280.12 | 41.02 | 0.00 | 122,280.12 | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 230 of 326

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0705 | GLA | 2,981.00 | 11/01/2026 | 05/31/2027 | 10,945.71 | 3.67 | 131,348.52 | 44.06 | 0.00 | 131,348.52 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Relocation | Activated | 07/24/2023 | 05/31/2027 | 07/24/2023 | 47 | 2,981.00 | 1st Amend Relocation | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0707 | Everstream Solutions LLC (t0085893) | Office Net | 4,137.00 | 08/01/2021 | 03/31/2029 | 92 | 2.83 | 12,569.68 | 3.04 | 150,836.16 | 36.46 | 0.01 | 1.74 | 23,928.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2023 | 07/31/2024 | 12,569.68 | 3.03 | 150,836.16 | 36.46 | 0.00 | 150,836.16 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2024 | 07/31/2025 | 12,883.92 | 3.11 | 154,607.04 | 37.37 | 0.00 | 154,607.04 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2025 | 07/31/2026 | 13,206.02 | 3.19 | 158,472.24 | 38.30 | 0.00 | 158,472.24 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2026 | 07/31/2027 | 13,536.17 | 3.27 | 162,434.04 | 39.26 | 0.00 | 162,434.04 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2027 | 07/31/2028 | 13,874.57 | 3.35 | 166,494.84 | 40.24 | 0.00 | 166,494.84 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2028 | 03/31/2029 | 14,221.44 | 3.43 | 170,657.28 | 41.25 | 0.00 | 170,657.28 | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TAXRC | CAM | 0707 | GLA | 4,137.00 | 07/24/2023 | 06/30/2024 | 3.30 | 0.00 | 39.60 | 0.01 | 0.00 | 39.60 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2023 | 07/31/2024 | 12,569.68 | 3.03 | 150,836.16 | 36.46 | 0.00 | 150,836.16 | |
| | | TAXUO | Misc | 0707 | GLA | 4,137.00 | 05/01/2024 | 03/31/2029 | 600.25 | 0.14 | 7,203.00 | 1.74 | 0.00 | 7,203.00 | |
| | | CAMRC | CAM | 0707 | GLA | 4,137.00 | 07/01/2024 | 03/31/2029 | 606.14 | 0.14 | 7,273.68 | 1.75 | 0.00 | 7,273.68 | |
| | | TAXRC | CAM | 0707 | GLA | 4,137.00 | 07/01/2024 | 03/31/2029 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2024 | 07/31/2025 | 12,883.92 | 3.11 | 154,607.04 | 37.37 | 0.00 | 154,607.04 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2025 | 07/31/2026 | 13,206.02 | 3.19 | 158,472.24 | 38.30 | 0.00 | 158,472.24 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2026 | 07/31/2027 | 13,536.17 | 3.27 | 162,434.04 | 39.26 | 0.00 | 162,434.04 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2027 | 07/31/2028 | 13,874.57 | 3.35 | 166,494.84 | 40.24 | 0.00 | 166,494.84 | |
| | | BROFF | Rent | 0707 | GLA | 4,137.00 | 08/01/2028 | 03/31/2029 | 14,221.44 | 3.43 | 170,657.28 | 41.25 | 0.00 | 170,657.28 | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Relocation | Activated | 07/24/2023 | 03/31/2029 | 07/24/2023 | 69 | 4,137.00 | 1st Amend. Relocation | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0800 | Mission Partners Group, LLC (t0085900) | Office Net | 1,589.00 | 01/15/2020 | 07/31/2027 | 91 | 4.42 | 5,253.52 | 3.31 | 63,042.24 | 39.67 | 1.27 | 1.74 | 9,335.38 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2024 | 01/31/2025 | 5,253.52 | 3.30 | 63,042.24 | 39.67 | 0.00 | 63,042.24 | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 231 of 326

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 232 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2025 | 01/31/2026 | 5,411.13 | 3.40 | 64,933.56 | 40.86 | 0.00 | 64,933.56 | | |
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2026 | 01/31/2027 | 5,573.46 | 3.50 | 66,881.52 | 42.09 | 0.00 | 66,881.52 | | |
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2027 | 07/31/2027 | 5,740.67 | 3.61 | 68,888.04 | 43.35 | 0.00 | 68,888.04 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0800 | GLA | 1,589.00 | 01/01/2023 | 06/30/2024 | 155.90 | 0.09 | 1,870.80 | 1.17 | 0.00 | 1,870.80 | | |
| | | TAXRC | CAM | 0800 | GLA | 1,589.00 | 01/01/2023 | 06/30/2024 | 12.63 | 0.00 | 151.56 | 0.09 | 0.00 | 151.56 | | |
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2024 | 01/31/2025 | 5,253.52 | 3.30 | 63,042.24 | 39.67 | 0.00 | 63,042.24 | | |
| | | TAXUO | Misc | 0800 | GLA | 1,589.00 | 05/01/2024 | 07/31/2027 | 230.55 | 0.14 | 2,766.60 | 1.74 | 0.00 | 2,766.60 | | |
| | | CAMRC | CAM | 0800 | GLA | 1,589.00 | 07/01/2024 | 07/31/2027 | 199.51 | 0.12 | 2,394.12 | 1.50 | 0.00 | 2,394.12 | | |
| | | TAXRC | CAM | 0800 | GLA | 1,589.00 | 07/01/2024 | 07/31/2027 | 12.99 | 0.00 | 155.88 | 0.09 | 0.00 | 155.88 | | |
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2025 | 01/31/2026 | 5,411.13 | 3.40 | 64,933.56 | 40.86 | 0.00 | 64,933.56 | | |
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2026 | 01/31/2027 | 5,573.46 | 3.50 | 66,881.52 | 42.09 | 0.00 | 66,881.52 | | |
| | | BROFF | Rent | 0800 | GLA | 1,589.00 | 02/01/2027 | 07/31/2027 | 5,740.67 | 3.61 | 68,888.04 | 43.35 | 0.00 | 68,888.04 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 01/15/2020 | 07/31/2027 | 01/15/2020 | 91 | 1,589.00 | Lease | | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0800B, 0801, 0803 | Lion Re:Sources, Inc. (t0085915) | Office Net | 9,034.00 | 12/01/2023 | 11/30/2024 | 12 | 0.50 | 26,349.17 | 2.92 | 316,190.04 | 35.00 | 0.00 | 1.74 | 0.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0800B, 0801, 0803 | GLA | 9,034.00 | 12/01/2023 | 11/30/2024 | 26,349.17 | 2.91 | 316,190.04 | 35.00 | 0.00 | 316,190.04 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0800B, 0801, 0803 | GLA | 9,034.00 | 12/01/2023 | 11/30/2024 | 26,349.17 | 2.91 | 316,190.04 | 35.00 | 0.00 | 316,190.04 | | |
| | | TAXUO | Misc | 0800B, 0801, 0803 | GLA | 9,034.00 | 05/01/2024 | 11/30/2024 | 1,310.76 | 0.14 | 15,729.12 | 1.74 | 0.00 | 15,729.12 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 12/01/2023 | 11/30/2024 | 12/01/2023 | 12 | 9,034.00 | 1st Amendment | Temporary Space | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0802 | James G. Davis Construction Corporation (t0085901) | Office Net | 2,563.00 | 01/01/2022 | 04/30/2025 | 40 | 2.42 | 8,135.39 | 3.17 | 97,624.68 | 38.09 | 0.00 | 1.74 | 25,014.87 | 0.00 |

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment    2. ** Pending Amendments    3. *** Past / Superseded Amendments

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 233 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | BROFF | Rent | 0802 | GLA | 2,563.00 | 01/01/2024 | 12/31/2024 | 8,135.39 | 3.17 | 97,624.68 | 38.09 | 0.00 | 97,624.68 | | |
| | | BROFF | Rent | 0802 | GLA | 2,563.00 | 01/01/2025 | 04/30/2025 | 8,338.29 | 3.25 | 100,059.48 | 39.04 | 0.00 | 100,059.48 | | |
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | BROFF | Rent | 0802 | GLA | 2,563.00 | 01/01/2024 | 12/31/2024 | 8,135.39 | 3.17 | 97,624.68 | 38.09 | 0.00 | 97,624.68 | | |
| | | TAXUO | Misc | 0802 | GLA | 2,563.00 | 05/01/2024 | 04/30/2025 | 371.87 | 0.14 | 4,462.44 | 1.74 | 0.00 | 4,462.44 | | |
| | | CAMRC | CAM | 0802 | GLA | 2,563.00 | 07/01/2024 | 04/30/2025 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | TAXRC | CAM | 0802 | GLA | 2,563.00 | 07/01/2024 | 04/30/2025 | 1.35 | 0.00 | 16.20 | 0.00 | 0.00 | 16.20 | | |
| | | BROFF | Rent | 0802 | GLA | 2,563.00 | 01/01/2025 | 04/30/2025 | 8,338.29 | 3.25 | 100,059.48 | 39.04 | 0.00 | 100,059.48 | | |
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | | Notes | | | | |
| | | Original Lease | Activated | 01/01/2022 | 04/30/2025 | 01/01/2022 | 40 | 2,563.00 | Lease | | | | | | | |
| Bourse Tower (of240052) | 0804 | Genesis Engineers, Inc. (t0085902) | Office Net | 11,001.00 | 12/01/2019 | 05/31/2027 | 90 | 4.50 | 35,855.40 | 3.26 | 430,264.80 | 39.11 | 0.97 | 1.74 | 31,857.06 | 0.00 |
| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2023 | 11/30/2024 | 35,855.40 | 3.25 | 430,264.80 | 39.11 | 0.00 | 430,264.80 | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2024 | 11/30/2025 | 36,931.07 | 3.35 | 443,172.84 | 40.28 | 0.00 | 443,172.84 | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2025 | 11/30/2026 | 38,039.00 | 3.45 | 456,468.00 | 41.49 | 0.00 | 456,468.00 | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2026 | 05/31/2027 | 39,180.17 | 3.56 | 470,162.04 | 42.73 | 0.00 | 470,162.04 | | |
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | CAMRC | CAM | 0804 | GLA | 11,001.00 | 01/01/2023 | 06/30/2024 | 862.27 | 0.07 | 10,347.24 | 0.94 | 0.00 | 10,347.24 | | |
| | | TAXRC | CAM | 0804 | GLA | 11,001.00 | 01/01/2023 | 06/30/2024 | 30.88 | 0.00 | 370.56 | 0.03 | 0.00 | 370.56 | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2023 | 11/30/2024 | 35,855.40 | 3.25 | 430,264.80 | 39.11 | 0.00 | 430,264.80 | | |
| | | TAXUO | Misc | 0804 | GLA | 11,001.00 | 05/01/2024 | 05/31/2027 | 1,596.16 | 0.14 | 19,153.92 | 1.74 | 0.00 | 19,153.92 | | |
| | | CAMRC | CAM | 0804 | GLA | 11,001.00 | 07/01/2024 | 05/31/2027 | 2,094.12 | 0.19 | 25,129.44 | 2.28 | 0.00 | 25,129.44 | | |
| | | TAXRC | CAM | 0804 | GLA | 11,001.00 | 07/01/2024 | 05/31/2027 | 33.30 | 0.00 | 399.60 | 0.03 | 0.00 | 399.60 | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2024 | 11/30/2025 | 36,931.07 | 3.35 | 443,172.84 | 40.28 | 0.00 | 443,172.84 | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2025 | 11/30/2026 | 38,039.00 | 3.45 | 456,468.00 | 41.49 | 0.00 | 456,468.00 | | |
| | | BROFF | Rent | 0804 | GLA | 11,001.00 | 12/01/2026 | 05/31/2027 | 39,180.17 | 3.56 | 470,162.04 | 42.73 | 0.00 | 470,162.04 | | |
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | | Notes | | | | |

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment    2. ** Pending Amendments    3. *** Past / Superseded Amendments

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 234 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | | 12/01/2019 | 05/31/2027 | 12/01/2019 | 90 | 11,001.00 | Lease | | | | | | |
| Bourse Tower (of240052) | 0900, 0950 | Piano Software, Inc. (t0085906) | Office Net | 10,191.00 | 06/01/2019 | 05/31/2027 | 96 | 5.00 | 30,987.36 | 3.04 | 371,848.32 | 36.49 | 1.98 | 1.74 | 55,728.02 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0950 | GLA | 5,022.00 | 06/01/2024 | 05/31/2025 | 15,270.19 | 3.04 | 183,242.28 | 36.48 | 0.00 | 183,242.28 | | |
| | | BROFF | Rent | 0900 | GLA | 5,169.00 | 06/01/2024 | 05/31/2025 | 15,717.17 | 3.04 | 188,606.04 | 36.48 | 0.00 | 188,606.04 | | |
| | | BROFF | Rent | 0950 | GLA | 5,022.00 | 06/01/2025 | 05/31/2026 | 15,651.95 | 3.11 | 187,823.40 | 37.40 | 0.00 | 187,823.40 | | |
| | | BROFF | Rent | 0900 | GLA | 5,169.00 | 06/01/2025 | 05/31/2026 | 16,110.10 | 3.11 | 193,321.20 | 37.40 | 0.00 | 193,321.20 | | |
| | | BROFF | Rent | 0950 | GLA | 5,022.00 | 06/01/2026 | 05/31/2027 | 16,043.25 | 3.19 | 192,519.00 | 38.33 | 0.00 | 192,519.00 | | |
| | | BROFF | Rent | 0900 | GLA | 5,169.00 | 06/01/2026 | 05/31/2027 | 16,512.85 | 3.19 | 198,154.20 | 38.33 | 0.00 | 198,154.20 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0950 | GLA | 5,022.00 | 01/01/2023 | 06/30/2024 | 1,525.21 | 0.30 | 18,302.52 | 3.64 | 0.00 | 18,302.52 | | |
| | | TAXRC | CAM | 0950 | GLA | 5,022.00 | 01/01/2023 | 06/30/2024 | 153.88 | 0.03 | 1,846.56 | 0.36 | 0.00 | 1,846.56 | | |
| | | TAXUO | Misc | 0950 | GLA | 5,022.00 | 05/01/2024 | 05/31/2027 | 1,478.63 | 0.29 | 17,743.56 | 3.53 | 0.00 | 17,743.56 | | |
| | | BROFF | Rent | 0950 | GLA | 5,022.00 | 06/01/2024 | 05/31/2025 | 15,270.19 | 3.04 | 183,242.28 | 36.48 | 0.00 | 183,242.28 | | |
| | | BROFF | Rent | 0900 | GLA | 5,169.00 | 06/01/2024 | 05/31/2025 | 15,717.17 | 3.04 | 188,606.04 | 36.48 | 0.00 | 188,606.04 | | |
| | | CAMRC | CAM | 0950 | GLA | 5,022.00 | 07/01/2024 | 05/31/2027 | 1,804.06 | 0.35 | 21,648.72 | 4.31 | 0.00 | 21,648.72 | | |
| | | TAXRC | CAM | 0950 | GLA | 5,022.00 | 07/01/2024 | 05/31/2027 | 156.19 | 0.03 | 1,874.28 | 0.37 | 0.00 | 1,874.28 | | |
| | | BROFF | Rent | 0950 | GLA | 5,022.00 | 06/01/2025 | 05/31/2026 | 15,651.95 | 3.11 | 187,823.40 | 37.40 | 0.00 | 187,823.40 | | |
| | | BROFF | Rent | 0900 | GLA | 5,169.00 | 06/01/2025 | 05/31/2026 | 16,110.10 | 3.11 | 193,321.20 | 37.40 | 0.00 | 193,321.20 | | |
| | | BROFF | Rent | 0950 | GLA | 5,022.00 | 06/01/2026 | 05/31/2027 | 16,043.25 | 3.19 | 192,519.00 | 38.33 | 0.00 | 192,519.00 | | |
| | | BROFF | Rent | 0900 | GLA | 5,169.00 | 06/01/2026 | 05/31/2027 | 16,512.85 | 3.19 | 198,154.20 | 38.33 | 0.00 | 198,154.20 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 06/01/2019 | 05/31/2027 | 06/01/2019 | 96 | 5,022.00 | Lease | | | | |
| | | Expansion | Activated | 06/01/2020 | 05/31/2027 | 06/01/2020 | 84 | 5,169.00 | Lease | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0920 | ChargeItSpot, LLC (t0085904) | Office Net | 3,891.00 | 06/01/2019 | 11/30/2025 | 78 | 5.00 | 13,576.35 | 3.49 | 162,916.20 | 41.87 | 1.27 | 1.74 | 6,936.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0920 | GLA | 3,891.00 | 06/01/2024 | 05/31/2025 | 13,576.35 | 3.48 | 162,916.20 | 41.87 | 0.00 | 162,916.20 | | |
| | | BROFF | Rent | 0920 | GLA | 3,891.00 | 06/01/2025 | 11/30/2025 | 13,916.81 | 3.57 | 167,001.72 | 42.92 | 0.00 | 167,001.72 | | |

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | CAMRC | CAM | 0920 | GLA | 3,891.00 | 01/01/2023 | 06/30/2024 | 380.34 | 0.09 | 4,564.08 | 1.17 | 0.00 | 4,564.08 | | |
| | | TAXRC | CAM | 0920 | GLA | 3,891.00 | 01/01/2023 | 06/30/2024 | 30.82 | 0.00 | 369.84 | 0.09 | 0.00 | 369.84 | | |
| | | TAXUO | Misc | 0920 | GLA | 3,891.00 | 05/01/2024 | 11/30/2025 | 564.55 | 0.14 | 6,774.60 | 1.74 | 0.00 | 6,774.60 | | |
| | | BROFF | Rent | 0920 | GLA | 3,891.00 | 06/01/2024 | 05/31/2025 | 13,576.35 | 3.48 | 162,916.20 | 41.87 | 0.00 | 162,916.20 | | |
| | | CAMRC | CAM | 0920 | GLA | 3,891.00 | 07/01/2024 | 11/30/2025 | 487.49 | 0.12 | 5,849.88 | 1.50 | 0.00 | 5,849.88 | | |
| | | TAXRC | CAM | 0920 | GLA | 3,891.00 | 07/01/2024 | 11/30/2025 | 31.75 | 0.00 | 381.00 | 0.09 | 0.00 | 381.00 | | |
| | | BROFF | Rent | 0920 | GLA | 3,891.00 | 06/01/2025 | 11/30/2025 | 13,916.81 | 3.57 | 167,001.72 | 42.92 | 0.00 | 167,001.72 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 06/01/2019 | 11/30/2025 | 06/01/2019 | 78 | 3,891.00 | 3rd Amendment | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0930 | Allen & Gerritsen, Inc. (t0085913) | Office Net | 7,065.00 | 07/01/2022 | 05/31/2034 | 143 | 1.92 | 22,574.89 | 3.20 | 270,898.68 | 38.34 | 0.00 | 1.74 | 0.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2024 | 05/31/2025 | 22,574.89 | 3.19 | 270,898.68 | 38.34 | 0.00 | 270,898.68 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2025 | 05/31/2026 | 23,082.83 | 3.26 | 276,993.96 | 39.20 | 0.00 | 276,993.96 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2026 | 05/31/2027 | 23,602.19 | 3.34 | 283,226.28 | 40.08 | 0.00 | 283,226.28 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2027 | 05/31/2028 | 24,133.24 | 3.41 | 289,598.88 | 40.99 | 0.00 | 289,598.88 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2028 | 05/31/2029 | 24,676.24 | 3.49 | 296,114.88 | 41.91 | 0.00 | 296,114.88 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2029 | 05/31/2030 | 25,231.46 | 3.57 | 302,777.52 | 42.85 | 0.00 | 302,777.52 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2030 | 05/31/2031 | 25,799.17 | 3.65 | 309,590.04 | 43.82 | 0.00 | 309,590.04 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2031 | 05/31/2032 | 26,379.65 | 3.73 | 316,555.80 | 44.80 | 0.00 | 316,555.80 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2032 | 05/31/2033 | 26,973.19 | 3.81 | 323,678.28 | 45.81 | 0.00 | 323,678.28 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2033 | 05/31/2034 | 27,580.09 | 3.90 | 330,961.08 | 46.84 | 0.00 | 330,961.08 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TAXUO | Misc | 0930 | GLA | 7,065.00 | 05/01/2024 | 05/31/2034 | 1,025.07 | 0.14 | 12,300.84 | 1.74 | 0.00 | 12,300.84 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2024 | 05/31/2025 | 22,574.89 | 3.19 | 270,898.68 | 38.34 | 0.00 | 270,898.68 | | |
| | | CAMRC | CAM | 0930 | GLA | 7,065.00 | 07/01/2024 | 05/31/2034 | 319.05 | 0.04 | 3,828.60 | 0.54 | 0.00 | 3,828.60 | | |
| | | TAXRC | CAM | 0930 | GLA | 7,065.00 | 07/01/2024 | 05/31/2034 | 2.79 | 0.00 | 33.48 | 0.00 | 0.00 | 33.48 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2025 | 05/31/2026 | 23,082.83 | 3.26 | 276,993.96 | 39.20 | 0.00 | 276,993.96 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2026 | 05/31/2027 | 23,602.19 | 3.34 | 283,226.28 | 40.08 | 0.00 | 283,226.28 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2027 | 05/31/2028 | 24,133.24 | 3.41 | 289,598.88 | 40.99 | 0.00 | 289,598.88 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2028 | 05/31/2029 | 24,676.24 | 3.49 | 296,114.88 | 41.91 | 0.00 | 296,114.88 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2029 | 05/31/2030 | 25,231.46 | 3.57 | 302,777.52 | 42.85 | 0.00 | 302,777.52 | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 235 of 326

Wednesday, June 26, 2024
10:25 AM

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2030 | 05/31/2031 | 25,799.17 | 3.65 | 309,590.04 | 43.82 | 0.00 | 309,590.04 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2031 | 05/31/2032 | 26,379.65 | 3.73 | 316,555.80 | 44.80 | 0.00 | 316,555.80 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2032 | 05/31/2033 | 26,973.19 | 3.81 | 323,678.28 | 45.81 | 0.00 | 323,678.28 | | |
| | | BROFF | Rent | 0930 | GLA | 7,065.00 | 06/01/2033 | 05/31/2034 | 27,580.09 | 3.90 | 330,961.08 | 46.84 | 0.00 | 330,961.08 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Renewal | Activated | 05/08/2023 | 05/31/2034 | 05/08/2023 | 133 | 7,065.00 | Lease | Permanent Space per Lease | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0960,  S960 | Diversified Lighting Associates, Inc. (t0085907) | Office Net | 5,074.00 | 08/09/2017 | 12/31/2024 | 89 | 6.83 | 14,165.33 | 2.79 | 169,983.96 | 33.50 | 1.72 | 2.45 | 24,430.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0960 | GLA | 4,886.00 | 09/01/2023 | 08/31/2024 | 14,165.33 | 2.89 | 169,983.96 | 34.79 | 0.00 | 169,983.96 | | |
| | | BROFF | Rent | 0960 | GLA | 4,886.00 | 09/01/2024 | 12/31/2024 | 14,519.56 | 2.97 | 174,234.72 | 35.66 | 0.00 | 174,234.72 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TAXUO | Misc | S960 | GLA | 188.00 | 02/01/2022 | 12/31/2024 | 27.87 | 0.14 | 334.44 | 1.77 | 0.00 | 334.44 | | |
| | | CAMRC | CAM | 0960 | GLA | 4,886.00 | 01/01/2023 | 06/30/2024 | 285.67 | 0.05 | 3,428.04 | 0.70 | 0.00 | 3,428.04 | | |
| | | TAXRC | CAM | 0960 | GLA | 4,886.00 | 01/01/2023 | 06/30/2024 | 442.25 | 0.09 | 5,307.00 | 1.08 | 0.00 | 5,307.00 | | |
| | | BROFF | Rent | 0960 | GLA | 4,886.00 | 09/01/2023 | 08/31/2024 | 14,165.33 | 2.89 | 169,983.96 | 34.79 | 0.00 | 169,983.96 | | |
| | | STORG | Misc | S960 | GLA | 188.00 | 09/01/2023 | 08/31/2024 | 272.60 | 1.45 | 3,271.20 | 17.40 | 0.00 | 3,271.20 | | |
| | | TAXUO | Misc | 0960 | GLA | 4,886.00 | 05/01/2024 | 12/31/2024 | 736.20 | 0.15 | 8,834.40 | 1.80 | 0.00 | 8,834.40 | | |
| | | CAMRC | CAM | 0960 | GLA | 4,886.00 | 07/01/2024 | 12/31/2024 | 455.88 | 0.09 | 5,470.56 | 1.12 | 0.00 | 5,470.56 | | |
| | | TAXRC | CAM | 0960 | GLA | 4,886.00 | 07/01/2024 | 12/31/2024 | 491.83 | 0.10 | 5,901.96 | 1.20 | 0.00 | 5,901.96 | | |
| | | BROFF | Rent | 0960 | GLA | 4,886.00 | 09/01/2024 | 12/31/2024 | 14,519.56 | 2.97 | 174,234.72 | 35.66 | 0.00 | 174,234.72 | | |
| | | STORG | Misc | S960 | GLA | 188.00 | 09/01/2024 | 12/31/2024 | 279.34 | 1.48 | 3,352.08 | 17.83 | 0.00 | 3,352.08 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 08/09/2017 | 12/31/2024 | 08/09/2017 | 89 | 4,886.00 | Lease | | | | |
| | | Expansion | Activated | 08/09/2017 | 12/31/2024 | 08/09/2017 | 89 | 188.00 | Storage | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 1000,  1020 | Robson Forensic, Inc. (t0085908) | Office Net | 6,189.00 | 01/12/2015 | 02/28/2025 | 122 | 9.42 | 18,261.50 | 2.95 | 219,138.00 | 35.41 | 3.50 | 1.74 | 6,541.46 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 1020 | GLA | 2,495.00 | 03/01/2024 | 02/28/2025 | 7,361.84 | 2.95 | 88,342.08 | 35.40 | 0.00 | 88,342.08 | | |

Wednesday, June 26, 2024
10:25 AM

# Tenancy Schedule I

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 237 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 1000 | GLA | 3,694.00 | 03/01/2024 | 02/28/2025 | 10,899.66 | 2.95 | 130,795.92 | 35.40 | 0.00 | 130,795.92 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ELECT | CAM | 1020 | GLA | 2,495.00 | 02/01/2022 | 02/28/2025 | 311.88 | 0.12 | 3,742.56 | 1.50 | 0.00 | 3,742.56 | | |
| | | ELECT | CAM | 1000 | GLA | 3,694.00 | 02/01/2022 | 02/28/2025 | 461.75 | 0.12 | 5,541.00 | 1.50 | 0.00 | 5,541.00 | | |
| | | CAMRC | CAM | 1000 | GLA | 3,694.00 | 01/01/2023 | 06/30/2024 | 410.60 | 0.11 | 4,927.20 | 1.33 | 0.00 | 4,927.20 | | |
| | | CAMRC | CAM | 1020 | GLA | 2,495.00 | 01/01/2023 | 02/28/2025 | 277.33 | 0.11 | 3,327.96 | 1.33 | 0.00 | 3,327.96 | | |
| | | TAXRC | CAM | 1000 | GLA | 3,694.00 | 01/01/2023 | 06/30/2024 | 203.53 | 0.05 | 2,442.36 | 0.66 | 0.00 | 2,442.36 | | |
| | | TAXRC | CAM | 1020 | GLA | 2,495.00 | 01/01/2023 | 02/28/2025 | 137.47 | 0.05 | 1,649.64 | 0.66 | 0.00 | 1,649.64 | | |
| | | BROFF | Rent | 1020 | GLA | 2,495.00 | 03/01/2024 | 02/28/2025 | 7,361.84 | 2.95 | 88,342.08 | 35.40 | 0.00 | 88,342.08 | | |
| | | BROFF | Rent | 1000 | GLA | 3,694.00 | 03/01/2024 | 02/28/2025 | 10,899.66 | 2.95 | 130,795.92 | 35.40 | 0.00 | 130,795.92 | | |
| | | TAXUO | Misc | 1000 | GLA | 3,694.00 | 05/01/2024 | 02/28/2025 | 897.97 | 0.24 | 10,775.64 | 2.91 | 0.00 | 10,775.64 | | |
| | | CAMRC | CAM | 1000 | GLA | 3,694.00 | 07/01/2024 | 02/28/2025 | 929.99 | 0.25 | 11,159.88 | 3.02 | 0.00 | 11,159.88 | | |
| | | TAXRC | CAM | 1000 | GLA | 3,694.00 | 07/01/2024 | 02/28/2025 | 378.39 | 0.10 | 4,540.68 | 1.22 | 0.00 | 4,540.68 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 01/12/2015 | 02/28/2025 | 01/12/2015 | 122 | 3,694.00 | Lease & 2nd Amend. | | | | | | | |
| | | Expansion | Activated | 04/01/2018 | 02/28/2025 | 04/01/2019 | 83 | 2,495.00 | 2nd Amendment | | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bourse Tower (of240052)** | **1005** | **MRP Realty (t0085909)** | **Office Net** | **2,345.00** | **11/01/2018** | **10/31/2028** | **120** | **5.58** | **6,351.04** | **2.71** | **76,212.48** | **32.50** | **0.00** | **2.17** | **0.00** | **0.00** |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 1005 | GLA | 2,345.00 | 02/01/2022 | 10/31/2028 | 6,351.04 | 2.70 | 76,212.48 | 32.50 | 0.00 | 76,212.48 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 1005 | GLA | 2,345.00 | 02/01/2022 | 10/31/2028 | 6,351.04 | 2.70 | 76,212.48 | 32.50 | 0.00 | 76,212.48 | | |
| | | TAXUO | Misc | 1005 | GLA | 2,345.00 | 02/01/2022 | 10/31/2028 | 424.45 | 0.18 | 5,093.40 | 2.17 | 0.00 | 5,093.40 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 11/01/2018 | 10/31/2028 | 11/01/2018 | 120 | 2,345.00 | | | | | | | | |

| Property | Unit(s) | Lease | | Area | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Bourse Tower (of240052)** | **0601** | **VACANT** | | **3,957.00** | | | | | | | | | | | | |
| **Bourse Tower (of240052)** | **0602** | **VACANT** | | **2,575.00** | | | | | | | | | | | | |
| **Bourse Tower (of240052)** | **0603** | **VACANT** | | **2,903.00** | | | | | | | | | | | | |

All Selected Properties  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower (of240052) | 0702 | VACANT | | 2,620.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0703 | VACANT | | 2,961.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0720 | VACANT | | 592.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0721 | VACANT | | 1,057.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0785 | VACANT | | 1,654.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0810 | VACANT | | 3,037.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0810A | VACANT | | 263.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0820 | VACANT | | 889.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0825 | VACANT | | 672.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0830 | VACANT | | 1,291.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0835 | VACANT | | 917.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0840 | VACANT | | 2,915.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0851 | VACANT | | 124.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0910 | VACANT | | 2,092.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 0935 | VACANT | | 2,272.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 1002 | VACANT | | 3,355.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 1006 | VACANT | | 3,771.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 1010 | VACANT | | 3,045.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | 1040 | VACANT | | 436.00 | | | | | | | | | | | | |
| Bourse Tower (of240052) | SC-1 | VACANT | | 66.00 | | | | | | | | | | | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 238 of 326

# Tenancy Schedule I

Property: of240055  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment    2. ** Pending Amendments    3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | 0110 | PNC Bank NA - 1002102 (t0085967) | Retail Net | 6,162.00 | 06/01/2020 | 05/31/2025 | 60 | 4.00 | 26,907.40 | 4.37 | 322,888.80 | 52.40 | 3.37 | 0.00 | 0.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BRRTL | Rent | 0110 | GLA | 6,162.00 | 06/01/2024 | 05/31/2025 | 26,907.40 | 4.36 | 322,888.80 | 52.40 | 0.00 | 322,888.80 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | WATER | CAM | 0110 | GLA | 6,162.00 | 02/01/2022 | 05/31/2025 | 40.00 | 0.00 | 480.00 | 0.07 | 0.00 | 480.00 | | |
| | | TAXRC | CAM | 0110 | GLA | 6,162.00 | 01/01/2023 | 06/30/2024 | 1,690.75 | 0.27 | 20,289.00 | 3.29 | 0.00 | 20,289.00 | | |
| | | BRRTL | Rent | 0110 | GLA | 6,162.00 | 06/01/2024 | 05/31/2025 | 26,907.40 | 4.36 | 322,888.80 | 52.40 | 0.00 | 322,888.80 | | |
| | | TAXRC | CAM | 0110 | GLA | 6,162.00 | 07/01/2024 | 05/31/2025 | 1,690.56 | 0.27 | 20,286.72 | 3.29 | 0.00 | 20,286.72 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 06/01/2020 | 05/31/2025 | 06/01/2020 | 60 | 6,162.00 | 1st Lease Ext. Option | | | | |

| 400 Market (of240055) | 0200 | Philadelphia Youth Network (t0085968) | Office Net | 13,876.00 | 05/21/2015 | 11/30/2025 | 127 | 9.08 | 29,604.09 | 2.13 | 355,249.08 | 25.60 | 5.77 | 0.00 | 47,409.67 | 0.00 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0200 | GLA | 13,876.00 | 06/01/2024 | 05/31/2025 | 29,604.09 | 2.13 | 355,249.08 | 25.60 | 0.00 | 355,249.08 | | |
| | | BROFF | Rent | 0200 | GLA | 13,876.00 | 06/01/2025 | 11/30/2025 | 30,344.19 | 2.18 | 364,130.28 | 26.24 | 0.00 | 364,130.28 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0200 | GLA | 13,876.00 | 01/01/2023 | 06/30/2024 | 5,197.36 | 0.37 | 62,368.32 | 4.49 | 0.00 | 62,368.32 | | |
| | | TAXRC | CAM | 0200 | GLA | 13,876.00 | 01/01/2023 | 06/30/2024 | 1,478.85 | 0.10 | 17,746.20 | 1.27 | 0.00 | 17,746.20 | | |
| | | BROFF | Rent | 0200 | GLA | 13,876.00 | 06/01/2024 | 05/31/2025 | 29,604.09 | 2.13 | 355,249.08 | 25.60 | 0.00 | 355,249.08 | | |
| | | CAMRC | CAM | 0200 | GLA | 13,876.00 | 07/01/2024 | 11/30/2025 | 5,125.98 | 0.36 | 61,511.76 | 4.43 | 0.00 | 61,511.76 | | |
| | | TAXRC | CAM | 0200 | GLA | 13,876.00 | 07/01/2024 | 11/30/2025 | 1,477.40 | 0.10 | 17,728.80 | 1.27 | 0.00 | 17,728.80 | | |
| | | BROFF | Rent | 0200 | GLA | 13,876.00 | 06/01/2025 | 11/30/2025 | 30,344.19 | 2.18 | 364,130.28 | 26.24 | 0.00 | 364,130.28 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 05/21/2015 | 11/30/2025 | 05/21/2015 | 127 | 13,876.00 | Lease | | | | |

Case 2:26-cv-05284-CFK  Document 1-4  Filed 07/28/26  Page 239 of 326

# Tenancy Schedule I

Property: of240055  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 240 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | 0210 | Entrepreneur Works (t0085969) | Office Net | 1,615.00 | 03/01/2018 | 02/28/2025 | 84 | 6.25 | 4,100.50 | 2.54 | 49,206.00 | 30.47 | 3.42 | 0.00 | 9,201.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0210 | GLA | 1,615.00 | 07/01/2023 | 06/30/2024 | 4,100.50 | 2.53 | 49,206.00 | 30.46 | 0.00 | 49,206.00 | | |
| | | BROFF | Rent | 0210 | GLA | 1,615.00 | 07/01/2024 | 02/28/2025 | 4,203.01 | 2.60 | 50,436.12 | 31.23 | 0.00 | 50,436.12 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0210 | GLA | 1,615.00 | 01/01/2023 | 06/30/2024 | 417.15 | 0.25 | 5,005.80 | 3.10 | 0.00 | 5,005.80 | | |
| | | TAXRC | CAM | 0210 | GLA | 1,615.00 | 01/01/2023 | 06/30/2024 | 43.06 | 0.02 | 516.72 | 0.32 | 0.00 | 516.72 | | |
| | | BROFF | Rent | 0210 | GLA | 1,615.00 | 07/01/2023 | 06/30/2024 | 4,100.50 | 2.53 | 49,206.00 | 30.46 | 0.00 | 49,206.00 | | |
| | | BROFF | Rent | 0210 | GLA | 1,615.00 | 07/01/2024 | 02/28/2025 | 4,203.01 | 2.60 | 50,436.12 | 31.23 | 0.00 | 50,436.12 | | |
| | | CAMRC | CAM | 0210 | GLA | 1,615.00 | 07/01/2024 | 02/28/2025 | 409.95 | 0.25 | 4,919.40 | 3.04 | 0.00 | 4,919.40 | | |
| | | TAXRC | CAM | 0210 | GLA | 1,615.00 | 07/01/2024 | 02/28/2025 | 43.01 | 0.02 | 516.12 | 0.32 | 0.00 | 516.12 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 03/01/2018 | 02/28/2025 | 03/01/2018 | 84 | 1,615.00 | 3rd Amendment | | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | 0360 | Professional Planning Assocation (t0085971) | Office Net | 3,329.00 | 01/01/2015 | 06/30/2025 | 126 | 9.42 | 6,103.17 | 1.83 | 73,238.04 | 22.00 | 5.77 | 2.33 | 10,541.83 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0360 | GLA | 3,329.00 | 01/01/2024 | 12/31/2024 | 6,103.17 | 1.83 | 73,238.04 | 22.00 | 0.00 | 73,238.04 | | |
| | | BROFF | Rent | 0360 | GLA | 3,329.00 | 01/01/2025 | 06/30/2025 | 6,103.17 | 1.83 | 73,238.04 | 22.00 | 0.00 | 73,238.04 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0360 | GLA | 3,329.00 | 01/01/2023 | 06/30/2024 | 1,246.72 | 0.37 | 14,960.64 | 4.49 | 0.00 | 14,960.64 | | |
| | | TAXRC | CAM | 0360 | GLA | 3,329.00 | 01/01/2023 | 06/30/2024 | 354.82 | 0.10 | 4,257.84 | 1.27 | 0.00 | 4,257.84 | | |
| | | TAXUO | Misc | 0360 | GLA | 3,329.00 | 01/01/2023 | 06/30/2024 | 645.18 | 0.19 | 7,742.16 | 2.32 | 0.00 | 7,742.16 | | |
| | | BROFF | Rent | 0360 | GLA | 3,329.00 | 01/01/2024 | 12/31/2024 | 6,103.17 | 1.83 | 73,238.04 | 22.00 | 0.00 | 73,238.04 | | |
| | | CAMRC | CAM | 0360 | GLA | 3,329.00 | 07/01/2024 | 06/30/2025 | 1,225.00 | 0.36 | 14,700.00 | 4.41 | 0.00 | 14,700.00 | | |
| | | TAXRC | CAM | 0360 | GLA | 3,329.00 | 07/01/2024 | 06/30/2025 | 354.00 | 0.10 | 4,248.00 | 1.27 | 0.00 | 4,248.00 | | |
| | | TAXUO | Misc | 0360 | GLA | 3,329.00 | 07/01/2024 | 06/30/2025 | 694.91 | 0.20 | 8,338.92 | 2.50 | 0.00 | 8,338.92 | | |
| | | BROFF | Rent | 0360 | GLA | 3,329.00 | 01/01/2025 | 06/30/2025 | 6,103.17 | 1.83 | 73,238.04 | 22.00 | 0.00 | 73,238.04 | | |

# Tenancy Schedule I

Property: of240055  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
| | | Original Lease | Activated | 01/01/2015 | 06/30/2025 | 01/01/2015 | 126 | 3,329.00 | Lease | | | | | | | |
| 400 Market (of240055) | 0460, SC06 | Falcon Travel Enterprises (t0085973) | Office Net | 2,496.00 | 09/01/2020 | 06/30/2026 | 70 | 3.75 | 6,717.79 | 2.69 | 80,613.48 | 32.30 | 3.09 | 2.71 | 8,836.46 | 0.00 |
| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | BRABT | Rent | 0460 | GLA | 2,495.00 | 10/01/2024 | 11/30/2024 | -6,237.50 | -2.50 | -74,850.00 | -30.00 | 0.00 | -74,850.00 | | |
| | | BROFF | Rent | 0460 | GLA | 2,495.00 | 09/01/2023 | 08/31/2024 | 6,717.79 | 2.69 | 80,613.48 | 32.31 | 0.00 | 80,613.48 | | |
| | | BROFF | Rent | 0460 | GLA | 2,495.00 | 09/01/2024 | 08/31/2025 | 6,886.20 | 2.76 | 82,634.40 | 33.12 | 0.00 | 82,634.40 | | |
| | | BROFF | Rent | 0460 | GLA | 2,495.00 | 09/01/2025 | 06/30/2026 | 7,058.77 | 2.82 | 84,705.24 | 33.95 | 0.00 | 84,705.24 | | |
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | STORG | Misc | SC06 | GLA | 1.00 | 02/01/2022 | 06/30/2026 | 80.00 | 80.00 | 960.00 | 960.00 | 0.00 | 960.00 | | |
| | | CAMRC | CAM | 0460 | GLA | 2,495.00 | 01/01/2023 | 06/30/2024 | 643.06 | 0.25 | 7,716.72 | 3.09 | 0.00 | 7,716.72 | | |
| | | TAXRC | CAM | 0460 | GLA | 2,495.00 | 01/01/2023 | 06/30/2026 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | TAXUO | Misc | SC06 | GLA | 1.00 | 01/01/2023 | 06/30/2024 | 15.50 | 15.50 | 186.00 | 186.00 | 0.00 | 186.00 | | |
| | | TAXUO | Misc | 0460 | GLA | 2,495.00 | 01/01/2023 | 06/30/2024 | 468.24 | 0.18 | 5,618.88 | 2.25 | 0.00 | 5,618.88 | | |
| | | BROFF | Rent | 0460 | GLA | 2,495.00 | 09/01/2023 | 08/31/2024 | 6,717.79 | 2.69 | 80,613.48 | 32.31 | 0.00 | 80,613.48 | | |
| | | CAMRC | CAM | 0460 | GLA | 2,495.00 | 07/01/2024 | 06/30/2026 | 555.51 | 0.22 | 6,666.12 | 2.67 | 0.00 | 6,666.12 | | |
| | | TAXUO | Misc | SC06 | GLA | 1.00 | 07/01/2024 | 06/30/2026 | 16.70 | 16.70 | 200.40 | 200.40 | 0.00 | 200.40 | | |
| | | TAXUO | Misc | 0460 | GLA | 2,495.00 | 07/01/2024 | 06/30/2026 | 504.33 | 0.20 | 6,051.96 | 2.42 | 0.00 | 6,051.96 | | |
| | | BROFF | Rent | 0460 | GLA | 2,495.00 | 09/01/2024 | 08/31/2025 | 6,886.20 | 2.76 | 82,634.40 | 33.12 | 0.00 | 82,634.40 | | |
| | | BRABT | Rent | 0460 | GLA | 2,495.00 | 10/01/2024 | 11/30/2024 | -6,237.50 | -2.50 | -74,850.00 | -30.00 | 0.00 | -74,850.00 | | |
| | | BROFF | Rent | 0460 | GLA | 2,495.00 | 09/01/2025 | 06/30/2026 | 7,058.77 | 2.82 | 84,705.24 | 33.95 | 0.00 | 84,705.24 | | |
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
| | | Original Lease | Activated | 09/01/2020 | 06/30/2026 | 09/01/2020 | 70 | 2,495.00 | 1st Amendment | | | | | | | |
| | | Expansion | Activated | 09/01/2020 | 06/30/2026 | 09/01/2020 | 70 | 1.00 | Storage | | | | | | | |
| 400 Market (of240055) | 0720 | Delaware County Professional Services (t0085976) | Office Net | 4,232.00 | 06/01/2020 | 11/30/2027 | 90 | 4.00 | 11,775.54 | 2.78 | 141,306.48 | 33.39 | 2.74 | 2.33 | 0.00 | 0.00 |
| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 241 of 326

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2024 | 05/31/2025 | 11,775.54 | 2.78 | 141,306.48 | 33.39 | 0.00 | 141,306.48 | | |
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2025 | 05/31/2026 | 12,068.24 | 2.85 | 144,818.88 | 34.22 | 0.00 | 144,818.88 | | |
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2026 | 05/31/2027 | 12,371.55 | 2.92 | 148,458.60 | 35.08 | 0.00 | 148,458.60 | | |
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2027 | 11/30/2027 | 12,681.89 | 2.99 | 152,182.68 | 35.96 | 0.00 | 152,182.68 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0720 | GLA | 4,232.00 | 01/01/2023 | 06/30/2024 | 966.05 | 0.22 | 11,592.60 | 2.73 | 0.00 | 11,592.60 | | |
| | | TAXRC | CAM | 0720 | GLA | 4,232.00 | 01/01/2023 | 11/30/2027 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | | |
| | | TAXUO | Misc | 0720 | GLA | 4,232.00 | 01/01/2023 | 06/30/2024 | 820.19 | 0.19 | 9,842.28 | 2.32 | 0.00 | 9,842.28 | | |
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2024 | 05/31/2025 | 11,775.54 | 2.78 | 141,306.48 | 33.39 | 0.00 | 141,306.48 | | |
| | | CAMRC | CAM | 0720 | GLA | 4,232.00 | 07/01/2024 | 11/30/2027 | 1,515.94 | 0.35 | 18,191.28 | 4.29 | 0.00 | 18,191.28 | | |
| | | TAXUO | Misc | 0720 | GLA | 4,232.00 | 07/01/2024 | 11/30/2027 | 883.41 | 0.20 | 10,600.92 | 2.50 | 0.00 | 10,600.92 | | |
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2025 | 05/31/2026 | 12,068.24 | 2.85 | 144,818.88 | 34.22 | 0.00 | 144,818.88 | | |
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2026 | 05/31/2027 | 12,371.55 | 2.92 | 148,458.60 | 35.08 | 0.00 | 148,458.60 | | |
| | | BROFF | Rent | 0720 | GLA | 4,232.00 | 06/01/2027 | 11/30/2027 | 12,681.89 | 2.99 | 152,182.68 | 35.96 | 0.00 | 152,182.68 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 06/01/2020 | 11/30/2027 | 06/01/2020 | 90 | 4,232.00 | Lease | | | | | | | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | 0800 | Deardorff Associates, Inc. (t0085977) | Office Net | 5,214.00 | 02/01/2018 | 03/31/2025 | 86 | 6.33 | 14,786.25 | 2.84 | 177,435.00 | 34.03 | 3.41 | 2.33 | 37,149.75 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | 0800 | GLA | 5,214.00 | 02/01/2024 | 01/31/2025 | 14,786.25 | 2.83 | 177,435.00 | 34.03 | 0.00 | 177,435.00 | | |
| | | BROFF | Rent | 0800 | GLA | 5,214.00 | 02/01/2025 | 03/31/2025 | 13,137.39 | 2.52 | 157,648.68 | 30.23 | 0.00 | 157,648.68 | | |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | CAMRC | CAM | 0800 | GLA | 5,214.00 | 01/01/2023 | 06/30/2024 | 1,341.94 | 0.25 | 16,103.28 | 3.08 | 0.00 | 16,103.28 | | |
| | | TAXRC | CAM | 0800 | GLA | 5,214.00 | 01/01/2023 | 06/30/2024 | 138.51 | 0.02 | 1,662.12 | 0.31 | 0.00 | 1,662.12 | | |
| | | TAXUO | Misc | 0800 | GLA | 5,214.00 | 01/01/2023 | 06/30/2024 | 1,010.51 | 0.19 | 12,126.12 | 2.32 | 0.00 | 12,126.12 | | |
| | | BROFF | Rent | 0800 | GLA | 5,214.00 | 02/01/2024 | 01/31/2025 | 14,786.25 | 2.83 | 177,435.00 | 34.03 | 0.00 | 177,435.00 | | |
| | | CAMRC | CAM | 0800 | GLA | 5,214.00 | 07/01/2024 | 03/31/2025 | 1,319.96 | 0.25 | 15,839.52 | 3.03 | 0.00 | 15,839.52 | | |
| | | TAXRC | CAM | 0800 | GLA | 5,214.00 | 07/01/2024 | 03/31/2025 | 138.48 | 0.02 | 1,661.76 | 0.31 | 0.00 | 1,661.76 | | |
| | | TAXUO | Misc | 0800 | GLA | 5,214.00 | 07/01/2024 | 03/31/2025 | 1,088.39 | 0.20 | 13,060.68 | 2.50 | 0.00 | 13,060.68 | | |
| | | BROFF | Rent | 0800 | GLA | 5,214.00 | 02/01/2025 | 03/31/2025 | 13,137.39 | 2.52 | 157,648.68 | 30.23 | 0.00 | 157,648.68 | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 242 of 326

Wednesday, June 26, 2024
10:25 AM

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
| | | Original Lease | Activated | 02/01/2018 | 03/31/2025 | 02/01/2018 | 86 | 5,214.00 | Lease | | Per the TRRA - expiration date was extended by 2 months. | | | | | |
| 400 Market (of240055) | 0825 | Vistar Media, Inc. (t0085978) | Office Net | 7,371.00 | 12/01/2018 | 07/31/2024 | 68 | 5.50 | 20,849.02 | 2.83 | 250,188.24 | 33.94 | 2.63 | 2.33 | 36,855.00 | 0.00 |
| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | BROFF | Rent | 0825 | GLA | 7,371.00 | 12/01/2023 | 07/31/2024 | 20,849.02 | 2.82 | 250,188.24 | 33.94 | 0.00 | 250,188.24 | | |
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | CAMRC | CAM | 0825 | GLA | 7,371.00 | 01/01/2023 | 06/30/2024 | 1,596.66 | 0.21 | 19,159.92 | 2.59 | 0.00 | 19,159.92 | | |
| | | TAXRC | CAM | 0825 | GLA | 7,371.00 | 01/01/2023 | 06/30/2024 | 15.93 | 0.00 | 191.16 | 0.02 | 0.00 | 191.16 | | |
| | | TAXUO | Misc | 0825 | GLA | 7,371.00 | 01/01/2023 | 06/30/2024 | 1,428.55 | 0.19 | 17,142.60 | 2.32 | 0.00 | 17,142.60 | | |
| | | BROFF | Rent | 0825 | GLA | 7,371.00 | 12/01/2023 | 07/31/2024 | 20,849.02 | 2.82 | 250,188.24 | 33.94 | 0.00 | 250,188.24 | | |
| | | CAMRC | CAM | 0825 | GLA | 7,371.00 | 07/01/2024 | 07/31/2024 | 1,560.74 | 0.21 | 18,728.88 | 2.54 | 0.00 | 18,728.88 | | |
| | | TAXRC | CAM | 0825 | GLA | 7,371.00 | 07/01/2024 | 07/31/2024 | 15.68 | 0.00 | 188.16 | 0.02 | 0.00 | 188.16 | | |
| | | TAXUO | Misc | 0825 | GLA | 7,371.00 | 07/01/2024 | 07/31/2024 | 1,538.65 | 0.20 | 18,463.80 | 2.50 | 0.00 | 18,463.80 | | |
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
| | | Original Lease | Activated | 12/01/2018 | 07/31/2024 | 12/01/2018 | 68 | 7,371.00 | Lease | | | | | | | |
| 400 Market (of240055) | 1100 | Momentum Telecom, Inc. (t0085981) | Office Net | 15,530.00 | 05/15/2015 | 05/31/2025 | 121 | 9.08 | 35,557.21 | 2.29 | 426,686.52 | 27.47 | 5.77 | 2.33 | 56,943.34 | 0.00 |
| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | BROFF | Rent | 1100 | GLA | 15,530.00 | 06/01/2024 | 05/31/2025 | 35,557.21 | 2.29 | 426,686.52 | 27.47 | 0.00 | 426,686.52 | | |
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | CAMRC | CAM | 1100 | GLA | 15,530.00 | 01/01/2023 | 06/30/2024 | 5,816.87 | 0.37 | 69,802.44 | 4.49 | 0.00 | 69,802.44 | | |
| | | TAXRC | CAM | 1100 | GLA | 15,530.00 | 01/01/2023 | 06/30/2024 | 1,655.12 | 0.10 | 19,861.44 | 1.27 | 0.00 | 19,861.44 | | |
| | | TAXUO | Misc | 1100 | GLA | 15,530.00 | 01/01/2023 | 06/30/2024 | 3,009.81 | 0.19 | 36,117.72 | 2.32 | 0.00 | 36,117.72 | | |
| | | BROFF | Rent | 1100 | GLA | 15,530.00 | 06/01/2024 | 05/31/2025 | 35,557.21 | 2.29 | 426,686.52 | 27.47 | 0.00 | 426,686.52 | | |
| | | CAMRC | CAM | 1100 | GLA | 15,530.00 | 07/01/2024 | 05/31/2025 | 5,738.49 | 0.37 | 68,861.88 | 4.43 | 0.00 | 68,861.88 | | |
| | | TAXRC | CAM | 1100 | GLA | 15,530.00 | 07/01/2024 | 05/31/2025 | 1,654.40 | 0.10 | 19,852.80 | 1.27 | 0.00 | 19,852.80 | | |

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 243 of 326

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | TAXUO | Misc | 1100 | GLA | 15,530.00 | 07/01/2024 | 05/31/2025 | 3,241.80 | 0.20 | 38,901.60 | 2.50 | 0.00 | 38,901.60 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 05/15/2015 | 05/31/2025 | 05/15/2015 | 121 | 15,530.00 | Lease | SUBLEASE to Cesium GS, Inc. 8/1/2022 to 5/31/2025 |
| | | Assignment | Activated | 07/20/2022 | | 07/20/2022 | | | From Alteva, Inc. | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | ANT | Level 3 Communications (t0085983) | Office Gross | 0.00 | 10/15/2019 | 09/30/2024 | 60 | 4.67 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ANTEN | Misc | ANT | GLA | 0.00 | 10/01/2023 | 09/30/2024 | 450.20 | 0.00 | 5,402.40 | 0.00 | 0.00 | 5,402.40 |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 10/15/2019 | 09/30/2024 | 10/15/2019 | 60 | 0.00 | License Agreement | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | B002 | MCI (Verizon GLC: PHQIPA) (t0085984) | Office Net | 125.00 | 05/09/2014 | | | 10.08 | 700.00 | 5.60 | 8,400.00 | 67.20 | 0.00 | 2.33 | 0.00 | 0.00 |

| | Rent Steps | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | B002 | GLA | 125.00 | 02/01/2022 | | 700.00 | 5.60 | 8,400.00 | 67.20 | 0.00 | 8,400.00 |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | BROFF | Rent | B002 | GLA | 125.00 | 02/01/2022 | | 700.00 | 5.60 | 8,400.00 | 67.20 | 0.00 | 8,400.00 |
| | | TAXUO | Misc | B002 | GLA | 125.00 | 01/01/2023 | 06/30/2024 | 24.23 | 0.19 | 290.76 | 2.32 | 0.00 | 290.76 |
| | | TAXUO | Misc | B002 | GLA | 125.00 | 07/01/2024 | | 26.09 | 0.20 | 313.08 | 2.50 | 0.00 | 313.08 |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Original Lease | Activated | 05/09/2014 | | 05/09/2014 | | 125.00 | 2nd Amendment | |

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | RF01 | TMobile, LLC 1PH2435A (t0085985) | Office Gross | 1.00 | 09/01/2017 | 08/25/2052 | 419 | 6.75 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 50,923.20 | 0.00 | 0.00 |

| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 244 of 326

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ANTEN | Misc | RF01 | GLA | 08/26/2023 | 08/25/2024 | 1.00 | | 4,243.60 | 4,243.60 | 50,923.20 | 50,923.20 | 0.00 | 50,923.20 | | |
| | | ANTEN | Misc | RF01 | GLA | 08/26/2024 | 08/25/2025 | 1.00 | | 4,370.91 | 4,370.91 | 52,450.92 | 52,450.92 | 0.00 | 52,450.92 | | |
| | | ANTEN | Misc | RF01 | GLA | 08/26/2025 | 08/25/2026 | 1.00 | | 4,502.03 | 4,502.03 | 54,024.36 | 54,024.36 | 0.00 | 54,024.36 | | |
| | | ANTEN | Misc | RF01 | GLA | 08/26/2026 | 08/25/2027 | 1.00 | | 4,637.10 | 4,637.10 | 55,645.20 | 55,645.20 | 0.00 | 55,645.20 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2027 | 08/25/2028 | 1.00 | | 4,776.21 | 4,776.21 | 57,314.52 | 57,314.52 | 0.00 | 57,314.52 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2028 | 08/25/2029 | 1.00 | | 4,919.50 | 4,919.50 | 59,034.00 | 59,034.00 | 0.00 | 59,034.00 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2029 | 08/25/2030 | 1.00 | | 5,067.08 | 5,067.08 | 60,804.96 | 60,804.96 | 0.00 | 60,804.96 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2030 | 08/25/2031 | 1.00 | | 5,219.09 | 5,219.09 | 62,629.08 | 62,629.08 | 0.00 | 62,629.08 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2031 | 08/25/2032 | 1.00 | | 5,375.66 | 5,375.66 | 64,507.92 | 64,507.92 | 0.00 | 64,507.92 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2032 | 08/25/2033 | 1.00 | | 5,536.94 | 5,536.94 | 66,443.28 | 66,443.28 | 0.00 | 66,443.28 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2033 | 08/25/2034 | 1.00 | | 5,703.04 | 5,703.04 | 68,436.48 | 68,436.48 | 0.00 | 68,436.48 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2034 | 08/24/2035 | 1.00 | | 5,874.13 | 5,874.13 | 70,489.56 | 70,489.56 | 0.00 | 70,489.56 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/25/2035 | 08/24/2036 | 1.00 | | 6,050.36 | 6,050.36 | 72,604.32 | 72,604.32 | 0.00 | 72,604.32 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/25/2036 | 08/25/2037 | 1.00 | | 6,231.87 | 6,231.87 | 74,782.44 | 74,782.44 | 0.00 | 74,782.44 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2037 | 08/25/2038 | 1.00 | | 6,418.83 | 6,418.83 | 77,025.96 | 77,025.96 | 0.00 | 77,025.96 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2038 | 08/25/2039 | 1.00 | | 6,611.39 | 6,611.39 | 79,336.68 | 79,336.68 | 0.00 | 79,336.68 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2039 | 08/25/2040 | 1.00 | | 6,809.73 | 6,809.73 | 81,716.76 | 81,716.76 | 0.00 | 81,716.76 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2040 | 08/25/2041 | 1.00 | | 7,014.02 | 7,014.02 | 84,168.24 | 84,168.24 | 0.00 | 84,168.24 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2041 | 08/25/2042 | 1.00 | | 7,224.44 | 7,224.44 | 86,693.28 | 86,693.28 | 0.00 | 86,693.28 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2042 | 08/25/2043 | 1.00 | | 7,441.18 | 7,441.18 | 89,294.16 | 89,294.16 | 0.00 | 89,294.16 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2043 | 08/25/2044 | 1.00 | | 7,664.41 | 7,664.41 | 91,972.92 | 91,972.92 | 0.00 | 91,972.92 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2044 | 08/25/2045 | 1.00 | | 7,894.35 | 7,894.35 | 94,732.20 | 94,732.20 | 0.00 | 94,732.20 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2045 | 08/25/2046 | 1.00 | | 8,131.18 | 8,131.18 | 97,574.16 | 97,574.16 | 0.00 | 97,574.16 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2046 | 08/25/2047 | 1.00 | | 8,375.11 | 8,375.11 | 100,501.32 | 100,501.32 | 0.00 | 100,501.32 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2047 | 08/25/2048 | 1.00 | | 8,626.37 | 8,626.37 | 103,516.44 | 103,516.44 | 0.00 | 103,516.44 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2048 | 08/25/2049 | 1.00 | | 8,885.16 | 8,885.16 | 106,621.92 | 106,621.92 | 0.00 | 106,621.92 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2049 | 08/25/2050 | 1.00 | | 9,151.71 | 9,151.71 | 109,820.52 | 109,820.52 | 0.00 | 109,820.52 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2050 | 08/25/2051 | 1.00 | | 9,426.26 | 9,426.26 | 113,115.12 | 113,115.12 | 0.00 | 113,115.12 | | |
| | | * ANTEN | Misc | RF01 | GLA | 08/26/2051 | 08/25/2052 | 1.00 | | 9,709.05 | 9,709.05 | 116,508.60 | 116,508.60 | 0.00 | 116,508.60 | | |

| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Renewal | Activated | 08/26/2022 | 08/25/2027 | 08/26/2022 | 60 | 1.00 | 3rd Amendment | | | |
| | | * Renewal | Activated | 08/26/2027 | 08/25/2032 | 08/26/2027 | 60 | | 1st Automatic Renewal | | | |
| | | * Renewal | Activated | 08/26/2032 | 08/25/2037 | 08/26/2032 | 60 | | 2nd Automatic Renewal | | | |
| | | * Renewal | Activated | 08/26/2037 | 08/25/2042 | 08/26/2037 | 60 | | 3rd Automatic Renewal | | | |
| | | * Renewal | Activated | 08/26/2042 | 08/25/2047 | 08/26/2042 | 60 | | 4th Automatic Renewal | | | |
| | | * Renewal | Activated | 08/26/2047 | 08/25/2052 | 08/26/2047 | 60 | | 5th Automatic Renewal | | | |

| Property | Unit(s) | Lease | Lease Type | Area | | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | RF03 | Zayo Group, LLC (400) (t0085987) | Office Gross | 1.00 | | 12/13/2013 | | | 10.50 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 3,509.64 | 0.00 | 0.00 |

Wednesday, June 26, 2024

10:25 AM

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 246 of 326

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | ANTEN | Misc | RF03 | GLA | 1.00 | 02/01/2022 | | 292.47 | 292.47 | 3,509.64 | 3,509.64 | 0.00 | 3,509.64 | | |
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
| | | Original Lease | Activated | 12/13/2013 | | 12/13/2013 | | 1.00 | 1st Amendment | | | | | | | |
| 400 Market (of240055) | RF05 | PECO Energy Company #RP913 (t0085989) | Office Gross | 10.00 | 05/07/2012 | 05/31/2026 | 169 | 12.08 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 2,363.58 | 0.00 | 0.00 |
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | ANTEN | Misc | RF05 | GLA | 10.00 | 06/01/2024 | 05/31/2025 | 1,969.65 | 196.96 | 23,635.80 | 2,363.58 | 0.00 | 23,635.80 | | |
| | | ANTEN | Misc | RF05 | GLA | 10.00 | 06/01/2025 | 05/31/2026 | 2,028.73 | 202.87 | 24,344.76 | 2,434.47 | 0.00 | 24,344.76 | | |
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
| | | Renewal | Activated | 06/01/2023 | 05/31/2026 | 06/01/2023 | 36 | 10.00 | Notice of Renewal | | | | | | | |
| 400 Market (of240055) | RF06 | CBS Broadcasting Inc. (t0085990) | Office Gross | 1.00 | 03/01/2007 | 02/28/2027 | 240 | 17.25 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 54,361.68 | 0.00 | 0.00 |
| | Charge Schedules | Charge | Type | Unit | Area Label | Area | From | To | Monthly Amt | Amt/Area | Annual | Annual/Area | Management Fee | Annual Gross Amount | | |
| | | ANTEN | Misc | RF06 | GLA | 1.00 | 02/01/2024 | 01/31/2025 | 4,530.14 | 4,530.14 | 54,361.68 | 54,361.68 | 0.00 | 54,361.68 | | |
| | | ANTEN | Misc | RF06 | GLA | 1.00 | 02/01/2025 | 01/31/2026 | 4,711.27 | 4,711.27 | 56,535.24 | 56,535.24 | 0.00 | 56,535.24 | | |
| | | ANTEN | Misc | RF06 | GLA | 1.00 | 02/01/2026 | 02/28/2027 | 4,899.80 | 4,899.80 | 58,797.60 | 58,797.60 | 0.00 | 58,797.60 | | |
| | Amendment | Type | Status | From | To | Move In | Term | Area | Description | | Notes | | | | | |
| | | Original Lease | Activated | 03/01/2007 | 02/28/2027 | 02/01/2007 | 240 | 1.00 | | | | | | | | |
| 400 Market (of240055) | 0101 | VACANT | | 242.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0104 | VACANT | | 73.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0105 | VACANT | | 2,442.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0108 | VACANT | | 172.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0300 | VACANT | | 4,685.00 | | | | | | | | | | | | |

# Tenancy Schedule I

Property: of240055  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment   2. ** Pending Amendments   3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | 0315 | VACANT | | 1,490.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0320 | VACANT | | 4,122.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0350 | VACANT | | 1,593.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0400 | VACANT | | 1,466.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0405 | VACANT | | 2,360.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0410 | VACANT | | 1,291.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0415 | VACANT | | 3,682.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0425 | VACANT | | 3,162.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0450 | VACANT | | 1,390.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0500 | VACANT | | 15,851.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0600 | VACANT | | 8,158.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0605 | VACANT | | 5,485.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0610 | VACANT | | 2,137.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0700 | VACANT | | 7,617.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0710 | VACANT | | 1,520.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0730 | VACANT | | 2,373.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0810 | VACANT | | 2,991.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0860 | VACANT | | 433.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 0900 | VACANT | | 15,788.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 1000 | VACANT | | 15,788.00 | | | | | | | | | | | | |

Wednesday, June 26, 2024
10:25 AM

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 247 of 326

Property: of240055  As of Date: 06/26/2024  By Property

Notes : 1. * Future Active lease / Future Active Amendment    2. ** Pending Amendments    3. *** Past / Superseded Amendments

| Property | Unit(s) | Lease | Lease Type | Area | Lease From | Lease To | Term | Tenancy Years | Monthly Rent | Monthly Rent/Area | Annual Rent | Annual Rent/Area | Annual Rec./Area | Annual Misc/Area | Security Deposit Received | LOC Amount/ Bank Guarantee |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 400 Market (of240055) | 1200 | VACANT | | 7,944.00 | | | | | | | | | | | | |
| 400 Market (of240055) | 1250 | VACANT | | 7,630.00 | | | | | | | | | | | | |
| 400 Market (of240055) | B001 | VACANT | | 150.00 | | | | | | | | | | | | |
| 400 Market (of240055) | C0100 | VACANT | | 0.00 | | | | | | | | | | | | |
| 400 Market (of240055) | C06 | VACANT | | 94.00 | | | | | | | | | | | | |
| 400 Market (of240055) | RF02 | VACANT | | 1.00 | | | | | | | | | | | | |
| 400 Market (of240055) | RF04 | VACANT | | 1.00 | | | | | | | | | | | | |
| 400 Market (of240055) | SC006 | VACANT | | 80.00 | | | | | | | | | | | | |
| 400 Market (of240055) | SIGN | VACANT | | 1.00 | | | | | | | | | | | | |

Wednesday, June 26, 2024
10:25 AM

**SCHEDULE VI**

**Leasing Costs**

[Attached]

*Bourse Building + 400 Market*
*Outstanding Leasing Costs*
*as of June 28, 2024*

**Outstanding Leasing Costs:**

| Building | Tenant | Lease Date | SF | TI/sf | Abatement Converted to TI | Total TI | TI Paid | TI Remaining | LC Remaining | LL Work Remaining | Abatement Remaining | Total $ Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower | Lion Re:Sources | 5/25/2023 | 54,941 | $122 | $2,154,145.06 | 8,856,947 | - | 8,856,947 | - | - | - | 8,856,947 |
| Bourse Mall | Lion Re:Sources | 5/25/2023 | 4,813 | $122 | $337,992.92 | 925,179 | - | 925,179 | - | - | - | 925,179 |
| 400 Market | Falcon Travel Enterprises | 1/23/2015 | 2,496 | | | | | - | - | - | 12,475 | 12,475 |
| **Total** | | | | | | | | | | | | **$9,794,601** |

**Digitas Expansion Option Leasing Costs[1]:**

| Building | Tenant | Lease Date | SF | | | Total TI | | | Total LC | | Total Abatement | Total $ Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Bourse Tower | Lion Re:Sources | - | 6,500 | - | - | 793,000 | - | - | 127,771 | - | 262,262 | 1,183,034 |

(1) Seller (i.e. KREF Lending III) is responsible for 50% of total costs related to the Digitas Expansion Option for 6,500 RSF, if the Option is exercised, which totals $591,516.82. Seller's portion of these costs will be held in an escrow account until Option expires or Tenant exercises. Tenant (i.e. Digitas) has until September 27, 2024 to exercise the Option.

## SCHEDULE VII

**Organizational Chart**

[Attached]



Doc ID # 11000714



\* The tax credit investor will have a right to put its equity in
LAK Bourse Master Tenant, LLC to LAK Bourse ML MM, LLC
exercisable five years after the building is placed in service.

**BOURSE / 400 MARKET STREET STRUCTURE CHART**
**06/07/2024 – Page 2 Bourse**

Doc ID # 11000717



* The tax credit investor will have a right to put its equity in
LAK Market Master Tenant, LLC to LAK Market ML MM, LLC
exercisable five years after the building is placed in service.

**BOURSE / 400 MARKET STREET STRUCTURE CHART**
**06/07/2024 – Page 3 400 Market Street**

Doc ID # 11000716

06/05/2024

**BOURSE/400 MARKET**
**STRUCTURE CHART – Page 4 Bourse Garage**



Doc ID # 11000720

06/05/2024

**BOURSE/400 MARKET**
**STRUCTURE CHART – Page 5 325 Chestnut**



LAK Independence Portfolio JV, LLC

74% Managing Member

74% Managing Member

100% Member

LAK IP 325 Chestnut Owner, LLC

26% Member

LAK IP Sub 8, LLC

26% Member

LAK IP Sub 7, LLC

Doc ID # 11000721

## <u>SCHEDULE VIII</u>

**Intellectual Property**


None.

## SCHEDULE IX

**Initial Approved Budget**


[Attached]

**Office P&L**

| Period | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Deal Year Date | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Total |
| **Revenue:** | | | | | | | | | | | | | |
| Base Rent | 391,571 | 399,461 | 399,816 | 414,237 | 414,525 | 415,598 | 377,656 | 377,656 | 360,637 | 376,110 | 376,520 | 396,355 | 4,700,142 |
| Free Rent | - | - | - | (14,421) | (14,421) | (14,421) | (28,745) | (14,324) | (14,324) | (29,797) | (30,002) | (41,279) | (201,734) |
| Tenant Reimbursements | 8,640 | 8,640 | 8,640 | 8,640 | 8,640 | 8,640 | 2,614 | 2,614 | 2,046 | 2,554 | 2,554 | 2,554 | 66,776 |
| Other Income | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 1,426 | 17,112 |
| Total Revenue | 401,637 | 409,527 | 409,882 | 409,882 | 410,170 | 411,243 | 352,951 | 367,372 | 349,785 | 350,293 | 350,498 | 359,056 | 4,582,296 |
| **Expenses:** | | | | | | | | | | | | | |
| Compensation | 26,538 | 26,538 | 26,538 | 26,538 | 26,538 | 26,538 | 27,201 | 27,201 | 27,201 | 27,201 | 27,201 | 27,201 | 322,434 |
| Security | 1,519 | 1,519 | 1,519 | 1,519 | 1,519 | 1,519 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 1,557 | 18,456 |
| Repairs & Maintenance | 32,453 | 32,453 | 32,453 | 32,453 | 32,453 | 32,453 | 33,264 | 33,264 | 33,264 | 33,264 | 33,264 | 33,264 | 394,302 |
| Cleaning | 50,134 | 50,283 | 50,283 | 50,623 | 50,623 | 50,623 | 51,073 | 51,073 | 50,624 | 50,978 | 50,978 | 51,384 | 608,670 |
| Tenant Electric | 16,880 | 16,989 | 16,989 | 17,239 | 17,239 | 17,239 | 17,071 | 17,071 | 16,740 | 17,001 | 17,001 | 17,299 | 204,758 |
| Gas | 3,686 | 3,697 | 3,697 | 3,722 | 3,722 | 3,722 | 3,755 | 3,755 | 3,722 | 3,748 | 3,748 | 3,778 | 44,752 |
| Water & Sewer | 2,064 | 2,070 | 2,070 | 2,084 | 2,084 | 2,084 | 2,103 | 2,103 | 2,085 | 2,099 | 2,099 | 2,116 | 25,061 |
| Insurance | 7,824 | 7,824 | 7,824 | 7,824 | 7,824 | 7,824 | 8,020 | 8,020 | 8,020 | 8,020 | 8,020 | 8,020 | 95,064 |
| Administrative | 20,623 | 20,623 | 20,623 | 20,623 | 20,623 | 20,623 | 21,138 | 21,138 | 21,138 | 21,138 | 21,138 | 21,138 | 250,566 |
| Management Fees | 16,065 | 16,381 | 16,395 | 16,395 | 16,407 | 16,450 | 14,118 | 14,695 | 13,991 | 14,012 | 14,020 | 14,362 | 183,291 |
| Real Estate Taxes | 37,946 | 37,946 | 37,946 | 37,946 | 37,946 | 37,946 | 38,895 | 38,895 | 23,714 | 23,714 | 23,714 | 23,714 | 400,322 |
| Non Cam | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 1,599 | 19,188 |
| Total Expenses | 217,331 | 217,922 | 217,936 | 218,565 | 218,577 | 218,620 | 219,794 | 220,371 | 203,655 | 204,331 | 204,339 | 205,432 | 2,566,873 |
| NOI | 184,306 | 191,605 | 191,946 | 191,317 | 191,593 | 192,623 | 133,157 | 147,001 | 146,130 | 145,962 | 146,159 | 153,624 | 2,015,423 |
| NOI Margin | 45.9% | 46.8% | 46.8% | 46.7% | 46.7% | 46.8% | 37.7% | 40.0% | 41.8% | 41.7% | 41.7% | 42.8% | |
| Office- TI CM Fee | - | 523 | - | 601 | - | - | 26,412 | - | - | 6,963 | - | 16,743 | 51,242 |
| Office- TI Soft Costs | - | 523 | - | 601 | - | - | 26,412 | - | - | 6,963 | - | 16,743 | 51,242 |
| Office- Capex CM Fee | - | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 95,616 |
| Office- Capex Soft Costs | - | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 8,692 | 95,616 |
| Office- Tenant Allowance | - | 10,460 | - | 12,018 | - | - | 528,240 | - | - | 139,251 | - | 334,860 | 1,024,829 |
| Office- Leasing Commission | - | 8,252 | - | 20,846 | - | - | 118,531 | - | - | 101,388 | - | 72,041 | 321,058 |
| Office- Relocation Costs | - | - | - | - | - | - | 500,000 | - | - | - | - | - | 500,000 |
| Office- Capital Expenditures | - | 173,847 | 173,847 | 173,847 | 173,847 | 173,847 | 173,847 | 173,847 | 173,847 | 173,847 | 173,847 | 173,847 | 1,912,315 |
| NCF | 184,306 | (19,384) | 715 | (33,980) | 362 | 1,392 | (1,257,669) | (44,230) | (45,101) | (299,834) | (45,072) | (477,994) | (2,036,494) |

**Retail P&L**

| Period | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Year 1 | Annual |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Deal Year Date | Jul-24 | Aug-24 | Sep-24 | Oct-24 | Nov-24 | Dec-24 | Jan-25 | Feb-25 | Mar-25 | Apr-25 | May-25 | Jun-25 | Total |
| **Revenue:** | | | | | | | | | | | | | |
| Base Rent | 24,065 | 24,065 | 24,065 | 24,065 | 24,065 | 24,065 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 292,026 |
| Tenant Reimbursements | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Income | 19,296 | 19,296 | 19,296 | 19,296 | 19,296 | 19,296 | - | - | - | - | - | - | 115,776 |
| Total Revenue | 43,361 | 43,361 | 43,361 | 43,361 | 43,361 | 43,361 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 24,606 | 407,802 |
| **Expenses:** | | | | | | | | | | | | | |
| Real Estate Taxes | 18,521 | 18,521 | 18,521 | 18,521 | 18,521 | 18,521 | 18,984 | 18,984 | 11,574 | 11,574 | 11,574 | 11,574 | 195,390 |
| Insurance | 3,819 | 3,819 | 3,819 | 3,819 | 3,819 | 3,819 | 3,914 | 3,914 | 3,914 | 3,914 | 3,914 | 3,914 | 46,398 |
| Compensation | 14,279 | 14,279 | 14,279 | 14,279 | 14,279 | 14,279 | 14,636 | 14,636 | 14,636 | 14,636 | 14,636 | 14,636 | 173,490 |
| Security | 632 | 632 | 632 | 632 | 632 | 632 | 648 | 648 | 648 | 648 | 648 | 648 | 7,680 |
| Repairs & Maintenance | 8,895 | 8,895 | 8,895 | 8,895 | 8,895 | 8,895 | 9,118 | 9,118 | 9,118 | 9,118 | 9,118 | 9,118 | 108,078 |
| Cleaning | 2,720 | 2,720 | 2,720 | 2,720 | 2,720 | 2,720 | 2,788 | 2,788 | 2,788 | 2,788 | 2,788 | 2,788 | 33,048 |
| Administrative | 14,279 | 14,279 | 14,279 | 14,279 | 14,279 | 14,279 | 14,636 | 14,636 | 14,636 | 14,636 | 14,636 | 14,636 | 173,490 |
| Management Fees | 1,734 | 1,734 | 1,734 | 1,734 | 1,734 | 1,734 | 984 | 984 | 984 | 984 | 984 | 984 | 16,308 |
| Non Cam | 780 | 780 | 780 | 780 | 780 | 780 | 780 | 780 | 780 | 780 | 780 | 780 | 9,360 |
| Tenant Electric | 5,743 | 5,743 | 5,743 | 5,743 | 5,743 | 5,743 | 5,886 | 5,886 | 5,886 | 5,886 | 5,886 | 5,886 | 69,774 |
| Gas | 1,679 | 1,679 | 1,679 | 1,679 | 1,679 | 1,679 | 1,721 | 1,721 | 1,721 | 1,721 | 1,721 | 1,721 | 20,400 |
| Water & Sewer | 952 | 952 | 952 | 952 | 952 | 952 | 976 | 976 | 976 | 976 | 976 | 976 | 11,568 |
| Total Expenses | 74,033 | 74,033 | 74,033 | 74,033 | 74,033 | 74,033 | 75,071 | 75,071 | 67,661 | 67,661 | 67,661 | 67,661 | 864,984 |
| NOI | (30,672) | (30,672) | (30,672) | (30,672) | (30,672) | (30,672) | (50,465) | (50,465) | (43,055) | (43,055) | (43,055) | (43,055) | (457,182) |
| Retail- Tenant Allowance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Retail- Leasing Commission | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Retail- Soft Costs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Retail- Construction Management Fee | - | - | - | - | - | - | - | - | - | - | - | - | - |
| NCF | (30,672) | (30,672) | (30,672) | (30,672) | (30,672) | (30,672) | (50,465) | (50,465) | (43,055) | (43,055) | (43,055) | (43,055) | (457,182) |

**Hospitality P&L**

| Deal Year Date | Year 1 Jul-24 | Year 1 Aug-24 | Year 1 Sep-24 | Year 1 Oct-24 | Year 1 Nov-24 | Year 1 Dec-24 | Year 1 Jan-25 | Year 1 Feb-25 | Year 1 Mar-25 | Year 1 Apr-25 | Year 1 May-25 | Year 1 Jun-25 | Annual Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | | | | | | | | |
| Rooms | - | - | - | - | - | - | - | - | - | - | - | - | - |
| F&B | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Revenue | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Departmental Expenses:** | | | | | | | | | | | | | |
| Rooms | - | - | - | - | - | - | - | - | - | - | - | - | - |
| F&B | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Departmental Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Administrative & General | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Information & Telecommunications | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Sales & Marketing | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Repairs & Maintenance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Utilities | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Undistributed Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Gross Operating Profit | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Management Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Insurance | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Real Estate Taxes | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Real Estate Tax Abatement | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other | - | - | - | - | - | - | - | - | - | - | - | - | - |
| FFE Reserve | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Operating Income | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hospitality- Hard Costs | - | - | - | - | - | 2,832,965 | 2,832,965 | 2,832,965 | 2,832,965 | 2,832,965 | 2,832,965 | 2,832,965 | 19,830,756 |
| Hospitality- Hard Cost Contingency | - | - | - | - | - | 293,802 | 293,802 | 293,802 | 293,802 | 293,802 | 293,802 | 293,802 | 2,056,614 |
| Hospitality- Development Fee | - | - | - | - | - | 156,338 | 156,338 | 156,338 | 156,338 | 156,338 | 156,338 | 156,338 | 1,094,368 |
| Hospitality- Soft Costs | 324,938 | 324,938 | 324,938 | 324,938 | 324,938 | 324,938 | 324,938 | 324,938 | - | - | - | - | 2,599,500 |
| Hospitality- Soft Cost Contingency | 47,993 | 47,993 | 47,993 | 47,993 | 47,993 | 47,993 | 47,993 | 47,993 | - | - | - | - | 383,940 |
| Hospitality- FF&E | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hospitality- FF&E Contingency | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hospitality- OS&E | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hospitality- OS&E Contingency | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hospitality- Preopening | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Hospitality- Preopening Contingency | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Interest Reserve - Senior Loan | 32,163 | 24,863 | 24,626 | 25,256 | 25,159 | 24,128 | 84,611 | 74,175 | 66,929 | 67,001 | 89,238 | 104,818 | 642,967 |
| NCF | (405,093) | (397,793) | (397,556) | (398,186) | (398,089) | (3,680,163) | (3,740,646) | (3,730,210) | (3,350,034) | (3,350,107) | (3,372,343) | (3,387,923) | (26,608,145) |

## SCHEDULE X

**Intentionally Omitted**

## SCHEDULE XI

**Office CapEx Projects and Project Budget**

[Attached]

| Office CapEx Projects / Office CapEx Project Budget | Budget | Per SF | % Cost |
|---|---|---|---|
| **Capital Expenditures** | | | |
| Chiller Bypass Piping | $575,836 | $4 | 13% |
| 5th Street Chiller re-build | $126,487 | $1 | 3% |
| Boiler Plant Refurbishment | $100,000 | $1 | 2% |
| Central Cooling Plant Repairs | $225,000 | $1 | 5% |
| Dock Lift | $45,000 | $0 | 1% |
| Electrical Substations | $550,000 | $3 | 12% |
| Modernize Two Freight Elevators | $800,000 | $5 | 17% |
| Office Capex | $1,000,000 | $6 | 22% |
| Switchgear | $750,000 | $5 | 16% |
| **Total Capital Expenditures** | **$4,172,323** | **$26** | **91%** |
| **Construction Management Fee** | | | |
| Capex CM Fee | $208,616 | | 5% |
| **Total Construction Management Fee** | **$208,616** | **$1** | **5%** |
| **Soft Costs** | | | |
| Capex Soft Costs | $208,616 | | 5% |
| **Total Soft Costs** | **$208,616** | **$1** | **5%** |
| **Total Uses** | **$4,589,555** | **$29** | **100%** |

## SCHEDULE XII

**Intentionally Omitted**

## SCHEDULE XIII

**Preliminary Hotel Conversion Budget**

[Attached]

| Preliminary Hotel Conversion Budget | | | | |
|---|---|---|---|---|
| | Budget | Per GSF | Per Unit | % Cost |
| **Hard Costs** | | | | |
| Hard Costs | $31,828,546 | $311 | $197,693 | 58% |
| Lower Level Amenity | $5,000,000 | $49 | $31,056 | 9% |
| **Total Hard Costs** | **$36,828,546** | **$359** | **$228,749** | 67% |
| | | | | |
| **Soft Costs** | | | | |
| A&E and Owners Consultants | $2,334,500 | $23 | $14,500 | 4% |
| Consultant Reimbursables | $30,000 | $0 | $186 | 0% |
| Purchasing Agent | $160,000 | $2 | $994 | 0% |
| Legal Fees | $50,000 | $0 | $311 | 0% |
| Misc Consultants | $300,000 | $3 | $1,863 | 1% |
| Travel & Misc | $75,000 | $1 | $466 | 0% |
| 3rd Party Project Management | $250,000 | $2 | $1,553 | 0% |
| **Total Soft Costs** | **$3,199,500** | **$31** | **$19,873** | 6% |
| | | | | |
| **Contingency** | | | | |
| Hard Cost | $3,819,426 | $37 | $23,723 | 7% |
| Soft Cost | $383,940 | $4 | $2,385 | 1% |
| FF&E Cost | $621,979 | $6 | $3,863 | 1% |
| OS&E Cost | $157,166 | $2 | $976 | 0% |
| Preopening Cost | $123,360 | $1 | $766 | 0% |
| **Total Contingency Costs** | **$5,105,870** | **$50** | **$31,713** | 9% |
| | | | | |
| **Development Fee** | | | | |
| Development Fee | $2,332,399 | $23 | $14,487 | 4% |
| **Total Development Fee** | **$2,332,399** | **$23** | **$14,487** | 4% |
| | | | | |
| **Project FF&E** | | | | |
| Guestrooms/Suites/Corridors | $2,799,000 | $27 | $17,385 | 5% |
| Warehouse/Install | $350,000 | $3 | $2,174 | 1% |
| Lobby | $850,000 | $8 | $5,280 | 2% |
| Fitness Center | $50,000 | $0 | $311 | 0% |
| BOH | $25,000 | $0 | $155 | 0% |
| Misc Owner Direct Purchases | $35,000 | $0 | $217 | 0% |
| Model Room | $100,000 | $1 | $621 | 0% |
| Freight | $631,350 | $6 | $3,921 | 1% |
| Sales Tax | $342,810 | $3 | $2,129 | 1% |
| **Total Project FF&E** | **$5,183,160** | **$51** | **$32,194** | 9% |
| | | | | |
| **Operating Supplies & Equipment** | | | | |
| Hotel Operations (Hair dryers, luggage racks, initial toiletries) | $450,800 | $4 | $2,800 | 1% |
| F&B Outlets (China, Cups Silverware) | $40,000 | $0 | $248 | 0% |
| Branded: Hotel Operations (hangers, uniforms, guestroom OS&E) | $61,950 | $1 | $385 | 0% |
| Branded: F&B Outlets (Napkins, coasters, collateral, uniforms) | $50,000 | $0 | $311 | 0% |
| Non-Branded: Hotel Operations (Guest/Bathroom Amenities) | $297,850 | $3 | $1,850 | 1% |
| Misc Owner (Laundry, Kitchen) | $200,000 | $2 | $1,242 | 0% |
| Freight | $110,060 | $1 | $684 | 0% |
| Sales Tax | $99,054 | $1 | $615 | 0% |
| **Total Project OS&E** | **$1,309,714** | **$13** | **$8,135** | 2% |
| | | | | |
| **Preopening/Tech/Misc** | | | | |
| Pre-Opening: Hotel | $600,000 | $6 | $3,727 | 1% |
| BOH Technology (POS/PMS/ETC) | $225,000 | $2 | $1,398 | 0% |
| Temporary Marketing Graphics | $3,000 | $0 | $19 | 0% |
| Website Development & Maintenance | $5,000 | $0 | $31 | 0% |
| Photography | $50,000 | $0 | $311 | 0% |
| PR | $12,000 | $0 | $75 | 0% |
| Social Media | $35,000 | $0 | $217 | 0% |
| Renderings | $90,000 | $1 | $559 | 0% |
| Copywriting | $3,000 | $0 | $19 | 0% |
| VIP Outreach | $5,000 | $0 | $31 | 0% |
| **Total Pre-Opening** | **$1,028,000** | **$10** | **$6,385** | 2% |
| **Total Uses** | **$54,987,189** | **$537** | **$341,535** | **100%** |

## SCHEDULE XIV

**Preliminary Hotel Conversion Construction Schedule**


[Attached]

# Bourse Building
## Conceptual Development Schedule



| ID | Task Name | Duration | Start | Finish | Predecessor |
|----|-----------|----------|-------|--------|-------------|
| 1 | Bourse Building | 436 days | Mon 5/6/24 | Mon 1/5/26 | |
| 2 | Project Start | 0 days | Mon 5/6/24 | Mon 5/6/24 | |
| 3 | Project Documentation | 145 days | Mon 5/6/24 | Fri 11/22/24 | |
| 4 | Schematic Design | 6 wks | Mon 5/6/24 | Fri 6/14/24 | |
| 5 | Design Development | 8 wks | Mon 6/17/24 | Fri 8/9/24 | 4 |
| 6 | Construction Documentation | 12 wks | Mon 8/12/24 | Fri 11/1/24 | 5 |
| 7 | Bidding & Negotiation | 3 wks | Mon 11/4/24 | Fri 11/22/24 | 6 |
| 8 | Permits | 61 days | Mon 8/12/24 | Mon 11/4/24 | |
| 9 | Demo Permit | 1 day | Mon 8/12/24 | Mon 8/12/24 | 5 |
| 10 | Building Permit | 1 day | Mon 11/4/24 | Mon 11/4/24 | 6 |
| 11 | Interior Design | 70 days | Mon 9/2/24 | Fri 12/6/24 | |
| 12 | Guestrooms | 50 days | Mon 9/2/24 | Fri 11/8/24 | |
| 13 | Schematic Design/Room Layouts | 4 wks | Mon 9/2/24 | Fri 9/27/24 | 6SS+3 wks |
| 14 | Brand Review & Approval | 2 wks | Mon 9/30/24 | Fri 10/11/24 | 13 |
| 15 | Update FF&E Specifications | 1 wk | Mon 10/14/24 | Fri 10/18/24 | 14 |
| 16 | Construction Drawings | 4 wks | Mon 10/14/24 | Fri 11/8/24 | 14 |

| | | | |
|---|---|---|---|
| Task | External Tasks | Manual Task | Finish-only | Manual Progress |
| Split | External Milestone | Duration-only | Deadline | |
| Milestone | Inactive Task | Manual Summary Rollup | Critical | |
| Summary | Inactive Milestone | Manual Summary | Critical Split | |
| Project Summary | Inactive Summary | Start-only | Progress | |

Project: Bourse Building
Date: Wed 5/8/24

Bourse - Initial Schedule - 24.05.09

Page 1

Wed 5/8/24

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 267 of 326

# Bourse Building
## Conceptual Development Schedule



| ID | Task Name | Duration | Start | Finish | Predecessor |
|---|---|---|---|---|---|
| 17 | IFC Drawings | 0 days | Fri 11/8/24 | Fri 11/8/24 | 16 |
| 18 | **Public Areas - Lobby, Etc.** | **50 days** | **Mon 9/30/24** | **Fri 12/6/24** | |
| 19 | Schematic Design | 4 wks | Mon 9/30/24 | Fri 10/25/24 | 13 |
| 20 | Brand Review & Approval | 2 wks | Mon 10/28/24 | Fri 11/8/24 | 19 |
| 21 | Update FF&E Specifications | 1 wk | Mon 11/11/24 | Fri 11/15/24 | 20 |
| 22 | Construction Drawings | 4 wks | Mon 11/11/24 | Fri 12/6/24 | 20 |
| 23 | IFC Drawings | 0 wks | Fri 12/6/24 | Fri 12/6/24 | 22 |
| 24 | **Model Unit Construction** | **115 days** | **Mon 9/9/24** | **Fri 2/14/25** | |
| 25 | Model Room ID/FF&E Specs | 6 wks | Mon 9/9/24 | Fri 10/18/24 | 6SS+1 mon |
| 26 | Construction | 14 wks | Mon 10/21/24 | Fri 1/24/25 | 25 |
| 27 | FF&E Installation | 2 wks | Mon 1/27/25 | Fri 2/7/25 | 26 |
| 28 | Approval | 1 wk | Mon 2/10/25 | Fri 2/14/25 | 27 |
| 29 | **FF&E Procurement** | **125 days** | **Mon 10/21/24** | **Fri 4/11/25** | |
| 30 | **Model Room** | **75 days** | **Mon 10/21/24** | **Fri 1/31/25** | |
| 31 | Bid Room Specs/Release PO's - Phased | 2 wks | Mon 10/21/24 | Fri 11/1/24 | 25 |
| 32 | Shop Drawings & CS/FS Approval | 2 wks | Mon 11/4/24 | Fri 11/15/24 | 31 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Task | | External Tasks | | Manual Task | | Finish-only | Manual Progress |
| Split | | External Milestone | ◇ | Duration-only | | Deadline ↓ | |
| Milestone ◆ | | Inactive Task | | Manual Summary Rollup | | Critical | |
| Summary | | Inactive Milestone ◇ | | Manual Summary | | Critical Split | |
| Project Summary | | Inactive Summary | | Start-only | | Progress | |

Project: Bourse Building
Date: Wed 5/8/24

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 268 of 326

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 269 of 326

# Bourse Building
## Conceptual Development Schedule



| ID | Task Name | Duration | Start | Finish | Predecessor |
|----|-----------|----------|-------|--------|-------------|
| 33 | Model Room Fabrication | 11 wks | Mon 11/18/24 | Fri 1/31/25 | 32 |
| 34 | **Guestrooms** | **125 days** | **Mon 10/21/24** | **Fri 4/11/25** | |
| 35 | Bid Room Specs/Release PO's | 2 wks | Mon 10/21/24 | Fri 11/1/24 | 15 |
| 36 | Shop Drawings & CS/FS Approval | 3 wks | Mon 11/4/24 | Fri 11/22/24 | 35 |
| 37 | Guest Room Fabrication | 20 wks | Mon 11/25/24 | Fri 4/11/25 | 36 |
| 38 | **Public Areas** | **120 days** | **Mon 10/28/24** | **Fri 4/11/25** | |
| 39 | Bid Public Area/Release PO's | 2 wks | Mon 10/28/24 | Fri 11/8/24 | 19 |
| 40 | Shop Drawings & CS/FS Approval | 2 wks | Mon 11/11/24 | Fri 11/22/24 | 39 |
| 41 | Public Area Fabrication | 20 wks | Mon 11/25/24 | Fri 4/11/25 | 40 |
| 42 | **MEP Procurement** | **300 days** | **Mon 8/12/24** | **Fri 10/3/25** | |
| 43 | Mechanical - VRF, Etc. | **0 days** | **Fri 11/1/24** | **Fri 11/1/24** | **6** |
| 44 | Fire Pumps | 20 wks | Mon 11/4/24 | Fri 3/21/25 | 6 |
| 45 | Specialty Lighting | 24 wks | Mon 11/4/24 | Fri 4/18/25 | 6 |
| 46 | Electrical Gear (If Needed) | 60 wks | Mon 8/12/24 | Fri 10/3/25 | 6FS-3 mons |
| 47 | **Construction** | **350 days** | **Tue 8/13/24** | **Mon 12/15/25** | |
| 48 | **Guestrooms** | **340 days** | **Tue 8/13/24** | **Mon 12/1/25** | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Task | ▬▬▬ | External Tasks | ▬▬▬ | Manual Task | ▬▬▬ | Finish-only | ⊐ | Manual Progress | ▬▬▬ |
| Split | ·········· | External Milestone | ◇ | Duration-only | ▬▬▬ | Deadline | ↓ | | |
| Milestone | ◆ | Inactive Task | | Manual Summary Rollup | ▬▬▬ | Critical | ▬▬▬ | | |
| Summary | ▮▬▬▮ | Inactive Milestone | ◇ | Manual Summary | ▮▬▬▮ | Critical Split | ·········· | | |
| Project Summary | ▮▬▬▮ | Inactive Summary | ▯▬▬▯ | Start-only | ⊏ | Progress | ▬▬▬ | | |

Project: Bourse Building
Date: Wed 5/8/24

Bourse - Initial Schedule - 24.05.09

Page 3

Wed 5/8/24

# Bourse Building
## Conceptual Development Schedule



| ID | Task Name | Duration | Start | Finish | Predecessor |
|----|-----------|----------|-------|--------|-------------|
| 49 | Demolition | 12 wks | Tue 8/13/24 | Mon 11/4/24 | 9 |
| 50 | Layout | 6 wks | Tue 11/5/24 | Mon 12/16/24 | 49 |
| 51 | Framing | 14 wks | Tue 12/17/24 | Mon 3/24/25 | 50 |
| 52 | MEP Rough-In | 20 wks | Tue 1/14/25 | Mon 6/2/25 | 51SS+1 mo |
| 53 | Close-Up/Drywall/Taping | 14 wks | Tue 3/25/25 | Mon 6/30/25 | 51 |
| 54 | Millwork/Trim | 14 wks | Tue 5/6/25 | Mon 8/11/25 | 53SS+6 wks |
| 55 | Painting | 10 wks | Tue 6/17/25 | Mon 8/25/25 | 54SS+6 wks |
| 56 | Tile | 14 wks | Tue 6/17/25 | Mon 9/22/25 | 54SS+6 wks |
| 57 | MEP Finishes | 10 wks | Tue 7/1/25 | Mon 9/8/25 | 55SS+2 wks |
| 58 | Flooring | 14 wks | Tue 7/15/25 | Mon 10/20/25 | 57SS+2 wks |
| 59 | Punch | 6 wks | Tue 10/21/25 | Mon 12/1/25 | 58 |
| 60 | **Corridors** | **200 days** | **Tue 2/25/25** | **Mon 12/1/25** | |
| 61 | MEP Rough-In | 14 wks | Tue 2/25/25 | Mon 6/2/25 | 52SS+6 wks |
| 62 | Close-Up/Drywall/Taping | 8 wks | Tue 5/6/25 | Mon 6/30/25 | 61FS-4 wks |
| 63 | Millwork/Trim | 8 wks | Tue 6/17/25 | Mon 8/11/25 | 62SS+6 wks |
| 64 | Painting | 4 wks | Tue 7/29/25 | Mon 8/25/25 | 63SS+6 wks |

Project: Bourse Building
Date: Wed 5/8/24

Legend:
- Task
- Split
- Milestone
- Summary
- Project Summary
- External Tasks
- External Milestone
- Inactive Task
- Inactive Milestone
- Inactive Summary
- Manual Task
- Duration-only
- Manual Summary Rollup
- Manual Summary
- Start-only
- Finish-only
- Deadline
- Critical
- Critical Split
- Progress
- Manual Progress

Page 4

# Bourse Building
## Conceptual Development Schedule



| ID | Task Name | Duration | Start | Finish | Predecessor |
|----|-----------|----------|-------|--------|-------------|
| 65 | MEP Finishes | 4 wks | Tue 8/12/25 | Mon 9/8/25 | 64SS+2 wks |
| 66 | Flooring | 6 wks | Tue 9/9/25 | Mon 10/20/25 | 65 |
| 67 | Punch | 6 wks | Tue 10/21/25 | Mon 12/1/25 | 66 |
| 68 | **Public Areas & Lobby** | **140 days** | **Tue 6/3/25** | **Mon 12/15/25** | |
| 69 | Lobby Construction | 6 mons | Tue 6/3/25 | Mon 11/17/25 | 52 |
| 70 | Misc. Public Areas | 6 mons | Tue 7/1/25 | Mon 12/15/25 | 69SS+1 mon |
| 71 | **FF&E Install & Final Cleaning** | **60 days** | **Tue 10/14/25** | **Mon 1/5/26** | |
| 72 | Guest Rooms | 12 wks | Tue 10/14/25 | Mon 1/5/26 | 58FS-1 wk,6 |
| 73 | Lobby & Public Areas | 8 wks | Tue 11/11/25 | Mon 1/5/26 | 72SS+4 wks |
| 74 | Final Cleaning/Pre-Opening | 4 wks | Tue 12/9/25 | Mon 1/5/26 | 72FS-4 wks |
| 75 | | | | | |

| | | | | |
|---|---|---|---|---|
| Task | ▬▬▬ | External Tasks | ▬▬▬ | Manual Task |
| Split | ·········· | External Milestone | ◇ | Duration-only |
| Milestone | ◆ | Inactive Task | | Manual Summary Rollup |
| Summary | ▐▬▬▬▌ | Inactive Milestone | ◇ | Manual Summary |
| Project Summary | ▌▬▬▬▐ | Inactive Summary | | Start-only |

| | | |
|---|---|---|
| Finish-only | | Manual Progress |
| Deadline | ↓ | |
| Critical | ▬▬▬ | |
| Critical Split | ·········· | |
| Progress | ▬▬▬ | |

Project: Bourse Building
Date: Wed 5/8/24

## SCHEDULE XV

### Approved Hotel Managers and Franchisors

**Hotel Managers:**

1. Schulte Hospitality Group
2. Valor
3. HEI
4. GF Hotels
5. Concord

**Franchisors:**

1. Hilton

## SCHEDULE XVI

### Approved Terminations and Relocations

[Attached]

# Tenant Relocation / Termination Schedule
**Bourse / 400 Market**

| Building | Tenant | Current Suite | Current SF | Expiration | Strategy |
|---|---|---|---|---|---|
| **Bourse:** | Mission Partners | 800 | 1,589 | Jul-27 | Relocation (9th fl) |
| | Davis Construction | 802 | 2,563 | Apr-25 | Termination |
| | Genesis Engineering | 804 | 11,001 | May-27 | Termination |
| | Digitas | 800B, 801, 803 | 9,034 | Dec-24 | Relocation (6th fl) |
| | Mexican Consulate | 3100, 3200 | 12,238 | Dec-24 | Termination |
| **400 Market:** | Philadelphia Youth Network | 200 | 13,876 | Jan-25 | Termination |
| | Entrepreneur Works | 210 | 1,615 | Feb-25 | Termination |
| | Falcon Travel | 460 | 2,495 | Jun-26 | Termination |
| | Professional Planning | 360 | 3,329 | Jun-25 | Termination |
| | Del. County Professional Services | 720 | 4,232 | Nov-27 | Termination |
| | Momentum (Cesium sublease) | 1100 | 15,530 | May-25 | Termination |
| | Deardorff Associates | 800 | 5,214 | Mar-25 | Termination |

## SCHEDULE XVII

**Schedule of Stored Materials and Deposits**

[Attached]

## The Bourse

*Philadelphia, PA*

|  | Jul-24 | Aug-24 |
|---|---|---|
| **FF&E** | | |
| Procurement Agent Service Fee | $0 | $0 |
| Model Room Deposit | $0 | $0 |
| FFE Rollout Deposit | $0 | $0 |
| **Total** | **$0** | **$0** |
| | | |
| HVAC VRF Units | $0 | $0 |
| Elevator (1 new elevator for hotel) | $0 | $0 |
| Electrical - Panels etc | $0 | $0 |
| Shower Doors | $0 | $0 |
| Tile | $0 | $0 |
| **Total** | **$0** | **$0** |
| | | |
| **Total Deposits** | **$0** | **$0** |

| Sep-24 | Oct-24 | Nov-24 | Dec-24 |
|---|---|---|---|
| $9,000 | $9,000 | $9,000 | $9,000 |
| $0 | $0 | $160,000 | $0 |
| $0 | $0 | $0 | $0 |
| **$9,000** | **$9,000** | **$169,000** | **$9,000** |
| | | | |
| $0 | $487,500 | $487,500 | $0 |
| $0 | $58,420 | $58,420 | $0 |
| $250,000 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 |
| **$250,000** | **$545,920** | **$545,920** | **$0** |
| | | | |
| **$259,000** | **$554,920** | **$714,920** | **$9,000** |

| Jan-25 | Feb-25 | Mar-25 | Apr-25 |
|---|---|---|---|
| $9,000 | $9,000 | $9,000 | $9,000 |
| $0 | $0 | $0 | $0 |
| $0 | $0 | $2,500,000 | $0 |
| **$9,000** | **$9,000** | **$2,509,000** | **$9,000** |
| | | | |
| $0 | $0 | $0 | $0 |
| $0 | $116,840 | $0 | $0 |
| $0 | $0 | $0 | $0 |
| $0 | $110,000 | $0 | $0 |
| $0 | $210,000 | $0 | $0 |
| **$0** | **$436,840** | **$0** | **$0** |
| | | | |
| **$9,000** | **$445,840** | **$2,509,000** | **$9,000** |

| May-25 | Jun-25 | Jul-25 | Aug-25 | Sep-25 |
|---|---|---|---|---|
| $9,000 | $9,000 | $9,000 | $9,000 | $9,000 |
| $0 | $0 | $0 | $0 | $0 |
| $2,500,000 | $0 | $0 | $0 | $0 |
| **$2,509,000** | **$9,000** | **$9,000** | **$9,000** | **$9,000** |
| | | | | |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| **$0** | **$0** | **$0** | **$0** | **$0** |
| | | | | |
| **$2,509,000** | **$9,000** | **$9,000** | **$9,000** | **$9,000** |

| Oct-25 | Nov-25 | Dec-25 | Jan-26 | Feb-26 |
|---|---|---|---|---|
| $9,000 | $9,000 | $9,000 | $9,000 | $9,000 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $9,000 | $9,000 | $9,000 | $9,000 | $9,000 |
| | | | | |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| $0 | $0 | $0 | $0 | $0 |
| | | | | |
| $9,000 | $9,000 | $9,000 | $9,000 | $9,000 |

## EXHIBIT A

**Form of AIA Form G706**

[Attached]



# **Document G706™ – 1994**

## *Contractor's Affidavit of Payment of Debts and Claims*

**PROJECT:** *(Name and address)*

**ARCHITECT'S PROJECT NUMBER:**

**CONTRACT FOR:**

OWNER ☐

ARCHITECT ☐

CONTRACTOR ☐

**TO OWNER:** *(Name and address)*

**CONTRACT DATED:**

SURETY ☐

OTHER ☐

**STATE OF:**

**COUNTY OF:**

The undersigned hereby certifies that, except as listed below, payment has been made in full and all obligations have otherwise been satisfied for all materials and equipment furnished, for all work, labor, and services performed, and for all known indebtedness and claims against the Contractor for damages arising in any manner in connection with the performance of the Contract referenced above for which the Owner or Owner's property might in any way be held responsible or encumbered.

**EXCEPTIONS:**

**SUPPORTING DOCUMENTS ATTACHED HERETO:**

1. Consent of Surety to Final Payment. Whenever Surety is involved, Consent of Surety is required. AIA Document G707™, Consent of Surety to Final Payment, may be used for this purpose.

   Indicate attachment:    ☐ Yes    ☒ No

The following supporting documents should be attached hereto if required by the Owner:

1. Contractor's Release or Waiver of Liens, conditional upon receipt of final payment

2. Separate Releases or Waivers of Liens from Subcontractors and material and equipment suppliers, to the extent required by the Owner, accompanied by a list thereof

3. Contractor's Affidavit of Release of Liens (AIA Document G706A™)

**CONTRACTOR:** *(Name and address)*

BY: _____

_____
*(Signature of authorized representative)*

_____
*(Printed name and title)*

Subscribed and sworn to before me on this date:

Notary Public:

My Commission Expires:

**CAUTION: You should sign an original AIA Contract Document, on which this text appears in RED. An original assures that changes will not be obscured.**

AIA Document G706™ – 1994. Copyright © 1970 and 1994 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. Purchasers are permitted to reproduce ten (10) copies of this document when completed. To report copyright violations of AIA Contract Documents, e-mail The American Institute of Architects' legal counsel, copyright@aia.org.

**<u>EXHIBIT B</u>**

**Form of Lien Waivers**

[Attached]

**Exhibit 3**
**CONTRACTOR**
**CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT**

PROPERTY:                                                    PROJECT:

CONTRACT DATE: _____(the "**Contract**")

TOTAL PAYMENTS RECEIVED TO DATE: $_____

The undersigned hereby acknowledges receipt of the amount equal to the Total Payments Received to Date (in cash only and not in equivalents or other agreements). The undersigned represents that the sum of the Total Payments Received to Date constitutes payment in full for all amounts due with respect to the Work at the Property and/or on the Project contemplated by the Contract through Contractor's Application for Payment No. _____ (the "**Work**").

Upon receipt by the undersigned of the sum of $_____, this instrument shall become effective and shall constitute a partial release of all rights, claims, mechanic's lien, stop notice, bond and/or demands that the undersigned may now have or may hereafter acquire against L-A Battery QOZ, LLC and all its lenders, principals, partners, members, officers, directors, sureties and/or any of their successors and/or assigns (the "**Released Parties**"), the Property listed above, and/or the above Project, for payments on account of all labor, services, equipment and/or materials furnished to the Project up to and including _____(the "**Specified Date**") arising out of or pertaining to the above referenced project. However, this partial release shall not apply to release any rights to retention held on the Project; nor shall this release apply to labor services, equipment and/or materials furnished after the Specified Date.

The undersigned certifies that all potential lienors for whom Contractor is responsible for direct payment have been paid in full for all materials, equipment, fees, licenses, insurances and taxes of every description, and that there are no liens, cause for liens or claims against the Released Parties for such items. The undersigned certifies that it will indemnify and hold harmless the Released Parties from any and all claims, liens, suits, losses, cost, expenses, and damages raised by Contractor or anyone for whom Contractor is responsible for direct payment including, but not limited to reasonable attorneys' fees, arising out of or resulting from the Work performed through Contractor's Application for Payment No. _____, and hereby releases forever all claim, title, and interest in the Property for the same.

The undersigned represents and warrants that (a) no assignment of claims for payments or rights to perfect a lien against the Property have been made; (b) the undersigned has the authority to execute this Conditional Lien Waiver and Release and (c) the undersigned has performed the labor, services and/or supplied the materials required of the undersigned. The undersigned has personal knowledge that the statements made herein are true and correct.

Duly authorized, executed and delivered by the undersigned on this ___ day of_____, 2020.

                    (SEAL)                              Fastrack Construction, Inc.
                                                        (Company Name)

                                                        By:         (Signature)

                                                        (Print or type name)

                                                        Note: If this instrument is executed by a corporation, it must be signed
                                                        by an officer, and if executed by a partnership, it must be signed by a
                                                        partner.

ACTIVE\02109\0004\359970.v1-4/22/20
PHIL1 9013916v.1

## Exhibit 4
## SUBCONTRACTOR/SUPPLIER
## CONDITIONAL WAIVER AND RELEASE UPON PROGRESS PAYMENT

PROPERTY:                                                    PROJECT:

SUBCONTRACT DATE: _____(the "Subcontract")

TOTAL PAYMENTS RECEIVED TO DATE: $_____

The undersigned hereby acknowledges receipt of the amount equal to the Total Payments Received to Date (in cash only and not in equivalents or other agreements). The undersigned represents that the sum of the Total Payments Received to Date constitutes payment in full for all amounts due with respect to the Work at the Property and/or on the Project contemplated by the Subcontract through Subcontractor's Application for Payment No. _____ (the "Work").

Upon receipt by the undersigned of the sum of $_____, this instrument shall become effective and shall constitute a partial release of all rights, claims, mechanic's lien, stop notice, bond and/or demands that the undersigned may now have or may hereafter acquire against L-A Battery QOZ, LLC and all its lenders, principals, partners, members, officers, directors, sureties and/or any of their successors and/or assigns and Fastrack Construction, Inc. (the "Released Parties"), the Property listed above, and/or the above Project, for payments on account of all labor, services, equipment and/or materials furnished to the Project up to and including _____(the "Specified Date") arising out of or pertaining to the above referenced project. However, this partial release shall not apply to release any rights to retention held on the Project; nor shall this release apply to labor services, equipment and/or materials furnished after the Specified Date.

The undersigned certifies that all potential lienors for whom Subcontractor/Supplier is responsible for direct payment have been paid in full for all materials, equipment, fees, licenses, insurances and taxes of every description, and that there are no liens, cause for liens or claims against the Released Parties for such items. The undersigned certifies that it will indemnify and hold harmless the Released Parties from any and all claims, liens, suits, losses, cost, expenses, and damages raised by Subcontractor/Supplier or anyone for whom Subcontractor/Supplier is responsible for direct payment including, but not limited to reasonable attorneys' fees, arising out of or resulting from the Work performed through Subcontractor's Application for Payment No. _____, and hereby releases forever all claim, title, and interest in the Property for the same.

The undersigned represents and warrants that (a) no assignment of claims for payments or rights to perfect a lien against the Property have been made; (b) the undersigned has the authority to execute this Conditional Lien Waiver and Release and (c) the undersigned has performed the labor, services and/or supplied the materials required of the undersigned. The undersigned has personal knowledge that the statements made herein are true and correct.

Duly authorized, executed and delivered by the undersigned on this ___ day of _____, 2020.

(SEAL)

                                                  _____

(Company Name)

By:      (Signature)

(Print or type name)

Note: If this instrument is executed by a corporation, it must be signed by an officer, and if executed by a partnership, it must be signed by a partner.

**Exhibit 5**
**CONTRACTOR**
**FINAL WAIVER AND RELEASE UPON FINAL PAYMENT**

PROPERTY:

PROJECT:

RELEASED PARTIES:    **L-A BATTERY QOZ, LLC** and all its lenders, principals, partners, members, officers, directors, sureties and/or any of their successors and/or assigns.

CONTRACTOR: FASTRACK CONSTRUCTION, INC.

CONSTRUCTION CONTRACT DATE: _____, 2020

TOTAL PAYMENTS RECEIVED TO DATE: $ _____

CLOSE-OUT  MOUNT: $_____

The Contractor hereby acknowledges that receipt of the amount equal to the Total Payments Received to Date (in cash only and not in equivalents or other agreements).  The Contractor represents that the sum of the Total Payments Received to Date and the Close-Out Amount constitutes payment in full for all amounts due with respect to the Work at the Property and/or on the Project.

The Contractor hereby certifies that the amounts set forth above are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material with respect to the Work other than those included in the Total Payments Received to Date set forth above.

Upon receipt of the Close-Out Amount, the Contractor has been paid in full for all labor, services, supplies, equipment and materials furnished with respect to the Work, and there is no additional amounts for which the Released Parties may be responsible.  The Contractor does hereby release and waive entirely any mechanic's lien or other lien, claims, actions, demands, or any right against any labor or material bond, which the Contractor may now or hereafter have for (a) all labor, materials, equipment, services and supplies furnished for use in or performed on or at the Property or (b) any other claim of any nature whatsoever arising out of or relating to the Work or the Property.  In addition to the foregoing, this instrument shall constitute a release of all rights, claims and demands of the Contractor against the Released Parties arising out of or pertaining to the above referenced project.

The Contractor certifies that all potential lienors, including laborers, subcontractors or materialmen, have been paid in full for all materials, equipment, fees, licenses, insurances and taxes of every description, and that there are no liens, cause for liens or claims against the Released Parties for such items.  The Contractor certifies that the Contractor will indemnify and hold harmless the Released Parties from any and all

Exhibit 5
Page 1

PHIL1 9014382v.1

claims, liens, suits, losses, cost, expenses and damages, including, but not limited to reasonable attorneys' fees arising out of or resulting from the Work, and hereby releases forever all claim, title and interest in the Property for the same.

The Contractor represents and warrants that (a) no assignment of claims for payments or rights to perfect a lien against the Property have been made, (b) the Contractor has the authority to execute this General Release and Final Waiver of Liens, (c) the Contractor has performed the labor and services supplied the materials required of the Contractor for the Work, and (d) that all warranties for labor and materials set for in the Construction Contract remain in place and are not impacted by this Release. The undersigned has personal knowledge that the statements made herein are true and correct.

The Contractor acknowledges and agrees that this General Release and Final Waiver of Liens will be relied upon by the Released Parties. Notwithstanding the foregoing, the Contractor acknowledges and agrees that such reliance shall not create or be deemed to create any express or implied liability, expense or obligation on behalf of any Released Party with respect to the Work or any amounts due in connection therewith.

Duly authorized, executed and delivered by the undersigned on this ____ day of _____, 202__.

FASTRACK CONSTRUCTION, INC.

(SEAL)

By: _____
Name:
Title:

STATE OF _____ )
                          )
COUNTY OF _____ )

On this ____ day of _____, 202__, before me, _____, personally appeared _____, known to me or proven on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity as the _____ of _____, and that, by his/her signature on the instrument the entity on behalf of which he/she acted executed the instrument.

WITNESS my hand and official seal.

_____
Notary
My Commission expires:

Exhibit 5
Page 2

PHIL1 9014382v.1

**Exhibit 6**
**SUBCONTRACTOR/SUPPLIER**
**FINAL WAIVER AND RELEASE UPON FINAL PAYMENT**

PROPERTY:

PROJECT:

RELEASED PARTIES:     FASTRACK CONSTRUCTION, INC., L-A BATTERY QOZ, LLC and all its lenders, principals, partners, members, officers, directors, sureties and/or any of their successors and/or assigns.

SUBCONTRACTOR/SUPPLIER:

SUBCONTRACT DATE: _____, 2020

TOTAL PAYMENTS RECEIVED TO DATE: $ _____

CLOSE-OUT AMOUNT: $ _____

The Subcontractor/Supplier hereby acknowledges that receipt of the amount equal to the Total Payments Received to Date (in cash only and not in equivalents or other agreements).   The Subcontractor/Supplier represents that the sum of the Total Payments Received to Date and the Close-Out Amount constitutes payment in full for all amounts due with respect to the Work at the Property and/or on the Project.

The Subcontractor/Supplier hereby certifies that the amounts set forth above are true and correct and acknowledges that there are no additional costs or claims for any extras or additions for labor and material with respect to the Work other than those included in the Total Payments Received to Date set forth above.

Upon receipt of the Close-Out Amount, the Subcontractor/Supplier has been paid in full for all labor, services, supplies, equipment and materials furnished with respect to the Work, and there is no additional amounts for which the Released Parties may be responsible.  The Subcontractor/Supplier does hereby release and waive entirely any mechanic's lien or other lien, claims, actions, demands, or any right against any labor or material bond, which the Subcontractor/Supplier may now or hereafter have for (a) all labor, materials, equipment, services and supplies furnished for use in or performed on or at the Property or (b) any other claim of any nature whatsoever arising out of or relating to the Work or the Property.  In addition to the foregoing, this instrument shall constitute a release of all rights, claims and demands of the Subcontractor/Supplier against the Released Parties arising out of or pertaining to the above referenced project.

The Subcontractor/Supplier certifies that all potential lienors, including laborers, subcontractors or materialmen, have been paid in full for all materials, equipment, fees, licenses, insurances and taxes of every description, and that there are no liens, cause for liens or claims against the Released Parties for such items.  The

Exhibit 6
Page 1

PHIL1 9014375v.1

Subcontractor/Supplier certifies that the Subcontractor/Supplier will indemnify and hold harmless the Released Parties from any and all claims, liens, suits, losses, cost, expenses and damages, including, but not limited to reasonable attorneys' fees arising out of or resulting from the Work, and hereby releases forever all claim, title and interest in the Property for the same.

The Subcontractor/Supplier r represents and warrants that (a) no assignment of claims for payments or rights to perfect a lien against the Property have been made, (b) the Subcontractor/Supplier has the authority to execute this General Release and Final Waiver of Liens, (c) the Contractor has performed the labor and services supplied the materials required of the Subcontractor/Supplier for the Work, and (d) that all warranties for labor and materials set for in the Construction Contract remain in place and are not impacted by this Release. The undersigned has personal knowledge that the statements made herein are true and correct.

The Subcontractor/Supplier acknowledges and agrees that this General Release and Final Waiver of Liens will be relied upon by the Released Parties. Notwithstanding the foregoing, the Subcontractor/Supplier acknowledges and agrees that such reliance shall not create or be deemed to create any express or implied liability, expense or obligation on behalf of any Released Party with respect to the Work or any amounts due in connection therewith.

Duly authorized, executed and delivered by the undersigned on this ___ day of _____, 202__.

|SUBCONTRACTOR/SUPPLIER|

(SEAL)

By: _____
Name:
Title:

STATE OF _____    )
                              )
COUNTY OF _____    )

On this ____ day of _____, 202__, before me, _____, personally appeared _____, known to me or proven on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he/she executed the same in his/her authorized capacity as the _____ of _____, and that, by his/her signature on the instrument the entity on behalf of which he/she acted executed the instrument.

WITNESS my hand and official seal.

_____
Notary
My Commission expires:

Exhibit 6
Page 2

**<u>EXHIBIT C</u>**

**Form of Tenant Direction Letters**

[Attached]

**LAK BOURSE MASTER HTC LANDLORD, LLC ("Landlord")**
c/o 111 S Independence Mall East
Suite 1015
Philadelphia, Pennsylvania 19106

_____, 2024

**VIA [HAND/OVERNIGHT] DELIVERY**

[Tenant Legal Notice Address]

[Tenant Legal CC Addresses]

RE: [Lease] dated as of [Date] between Landlord and [Tenant] ("**Tenant**"), as may have been amended or otherwise modified from time to time (the "**Lease**"), with respect to [Property Address]

Ladies and Gentleman:

The Lease has been conveyed to a new owner, effective as of the date hereof. All rent and additional rent payable under the Lease is to be remitted as instructed below.

Please be advised that all future notices, demands, requests, consents, approvals, offers, statements and other instruments and communications directed to Landlord under the Lease should be sent to the following address:

> c/o Keystone Property Group, L.P.
> 1001 Conshohocken State Road, Suite 2-201
> West Conshohocken, PA  19428
> Attention:  [_____]

All rental payments made pursuant to the Lease should be sent by wire or ACH directly to the following account:

> TriState Capital Bank, a Pennsylvania state-chartered banking institution
> ABA #: 043019003
> ACCT NO:  [_____]
> ACCT NAME:  [_____]

Payment by check or money order should be made directly to the following address:

If by USPS Mail:

[_____]
[_____]
[_____]

If by Overnight Mail:

[_____]
[_____]
[_____]
[_____]

If you have any questions regarding the contents of this letter, please do not hesitate to contact [_____] (Telephone [_____]; e-mail:  [_____]).

[Signature Follows.]

Sincerely,

[Landlord Block]

**LAK MARKET MASTER HTC LANDLORD, LLC** ("**Landlord**")
c/o 400 Market Street
Philadelphia, Pennsylvania 19106

_____, 2024

**VIA [HAND/OVERNIGHT] DELIVERY**

[Tenant Legal Notice Address]

[Tenant Legal CC Addresses]

RE: [Lease] dated as of [Date] between Landlord and [Tenant] ("**Tenant**"), as may have been amended or otherwise modified from time to time (the "**Lease**"), with respect to [Property Address]

Ladies and Gentleman:

The Lease has been conveyed to a new owner, effective as of the date hereof. All rent and additional rent payable under the Lease is to be remitted as instructed below.

Please be advised that all future notices, demands, requests, consents, approvals, offers, statements and other instruments and communications directed to Landlord under the Lease should be sent to the following address:

c/o Keystone Property Group, L.P.
1001 Conshohocken State Road, Suite 2-201
West Conshohocken, PA  19428
Attention:  [_____]

All rental payments made pursuant to the Lease should be sent by wire or ACH directly to the following account:

TriState Capital Bank, a Pennsylvania state-chartered banking institution
ABA #: 043019003
ACCT NO:  [_____]
ACCT NAME:  [_____]

Payment by check or money order should be made directly to the following address:

If by USPS Mail:

[_____]
[_____]
[_____]

If by Overnight Mail:

[_____]
[_____]
[_____]
[_____]

If you have any questions regarding the contents of this letter, please do not hesitate to contact [_____] (Telephone [_____]; e-mail: [_____]).

[Signature Follows.]

Sincerely,

[Landlord Block]

## EXHIBIT D

### Form of Architect's Certificate

[Attached]

**ARCHITECT′S CERTIFICATION**

[Letterhead of Borrower's Architect]

_____, 20__

KREF LENDING III LLC
30 Hudson Yards
New York, New York 10001
Attention: Paul Fine

Re:     "The Bourse" at 111 S. Independence Mall East, Philadelphia, Pennsylvania (the "**Property**")

Ladies and Gentlemen:

The undersigned ("**Architect**") understands that KREF LENDING III LLC, a Delaware limited liability company (together with its successors and/or assigns, "**Lender**") has made a loan (the "**Loan**") and will continue to make advances under the Loan to **LAK BOURSE OWNER, LLC**, a Delaware limited liability company ("**Bourse Fee Borrower**"), **LAK BOURSE MASTER HTC LANDLORD, LLC**, a Delaware limited liability company ("**Bourse Leasehold Borrower**", and together with Bourse Fee Borrower, collectively, "**Bourse Borrower**"), **LAK 400 OWNER, LLC,** a Delaware limited liability company ("**400 Market Fee Borrower**"), and **LAK MARKET MASTER HTC LANDLORD, LLC,** a Delaware limited liability company ("**400 Market Leasehold Borrower**", and together with 400 Market Fee Borrower, collectively, "**400 Market Borrower**"; Bourse Fee Borrower, Bourse Leasehold Borrower, 400 Market Fee Borrower and 400 Market Leasehold Borrower, each, a "**Borrower**" and collectively, "**Borrower**"), which Loan and such advances, among other things, will be used to finance construction by Borrower of the conversion of certain improvements on the Property into a hotel (the "**Improvements**") at the Property and will be advanced pursuant to that certain Loan Agreement (the "**Loan Agreement**"), entered into by Lender and Borrower, dated as of June 28, 2024.

Architect has prepared certain plans and specifications in connection with the construction of the Improvements, which are described in Exhibit A hereto (the "**Plans and Specifications**"). In addition, Architect has been engaged to act as the Architect for the Improvements and such engagement has been confirmed by that certain [ARCHITECT'S CONTRACT], between Borrower and Architect, dated as of [_____] [__], 20[_] (the "**Contract**").

Based on its on-site observation of the Improvements, including, without limitation, its preparation of the Plans and Specification, each to the date of this Certification, to the best of its professional knowledge, information and belief, Architect states to Lender that except as the same relates to punch list items, the Improvements and its contemplated uses, as identified to us by Borrower, comply with all applicable building codes, project approvals and all other governmental rules, laws and regulations relating to its architectural design, to the extent applicable, and a [permanent certificate of occupancy][letter of completion] for the use of the Improvements for

their intended purposes should be issued by the City of Philadelphia upon review and inspection of the Improvements by the appropriate departments in the City of Philadelphia.

To the best of its professional knowledge, Architect further states to Lender that the Improvements comply (and after the completion of the punch list items will comply) with all applicable requirements of the applicable zoning and building laws and ordinances which are in effect as of the date hereof.

Architect's statements in this letter are an expression of Architect's professional opinion as of the date of this letter and are based on Architect's performance of services pursuant to the Contract in accordance with the standards of care and skill of the members of Architect's profession in the Commonwealth of Pennsylvania practicing under similar circumstances and conditions and on services, information and opinions provided by others, including without limitation Borrower's real estate counsel, Borrower's zoning counsel , other design consultants and Borrower's surveyor.  This letter is not a guaranty or warranty of any kind.  It is issued at the request of Borrower and is to be provided to Lender in connection with the loan for construction of the Improvements provided pursuant to the Loan Agreement, and may be relied upon by Lender and its successors and assigns.  No other party may rely hereon.  Architect has no obligation to update or otherwise modify this letter after the date hereof.

Signed this _____ of _____, 20__.

**[ARCHITECT]**
a [_____]

By:  _____

Name:
Title:

**EXHIBIT A**

**PLANS AND SPECIFICATIONS**

(To be inserted)

<u>**EXHIBIT E**</u>

**Form of Application and Certificate for Payment (AIA Document No. G702 and No. G703)**

[Attached]

# INSTRUCTION SHEET
## AIA DOCUMENTS G702 and G703

### A. GENERAL INFORMATION

#### 1. Purpose and Related Documents

AIA Document G702, Application and Certificate for Payment, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed to be used on a Project where a Contractor has a direct Agreement with the Owner. Procedures for their use are covered in AIA Document A201, General Conditions of the Contract for Construction, 1987 Edition.

#### 2. Use of Current Documents

Prior to using any AIA document, the user should consult the AIA, an AIA component chapter or a current AIA Documents List to determine the current edition of each document.

#### 3. Limited License for Reproduction

AIA Documents G702 and G703 are copyrighted works and may not be reproduced or excerpted from in substantial part without the express written permission of the AIA. The documents are intended to be used as consumables—that is, the original documents purchased by the user are intended to be consumed in the course of being used. There is no implied permission to reproduce these documents, nor does membership in The American Institute of Architects confer any further rights to reproduce G702 and G703.

A limited license is hereby granted to retail purchasers to reproduce a maximum of ten copies of a completed or executed G702 and G703, but only for use in connection with a particular Project. Further reproductions are prohibited without the express written permission of the AIA.

### B. COMPLETING THE G702 FORM:

After the Contractor has completed AIA Document G703, Continuation Sheet, summary information should be transferred to AIA Document G702, Application and Certificate for Payment.

The Contractor should sign G702, have it notarized and submit it, together with G703, to the Architect.

The Architect should review G702 and G703 and, if they are acceptable, complete the Architect's Certificate for Payment on G702. The Architect may certify a different amount than that applied for, pursuant to Paragraphs 9.5 and 9.6 of A201. The Architect should then initial all figures on G702 and G703 that have been changed to conform to the amount certified and attach an explanation. The completed G702 and G703 should be forwarded to the Owner.

### C. COMPLETING THE G703 FORM:

**Heading:** This information should be completed to be consistent with similar information on AIA Document G702, Application and Certificate for Payment.

**Columns A, B & C:** These columns should be completed by identifying the various portions of the Project and their scheduled value consistent with the schedule of values submitted to the Architect at the commencement of the Project or as subsequently adjusted. The breakdown may be by sections of the Work or by Subcontractors and should remain consistent throughout the Project. Multiple pages should be used when required.

Column C should be subtotaled at the bottom when more than one page is used and totaled on the last page. Initially, this total should equal the original Contract Sum. The total of column C may be adjusted by Change Orders during the Project.

**Column D:** Enter in this column the amount of completed work covered by the previous application (columns D + E from the previous application). Values from column F (Materials Presently Stored) from the previous application should not be entered in this column.

**Column E:** Enter here the value of Work completed at the time of this application, including the value of materials incorporated into the project which were listed on the previous application under Materials Presently Stored (column F).

**Column F:** Enter here the value of Materials Presently Stored for which payment is sought. The total of the column *must* be recalculated at the end of each pay period. This value covers both materials newly stored for which payment is sought and materials previously stored which are not yet incorporated into the Project. Mere payment by the Owner for stored materials does not result in a deduction from this column. Only as materials are incorporated into the Project is their value deducted from this column and incorporated into column E (Work Completed—This Period).

**Column G:** Enter here the total of columns D, E and F. Calculate the percentage completed by dividing column G by column C.

**Column H:** Enter here the difference between column C (Scheduled Value) and column G (Total Completed and Stored to Date).

**Column I:** This column is normally used only for contracts where variable retainage is permitted on a line-item basis. It need not be completed on projects where a constant retainage is withheld from the overall contract amount.

**Change Orders:** Although Change Orders could be incorporated by changing the schedule of values each time a Change Order is added to the Project, this is not normally done. Usually, Change Orders are listed separately, either on their own G703 form or at the end of the basic schedule. The amount of the original contract adjusted by Change Orders is to be entered in the appropriate location on the G702 form.

Construction Change Directives: Amounts not in dispute that have been included in Construction Change Directives should be incorporated into one or more Change Orders. Amounts remaining in dispute should be dealt with according to Paragraph 7.3 in A201.

### D. MAKING PAYMENT

The Owner should make payment directly to the Contractor based on the amount certified by the Architect on AIA Document G702, Application and Certificate for Payment. The completed form contains the name and address of the Contractor. Payment should not be made to any other party unless specifically indicated on G702.

### E. EXECUTION OF THE DOCUMENT

Each person executing the Agreement should indicate the capacity in which they are acting (i.e., president, secretary, partner, etc.) and the authority under which they are executing the Agreement. Where appropriate, a copy of the resolution authorizing the individual to act on behalf of the firm or entity should be attached.

TO OWNER:

FROM CONTRACTOR:

PROJECT:

VIA ARCHITECT:

APPLICATION NO.:
PERIOD TO:
PROJECT NOS.:

CONTRACT DATE:

Distribution to:
☐ OWNER
☐ ARCHITECT
☐ CONTRACTOR
☐
☐

CONTRACT FOR:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

1. **ORIGINAL CONTRACT SUM** . . . . . . . . . . . . . . . . . . $_____

2. **Net change by Change Orders** . . . . . . . . . . . . . . . $_____

3. **CONTRACT SUM TO DATE** (Line 1 ± 2) . . . . . . . . $_____

4. **TOTAL COMPLETED & STORED TO DATE** . . . . . . $_____
   (Column G on G703)

5. **RETAINAGE:**
   a. _____% of Completed Work        $_____
      (Columns D + E on G703)
   b. _____% of Stored Material        $_____
      (Column F on G703)
   Total Retainage (Line 5a + 5b or
      Total in Column I of G703) . . . . . . . . . . . . . . . . $_____

6. **TOTAL EARNED LESS RETAINAGE** . . . . . . . . . . . $_____
   (Line 4 less Line 5 Total)

7. **LESS PREVIOUS CERTIFICATES FOR PAYMENT**
   (Line 6 from prior Certificate) . . . . . . . . . . . . . . . $_____

8. **CURRENT PAYMENT DUE** . . . . . . . . . . . . . . . . | $_____ |

9. **BALANCE TO FINISH, INCLUDING RETAINAGE**
   (Line 3 less Line 6)        $_____

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____  Date: _____

State of:
County of:
Subscribed and sworn to before
me this                day of

Notary Public:
My Commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . $_____
*(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)*
ARCHITECT:
By: _____  Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

**AIA DOCUMENT G702** • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**G702-1992**

CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.

See the instruction Sheet for information on licensed reproduction. This standard document is NOT a model form. Its inclusion in the Architect's Handbook of Professional Practice, 12th Edition, does not constitute a grant of any implied or explicit license to copy it in whole or in part.



Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 303 of 326

# INSTRUCTION SHEET

## FOR AIA DOCUMENT G702/CMa, APPLICATION AND CERTIFICATE FOR PAYMENT
## CONSTRUCTION MANAGER-ADVISER EDITION

### A. GENERAL INFORMATION

AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed to be used on a Project where a Construction Manager is employed as an adviser to the Owner, but not as a constructor, and where multiple Contractors have direct Agreements with the Owner. Procedures for their use are covered in AIA Document A201/CMa, General Conditions of the Contract for Construction, Construction Manager-Adviser Edition, 1992 Edition.

### B. COMPLETING THE G702/CMa FORM:

After the Contractor has completed AIA Document G703, Continuation Sheet, summary information should be transferred to AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition.

The Contractor should sign G702/CMa, have it notarized and submit it, together with G703, to the Construction Manager and Architect.

The Construction Manager and Architect should review G702/CMa and G703 and, if they are acceptable, complete the Certificate for Payment on G702/CMa. The Construction Manager and Architect may certify a different amount than that applied for, pursuant to Paragraphs 9.5 and 9.6 of A201/CMa. They should then initial all figures on G702/CMa and G703 that have been changed to conform to the amount certified and attach an explanation. The completed G702/CMa and G703 should be forwarded to the Owner.

### C. COMPLETING THE G703 FORM:

**Heading:** This information should be completed to be consistent with similar information on AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition.

**Columns A, B & C:** These columns should be completed by identifying the various portions of the Project and their scheduled value consistent with the schedule of values submitted to the Architect at the commencement of the Project or as subsequently adjusted. The breakdown may be by sections of the Work or by Subcontractors and should remain consistent throughout the Project. Multiple pages should be used when required.

Column C should be subtotaled at the bottom when more than one page is used and totaled on the last page. Initially, this total should equal the original Contract Sum. The total of column C may be adjusted by Change Orders during the Project.

**Column D:** Enter in this column the amount of completed work covered by the previous application (columns D & E from the previous application). Values from column F (Materials Presently Stored) from the previous application should not be entered in this column.

**Column E:** Enter here the value of Work completed at the time of this application, including the value of materials incorporated into the project which were listed on the previous application under Materials Presently Stored (column F).

**Column F:** Enter here the value of Materials Presently Stored for which payment is sought. The total of the column *must* be recalculated at the end of each pay period. This value covers both materials newly stored for which payment is sought and materials previously stored which are not yet incorporated into the Project. Mere payment by the Owner for stored materials does not result in a deduction from this column. Only as materials are incorporated into the Project is their value deducted from this column and incorporated into column E (Work Completed—This Period).

**Column G:** Enter here the total of columns D, E and F. Calculate the percentage completed by dividing column G by column C.

**Column H:** Enter here the difference between column C (Scheduled Value) and column G (Total Completed and Stored to Date).

**Column I:** This column is normally used only for contracts where variable retainage is permitted on a line-item basis. It need not be completed on projects where a constant retainage is withheld from the overall contract amount.

**Change Orders:** Although Change Orders could be incorporated by changing the schedule of values each time a Change Order is added to the Project, this is not normally done. Usually, Change Orders are listed separately, either on their own G703 form or at the end of the basic schedule. The amount of the original contract adjusted by Change Orders is to be entered in the appropriate location on the G702/CMa form.

**Construction Change Directives:** Amounts not in dispute that have been included in Construction Change Directives should be incorporated into one or more Change Orders. Amounts remaining in dispute should be dealt with according to Paragraph 7.3 in A201/CMa.

### D. MAKING PAYMENT

The Owner should make payment directly to the Contractor based on the amount certified by the Construction Manager and Architect on AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition. The completed form contains the name and address of the Contractor. Payment should not be made to any other party unless specifically indicated on G702/CMa.

TO OWNER:

PROJECT:

FROM CONTRACTOR:

CONTRACT FOR:

APPLICATION NO.:
PERIOD TO:
PROJECT NOS.:

CONTRACT DATE:

Distribution to:
☐ OWNER
☐ CONSTRUCTION
   MANAGER
☐ ARCHITECT
☐ CONTRACTOR

VIA CONSTRUCTION MANAGER:
VIA ARCHITECT:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

1. **ORIGINAL CONTRACT SUM** . . . . . . . . . . . . . . . . .$_____

2. **Net Change By Change Orders** . . . . . . . . . . . . . .$_____

3. **CONTRACT SUM TO DATE** (Line 1 ± 2) . . . . . . . .$_____

4. **TOTAL COMPLETED & STORED TO DATE** . . . . . .$_____
   (Column G on G702)

5. **RETAINAGE:**
   a. _____% of Completed Work          $_____
      (Columns D + E on G703)

   b. _____% of Stored Material          $_____
      (Column F on G703)
      Total Retainage (Line 5a + 5b or
      Total in Column I of G703) . . . . . . . . . . . . . . . .$_____

6. **TOTAL EARNED LESS RETAINAGE** . . . . . . . . . . .$_____
   (Line 4 less Line 5 Total)

7. **LESS PREVIOUS CERTIFICATES FOR PAYMENT**
   (Line 6 from prior Certificate) . . . . . . . . . . . . . . . .$_____

8. **CURRENT PAYMENT DUE** . . . . . . . . . . . . . . . .| $ |

9. **BALANCE TO FINISH, INCLUDING RETAINAGE**
   (Line 3 less Line 6)          $_____

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____     Date: _____

State of:
County of:
Subscribed and sworn to before
me this          day of

Notary Public:
My Commission expires:

## CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Construction Manager and Architect certify to the Owner that to the best of their knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

**AMOUNT CERTIFIED** . . . . . . . . . . . . . . . . . . . . . . . . . . . .$_____
*(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that changed to conform to the amount certified.)*

CONSTRUCTION MANAGER:

By: _____     Date: _____

ARCHITECT:

By: _____     Date: _____

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.



AIA DOCUMENT G702/CMa • APPLICATION AND CERTIFICATE FOR PAYMENT • CONSTRUCTION MANAGER-ADVISER EDITION
1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON,
D.C. 20006-5292 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**G702/CMa-1992**

**CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.**

# INSTRUCTION SHEET
## AIA DOCUMENTS G702 and G703

### A. GENERAL INFORMATION

#### 1. Purpose and Related Documents

AIA Document G702, Application and Certificate for Payment, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed to be used on a Project where a Contractor has a direct Agreement with the Owner. Procedures for their use are covered in AIA Document A201, General Conditions of the Contract for Construction, 1987 Edition.

#### 2. Use of Current Documents

Prior to using any AIA document, the user should consult the AIA, an AIA component chapter or a current AIA Documents List to determine the current edition of each document.

#### 3. Limited License for Reproduction

AIA Documents G702 and G703 are copyrighted works and may not be reproduced or excerpted from in substantial part without the express written permission of the AIA. The documents are intended to be used as consumables— that is, the original documents purchased by the user are intended to be consumed in the course of being used. There is no implied permission to reproduce these documents, nor does membership in The American Institute of Architects confer any further rights to reproduce G702 and G703.

A limited license is hereby granted to retail purchasers to reproduce a maximum of ten copies of a completed or executed G702 and G703, but only for use in connection with a particular Project. Further reproductions are prohibited without the express written permission of the AIA.

### B. COMPLETING THE G702 FORM:

After the Contractor has completed AIA Document G703, Continuation Sheet, summary information should be transferred to AIA Document G702, Application and Certificate for Payment.

The Contractor should sign G702, have it notarized and submit it, together with G703, to the Architect.

The Architect should review G702 and G703 and, if they are acceptable, complete the Architect's Certificate for Payment on G702. The Architect may certify a different amount than that applied for, pursuant to Paragraphs 9.5 and 9.6 of A201. The Architect should then initial all figures on G702 and G703 that have been changed to conform to the amount certified and attach an explanation. The completed G702 and G703 should be forwarded to the Owner.

### C. COMPLETING THE G703 FORM:

**Heading:** This information should be completed to be consistent with similar information on AIA Document G702, Application and Certificate for Payment.

**Columns A, B & C:** These columns should be completed by identifying the various portions of the Project and their scheduled value consistent with the schedule of values submitted to the Architect at the commencement of the Project or as subsequently adjusted. The breakdown may be by sections of the Work or by Subcontractors and should remain consistent throughout the Project. Multiple pages should be used when required.

Column C should be subtotaled at the bottom when more than one page is used and totaled on the last page. Initially, this total should equal the original Contract Sum. The total of column C may be adjusted by Change Orders during the Project.

**Column D:** Enter in this column the amount of completed work covered by the previous application (columns D    E from the previous application). Values from column F (Materials Presently Stored) from the previous application should not be entered in this column.

**Column E:** Enter here the value of Work completed at the time of this application, including the value of materials incorporated into the project which were listed on the previous application under Materials Presently Stored (column F).

**Column F:** Enter here the value of Materials Presently Stored for which payment is sought. The total of the column *must* be recalculated at the end of each pay period. This value covers both materials newly stored for which payment is sought and materials previously stored which are not yet incorporated into the Project. Mere payment by the Owner for stored materials does not result in a deduction from this column. Only as materials are incorporated into the Project is their value deducted from this column and incorporated into column E (Work Completed— This Period).

**Column G:** Enter here the total of columns D, E and F. Calculate the percentage completed by dividing column G by column C.

**Column H:** Enter here the difference between column C (Scheduled Value) and column G (Total Completed and Stored to Date).

**Column I:** This column is normally used only for contracts where variable retainage is permitted on a line-item basis. It need not be completed on projects where a constant retainage is withheld from the overall contract amount.

**Change Orders:** Although Change Orders could be incorporated by changing the schedule of values each time a Change Order is added to the Project, this is not normally done. Usually, Change Orders are listed separately, either on their own G703 form or at the end of the basic schedule. The amount of the original contract adjusted by Change Orders is to be entered in the appropriate location on the G702 form.

Construction Change Directives: Amounts not in dispute that have been included in Construction Change Directives should be incorporated into one or more Change Orders. Amounts remaining in dispute should be dealt with according to Paragraph 7.3 in A201.

### D. MAKING PAYMENT

The Owner should make payment directly to the Contractor based on the amount certified by the Architect on AIA Document G702, Application and Certificate for Payment. The completed form contains the name and address of the Contractor. Payment should not be made to any other party unless specifically indicated on G702.

### E. EXECUTION OF THE DOCUMENT

Each person executing the Agreement should indicate the capacity in which they are acting (i.e., president, secretary, partner, etc.) and the authority under which they are executing the Agreement. Where appropriate, a copy of the resolution authorizing the individual to act on behalf of the firm or entity should be attached.

# CONTINUATION SHEET

AIA DOCUMENT G703 (Instructions on reverse side)

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.:
APPLICATION DATE:
PERIOD TO:
ARCHITECT'S PROJECT NO.:

| A | B | C | WORK COMPLETED | | E | F | G | % (G ÷ C) | H | I |
|---|---|---|---|---|---|---|---|---|---|---|
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | | BALANCE TO FINISH (C – G) | RETAINAGE (IF VARIABLE) RATE) |
| | | | | | | | | | | |
| | | | | | | | | | | |

AIA DOCUMENT G703 • CONTINUATION SHEET FOR G702 • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

**G703-1992**

**CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.**

This standard document is NOT a model form. Its inclusion in the Architect's Handbook of Professional Practice, 12th Edition, does not constitute a grant of any implied or explicit license to copy it in whole or in part. See the Instruction Sheet for information on licensed reproduction.

SAMPLE

Case 2:26-cv-05284-CFK   Document 1-4   Filed 07/28/26   Page 307 of 326

**<u>EXHIBIT F</u>**

**Intentionally Omitted**

## EXHIBIT G

**Form of Anticipated Cost Report (Borrower)**

[Attached]

**Form of Anticipated Cost Report (Borrower)**

| | Budget | | | | O | Project Commitments | | | Varianc | | Payments | | | | |
| | A | B | C | D=A+B+C | | E | F | G=E+F | H=D-G | | I | J | K=I+J | L=G-K | M=K/G |
| | Approved Original Budget | Approved Budget Change | Current Requested Budget | Current Approved Budget | | Committed Costs | Uncommitted Future Costs | Total Forecasted Cost at Completion | Savings / (Overrun) | | Previous Payments | Payents this Period | Total Payments | Balance to Pay on Total Forecast | % of Total Forecast Paid |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Acquisition Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Purchase Price | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Other Acquisition Costs | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| **Total Acquisition Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| **Construction Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| GMP Trades | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| GMP General Conditions | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| GMP CCIP Insurance | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| GMP SDI | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| GMP Contingency | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| GMP Fee | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| *New Line GMP* | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Other Trades/Demolition | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Other Hard Cost InedrOcts | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Hard Cost Contingency | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| *Total Hard Costs* | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| A& E | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Other Soft Costs | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Insurance | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Special Inspections | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Permits | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Legal Fees | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Marketing | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| FF& E | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Development Fee/ Reimbursables | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Soft Cost Contingency | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Project Contingency | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| *Total Soft Costs* | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| **Total Construction Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| **Financing Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Financing Costs - Construction Loan | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Financing Costs - Acq Loan | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Capital Reserve | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| **Total Refinance Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| **Carry Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Interest and Carry - Construction Loan | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| Interest and Carry - Acq Loan | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| **Total Carry Costs** | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | | - | - | - | - | - | - | - | - |

| | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Leasing Costs** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tenant Improvements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Leasing Commissions and Legal | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Leasing Costs** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | - | - | - | - | | | | | | | | | | | | | | |
| **Misc. Costs** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Tenant Relocation and Buyout | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Misc. Costs** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **TOTAL COSTS** | | | | | | | | | | | | | | | | | | |

2

## EXHIBIT H

**Form of Architect′s Certificate (Completion)**


[Attached]

**ARCHITECT'S CERTIFICATION AND CONSENT**

[Letterhead of Borrower's Architect]

[_____], 20__

KREF LENDING III LLC
30 Hudson Yards
New York, New York 10001
Attention: Paul Fine

Re:    "The Bourse" at 111 S. Independence Mall East, Philadelphia, Pennsylvania (the "**Property**")

Ladies and Gentlemen:

The undersigned ("**Architect**") understands that KREF LENDING III LLC, a Delaware limited liability company (together with its successors and/or assigns, "**Lender**") has made a loan (the "**Loan**") and will continue to make advances under the Loan to **LAK BOURSE OWNER, LLC**, a Delaware limited liability company ("**Bourse Fee Borrower**"), **LAK BOURSE MASTER HTC LANDLORD, LLC**, a Delaware limited liability company ("**Bourse Leasehold Borrower**", and together with Bourse Fee Borrower, collectively, "**Bourse Borrower**"), **LAK 400 OWNER, LLC,** a Delaware limited liability company ("**400 Market Fee Borrower**"), and **LAK MARKET MASTER HTC LANDLORD, LLC,** a Delaware limited liability company ("**400 Market Leasehold Borrower**", and together with 400 Market Fee Borrower, collectively, "**400 Market Borrower**"; Bourse Fee Borrower, Bourse Leasehold Borrower, 400 Market Fee Borrower and 400 Market Leasehold Borrower, each, a "**Borrower**" and collectively, "**Borrower**"), which Loan and such advances, among other things, will be used to finance construction by Borrower of the Hotel Conversion (as defined in the Loan Agreement) (the "**Improvements**") at the Property and will be advanced pursuant to that certain Loan Agreement (the "**Loan Agreement**"), entered into by Lender and Borrower, dated as of June 28, 2024.

Architect has prepared certain plans and specifications in connection with the construction of the Improvements, which are described in Exhibit A hereto (the "**Plans and Specifications**"). In addition, Architect has been engaged to act as the Architect for the Improvements and such engagement has been confirmed by that certain [ARCHITECT'S CONTRACT], between Borrower and Architect, dated as of [_____] [__], 20[__] (the "**Contract**").

Based on its on-site observation of the Improvements, including, without limitation, its preparation of the Plans and Specifications, each as of the date of this Certificate, to the best of its professional knowledge, information and belief, Architect states to Lender that upon completion of the Improvements in accordance with the Plans and Specifications, the Improvements should be available for occupancy in accordance with their contemplated uses, as identified to us by Borrower, and comply with all applicable building codes, project approvals (as may be modified during the course of construction of the Improvements) and all other governmental rules, laws and regulations relating to the architectural design of the Improvements, to the extent applicable and

in effect as of the date hereof, and [a temporary certificate of occupancy][letter of completion] for the use of the Improvements for their intended purposes should be issued by the City of Philadelphia upon review and inspection of the Improvements by the appropriate departments in the City of Philadelphia.

Architect understands that as additional security for the Loan, Borrower has assigned its interests under the Contract and in and to the Plans and Specifications to Lender pursuant to a collateral assignment of contracts and Architect hereby consents to be bound by such collateral assignment subject to the terms of this Certificate.

Architect agrees that upon the continuance of an Event of Default (as defined herein) under any of the documents evidencing and/or securing the loan ("**Loan Documents**"), Architect will, at Lender's written request and upon receipt of payment of all monies due pursuant to the Contract, continue performance on Lender's behalf under the Contract for all services rendered or to be rendered for the benefit of Lender and its nominee, subsidiary or assign(s).  Nevertheless, during the continuance of a default under the Loan beyond notice and cure (an "**Event of Default**"), the time periods set forth in the Contract for the performance of Borrower's obligations thereunder shall be deemed extended by the period of time necessary for Lender to obtain possession of the Property pursuant to its remedies under the Loan Documents, provided that Lender pays Architect all sums due pursuant to the Contract in accordance with the terms thereof.

Architect hereby further agrees that if, at any time, Lender or its designee shall become the owner of the Property or Borrower or otherwise requires the use of the Plans and Specifications in connection with the Property, Lender shall have the right to use the Plans and Specifications, together with any and all modifications thereof (including any additions, enlargements or extensions thereof) without any additional cost or expense other than payment of any balance and other sums that may be due or owing to Architect by Borrower for the preparation of the Plans and Specifications, pursuant to the terms of the Contract.  In the event that Lender or its designee uses the Plans and Specifications to complete the Project without Architect, such party agrees to make commercially reasonable efforts to supersede Architect and Architect's consultants with new professionals on all applications, permits and filings within 120 days of commencing such use. Such party shall make commercially reasonable efforts to cause its superseding professional(s) to remove Architect's signature, seal and other identifying information and to sign and seal any Plan or Specification that has been modified by said professional, including the date and reference to the particular modification made.  Lender shall not use the Plans and Specifications if passage of time or change in law renders them unfit for the use for which they are intended.

Architect shall send copies to Lender of all notices of default sent by Architect to Borrower or by Borrower to Architect pursuant to the Contract and no such notice shall be effective for any purpose unless and until a copy thereof shall have been received by Lender.  Architect shall not terminate the Contract on account of any default of Borrower thereunder without written notice to Lender and first providing Lender a reasonable opportunity, but not less than the greater of (i) 120 days and (ii) the cure period set forth in the Contract, to effect a cure of the default or to declare an Event of Default under the Loan Agreement and commence to complete or cause the completion of construction of the Improvements, provided the Lender shall make payment for all services rendered during such cure period in accordance with the requirements of the Contract.  In the event Lender so elects to complete or cause the completion of the Improvements, Architect agrees not

to terminate, and agrees to diligently continue to perform its services under, the Contract so long as the defaults of Borrower thereunder are cured by Lender within the time periods set forth herein and Architect has received all sums then due and payable to Architect under the Contract. Nothing contained herein, however, shall require Lender to cure any default of Borrower under the Contract, but shall only give Lender the option to do so if Lender desires that Architect continue performance under the Contract. If Lender elects not to cure such default, Architect shall not be required to continue any work under the Contract except work for which it has been paid.

Architect's statements in this letter have been made and the services of Architect pursuant to the Contract have been performed in accordance with the standards of care and skill of the Architect's profession in the Philadelphia area for building projects of the scope and quality of the Improvements. This letter is being issued with the intent that it shall be relied on by Lender and its successors and assigns, in connection with the disbursements for the construction of the Improvements as contemplated by the Loan Agreement referenced therein, and any lender refinancing the Loan , and does not alter or increase the term; obligations or liabilities of the undersigned to Borrower, Lender or their respective successors and assigns under the Contract. Neither this letter nor any statement made herein is a guaranty. The statements made herein are an expression of the undersigned's professional opinion and are made to the best of the undersigned's knowledge and belief, based on the undersigned's professional experience, and on services and information and opinions provided by others including other design consultants and Borrower's zoning counsel, real estate counsel and surveyor. Architect has no obligation to update or otherwise modify this letter after the date hereof.

[ARCHITECT]

By: _____
Name:
Title:

**EXHIBIT A**

**PLANS AND SPECIFICATIONS**

(To be inserted)

## <u>EXHIBIT I</u>

**Form of Draw Request**

[Attached]

## FORM OF DRAW REQUEST

[Letterhead of Bourse Borrower]

_____, 20___

KREF LENDING III LLC, as Lender
30 Hudson Yards
New York, New York 10001

Attn: Paul Fine

    Re:    _____

Ladies and Gentlemen:

This Certificate is furnished pursuant to and in accordance with that certain Loan Agreement (the "**Loan Agreement**"), dated as of June [28], 2024, among **KREF LENDING III LLC**, a Delaware limited liability company and (together with its successors and assigns, "**Lender**") and **LAK BOURSE OWNER, LLC**, a Delaware limited liability company ("**Bourse Fee Borrower**"), **LAK BOURSE MASTER HTC LANDLORD, LLC**, a Delaware limited liability company ("**Bourse Leasehold Borrower**", and together with Bourse Fee Borrower, collectively, "**Bourse Borrower**"), **LAK 400 OWNER, LLC**, a Delaware limited liability company, and **LAK MARKET MASTER HTC LANDLORD, LLC**, a Delaware limited liability company. This Certificate will serve as Bourse Borrower's Requisition requesting the sum of $ _____ under the Loan Agreement. Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings ascribed thereto in the Loan Agreement.

The draw amount for this month is as follows:

Current Total Draw Amount:          $ _____
less Lender holdbacks for reimbursements:    ($ _____)
Net Amount of Wire:               $ _____

Please wire the funds on [DATE] as follows: Amount:

    Bank:
    ABA#:
    Account:
    Account Number:

11030552.v3

The support for the above Advances is provided in the attached draw schedules.  Please advise the undersigned as soon as the Advance has been credited.

Bourse Borrower hereby acknowledges that it has no outstanding defenses, claims, counterclaims or offsets against Lender under the Loan Documents.

The undersigned hereby represents, warrants and certifies to Lender as of the date hereof as follows:

(i)     The undersigned is an authorized representative of Bourse Borrower.

(ii)    This Certificate and the requisition contained herein meets all applicable conditions contained in the Loan Agreement (as applicable to such Advance) and Bourse Borrower has satisfied all conditions precedent applicable to such Advance set forth in the Loan Agreement.

(iii)   All amounts shown on all previous Draw Requests have been paid in full and all amounts requested herein have been paid or will be paid in full from the proceeds of the disbursement requested hereby.  The amount requested to be disbursed does not exceed the amount available to Bourse Borrower as an Advance as of the date of this Certificate and the date on which such disbursement is to be made, such that at no time shall Lender be obligated to pay amounts to Bourse Borrower in excess of the total amount available to Bourse Borrower as an Advance at the time of disbursement.

(iv)    All work on the Bourse Property for which payment is requested in this Certificate has been performed in accordance with the terms and conditions set forth in the Loan Agreement. The following are attached and the undersigned certifies as true, complete, and correct: (i) sworn unconditional lien waivers from (A) contractors and subcontractors and (B) materialmen, suppliers and vendors, covering all work for which funds have been disbursed pursuant to a prior request for disbursement, in each case, to the extent required pursuant to the Loan Agreement, and (ii) invoices, contracts, or other supporting documentation supplied.

(v)     Intentionally Omitted.[1]

(vi)    None of the amounts for which payment is requested in this Certificate have been included in any prior Draw Request.  All construction costs for which the current disbursement is sought have been incurred and are consistent with the most recently applicable budget.

(vii)   All required Governmental Approvals by any Governmental Authority have been obtained with respect to the work that is the subject of the request for disbursement, to the extent the same may be issued given the stage of construction.

(viii)  All building permits required for the commencement of construction of the individual Office CapEx Project that is the subject of the request for disbursement in accordance with the Loan Agreement, to the extent the same may be issued given the stage of

---

[1] This may not be true.  The request may be for deposits or stored materials.

11030552.v3                                        2

construction, have been obtained in accordance with all applicable material Legal Requirements and are in full force and effect.

(ix) [FOR INITIAL HOTEL CONVERSION ADVANCE ONLY] All building permits required for the commencement of construction of the Hotel Conversion (being the conversion of the 3rd, 4th and 8th floors of the existing Improvements into hotel keys) have been obtained in accordance with all applicable material Legal Requirements and are in full force and effect.

11030552.v3                                    3

(x)    To Bourse Borrower's knowledge, all work on the Bourse Property, which has been completed and for which disbursement is sought does not violate any applicable material Legal Requirement.

Very truly yours

**LAK BOURSE OWNER, LLC**
**LAK BOURSE MASTER HTC LANDLORD, LLC**

_____
Name:
Title:

11030552.v3                                       4

**<u>EXHIBIT J</u>**

**Form of Draw Endorsement**

[Attached]

**First American**

**DISBURSEMENT ENDORSEMENT**

**Issued by**

## First American Title Insurance Company

Attached to and made a part of Policy No.: 1Q7GPA01          File No.: 3020-1Q7GPA01

The Company insures against loss or damage sustained by the Insured by reason of:

1. The Date of Coverage is amended to _____.

   a. The current disbursement is: $_____

   b. The aggregate amount, including the current disbursement, recognized by the Company as disbursed by the Insured is: $_____

2. Schedule A is amended as follows:

   _____

3. Schedule B is amended as follows:

   _____

   _____

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

**IN WITNESS WHEREOF,** the Company has caused this endorsement to be issued and become valid when signed by an authorized officer or licensed agent of the Company.

**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____          By: _____
Kenneth D. DeGiorgio, President              Lisa W. Cornehl, Secretary

| Form 50-PA1520 (7-1-14) | Page 29 of 45 | TIRBOP 1520 (ALTA 33-06) Disbursement (7-1-14) |

**EXHIBIT K**

**Form of Release Endorsement**

[Attached]

 **First American**

**MORTGAGE RELEASE ENDORSEMENT**

**Issued by**

*First American Title Insurance Company*

Attached to and made a part of Policy Number: 1Q7GPA01

File No.: 3020-1Q7GPA01

The Company hereby insures the Insured that the Insured Mortgage remains a valid and enforceable lien on that portion of the Land not released by _____, and the priority of the lien of the Insured Mortgage on the portion of the Land not released is unaffected thereby.

This endorsement is issued as part of the policy. Except as it expressly states, it does not (i) modify any of the terms and provisions of the policy, (ii) modify any prior endorsements, (iii) extend the Date of Policy, or (iv) increase the Amount of Insurance. To the extent a provision of the policy or a previous endorsement is inconsistent with an express provision of this endorsement, this endorsement controls. Otherwise, this endorsement is subject to all of the terms and provisions of the policy and of any prior endorsements.

Date: _____

***IN WITNESS WHEREOF,*** the Company has caused this endorsement to be issued and become valid when signed by an authorized officer or licensed agent of the Company.



**FIRST AMERICAN TITLE INSURANCE COMPANY**

By: _____
Kenneth D. DeGiorgio, President

By: _____
Lisa W. Cornehl, Secretary

By:
    Authorized Countersignature

| Form 58-12048 (3-1-18) | Page 2 of 2 | PA 1290 Mortgage Release (4-1-07)<br>Loan Policy Only<br>Prohibited for Policies Covering 1-4 Family Residential Property |
|---|---|---|